# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 10/06/2022 10:59 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk

Case 2:22-cv-08851-AB-PVC   Document 15-1   Filed 12/07/22   Page 2 of 303   Page ID #:135

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Lia Martin

1   Dan L. Stanford (SBN 067658)
    STANFORD AND ASSOCIATES
2   101 West Broadway, Suite 810
    San Diego, CA 92101
3   Telephone: (619) 695-0655
    dan@stanfordandassociates.com
4

5   Kevin V. DeSantis, Esq. (SBN 137963)
    James A. McFaul, Esq. (SBN 248670)
6   David D. Cardone, Esq. (SBN 254954)
    Adam J. Yarbrough, Esq. (SBN 247687)
7   DUNN DESANTIS WALT & KENDRICK, LLP
    750 B Street, Suite 2620
8   San Diego, CA 92101
    Telephone: (619) 573-4488
9   kdesantis@ddwklaw.com
    jmcfaul@ddwklaw.com
10  dcardone@ddwklaw.com
    ayarbrough@ddwklaw.com
11

12  Attorneys for Plaintiff Robert Joseph Armijo

13          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                  **COUNTY OF LOS ANGELES**

15  ROBERT JOSEPH ARMIJO, an individual,      | CASE NO.   22STCV32793

16          Plaintiff,                        | **COMPLAINT FOR:**

17  vs.                                       | **(1) PROFESSIONAL NEGLIGENCE /**
                                              |     **GROSS NEGLIGENCE;**
18  PAUL R. WASSGREN, an individual;          | **(2) NEGLIGENT**
    DLA PIPER LLP (US); FOX ROTHSCHILD        |     **MISREPRESENTATION;**
19  LLP; and DOES 1 through 50, inclusive,    | **(3) AIDING AND ABETTING FRAUD;**
                                              | **(4) EQUITABLE INDEMNITY;**
20          Defendants.                       | **(5) TORT OF ANOTHER;**
                                              | **(6) VIOLATION OF UNFAIR**
21                                            |     **COMPETITION LAW**

22                                            | **(DEMAND FOR JURY TRIAL)**

23

24

25          COMES NOW Plaintiff ROBERT JOSEPH ARMIJO ("Plaintiff" or "Armijo") with his

26  Complaint for causes of action against Defendants PAUL R. WASSGREN ("Wassgren"), DLA

27  PIPER LLP (US) ("DLA"), FOX ROTHSCHILD LLP ("Fox Rothschild"), and DOES 1-50,

28  inclusive (collectively, "Defendants"), and alleges as follows:

*(left margin, vertical text)* DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

# I. <u>INTRODUCTION</u>

1.     Defendants' clients, according to the Securities and Exchange Commission ("SEC") and the Court-appointed receiver for their businesses, perpetrated a fraudulent real-estate investment scheme.

2.     Defendants knew about the scheme – and actively participated in advancing it.

3.     Much more is expected of lawyers.  And such transgressions by lawyers result in widespread liability for them and their law firms.  When a lawyer knows or should know that his clients are engaged or participating in an ongoing fraud, the lawyer has an ethical duty and professional obligation to avoid furthering that fraud in any way.  And, if the client does not cease the fraudulent conduct, the lawyer must either: (a) limit the scope of his representation to matters that do not involve participation in or furthering of the client's fraud (but only if the lawyer is *fully confident* that his limited going-forward representation will in no way further the fraud), or (b) terminate the representation.  In other words, lawyers are duty-bound – *to everyone* – to not further their clients' fraudulent activities.  When a lawyer violates these tenets of the legal profession by furthering a client's fraud – whether knowingly or through gross negligence – then the lawyer becomes a dangerous weapon to further or potentially expand the reach of – the client's wrongdoings.  And, in such circumstances, the lawyer has become liable to third-parties for the harm they suffer as a result of a fraudulent scheme the lawyer actively furthered.

4.     Furthermore, when a lawyer helps secure the involvement of an unsuspecting third-party participant to be used as a pawn to further and expand the client's fraudulent scheme – unbeknown to that third-party participant – the lawyer, himself, commits wrongdoing and faces liability to that third party.  This not only potentially leads to an increase in the number of direct victims of the client's fraud and the damages suffered by those direct victims, but can also cause the group accused of being party to the client's fraud to grow to include such unsuspecting participants.

5.     Client-wrongdoers, and the lawyers who assists their fraudulent scheme, are decidedly deserving of prosecution.  But the other third-party participants who were swept up and into the scheme by the client-wrongdoers with the assistance of their lawyers, as innocent pawns

of the wrongdoers, are not deserving of fault or responsibility for the damage caused by the scheme, having been duped into being involved by the wrongdoers.  In such a situation, the lawyer is responsible for that damage, not the pawn.

6.     Such is precisely what happened to Plaintiff.  Once a well-regarded financial advisor, Plaintiff's reputation, financial advisory business, personal relationships and other business opportunities have been shattered because he was defrauded – by Defendants' clients, with Defendants' knowing (or grossly-negligent) assistance – into participating in the sales of what Plaintiff was led by Defendants to believe were legitimate, legally-compliant investments.  Had Defendants simply been honest with Plaintiff, rather than steering Plaintiff in the wrong direction for the benefit of Defendants' clients, knowing Plaintiff would rely on Defendants' representations and legal guidance, Plaintiff would not have suffered all of the financial, reputational, emotional and health-related harms he has been caused to suffer.

7.     Defendants' clients' scheme took place with the knowing (or grossly-negligent) assistance of the Defendants.  Along the way, and with Defendants' direct knowledge (or gross negligence) and active assistance and participation in their clients' fraudulent scheme, Plaintiff was convinced: (a) that Defendants' clients' investment offerings were legitimate and legally-compliant; (b) that Plaintiff's clients (and Plaintiff individually) would benefit from investing in Defendants' clients' offerings; and (c) that Plaintiff held the necessary licenses to lawfully participate in the sale of Defendants' clients' investment offerings to Plaintiff's clients.  Defendants' clients could not have perpetuated their fraudulent scheme – or secured the involvement of Plaintiff – without the active assistance of, and participation by, Defendants.

8.     Relying on Defendants' representations and advice, Plaintiff: (a) introduced many of his valued clients – including close, long-time friends and respected businesspeople – to Defendants' clients and participated in the sale of Defendants' clients' investment offerings to such clients and friends; and (b) personally purchased investment offerings from Defendants' clients.  Plaintiff would have done none of this but for Defendants' representations and advice, which – if the SEC is correct – was false and grossly-deficient.  Plaintiff would have done none of this but for Defendants actively inducing Plaintiff – knowingly (or with gross negligence) – in furtherance of

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

3
COMPLAINT

Defendants' clients' fraudulent scheme, to the benefit of Defendants' clients and Defendants themselves.

9.      Despite Plaintiff's due diligence, Plaintiff never knew Defendants' clients were perpetrating a fraudulent scheme, or that Defendants were knowingly (or grossly-negligently) furthering their clients' wrongdoings, until the SEC brought the scheme down.

10.      As a result of Defendants' clients' scheme and Plaintiff's justifiable reliance on Defendants' false representations and grossly-deficient advice, Plaintiff – like Defendants' clients – became a target of actions by the SEC and Defendants' clients' investors and court-appointed receiver, all due to Plaintiff's unwitting participation in Defendants' clients' fraudulent scheme. Plaintiff did so only because of Plaintiff's justifiable reliance on Defendants' false representations and grossly-deficient advice.

11.      Plaintiff's reputation and business as a financial investment advisor are ruined. Plaintiff has suffered significant financial harm having to spend time and money to defend actions pursued by the SEC, and Defendants' clients' receiver and investors.  Plaintiff has also suffered serious emotional distress and serious health conditions.  All of these consequences suffered by Plaintiff could have easily been avoided had Defendants not utilized their professional stature to further their clients' fraudulent scheme, and had Defendants been truthful in their representations and advice to Plaintiff.

## II. **PARTIES**

### A.      **Plaintiff**

12.      Armijo was at all times relevant hereto a resident of the State of California, County of San Diego.  Between 2012 and 2021, Armijo was an Investment Advisor Representative licensed by the State of California, with a Series 65 license.  Armijo is, and at all times relevant was, the managing member and sole owner of Joseph Financial Investment Advisors, LLC ("JFI").  Between May 2016 and 2021, JFI was a Registered Investment Advisor in the State of California, advising clients on investments and managing their portfolios. Armijo was the Investment Advisor Representative for JFI between May 2016 and 2021.

/ / /

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

B.     **Defendant Attorney and Law Firms**

13.     DLA is a Maryland limited liability partnership and a United States affiliate of a global law firm headquartered in London, United Kingdom, which has approximately 4,200 attorneys worldwide.  DLA is headquartered in Baltimore, Maryland, and has offices throughout the United States, including offices in San Diego and Los Angeles, California.

14.     Fox Rothschild is a Pennsylvania limited liability general partnership and a law firm with approximately 950 attorneys and 29 offices in the United States, including offices in Los Angeles, California.

15.     Wassgren is an attorney licensed to practice law in California and Nevada.

16.     Wassgren worked at, was a partner at, and was an agent of Fox Rothschild from approximately July of 2010 until May of 2017.  Between July of 2010 and May of 2017, Fox Rothschild was responsible for the supervision of Wassgren and for any improper, negligent or illegal actions undertaken by Wassgren in connection with his practice of law.  Legal work that forms a basis of this action, and misrepresentations made by Wassgren and Fox Rothschild, occurred while Wassgren was working for Fox Rothschild out of Fox Rothschild's Los Angeles, California, office.

17.     Wassgren worked at, was a partner at, and was an agent of DLA from approximately May of 2017 until November 2020, when he was asked to resign from DLA.  (A copy of an online profile of Wassgren utilized by DLA is attached as Exhibit "A.")  Between May of 2017 until November 2020, DLA was responsible for the supervision of Wassgren and for any improper, negligent or illegal actions undertaken by Wassgren in connection with his practice of law.  Legal work that is a basis of this action, and misrepresentations made by Wassgren and DLA, occurred while Wassgren was working for DLA out of DLA's Los Angeles, California, office.

18.     While working at Fox Rothschild and DLA, Wassgren held himself out and was represented to be a transactional lawyer specializing in corporate, securities and real estate matters.

19.     Plaintiff is ignorant of the true names and capacities, whether individual, corporate, partnership or otherwise, of Defendants sued herein as DOES 1 through 50, inclusive, and, therefore, sue these Defendants by such fictitious names pursuant to Code of Civil Procedure § 474.

5

COMPLAINT

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

Upon learning the true names and capacities of the fictitiously-named Defendants, Plaintiff will seek leave of court to amend this complaint to include the true names and capacities of said Defendants.

20.     Plaintiff is informed and believes, and based thereon alleges, that each Defendant designated as a DOE caused, or is legally responsible for, the events, happenings, occurrences, omissions, and damages referred to herein, as a principal, beneficiary, agent, partner, employee, co-developer, joint venturer, general contractor, subcontractor, consultant, representative, independent contractor, co-conspirator, aider and abettor, and/or alter ego, for the events, happenings, occurrences, omissions, and damages referred to herein, and thereby proximately caused injury and damage to Plaintiff as alleged herein.

### III.  JURIDISCTION AND VENUE

21.     This Court has subject matter jurisdiction over this matter.  Plaintiff's damages exceed $25,000.00.

22.     This Court has personal jurisdiction over each of the Defendants.  Each of the Defendants have availed themselves of the laws of the State of California, have conducted business in and established sufficient minimum contacts with the State of California during all relevant times, and the actions of Defendants as they relate to Plaintiff occurred in the State of California. All of the acts, failure to act and misconduct by Defendants complained about herein occurred in the State of California.

23.     Venue is proper in Los Angeles County because Defendants transacted business in the County of Los Angeles and the actions of Defendants as they relate to Plaintiff and Defendants' liability to Plaintiff occurred in the County of Los Angeles.

### IV.  GENERAL ALLEGATIONS

**A.     EquiAlt**

24.     EquiAlt LLC ("EquiAlt") is a Nevada limited liability company based in Tampa, Florida.  It was formed in 2011 by Brian Davison ("Davison"), EquiAlt's CEO, and Barry Rybicki ("Rybicki"), EquiAlt's Managing Director (collectively "EquiAlt Managers").

/ / /

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

25.     EquiAlt claimed to be primarily engaged in managing various real estate investments funds, established at varying times, known as EquiAlt Fund, LLC ("Fund 1"), EquiAlt Fund II, LLC ("Fund 2"), EquiAlt Fund III, LLC ("Fund 3"), EA SIP, LLC ("SIP Fund"), EquiAlt Qualified Opportunity Zone Fund, LP ("QOZ Fund") and EquiAlt Secured Income Portfolio Reit, Inc. ("Reit") (collectively the "EquiAlt Funds").  EquiAlt and the EquiAlt Funds issued and sold unregistered securities they styled – with the advice and assistance of Defendants – as fixed-interest debentures ("EquiAlt Securities").   Investors received unsecured notes or debentures, as opposed to membership interest in the issuing entity, and were promised fixed-rate returns.

26.     Another entity overseen and operated by Rybicki – BR Support Services LLC ("BRSS") – recruited, oversaw and paid sales agents to market and sell the EquiAlt Securities to investors.  EquiAlt, EquiAlt Managers, EquiAlt Funds and BRSS are collectively referred to herein as the "EquiAlt Parties."

27.     The EquiAlt Parties represented to investors and sales agents recruited by the EquiAlt Parties – with the assistance of Defendants, their lawyers – through marketing materials and offering documents prepared and/or approved by Defendants, that substantially all of the investors' funds would be used to purchase, renovate, rent and/or sell for a profit residential properties located in distressed markets throughout the United States, thereby generating significant returns for investors.  In total, the EquiAlt Funds – with the assistance of Defendants – collectively raised more than $170 million from more than 1,100 investors.

**B.     The SEC Investigation and Action Against the EquiAlt Parties**

28.     In 2020, the Securities and Exchange Commission ("SEC") brought an emergency enforcement action against EquiAlt, the EquiAlt Managers, Fund 1, Fund 2, Fund 3 and SIP Fund. The SEC charged the EquiAlt Parties with violations of federal securities laws and regulations in connection with what the SEC claimed to be a fraudulent real estate scheme.

29.     Immediately after the SEC filed its enforcement action, EquiAlt and the EquiAlt Funds were placed into a liquidating receivership and a receiver – Burton W. Wiand (the "Receiver") – was appointed by the Court for various of the EquiAlt Parties.

/ / /

30.     The SEC and the Receiver have concluded that the EquiAlt Parties were operating a "Ponzi scheme."  According to the SEC and the Receiver, EquiAlt and the EquiAlt Managers comingled and diverted investors' funds for improper purposes and they wrongfully enriched themselves by looting millions of dollars from the EquiAlt Funds for their own personal benefit. Investor moneys were used by EquiAlt and EquiAlt Managers to purchase personal real estate, luxury cars, jewelry, jets, and the like, and applied to charging fees, commissions and expenses that were neither disclosed nor earned.  If the SEC's and Receiver's conclusions are correct, rather than providing the promised returns on investments, EquiAlt and the EquiAlt Managers – with the active assistance of Defendants – fraudulently misappropriated millions of dollars for their own personal benefit by selling the EquiAlt Securities, which the SEC claims to have been fraudulent, unregistered securities.

31.     The SEC and Receiver assert that the use of investor funds was inconsistent with the various Private Placement Memorandums (each a "PPM") used to offer and sell EquiAlt Securities.  The PPMs were prepared and/or approved by Defendants.  The resultant misuse of funds caused the EquiAlt Funds to incur financial losses to the point of insolvency, rendering the EquiAlt Funds incapable of paying amounts promised to their investors other than by raising new investor funds and diverting investment funds from one EquiAlt Fund to another.  Defendants were aware of this scheme.

32.     None of the EquiAlt Parties' wrongdoings, or Defendants' wrongful participation in furtherance of the EquiAlt Parties' wrongdoings, was known to Plaintiff prior to the SEC, Receiver or EquiAlt's investors pursuing claims.

**C.      Defendants Aided and Abetted the EquiAlt Parties' Wrongdoings**

> **1.      Wassgren and His Law Firms Were Intimately Involved in EquiAlt Every Step of the Way**

33.     Wassgren, and each of Fox Rothschild and DLA during the time periods Wassgren was employed at each law firm, were intimately involved in the creation and structuring of EquiAlt and the EquiAlt Funds, and in their operation since inception.

/ / /

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

34.     Wassgren and Fox Rothschild formed EquiAlt and Fund 1 in 2011; Fund 2 and Fund 3 in 2013; and SIP Fund in 2016.

35.     Wassgren and DLA formed Reit in 2017, and QOZ Fund in 2018.

36.     Wassgren, and each of Fox Rothschild and DLA during the time periods Wassgren was employed at each law firm, were provided detailed information regarding (and kept regularly informed of) how the EquiAlt Parties operated, represented the EquiAlt Parties on a continuous basis from their inception, aided and abetted the EquiAlt Parties' operations in various ways, and were involved in almost every aspect of the EquiAlt Parties' businesses.

37.     Wassgren and his law firms, first at Fox Rothschild and then at DLA, drafted and revised PPMs and other offering/sales documents for EquiAlt and the EquiAlt Funds, which Defendants knew would be utilized: (a) to lure sales agents to sell EquiAlt Securities and (b) to lure investors to purchase EquiAlt Securities.   Defendants rendered legal advice on regulatory compliance, selling practices and other legal matters related to EquiAlt and the EquiAlt Funds, to the EquiAlt Parties and sales agents that the EquiAlt Parties courted.   Defendants participated in the selling process by receiving and approving questionnaires and subscription documents from investors before they were issued EquiAlt Securities.   And Defendants counseled the EquiAlt Parties regarding transactions alleged to have resulted in the improper payment or diversion of assets of the EquiAlt Funds for the benefit of EquiAlt and the EquiAlt Managers.   Defendants also actively assisted EquiAlt in developing and implementing strategic long-term planning, going well beyond the scope of the routine rendition of legal services.

**2.     Defendants Encouraged EquiAlt to Advertise Their Involvement with EquiAlt**

38.     Wassgren, and each of Fox Rothschild and DLA during the time periods Wassgren was employed at each law firm, knew that the EquiAlt Parties advertised to sales agents and investors that Wassgren and his law firms were counsel to the EquiAlt Parties.  The EquiAlt Parties actively marketed to and informed sales agents and investors that Defendants were "independent" professionals and could "absolutely" be contacted by them for "insight into the fund and its activities."

DUNN DeSANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

39.     Defendants were aware of, and knowingly permitted, the EquiAlt Parties to represent to investors and sales agents that Defendants would vouch for the legality of EquiAlt's Securities offering and use of the funds raised thereby.  What better way to instill confidence in the EquiAlt Securities and EquiAlt Parties than by having two very large law firms – one among the largest in the world – endorse them.

40.     Defendants were aware of and encouraged such messaging, knowing that the EquiAlt Parties did this with the intent of creating apparent legitimacy of their operation and to cause sales agents and investors to believe the EquiAlt Parties were operating in compliance with all applicable laws.  Defendants further believed it would benefit the EquiAlt Parties (and Defendants themselves) to publicly advertise Defendants as being EquiAlt's counsel, and Defendants intended for investors and sales agents to develop a sense of trust in the EquiAlt Parties and the EquiAlt Securities because of Defendants' involvement, all to the benefit of Defendants and Defendants' clients.

41.     Similarly, the PPMs and other offering documents prepared by Defendants, and supplied to EquiAlt's sales agents and investors, represented that: (a) the EquiAlt Securities were offered subject to the approval of Defendants; (b) that Defendants would review documents used to effectuate the real estate transactions by which the EquiAlt Funds intended to acquire properties; (c) the EquiAlt Funds would rely on Defendants' opinions; and (d) the EquiAlt Securities would not be transferred unless, among other things, Defendants' opinion was that registration with the SEC was not required.  These statements were made by Defendants to induce sales agents to want to partake in selling EquiAlt Securities, and to induce investors to purchase EquiAlt Securities.  Defendants included such representations in documents they prepared to help further the EquiAlt Parties' scheme.

42.     Defendants agreed to actively assist in the offer and sale of the EquiAlt Securities in order to generate fees, enhance their professional reputation and further the EquiAlt Parties' fraudulent scheme.

/ / /

/ / /

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

### 3.     Wassgren and His Firms Prepared Misleading Sales Documents to Mislead Investors and Sales Agents for the Benefit of EquiAlt

43.     Based on information learned since the SEC initiated its action against EquiAlt and the EquiAlt Managers, the PPMs relative to the EquiAlt Funds, and other offering/sales documents prepared and/or reviewed and approved by Defendants, contained numerous statements that Defendants knew or should have known were false, or omitted material facts which Defendants knew or should have known were necessary for Plaintiff, other sales agents and investors to make informed decisions relative to EquiAlt and the EquiAlt Securities.  These misrepresentations and omissions, relied upon by Plaintiff and others, included but are not necessarily limited to:

a.   PPMs indicated that approximately 90% of investor funds would be used to "invest in property."  But, if the SEC and Receiver are correct, less than 50% of investor funds were actually used for that purpose.  Defendants knew or should have known this based on all information Defendants had relative to the EquiAlt Parties' operations;

b.   PPMs failed to disclose that investment monies would be used to pay EquiAlt extraneous fees.  Defendants knew of the fees being collected by EquiAlt;

c.   Investors were not informed that invested funds would be transferred between the EquiAlt Funds to use monies from one EquiAlt Fund to pay the debts of another EquiAlt Fund.  Defendants knew of these transfers;

d.   Many of the subscription agreements stated that investments in the EquiAlt Funds were being sold without the payment of a commission.  And PPMs stated only that the EquiAlt Funds "may" pay commissions to sales agents.  In realty, as Defendants knew, an amount equal to a percentage of the investments was always paid to sales agents in connection with the sale of EquiAlt Securities regardless of the licensure status of the sales agents.

e.   The Offering Memoranda for Fund 1 states "Securities are being offered directly through the Company. No commissions of any kind will be paid to selling agents or brokers." That representation – drafted by Wassgren – was false and was known (or

11

COMPLAINT

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

should have been known) by Wassgren to be false. The EquiAlt Funds paid a 12% commission to Rybicki and/or BRSS, who, in turn, paid a least one-half of that amount to various sales agents regardless of their licensure status. All of this was known (or should have been known) by Wassgren, who was often in direct contact with sales agents and knew how they were being paid;

f. Investors were told no management fees would be paid to EquiAlt, yet EquiAlt collected substantial management fees from the EquiAlt Funds and there was never any disclosure to investors as to what or how management fees would be paid. Wassgren knew this;

g. Investors were misled about the EquiAlt Funds' performance, being told the EquiAlt Funds were realizing net profits despite operating at a loss. Defendants knew, or should have known based on all information they had or that was available to them, that this was false;

h. The EquiAlt Securities were not sold with either state or federal securities registration, but instead were purportedly sold under a Regulation D ("Reg D") exemption from registration; however, if the SEC and Receiver are correct, none of EquiAlt Securities qualified for a Reg D exemption or any other exemption from registration since inception. Wassgren knew or should have known this. And, even if the EquiAlt Securities somehow could initially have qualified for the Reg D exemption, Wassgren knew or should have known that, based on all facts and circumstances, the SEC could assert that all requirements to satisfy and maintain a Reg D exemption did not occur. Accordingly, Wassgren knew or should have known that the EquiAlt Parties' continued sale of EquiAlt Securities as unregistered securities could be found to be unlawful;

i. PPMs stated that under no circumstances would the EquiAlt Funds admit more than 35 non-accredited investors, as computed under Rule 501 of Reg D. All of the investors submitted questionnaires and subscription documents to Defendants, who were to review them and advise as to whether that investor should be accepted. As

1    a result, Defendants knew (or should have known) that the funds, if deemed

2    integrated, had in excess of 35 unaccredited investors;

3    j.   PPMs informed investors that a CPA with an MBA degree was serving as EquiAlt's

4    Chief Financial Officer.  However, the identified person never filled such a role.

5    Defendants knew this, or should have known it;

6    k.   Prior to starting the EquiAlt Funds, the EquiAlt Managers filed for personal

7    bankruptcy.  Defendants knew, or should have known, this.  But Defendants drafted

8    the PPMs to all describe the EquiAlt Managers' business experience in flattering

9    terms, and omitted from disclosure the facts that the EquiAlt Managers' prior real

10   estate ventures ended in personal bankruptcy for each of them;

11   l.   PPMs falsely assured prospective investors that EquiAlt did not have significant

12   operating costs.  Defendants knew, or should have known, that this was false; and,

13   m.  The PPMs did not disclose that EquiAlt investments could be viewed as one

14   "integrated offering" resulting in the loss of exemption under Reg D, because non-

15   accredited investors would exceed 35.

16   **4.    Defendants Knew the EquiAlt Parties Could Be Found to Not Be**

17   **Operating in Compliance with Governing Law**

18   44.   Defendants were uniquely positioned to know whether the EquiAlt Parties were

19   operating in a legally-compliant fashion.   Defendants knew or should have known that

20   misstatements and omissions of material fact had been made in the offering documents they

21   prepared and those misstatements and omissions were continuing to be made in conjunction with

22   the past and ongoing sales of EquiAlt Securities.  Defendants knowingly aided and abetted the

23   EquiAlt Parties in these continuing violations, by failing to alert any of the investors, sales agents

24   or appropriate authorities as to these ongoing activities, and by continuing to assist, aid and abet

25   the ongoing investments into the EquiAlt Funds.  Defendants willfully, intentionally or through

26   gross-negligence participated in the fraudulent EquiAlt scheme.

27   45.   If what the SEC and Receiver have uncovered is true, then Defendants knew the

28   representations in the PPMs (that the EquiAlt Securities were exempt from registration under the

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

13

federal securities laws pursuant to Reg D and were made "in strict compliance with the applicable state securities laws") were false and misleading.  Among other things, Wassgren knew that: (a) EquiAlt intended to sell and did in fact sell EquiAlt Securities to more than 35 non-accredited investors through the EquiAlt Funds, which Wassgren knew (or should have known) could result in the SEC considering all EquiAlt Securities to be considered part of a single integrated offering and, therefore, create risk that the EquiAlt Securities would be found not to be exempt from registration; (b) the EquiAlt Parties engaged directly and through its agents in general solicitations and advertising to market its unregistered securities; (c) the EquiAlt Parties made payments to unlicensed sales agents that were not disclosed in its SEC filings claiming the Reg D exemption from registration; and (d) the EquiAlt Parties would and did fail to provide investors with information and disclosures required by Reg D, including audited financial statements.

46.     Wassgren assisted the EquiAlt Parties in claiming an exemption from registration under Reg D, and had actual knowledge of the requirements the EquiAlt Parties were required to follow in order to qualify as exempt; however, through Defendants' active involvement in the documentation, offering and sales of the EquiAlt Securities, and their interactions with the EquiAlt Parties and their interactions with the EquiAlt sales agents and securities regulators, Defendants knew that the EquiAlt Securities were in fact offered and sold in a manner that could be deemed to not comply with the requirements of Reg D.  Yet Defendants continued to represent to sales agents and investors – without qualification – that the EquiAlt Parties *were* operating in full compliance with all applicable laws.

47.     Defendants knew that investments in the EquiAlt Securities were being solicited in such a manner that could render the EquiAlt Securities to not be in compliance with maintaining a Reg D exemption.

48.     Defendants drafted the subscription materials to be completed by potential investors to confirm the accredited or non-accredited status of the potential investors. Defendants drafted those subscription materials for completion and return directly to Defendants' offices, for review by Wassgren, and thereby received direct reports of the number, age, geographic location, and financial sophistication of the investors to whom the EquiAlt Securities were being offered and

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

14

COMPLAINT

sold.  Defendants thus knew that many of the investors had indicated they were unaccredited or unsophisticated in that they lacked knowledge and expertise in financial or business matters, were not capable of evaluating the merits and risks of the investment, and were not otherwise capable of bearing the economic risks of the investment.

49.     Defendants knew, were willfully blind to knowing, or were reckless in not knowing, that EquiAlt had not satisfied the general condition that the offerors supply all non-accredited investors with the EquiAlt financial reports and information required under Rule 502(b).

50.     Defendants knew, were willfully blind to knowing, or were reckless in not knowing, that their clients were engaged in multiple ongoing violations of applicable federal and state securities laws.  And rather than disclosing the ongoing securities violations, or withdrawing from further representation (as required by the applicable ethical rules), Defendants instead assisted the EquiAlt Parties in its attempt to conceal those violations by orchestrating the creation of multiple purportedly-separate investment funds in an attempt to conceal the number of unaccredited investors to whom the unregistered securities were sold and assisting in the preparation of materially-false SEC filings which – to conceal the EquiAlt Parties' ongoing securities law violations – intentionally understated the number of non-accredited investors and misrepresented the nature and amounts paid to the sales agents.

51.     Defendants were also aware of sales agents who did not possess the required licensing necessary to likely be deemed lawfully permitted to participate in the sale of EquiAlt Securities.

52.     Defendants' involvement in the affairs and business operations of the EquiAlt Parties was all-encompassing.  Wassgren provided advice and input on virtually all aspects of the EquiAlt Parties' operations, including preparation of the false and misleading PPMs and marketing materials used to induce investors into purchasing the EquiAlt Securities, compliance with the applicable securities laws and payments to sales agents.  EquiAlt retained the services of Wassgren in virtually all aspects of EquiAlt's business operations and entrusted him with ensuring EquiAlt complied with securities laws.  Wassgren prepared EquiAlt's marketing materials to investors with awareness of the purpose for which these materials would be disseminated and used; vetted and

participated in approving EquiAlt's PPMs; and provided legal advice to EquiAlt as to the legality of paying commissions to unregistered sales agents for the sale of debentures.  And, EquiAlt directed sales agents to speak with Wassgren when they had questions regarding the legal requirements for selling EquiAlt Securities.

53.     Indeed, Wassgren played a substantial role in, and lent substantial assistance to, Defendants' clients' ongoing scheme to defraud sales agents and investors. Wassgren knew or should have known that under the standards of the legal profession a lawyer has an obligation to not knowingly participate in any violation by the client of securities laws. In these circumstances, Wassgren was professionally obligated to terminate his representation to avoid covering-up and assisting the ongoing (and past) fraud perpetrated by the EquiAlt Parties. He did not do so, but instead decided to aid and abet the EquiAlt Parties' wrongdoings.  And Plaintiff became among the victims of the whole scheme.

54.     Defendants — (1) knowing that each Fund and the EquiAlt Parties' sales agents who offered and sold each Fund's securities relied on the statutory private-placement exemption from registration of § 4(a)(2) of the Securities Act of 1933 (15 U.S.C. 77d(a)(2)) and the regulatory "safe-harbor" exemption from registration of Reg D, Rule 506(b); (2) knowing that Plaintiff relied on Defendants' knowledge of the securities laws as applied to the EquiAlt Parties; and (3) knowing or having good reason to suspect, believe and investigate whether the EquiAlt Parties had undertaken actions to disqualify from these exemptions — chose not to inform and did not inform Plaintiff (and similarly situated sales agents) of the significant risks they were taking in participating in the sale of the Funds' unregistered securities for which exemptions could possibly fail.  Instead, Defendants led Plaintiff and other sales agents to believe their participation was in full compliance with the law.

**D.    Sales Agents Were Recruited – With Defendants' Assistance and Assurances – to Be Sales Agents for the EquiAlt Parties**

55.     Rybicki and BRSS – with the assistance of Defendants – recruited sale agents to introduce investors to EquiAlt and the EquiAlt Funds to purchase EquiAlt Securities.  Wassgren knew that Rybicki and BRSS were interfacing with broker-dealers, registered investment advisers

DUNN DeSANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

and other professionals within the securities and insurance industry on behalf of the various EquiAlt Funds.  And Wassgren knew that not all of those persons Rybicki and BRSS were recruiting as sales agents of EquiAlt Securities held Series 7 licenses.

56.     The EquiAlt Parties: (a) directed and paid Wassgren and his firms to provide legal advice to the EquiAlt Parties's sales agents (including Plaintiff); and (b) intended EquiAlt's sales agents (including Plaintiff) to rely on representations and legal advice provided by Wassgren relative to their dealings with the EquiAlt Parties.  Defendants accepted such responsibilities and payment for the time spent providing such representations and legal advice to the EquiAlt Parties's sales agents (including Plaintiff).  And Defendants made representations and provided legal advice to the EquiAlt Parties's sales agents (including Plaintiff), which Defendants knew or should have known was false or erroneous, because Defendants knew doing so would be a benefit to the EquiAlt Parties.  (And, of course, the simultaneous benefit to Defendants was that the longer the EquiAlt Parties were able to operate, albeit fraudulently, the more Wassgren would be able to generate in attorneys' fees for his and his firm's representation of the EquiAlt Parties.)  Indeed, Defendants actively assisted in the offer and sale of the EquiAlt Securities by unlicensed securities broker-dealers and sales agents by assuring them that such sales complied with the operative securities laws.

57.     When investors' funds were received, EquiAlt would disburse an amount equal to 12% of the invested amounts to BRSS, and BRSS would pay the sales agents an amount equal to some percentage of the amount invested.  This was known to Defendants, and Defendants represented to the EquiAlt Parties, Plaintiff and other sales agents that this was legally permissible.

58.     Wassgren was regularly in contact with EquiAlt's sales agents, knew that they were not licensed securities brokers, and knew that securities regulatory and self-regulatory organizations like FINRA could very well take the position that the sales agents could not legally participate in the sale of EquiAlt Securities.  Despite this, Wassgren advised Rybicki and numerous sales agents – including Plaintiff – without equivocation or qualification, that they were allowed to sell EquiAlt Securities without a Series 7 license.

/ / /

17

COMPLAINT

59.     Wassgren's actions to assist and in concert with the EquiAlt Parties went far beyond his role as legal counsel to the EquiAlt Parties. Wassgren spoke directly with many of the unlicensed broker-dealer sales agents and provided them with false assurances that EquiAlt complied with all securities laws and that the sales agents could lawfully offer and sell the EquiAlt Securities, even though they were not properly licensed.

60.     Wassgren knew that the sales agents selling the EquiAlt Securities were not registered as brokers under federal, FINRA or state securities laws. Nonetheless, in furtherance of his client's fraudulent scheme, Wassgren personally, systematically, affirmatively, and falsely represented to the sales agents *that they could lawfully participate* in the sale of the unregistered EquiAlt Securities.

61.     Defendants also knew that the EquiAlt Securities were being offered and sold in California, Arizona, Florida, Colorado, Nevada and elsewhere by unlicensed securities broker-dealers and sales agents. And Defendants further knew the amounts paid to the sales agents were not reported in EquiAlt's SEC filings.

### E.     Plaintiff Was Recruited – With Defendants' Assistance and Assurances – to Be a Sales Agent for the EquiAlt Parties

62.     Plaintiff was one of approximately 19 sales agents recruited to sell EquiAlt Securities with the assistance and assurances of Wassgren.

63.     Plaintiff first learned about EquiAlt in 2013 from Dale Tenhulzen. Mr. Tenhulzen – who only possessed a life insurance and life settlement licenses, and never held any securities license – was participating in the sale of EquiAlt Securities to his clients. Mr. Tenhulzen invited Plaintiff to introduce Plaintiff's clients to Mr. Tenhulzen for the opportunity to buy EquiAlt Securities. Plaintiff did so, and Mr. Tenhulzen shared compensation he received from the sales of EquiAlt Securities to Plaintiff's clients with Plaintiff.

64.     Mr. Tenhulzen was paid by the EquiAlt Parties based on the amounts his clients (including those clients he obtained from Plaintiff) invested in the EquiAlt Funds. He was told he could speak with Wassgren about the EquiAlt Funds and the manner in which Mr. Tenhulzen was paid, since Wassgren had put the PPM together. Mr. Tenhulzen did speak with Wassgren on several

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

occasions.  During discussions with Wassgren, Mr. Tenhulzen asked Wassgren if he could sell EquiAlt Securities while only having life insurance and life settlement licenses.  Wassgren – without qualification or equivocation – represented to Mr. Tenhulzen that he could sell EquiAlt Securities while only having life insurance and life settlement licenses.  Wassgren never informed Mr. Tenhulzen that he needed – or even possibly needed – to have a Series 7 license to sell EquiAlt Securities.  Wassgren also represented to Mr. Tenhulzen – without qualification or equivocation – that how Mr. Tenhulzen was to be paid by the EquiAlt Parties was entirely permissible.  Wassgren knew these representations and advice were grossly below the standard of care expected of an attorney specializing in securities law.

65.    In approximately the beginning of 2016, Plaintiff's relationship with Mr. Tenhulzen ended.  When one of Plaintiff's clients wanted to renew their investment in an EquiAlt Fund, Armijo opened direct discussions with Rybicki about the EquiAlt Funds and ultimately how to process that renewal.  That led to Rybicki talking with Armijo about becoming a sales agent for EquiAlt.

66.    On January 19, 2016, Armijo and Rybicki had a lengthy telephone conversation about the possibility of Armijo becoming involved in the sale of EquiAlt Securities for Fund 1.  During Armijo's discussions with Rybicki, Armijo was told how Fund 1 worked and how sales agents were paid for the sale of EquiAlt Securities, which was the same manner Armijo understood that Mr. Tenhulzen had been paid.  Rybicki assured Armijo that how sales agents were paid by the EquiAlt Parties – specifically from BRSS and based on the amounts invested by Plaintiff's clients – was fully known by Wassgren, designed by Wassgren and that Wassgren represented that paying sales agents in such a fashion was lawful.  When Armijo informed Rybicki that Armijo possessed a Series 65 license but not a Series 7 license, Rybicki represented to Armijo that Wassgren had previously confirmed that sales agents were not required to possess a Series 7 license, and that Plaintiff's licensure status was not an issue.  Rybicki also invited Armijo to contact Wassgren directly to discuss any questions Armijo had regarding the EquiAlt Parties and doing business with the EquiAlt Parties.  Hearing that an attorney working for a large, well-known national law firm, and who specialized in securities law, was so intimately aware of the EquiAlt Parties' business

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

19

operations, and that he not only represented the operation to be legally-compliant from its establishment but also assisted in ensuring the EquiAlt Parties were conducting themselves in a lawful manner during the course of the operation, and that this attorney was ensuring any sales agents were doing business with the EquiAlt Parties in a legally-compliant manner, brought Plaintiff comfort and induced Plaintiff to proceed with becoming an EquiAlt sales agent.

67.     Additionally, that same day, following Armijo's initial discussion with Rybicki, Plaintiff was provided paperwork relative to Fund 1, including the PPM for Fund 1.  Plaintiff understood this paperwork to have been prepared by Wassgren and his law firm.  The representations provided in such documentation provided Plaintiff further assurances that EquiAlt Securities could be a positive investment for Plaintiff' clients, and further induced Plaintiff to become a sales agent for EquiAlt Securities.

68.     On July 5, 2017, Rybicki emailed Armijo the contact information for Wassgren, who Rybicki described as "Our attorney."  Rybicki had previously represented to Armijo that Wassgren was engaged by EquiAlt as counsel for everyone involved in selling the EquiAlt Securities and that Armijo could seek legal advice from Wassgren regarding anything having to do with the EquiAlt business and Plaintiff's dealings with EquiAlt.

69.     Rybicki provided Wassgren's contact information to Plaintiff intending for Armijo to contact Wassgren.  Rybicki also informed Wassgren via email that Armijo would be reaching out to Wassgren, that Armijo "has 65 licensing but wanted to talk about compliance moving forward," and "wants to be positioned properly for selling of the fund and the REIT."  Indeed, despite all previous assurances from Rybicki about Wassgren's advice relative to Armijo's licensure and how he (and other sales agents) were being paid for the sale of EquiAlt Securities, Armijo wanted to speak with Wassgren directly about such issues.  Wassgren consented to Rybicki providing Armijo his contact information and accepted the responsibility to provide legal advice upon which he knew Plaintiff would rely, and on which he intended Plaintiff to rely, for the benefit of the EquiAlt Parties.  Indeed, Wassgren and his law firms billed, and gladly accepted payment from, EquiAlt for the discussions Armijo and other sales agents had with Wassgren.

/ / /

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

20

COMPLAINT

70.     On July 5, 2017, the same day that Armijo received Wassgren's contact information from Rybicki, Armijo had a telephone conversation with Wassgren.  During that conversation, Armijo told Wassgren that he did not have a Series 7 license but only had a Series 65 license.  Armijo also told Wassgren that he was being compensated from a marketing account and that Armijo did not know about the licenses that may be required.  Armijo told Wassgren that Rybicki had told Armijo that Wassgren said Armijo's licensure was fine for purposes of participating in the sale of EquiAlt Securities.  Wassgren never told Armijo this was incorrect.  (Armijo also told Wassgren that he knew other sales agents who did not even have a Series 65 license and were being compensated in the same fashion for selling EquiAlt Securities.)  Armijo told Wassgren that he wanted to know if something relative to his licensure needed to change, or if he needed to get another license, and if so, Armijo would proceed to do so.  Wassgren told Armijo that he understood his licensure and how he would be paid, and that if there was ever any concern about Armijo's licensing, Wassgren would let Armijo know or Wassgren would let Rybicki know so that Rybicki could relay that to Armijo.  Armijo also told Wassgren that Rybicki had told him that Armijo could be paid for selling EquiAlt Securities with only a Series 65 license, because Armijo was being paid from a marketing account – through BRSS – and not directly from any of the EquiAlt Funds, and that Wassgren approved this.  Wassgren never told Armijo that this was incorrect or that there were any issues with how Armijo was being paid.  Wassgren made all of these representations to Armijo knowing that Plaintiff would rely on them, with the intention that Plaintiff would rely on them, and knowing (or while he should have known) that his representations were false.

71.     Wassgren's representations to Armijo were consistent with representations other EquiAlt sales agents have reported being made by Wassgren.  That is, Wassgren informed other sales agents that they could sell EquiAlt securities without a securities license and that they could be compensated through the marketing company (i.e., BRSS).

72.     Wassgren knew (or should have known) that his representations and advice to Armijo were false, not forthcoming and below the standard of care expected of an attorney who specializes in securities.  Wassgren knew Armijo was not a licensed broker and that Armijo did not have a Series 7 license.  Wassgren knew Armijo was being paid an amount equal to a certain

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

21

percentage of the amounts Plaintiff's clients invested in the EquiAlt Funds.   Wassgren had previously informed the EquiAlt Parties that "[b]eing a registered investment advisor alone would not solve the broker dealer problem" and that "the safest route is for each person selling the REIT product to be securities licensed or to be part of EquiAlt."   But Wassgren did not inform Plaintiff it would be safest for Plaintiff to obtain a Series 7 license.   Wassgren did not even recommend to Plaintiff that Plaintiff obtain a Series 7 license.   Wassgren did not tell Plaintiff that if Plaintiff did not obtain a Series 7 license, there would need to be "a creative solution" that involved paying him "a introduction/finder's fee."  Wassgren simply led Plaintiff to believe Plaintiff had the proper licensure to participate in the sale of EquiAlt Securities, and that how EquiAlt was paying Plaintiff was entirely legal.

73.     Wassgren never told Armijo that he should get his own counsel, never told Armijo that Wassgren was not providing him legal advice, and never told Armijo that Wassgren did not represent Armijo.

74.     Not long after the first call between Armijo and Wassgren, Rybicki called Armijo and told him that the way Armijo was licensed (Series 65) was perfectly fine.  Rybicki told Armijo that he was communicating this information from Wassgren, who had told Rybicki that the way Armijo was licensed was appropriate.

75.     On November 21, 2017, Armijo again raised the question with Rybicki in a text message whether Armijo needed a Series 7 license to become involved in the sale of the certain new EquiAlt Securities which were then being introduced.  Rybicki represented to Armijo that he would again confer with Wassgren.  Rybicki then responded to Armijo in a November 21, 2017 text message, "Series 65 is good to go!" Rybicki was relaying Wassgren's representation and advice that Armijo did not need a Series 7 license.  Indeed, Wassgren confirmed his advice in writing to Rybicki on November 20, 2017 – in response to a question from Rybicki – "do the advisors selling [EquiAlt Securities] need to have a series 7 or will a 65 work? – that "the RIAs can sell [EquiAlt Securities] to their clients."  Then, on November 21, 2017, Wassgren, in response to Rybicki's follow-up question – "can an Advisor sell [EquiAlt Securities] with a series 65?" – informed Rybicki that a "Series 65 should be adequate" to sell EquiAlt Securities.  Wassgren knew his

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

22

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

1  representations would be relied on by Armijo.

2       76.    On April 29, 2018, Armijo executed the EquiAlt Secured Income Portfolio REIT,

3  Inc., Selected Dealer Agreement, a document prepared by Wassgren and his law firm that is riddled

4  with false representations intentionally made by Wassgren to induce Armijo to sell certain EquiAlt

5  Securities.  When signing the Selected Dealer Agreement, Armijo included, in response to the

6  inquiry to list the States where he was "Licensed as broker-dealer," "N/A series 65," consistent

7  with his discussions with Rybicki and Wassgren that Armijo was not a licensed broker-dealer and

8  only held a Series 65 license.  At no time – including after Armijo submitted the signed Selected

9  Broker Dealer Agreement – did Rybicki or Wassgren ever tell Armijo that he required a Series 7

10  license to sell EquiAlt Securities.  Rybicki represented to Armijo that Wassgren had reviewed

11  Armijo's executed Selected Dealer Agreement and that Armijo was "good to go" with participating

12  in the sale of EquiAlt Securities relative to the Reit.

13       77.    On March 7, 2019, Rybicki again informed Armijo in a text message that Armijo's

14  Series 65 license was "good."  Rybicki was relaying Wassgren's representation that Armijo did not

15  need a Series 7 license and that Armijo's Series 65 license sufficed.  Again, Wassgren knew his

16  representations would be relied on by Plaintiff, and Plaintiff did reasonably rely on Wassgren's

17  representations when continuing to act as an EquiAlt sales agent.

18       78.    On or about May 14, 2019, Armijo had another telephone call with Wassgren, with

19  Rybicki's knowledge and permission.  Wassgren again represented to Armijo on that telephone call

20  that Armijo's Series 65 license was sufficient – without qualification or equivocation – to be

21  involved in the sale of EquiAlt Securities.  Wassgren knew his representations would be relied on

22  by Armijo, and Armijo did reasonably rely on Wassgren's representations when continuing to act

23  as an EquiAlt sales agent.

24       79.    On August 12, 2019, Wassgren informed Rybicki that "commissions should be paid

25  to registered broker-dealers.  If we need a work around for those without appropriate licensing, we

26  may be able to find a solution, but it's not ideal."  This was in response to several questions from

27  Rybicki, including whether EquiAlt could "still pay" BRSS and then have BRSS pay the sales

28  agents.  Notably, while Wassgren qualified his statements to Rybicki that a work-around for those

<center>23</center>

<center>COMPLAINT</center>

without "appropriate licensing" may be able to be found, but that it would not be "ideal," such qualifications were never provided to Plaintiff in conjunction with Wassgren's representations to Plaintiff regarding Plaintiff's licensure.  Wassgren refrained from providing such qualifications to Plaintiff with the intent that Plaintiff would rely on Wassgren's representations for the benefit of EquiAlt, which Plaintiff reasonably did.

80.     At the very least, Wassgren should have informed Plaintiff that there was risk that governing bodies could assert that Armijo required a Series 7 license to participate in the sale of EquiAlt Securities and, based on all information known (or which should have been known to Wassgren), that governing bodies could find that EquiAlt was not operating in a manner consistent with maintaining a Reg D exemption.  At no time did Wassgren inform Plaintiff that there was any potential that the SEC would see his participation as unlawful, or that the SEC could assert that additional securities licenses were necessary to participate in the sale of the EquiAlt Securities.  At no time did Wassgren explain to Plaintiff the legal difference between a finder, broker-dealer and registered representative in reference to the sale of securities.  At no time did Wassgren explain the requirements and limitations applicable to a "finder" with respect to securities under the California Corporations Code § 25206.1, effective January 1, 2016.  And at no time did Wassgren inform Plaintiff that he had prepared a "Finder's Fee Agreement" for the EquiAlt Parties to utilize with unlicensed sales agents.

81.     Despite all of Plaintiff's due diligence, Plaintiff was entirely unaware of EquiAlt and the EquiAlt Managers' allegedly-unlawful conduct before or during the time period Plaintiff was participating in the sale of EquiAlt Securities.  Any representations made by Plaintiff to investors regarding the EquiAlt Parties and the EquiAlt Securities, were based on and entirely consistent with information provided to Plaintiff and representations made to Plaintiff – about which Plaintiff had no contrary information despite Plaintiff's reasonable due diligence – by EquiAlt, the EquiAlt Funds, BRSS, Rybicki and Wassgren.

82.     Wassgren – touted by himself, his firms and EquiAlt as an expert and specialist in the legal, regulatory and customary compliance aspects of the investment fund business – advised Plaintiff in direct discussions, and indirectly through Rybicki, that EquiAlt's business was legally-

compliant and that Plaintiff held the appropriate licensure to lawfully sell EquiAlt Securities.

83.    Wassgren was fully aware that Armijo did not have a Series 7 license or registration but that Armijo had a Series 65 license.    Wassgren – in both direct discussions with Plaintiff and via advice communicated through Rybicki – told Plaintiff, without qualification, that Armijo's Series 65 license was sufficient and that a Series 7 license was unnecessary to participate in the sale of the EquiAlt Securities.

84.    Wassgren was fully aware that Plaintiff would, and did, receive transaction-based compensation from BRSS in connection with the sale of EquiAlt Securities, and the compensation would be, and was, equal to a percentage of any sale of EquiAlt Securities Plaintiff participated in. Wassgren – in both direct discussions with Plaintiff and via advice communicated through Rybicki – told Plaintiff, without qualification, that this compensation structure was legally permissible.

85.    Wassgren's misrepresentations to Plaintiff, and fraudulent concealment of facts from Plaintiff, was a substantial factor in causing Plaintiff to become an EquiAlt sales agent and for investors to purchase EquiAlt Securities through Plaintiff, and ultimately was a substantial factor in causing (a) such investors to bring individual and class actions for securities fraud against Plaintiff; (b) an investigation and pending litigation by the SEC against Plaintiff, including a request for civil penalties and disgorgement; (c) the Receiver to pursue claims against Plaintiff; (d) the destruction of Plaintiff's reputation among his clients in the insurance and financial advising industry; (e) Plaintiff incurring significant attorneys' fees and time to respond to the foregoing matters; (f) Plaintiff being forced leave the financial advising industry; (g) Plaintiff losing investment opportunities due to financial institutions closing Plaintiff's investment accounts and various financial institutions refusing to do business with Plaintiff; and (h) Plaintiff suffering serious emotional distress and serious physical harm, including heart problems and depression.

**F.    The Receiver and Investors All Recognize Defendants' Liability**

86.    Certain EquiAlt investors brought a class action lawsuit – on behalf of classes of individuals from Florida, California, Arizona, Colorado and Nevada – against Defendants on July 21, 2020, for: aiding and abetting fraud; aiding and abetting breach of fiduciary duty; civil conspiracy; violation of the California Securities Law of 1968; aiding and abetting fraud and deceit;

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

financial abuse under the Elder Abuse Act; violation of Unfair Competition Law Business & Professions Code § 17200, *et seq.*; violation of A.R.S. §§ 44-1841, 44-1842, and 44-1911(A); statutory aiding and abetting anti-fraud violations and registration violations under the Colorado Securities Act; aiding and abetting intentional misrepresentation; statutory secondary liability under the Nevada Securities Act; fraudulent concealment; violation of the Nevada Trade Practices Act (N.R.S. 41.600); and, aiding and abetting violation of the Nevada Trade Practices Act (N.R.S. 41.600). A copy of the Amended Complaint filed by such EquiAlt investors in the United States District Court, Middle District of Florida, Tampa Division, Case No. 8:20-cv-01677-MSS-CPT, is attached hereto as Exhibit "B" ("Investor Action").

87.    Notably, and recently, an attorney designated as an expert by the Receiver – who worked for approximately a decade as Colorado Securities Commissioner and served as the President and Executive Director of the North American Securities Administrators Association – testified in deposition, in an ongoing action related to EquiAlt, that if the facts in the complaint in the Investor Action that he read are true, and if he were still in office, he "would try to prosecute Mr. Wassgren" and he "would have referred [Wassgren] for criminal prosecution." According to the Receiver's designated expert, based on the complaint he read, he "would have said that [Wassgren] aided and abetted a major Ponzi scheme" and that "any attorney in [Wassgren's] position had to know better and would have known better and should have known better." According to the Receiver's designated expert, Wassgren's (and therefore his firms') reprehensible conduct included "[t]he obfuscation of the number of unsophisticated nonaccredited investors; the vague responses or guidance [Wassgren] gave to his clients on a number of issues; and inserting himself and his law firm into the offering process … ." The Receiver's designated expert described Wassgren's conduct as "extraordinary." He also opined that, among other issues, if Wassgren advised Rybicki that sales agents were allowed to sell the EquiAlt Securities without license or registration, in violation of securities laws, "[Wassgren] was aiding and abetting violations of the securities laws."

88.    The Receiver brought suit against Defendants on December 20, 2020, for breach of fiduciary duty, negligence/gross negligence/professional malpractice, common law aiding and

26

abetting of fraud and common law aiding and abetting of breach of fiduciary duty.  A copy of the Complaint filed by the Receiver in Los Angeles Superior Court Case No. 20STCV49670 is attached hereto as Exhibit "C."

      **G.**      **Plaintiff' Claims Are Timely**

     89.    Plaintiff and Defendants previously entered into a tolling agreement related to any claims arising out of and related to Defendants' conduct as alleged herein.  All claims pleaded herein are timely.

<div align="center">

**FIRST CAUSE OF ACTION**

**Professional Negligence/Gross-Negligence**

**(By Plaintiff As to All Defendants)**

</div>

     90.    Plaintiff hereby incorporates by reference each, every, and all allegations set forth above in the instant Complaint as though fully set forth herein.

     91.    Defendants were attorneys or law firms who undertook providing, and were paid to provide, legal advice and information to Plaintiff.  EquiAlt, through Rybicki, represented to Plaintiff that Wassgren was "our lawyer" (meaning not just for the EquiAlt Parties but also for Plaintiff and other sales agents in connection with their work related to EquiAlt) and EquiAlt would handle all fees for Defendants' counseling and/or representation of Plaintiff.  Plaintiff therefore understood that he could seek counsel from Defendants, and that he could rely on the advice and counsel from Defendants.

     92.    Defendants owed Plaintiff a duty not to further Defendants' clients' fraudulent activities.  Additionally, by accepting the EquiAlt Parties' direction to advise Plaintiff regarding the legality of Plaintiff's business dealings with the EquiAlt Parties, and the legality of the EquiAlt Parties' operations in general, Defendants accepted and owed Plaintiff the duties and obligations to provide legal advice consistent with the required standard of care, and to be truthful in their representations to Plaintiff.

     93.    Defendants neglected their legal duties and responsibilities owed to Plaintiff.  Defendants conducted themselves in a manner that furthered their clients' fraudulent activities and provided advice and representations to Plaintiff that were false and below the standard of care

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

1  required of Defendants.

2      94.    Defendants knew that Plaintiff was relying on Defendants' advice and

3  representations, and that Defendants' advice and representations would affect Plaintiff's actions or

4  inactions as it related to Plaintiff's business dealings with the EquiAlt Parties, including whether

5  Plaintiff proceeded to do business with the EquiAlt Parties, or refrained from doing business with

6  the EquiAlt Parties.   Specifically, Defendants knew Plaintiff was relying on Defendants' advice

7  and representations regarding: (a) whether Plaintiff possessed the required licensure to be able to

8  lawfully participate in the sale of EquiAlt Securities; (b) whether the manner in which Plaintiff was

9  being paid by the EquiAlt Parties was lawful; and (c) whether the EquiAlt Parties, and therefore

10  the EquiAlt Funds and EquiAlt Securities, were operating in a lawful manner such that Plaintiff

11  could lawfully participate in the sale of EquiAlt Securities.

12      95.    Defendants further knew that Plaintiff could suffer significant harm if Defendants'

13  advice and representations were false and/or fell below the standard of care.  And Defendants knew

14  that by providing false information and/or legal advice that was below the standard of care, Plaintiff

15  would be exposed to significant damages as both an investor in EquiAlt Securities and as a sales

16  agent for the EquiAlt Parties.

17      96.    Lawyers are not – and should not be – permitted to further a clients' fraud by

18  inducing a third party into assisting the lawyers' clients through false representations and legal

19  advice that falls well below the standard of care.  And imposing liability on lawyers for doing so

20  certainly does not impose an undue burden on the profession.  Indeed, it is necessary to maintain

21  the ethics and veracity of the legal profession.  When lawyers undertake to make representations

22  and provide advice to anyone, even with the intention of securing a benefit for their client, they

23  must be truthful and provide advice with due care.  Otherwise, they will have breached a duty owed

24  to those they attempted or expected to influence on behalf of their clients.

25      97.    Defendants knew that their advice and representations to Plaintiff was rendered for

26  the purpose of influencing Plaintiff's conduct and securing a benefit for Defendants' clients, and

27  the harm to Plaintiff as a result of false representations and erroneous legal advice was readily

28  foreseeable to attorneys specializing in securities.  Indeed, Plaintiff would not have become an

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

28

COMPLAINT

investor or sales agent of EquiAlt Securities but for the representations, legal advice and assurance of Defendants.  Plaintiff would therefore not have suffered the significant financial, emotional and/or physical harm that he did had Defendants not breached their obligations to Plaintiff.

98.     Defendants' professional negligence and/or gross negligence was a substantial factor in causing Plaintiff's harm.  As a proximate result of Defendants' professional negligence and/or gross-negligence, Plaintiff has suffered millions of dollars in damages (including but not limited to lost business opportunities, forced closure of Plaintiff's investment advising business, destruction of Plaintiff's insurance business, lost personal investment opportunities given involuntary closure of numerous investment, credit and banking accounts previously held by Plaintiff), reputational harm (every person who conducts an internet search of Plaintiff quickly sees allegations of Plaintiff's connection to the EquiAlt scheme, which could have been avoided had Defendants not facilitated the EquiAlt Parties' scheme and had Defendants not provided the representations, legal advice and assurances that they did), serious emotional distress, lost personal relationships and serious physical harm and pain and suffering, including heart problems and depression, all of which shall be according to proof at trial.

99.     Furthermore, as a direct, proximate and foreseeable result of Defendants' tortious conduct, Plaintiff has been forced to incur significant expense and time defending against the actions filed against him by the SEC, EquiAlt investors and the Receiver (including attorneys' fees and costs of defending such actions), all of which shall be according to proof at trial.

## SECOND CAUSE OF ACTION

### Negligent Misrepresentation

### (By Plaintiff As to All Defendants)

100.     Plaintiff hereby incorporates by reference each, every, and all allegations set forth above in the instant Complaint as though fully set forth herein.

101.     Through the various documents prepared by Defendants relative to the EquiAlt Parties, in direct discussions with Plaintiff and via representations made to Rybicki which Defendants intended or reasonably expected would be repeated to Plaintiff, Defendants represented to Plaintiff that certain facts regarding the EquiAlt Parties' operation were true, when they were not

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

29

true.  Defendants knew (or should have known) their representations were false and had no reasonable basis for believing their representations were true based on all information known and/or available to Defendants.

102.   Defendants also claimed to have special knowledge regarding securities laws and made representations to Plaintiff (that were not merely casual expressions of belief but rather were declared in a matter to be true), in direct discussions with Plaintiff and via representations made to Rybicki which Defendants intended or reasonably expected would be repeated to Plaintiff, knowing that Plaintiff would rely on such representations, regarding both the EquiAlt Parties' legal compliance and Plaintiff's ability to participate in the sale of EquiAlt Securities without a Series 7 license, all of which Defendants knew (or should have known) were false and for which Defendants had no reasonable basis for believing to be true based on all information known and/or available to Defendants.  Indeed, had Defendants utilized the skill, prudence and diligence commonly possessed and exercised by members of their profession, and had they complied with the ethical tenets required of lawyers, they would not have provided the representations to Plaintiff that they did.

103.   Defendants intended Plaintiff to rely on Defendants' representations and, as a result, to both perform as a sales agent for the EquiAlt Parties and invest personally in EquiAlt Securities.

104.   Plaintiff reasonably relied on Defendants' representations.  Despite all due diligence conducted by Plaintiff, Plaintiff had no reason to doubt that the representations made to Plaintiff by Defendants – who were held out as experts in securities laws – were false.

105.   Plaintiff's reliance on Defendants' misrepresentations was a substantial factor in causing Plaintiff's harm.  As a proximate result of Plaintiff's reliance on Defendants' misrepresentations, Plaintiff has suffered millions of dollars in damages (including but not limited to lost business opportunities, forced closure of Plaintiff's investment advising and insurance businesses, lost personal investment opportunities given involuntary closure of numerous investment, credit and banking accounts previously held by Plaintiff), reputational harm, serious emotional distress, lost personal relationships and serious physical harm and pain and suffering, including heart problems and depression, all of which shall be according to proof at trial.

/ / /

106.   Furthermore, as a direct, proximate and foreseeable result of Defendants' tortious conduct, Plaintiff has been forced to incur significant expense and time defending against the actions filed against him by the SEC, harmed investors and the Receiver (including attorneys' fees and costs of defending such actions), all of which shall be according to proof at trial.

### THIRD CAUSE OF ACTION

**Aiding and Abetting Fraud and Deceit**

**(By Plaintiff As to All Defendants)**

107.   Plaintiff hereby incorporates by reference each, every, and all allegations set forth above in the instant Complaint as though fully set forth herein.

108.   Based on what has been discovered by the SEC and Receiver, there existed an underlying fraud in the sale of EquiAlt Securities and in the EquiAlt Parties' operations.

109.   Defendants knew that the EquiAlt Parties' actions, activities and operations were in violation of securities laws, and that the actions, activities and operations of the EquiAlt Parties constituted an ongoing fraudulent investment scheme.

110.   Defendants knew they had an obligation to not further their clients' fraudulent scheme.  Defendants, however, chose to ignore such obligation and rendered legal advice and substantial assistance and encouragement to the EquiAlt Parties that knowingly aided and abetted the EquiAlt Parties' continuing fraudulent scheme.  Defendants did so by making false representations and concealing material facts from various third parties, including investors and sales agents (including Plaintiff), concerning the EquiAlt Parties' compliance with securities laws, the safety and risks of the EquiAlt Securities, and the financial performance and solvency of the EquiAlt Parties, and unlicensed sales agents' abilities to sell EquiAlt Securities without a Series 7 license, all with the intent to deceive investors and sales agents and to benefit Defendants' clients and Defendants. Defendants acted with the specific intent of facilitating the EquiAlt Parties' wrongdoing.

111.   In exchange for aiding and abetting the EquiAlt Parties, Defendants were paid hundreds of thousands of dollars by the EquiAlt Parties.

112.   Plaintiff justifiably relied on Defendants' false representations and material

COMPLAINT

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

1   omissions, was unaware of the falsity of Defendants' representations or the omitted facts, and

2   would not have acted as a sales agent for the EquiAlt Parties, or purchased EquiAlt Securities, had

3   he known the true facts.

4          113.   Defendants' conduct was a substantial factor in causing Plaintiff's harm.  As a

5   proximate result of Plaintiff's reliance on Defendants' misrepresentations, Plaintiff has suffered

6   millions of dollars in damages (including but not limited to lost business opportunities, forced

7   closure of Plaintiff's investment advising and insurance businesses, lost personal investment

8   opportunities given involuntary closure of numerous investment, credit and banking accounts

9   previously held by Plaintiff), reputational harm, serious emotional distress, lost personal

10   relationships and serious physical harm and pain and suffering, including heart problems and

11   depression, all of which shall be according to proof at trial.

12          114.   Furthermore, as a direct, proximate and foreseeable result of Defendants' tortious

13   conduct, Plaintiff has been forced to incur significant expense and time defending against the

14   actions filed against him by the SEC, harmed investors and the Receiver (including attorneys' fees

15   and costs of defending such actions), all of which shall be according to proof at trial.

16          115.   Defendants' actions were undertaken maliciously, oppressively and with the intent

17   to defraud Plaintiff (and others).  Accordingly, Plaintiff is entitled to punitive damages against

18   Defendants according to proof at trial.

19                              **FOURTH CAUSE OF ACTION**

20                                  **Equitable Indemnity**

21                           **(By Plaintiff As to All Defendants)**

22          116.   Plaintiff hereby incorporates by reference each, every, and all allegations set forth

23   above in the instant Complaint as though fully set forth herein.

24          117.   The Receiver, on behalf of several of the EquiAlt Parties, and EquiAlt investors

25   have claimed that certain of the EquiAlt Parties, Plaintiff and Defendants contributed to causing

26   them to suffer harm as a result of the EquiAlt Parties' fraudulent scheme.   While Plaintiff certainly

27   regrets being duped into the EquiAlt Parties' fraudulent scheme, both as an investor and a sales

28   agent, Plaintiff has denied liability to the Receiver, EquiAlt Parties and EquiAlt investors.

118.   The SEC has also pursued claims against Plaintiff, which claims Plaintiff has denied.

119.   Plaintiff alleges, however, that if Plaintiff is held liable to the Receiver, any EquiAlt Parties, any EquiAlt investors or the SEC, which liability is expressly denied, such liability will attach only by reason of the wrongful actions of Defendants, and that Defendants are therefore bound by implication of law to indemnify and save harmless Plaintiff, not only for the amount of any judgments or settlements, but also for costs of defense of such matters, all of which shall be according to proof at trial.

## FIFTH CAUSE OF ACTION

### Tort of Another

### (By Plaintiff As to All Defendants)

120.   Plaintiff hereby incorporates by reference each, every, and all allegations set forth above in the instant Complaint as though fully set forth herein.

121.   As set forth above, Defendants committed torts against Plaintiff and others, including but not limited to negligence, negligent misrepresentation and aiding and abetting fraud.

122.   As a proximate result of Defendants' tortious conduct and/or omissions, Plaintiff was and has been forced to incur significant expense and time defending against the actions filed against him by the SEC, harmed investors and the Receiver (including attorneys' fees and costs of defending such actions), in the protection of Plaintiff's interests, all of which shall be according to proof at trial.

## SIXTH CAUSE OF ACTION

### Violation of Unfair Competition Law (Bus. & Prof. Code § 17200, *et seq.*)

### (By Plaintiff As to All Defendants)

123.   Plaintiff hereby incorporates by reference each, every, and all allegations set forth above in the instant Complaint as though fully set forth herein.

124.   California's Unfair Competition Law (Bus. & Prof. Code § 17200, *et seq.*) ("UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Bus. & Prof. Code § 17500).

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

33

125.    Defendants' acts have violated the UCL by aiding and abetting their clients' fraudulent activities, and by engaging in conduct likely to deceive – and that did deceive – members of the public.  Defendants' conduct was offensive, unethical and substantially injurious to many.

126.    Defendants' conduct was a substantial factor in causing Plaintiff's harm.  As a proximate result of Plaintiff's reliance on Defendants' misrepresentations, Plaintiff has suffered millions of dollars in damages (including but not limited to lost business opportunities, forced closure of Plaintiff's investment advising and insurance businesses, lost personal investment opportunities given involuntary closure of numerous investment, credit and banking accounts previously held by Plaintiff), reputational harm, serious emotional distress, lost personal relationships and serious physical harm and pain and suffering, including heart problems and depression, all of which shall be according to proof at trial.

127.    Furthermore, as a direct, proximate and foreseeable result of Defendants' tortious conduct, Plaintiff has been forced to incur significant expense and time defending against the actions filed against him by the SEC, harmed investors and the Receiver (including attorneys' fees and costs of defending such actions), all of which shall be according to proof at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.  For all past and future economic damages Plaintiff has or will incur as a result of Defendants' misrepresentations and advice that fell below the standard of care, in an amount to be proven at trial, including but not limited to: all attorneys' fees and costs spent defending against the actions filed against Plaintiff by the SEC, EquiAlt investors and the Receiver; for the reasonable value of Plaintiff's time defending such actions; for Plaintiff's lost business and lost business opportunities; for lost investment opportunities; and for any amounts Plaintiff were or are ordered to pay to the SEC, EquiAlt investors and/or the Receiver;

2.  For general damages, including but not limited to the reputational harm and serious emotional distress Plaintiff has been caused to suffer;

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

3.  For costs of suit incurred herein;

4.  For prejudgment interest;

5.  For attorneys' fees as allowed by law;

6.  For punitive damages on the third cause of action; and

7.  For such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues set forth in this Complaint which are so triable.

Dated:      October 6, 2022               **DUNN DESANTIS WALT & KENDRICK, LLP**

By: _____
Kevin V. DeSantis
James A. McFaul
David D. Cardone
Adam J. Yarbrough
Attorneys for Plaintiff, Robert Joseph Armijo

DUNN DESANTIS WALT & KENDRICK, LLP
www.ddwklaw.com

35
COMPLAINT

59

# EXHIBIT A





## Paul Wassgren
Partner
[email protected]

Los Angeles (Century City)
T: +1 310 595 3035
F: +1 310 595 3335

Paul Wassgren practices at the intersection of corporate law, real estate, and securities. He regularly represents funds, real estate sponsors, and investors. Paul has extensive experience in the areas of project and real estate finance, acquisitions, general corporate law and private placements. His clients range in size from individual entrepreneurs to multinational corporations.

**RELATED SERVICES**
○ Corporate

**RELATED SECTORS**
○ Real Estate

Before joining DLA Piper, Paul was a corporate partner at another AmLaw100 firm. Prior to practicing law, Paul worked as a consultant in the biotechnology industry, and was among the youngest licensed stock and bond brokers in US history.

## EXPERIENCE

## REPRESENTATIVE MATTERS

Paul has represented, or advised on, the following:
- The US subsidiary of a Chinese publicly traded company in its acquisition of a Silicon Valley semiconductor company
- A Japanese publicly traded company in its acquisition of a California-based technology company
- A PRC-based lender in a US$200 million senior secured debt facility to a multinational technology company
- A PRC-based lender in a US$655 million secured loan to a NYSE-listed corporation in the mining industry
- Fund and REIT formations, including a series of private offerings for a US-based real estate company focused on the single-family residential market
- A development company, on its 1,600-acre rail and industrial project in the Bakken Oil Field
- A publicly traded gaming corporation, in connection with the issuance of US$225 million in senior debt
- A pharmaceutical company based in China, on the placement of US$15 million in preferred securities to two Singapore-based institutional investors
- A public health care company, in connection with a US$407 million secured debt refinancing and the transfer of a US$175 million unsecured note
- The sellers of a 20-story commercial building in Dallas, Texas to a private equity fund
- The tenants-in-common of an office park in San Diego County, in the sale of the property to a private equity fun
- The financing for the construction of an award-winning technology business park in Las Vegas, consisting of 140,000 square feet
- The financing for an award-winning retail development in Las Vegas, including one of the first New Markets Tax Credits in the state
- A developer, in connection with several private placements of securities to fund the construction of vacation properties in Cabo San Lucas, Mexico, and the acquisition and development of real property in Belize
- A private corporation, in a dispute with dissenting shareholders involving the forced redemption of stock in order to elect Subchapter S tax treatment following the sale of real property in California

## CREDENTIALS

DLA Piper is a global law firm operating through various separate and distinct legal entities. Further details of these entities can be found at www.dlapiper.com. This may qualify as "Attorney Advertising" requiring notice in some jurisdictions. Prior results do not guarantee a similar outcome. Copyright © 2017 DLA Piper. All rights reserved.

**Admissions**
- California
- Nevada

**Recognitions**
- "Rising Stars" list, *Super Lawyers Mountain States Magazine*, 2011-2012, 2015

**Education**
- M.A., Oxford University, *Honors*, 2008

- M.B.A., Oxford University, 2003

- B.A., Oxford University, *Honors in Jurisprudence*, 2003
- B.A., Pepperdine University, *Valedictorian and summa cum laude*, 1997

**Civic and Charitable**
- Vice President of the Board of Trustees, Leukemia & Lymphoma Society, Desert Mountain States Chapter, 2010-2012

## INSIGHTS

**Publications**

## PUBLICATIONS

- Author, "Balancing Act," *Think Realty*, April 21, 2016
- Author, "Thinking About Crowdfunding Your Next Syndicated Deal?," *Daily Properties*, February 17, 2016
- Author, "New Markets Tax Credit Financing: Nevada's Great Awakening," *Las Vegas Business Press*, November 9, 2015
- Author, "'B' Corporations: Will Nevada Be Left Behind?" *Las Vegas Review Journal*, December 4, 2011

## NEWS

## MEDIA MENTIONS

- "How Will Tax Reform Impact California's Housing Market?," *GlobeSt.com,* May 30, 2018

DLA Piper is a global law firm operating through various separate and distinct legal entities. Further details of these entities can be found at www.dlapiper.com. This may qualify as "Attorney Advertising" requiring notice in some jurisdictions. Prior results do not guarantee a similar outcome. Copyright © 2017 DLA Piper. All rights reserved.

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

RICHARD GLEINN and PHYLLIS GLEINN,
CARY TOONE, JOHN CELLI and MARIA
CELLI, EVA MEIER, GEORGIA MURPHY,
STEVEN J. RUBINSTEIN and TRACEY F.
RUBINSTEIN, as trustees for THE
RUBINSTEIN FAMILY LIVING
TRUST DATED 6/25/2010, BERTRAM D.
GREENBERG, as trustee for the Greenberg
Family Trust, BRUCE R. AND GERALDINE
MARY HANNEN, ROBERT COBLEIGH,
RORY O'NEAL AND MARCIA O'NEAL,
and SEAN O'NEAL, as trustee for THE
O'NEAL FAMILY TRUST DATED
4/6/2004, individually and on behalf of others
similarly situated,

        Plaintiffs,

vs.

PAUL WASSGREN, an individual; DLA
PIPER (US), a limited liability partnership; and
FOX ROTHSCHILD LLP, a limited liability
partnership,

    Defendants.

Case No. **8:20-cv-01677-VMC-CPT**

**JURY DEMANDED**

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Richard Gleinn; Phyllis Gleinn; Cary Toone, John Celli; Maria Celli; Eva Meier;

Georgia Murphy; Steven J. Rubinstein and Tracey F. Rubinstein, as trustees for The Rubinstein

Family Living Trust Dated 6/25/2010; Bertram D. Greenberg, as trustee for the Greenberg

Family Trust; Bruce R. Hannen; Geraldine Mary Hannen; Robert Cobleigh; Rory O'Neal;

Marcia O'Neal; and Sean O'Neal, as trustee for The O'Neal Family Trust Dated 4/6/2004, as

amended (collectively, "Plaintiffs") allege the following claims for their complaint against

Defendants Paul Wassgren ("Wassgren"), DLA Piper (US) ("DLA Piper") and Fox

Rothschild LLP ("Fox

Rothschild") (collectively, "Defendants"). Plaintiffs allege the following on information and belief, except as to those allegations that specifically pertain to the named Plaintiffs, which are alleged on personal knowledge.

## INTRODUCTION

1.      Plaintiffs bring this class action against the Defendants to obtain rescission, damages, and/or other relief on behalf of themselves and hundreds of other investors who collectively have lost millions of dollars in a Ponzi scheme orchestrated and perpetrated by the principals of EquiAlt, a private real estate investment firm based in Florida. The Ponzi scheme, which involved the unlawful sale of unregistered securities ("the EquiAlt Securities") combined with  fraudulent misrepresentations, was carried out by the managers of EquiAlt acting in concert with Wassgren, a partner at the Fox Rothschild law firm and, later, a partner at the DLA Piper law firm.

2.      EquiAlt and its promoters could not have perpetuated the massive fraudulent Ponzi scheme without the active assistance and participation of their lawyers. This class action is brought on behalf of the EquiAlt investors in (1) Florida, (2) California, (3) Arizona, (4) Colorado, and (5) Nevada seeking to hold accountable Wassgren, Fox Rothschild, and DLA Piper—the lawyers who knowingly aided and abetted the fraudulent scheme.

3.      Over time, EquiAlt and Wassgren, through integrated offerings of unregistered securities, raised more than $170 million from at least 1,100 investors located in various states, including investors residing in Florida, California, Arizona, Colorado and Nevada. A large percentage of the EquiAlt investors are elderly and many of them invested their life savings in the unregistered EquiAlt Securities.

4.     On February 11, 2020, the Securities and Exchange Commission ("SEC") in the Middle District of Florida filed an enforcement action against EquiAlt, the EquiAlt investment funds, and the EquiAlt promoters, Brian Davison (Chief Executive Officer) and Barry Rybicki (Managing Director), seeking injunctive and other relief (the "SEC Action"). The complaint in the SEC Action charges that those defendants operated EquiAlt as a Ponzi scheme and committed multiple violations of the Federal securities laws:

> The Commission brings this emergency action to halt an ongoing fraud conducted by EquiAlt LLC, a private real estate investment company. Beginning in 2011, to the present, Defendants EquiAlt, Brian Davison and Barry Rybicki conducted a Ponzi scheme raising more than $170 million from over 1,000 investors nationwide, many of them elderly, through fraudulent unregistered securities offerings. Defendants promised investors that substantially all of their money would be used to purchase real estate in distressed markets in the United States and their investments would yield generous returns. Instead, EquiAlt, Davison and Rybicki misappropriated millions in investor funds for their own personal use and benefit.

Complaint for Injunctive and Other Relief and Demand for Jury Trial, ¶ 1, copy attached as **Exhibit A.**

5.     Three days after the SEC filed the SEC Action, EquiAlt was placed into a liquidating receivership. On May 8, 2020, the EquiAlt Receiver ("The Receiver") filed its first quarterly report, a copy of which is attached as **Exhibit B** ("the Receiver's Report"). The Receiver's Report includes extensive findings regarding the operations of the EquiAlt Ponzi scheme. In particular, the Receiver reported:

> These [EquiAlt] investments were sold without registration with either state or federal regulatory agencies. The offerings were purportedly made pursuant to federal exemptions from registration under the provisions of the Securities Act of 1933 provided in Regulation D. However, none of the first four [EquiAlt] Funds qualified for a Regulation D exemption or any other exemption from registration. The offerings appear to be one continuous fraudulent offering of unregistered securities. The lack of any exemption was clear to the perpetrators from the language contained in offering documents delivered to investors.

Ex. B at 14.

## PARTIES AND NON-PARTY ACTORS

### PLAINTIFFS

6.      Plaintiffs Richard and Phyllis Gleinn are individuals and spouses, who reside and are domiciled in Sumter County, Florida. The Gleinns are investors in EquiAlt Securities.

7.      Plaintiff Cary Toone is an individual who resides and is domiciled in the State of Arizona. Toone is an investor in EquiAlt Securities.

8.      Plaintiffs John and Maria Celli are individuals and spouses who reside and are domiciled in the State of Arizona. The Cellis are investors in EquiAlt Securities.

9.      Plaintiff Steven J. and Tracey F. Rubinstein are individuals and spouses who reside and are domiciled in the State of Arizona. The Rubinsteins are trustees of the Rubinstein Family Living Trust Dated 6/25/2010, which invested in EquiAlt. The Rubinsteins, via their trust, are investors in EquiAlt Securities.

10.     Plaintiff Eva Meier is an individual who resides and is domiciled in San Diego, California. Meier is an investor in EquiAlt Securities.

11.     Plaintiff Georgia Murphy is an individual who resides and is domiciled in San Diego, California. Meier is an investor in EquiAlt Securities.

12.     Plaintiff Greenberg is the trustee of the Greenberg Family Trust, a revocable trust. Plaintiff Bert Greenberg is, and was at all material times, who resides and is domiciled in Santa Clara County, California. Greenberg is an investor in EquiAlt Securities.

13.     Plaintiffs Bruce R. Hannen and Geraldine Mary Hannen are spouses and individuals who reside and are domiciled in the state of Colorado. The Hannens are investors in EquiAlt Securities.

4
AMENDED CLASS ACTION COMPLAINT

14. Plaintiffs Rory and Marcia O'Neal are individuals and spouses who reside and are domiciled in the State of Nevada. The O'Neals are investors in EquiAlt Securities.

15. Plaintiff Sean O'Neal is the trustee of the O'Neal Family Trust. Plaintiff Sean O'Neal is an individual who resides and is domiciled in the State of Nevada. O'Neal is an investor in EquiAlt Securities.

16. Plaintiff Robert Cobleigh is an individual who resides and is domiciled in the State of California. Cobleigh is an investor in EquiAlt Securities.

## **DEFENDANTS**

17. Defendant DLA Piper is a Maryland limited liability partnership operating as a law firm with its principal place of business at 6225 Smith Avenue, Baltimore, MD 21209. DLA Piper is thus a citizen of Maryland. DLA Piper does business in Florida at 200 South Biscayne Boulevard, Suite 2500, Miami, Florida.

18. Defendant Fox Rothschild is a Pennsylvania limited liability partnership operating as a law firm with its principal place of business located at 2000 Market St, 20th Floor, Philadelphia, PA, 19103. Fox Rothschild is thus a citizen of Pennsylvania. Fox Rothschild does business in Florida at One Biscayne Tower, 2 South Biscayne Blvd., Suite 2750, Miami Florida.

19. Fox Rothschild and DLA Piper served as EquiAlt's legal counsel in connection with the offer and sale of the EquiAlt Securities

20. Defendant Wassgren is an individual who resides and is domiciled in the State of California. Wassgren is thus a citizen of California. Wassgren is an attorney who has been a partner at DLA Piper since 2017. Prior to his affiliation with DLA Piper, Wassgren was a partner at Fox Rothschild. At all times relevant to the allegations of this complaint, Wassgren was acting within

the course and scope of his employment with Fox Rothschild and his later employment with DLA Piper.

## OTHER NON-PARTY ACTORS

21.     Non-defendant EquiAlt LLC ("EquiAlt") is a Nevada limited liability company that engaged in the offer and sale of the EquiAlt Securities to investors in several states, including Florida.

22.     Non-defendant Brian Davison ("Davison") is the former CEO of EquiAlt.

23.     Non-defendant Barry Rybicki (Rybicki") is a Managing Director of EquiAlt.

24.     Non-defendants EquiAlt Fund LLC ("Fund 1"); EquiAlt Fund II, LLC ("Fund 2"), EquiAlt Fund III, LLC ("Fund 3") and EA SIP LLC ("Fund 4") (collectively, the "Funds") are investment funds formed by Non-Defendants Davison and Rybicki to raise monies from investors through the sale of the EquiAlt Securities.

25.     Non-Defendants EquiAlt, the Funds, Davison, and Rybicki are hereinafter referred to collectively as the "Non-Defendant Promoters."

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA") codified as 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs; each alleged class will have 100 or more members, and minimal diversity exists.

27.     This Court has personal jurisdiction over each Defendant because each Defendant was involved in the marketing and sale of the EquiAlt Securities issued from EquiAlt headquarters in Tampa, Florida. Defendants have purposefully availed themselves of the laws of the State of Florida and have established minimum contacts with the State of Florida. The Court also has

personal jurisdiction under Fla. Stat. §§ 48.193(1)(a)(1) over the Defendants because they operate, conduct, engage in, or carrying on a business or business venture in this state or having an office or agency in this state. Both Fox Rothschild and DLA Piper transact substantial business in Florida, including from a DLA office in Miami, Florida, and Fox Rothschild offices in Miami and West Palm Beach, Florida. Defendants market, promote, distribute, and render their services in Florida, causing Defendants to incur both obligations and liabilities in Florida. Further, the Court has personal jurisdiction over Wassgren under Fla. Stat. § 48.193(1)(a)(2).

28. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. In addition, the SEC Action was filed in this district.

## GENERAL ALLEGATIONS

### A.    Background of the EquiAlt Ponzi Scheme

29. EquiAlt was formed in 2011 by its Chief Executive Officer Davison and its Managing Director Rybicki (collectively, the "Managers"). EquiAlt represented to its investors in offering documents that substantially all of their invested funds would be used to purchase, rehabilitate and sell for profit single-family properties located in distressed markets throughout the United States, thereby generating generous returns of 8–12% for the investors. Instead, EquiAlt, Davison, and Rybicki with the active assistance of Defendants perpetrated an illegal Ponzi scheme by which they fraudulently misappropriated millions of dollars for their own personal benefit from the offer and sale of unregistered securities in violation of the federal and state securities laws, through a network of unlicensed sales agents located in Florida, California, Arizona, Colorado, and Nevada, and other states.

30. According to the Declaration of Mark Dee filed in the SEC action, EquiAlt morphed into a Ponzi scheme soon after its inception in 2011. A copy of the Declaration of Mark

Dee (the "Dee Declaration") is attached as **Exhibit C.** Mr. Dee, a Senior Accountant for the SEC, attested that Davison and Rybicki misappropriated millions of dollars for their own personal benefit, misused investor funds for purposes inconsistent with the Private Placement Memorandums used to offer and sell the EquiAlt Securities ("PPMS"), and saddled the Funds with financial losses stemming from excessive fees, bonuses and payments to insiders and affiliated entities. These excessive misappropriated fees rendered EquiAlt insolvent and unable to pay the amounts due to investors other than by raising new investor funds as part of the resulting Ponzi scheme. In short order the proceeds received by the Funds from property sales and loan receipts were inadequate to pay the high payments due to investors under the unregistered EquiAlt Securities, which obligated the Funds to pay interest to investors at rates ranging from 8% to 12%. Consequently, EquiAlt systematically diverted monies from one Fund to another and used investment proceeds raised from new investors to make the interest payments due to existing investors.

31. EquiAlt conducted its business affairs and perpetrated an illegal and fraudulent Ponzi scheme through a series of limited liability companies ("LLCs") controlled by Davison and Rybicki. EquiAlt itself was formed as a Nevada LLC to manage a series of real estate investment funds that issued and sold to investors unregistered securities styled as fixed-interest debentures. The unregistered EquiAlt Securities were issued by the Funds. Another LLC operated by Rybicki, BR Support Services LLC ("BR Services"), was formed in Arizona to recruit, oversee and pay commissions to the unlicensed sales agents who marketed and sold the unregistered EquiAlt Securities to unsuspecting investors.

32. Shortly after EquiAlt was formed in 2011, Davison and Rybicki began to aggressively promote sales of the EquiAlt Securities issued by Fund 1 through a network of

unlicensed sales agents located in Florida, California, Arizona, Nevada, and other states. Davison managed EquiAlt's financing and day-to-day operations, including the acquisition and development of properties owned by the Funds. Rybicki solicited and oversaw the activities of the unlicensed sales agents, communicated with investors and raised monies from investors.

33.     Over time, Rybicki recruited approximately 19 sales agents through BR Services. Participating sales agents would submit to BR Services certain documentation and the investors' funds, which BR Services would transmit to EquiAlt. When the investors' funds were received, EquiAlt would disburse funds to BR Service equal to 12% of the invested amounts and BR Services in turn would pay commissions to the agents equal to 6% or more of the invested amounts. For example, the following chart from the Receiver's Report lists sales commissions paid to the sales agents recruited by Rybicki:

| Sales Agent Name | Total Paid |
|---|---|
| Agents Insurance Sales / Barry Wilken | $ (240,159.33) |
| American Financial Security / Ron Stevenson / Barbara Stevenson | (1,712,750.95) |
| Barry Neal | (119,037.20) |
| Ben Mohr | (113,578.00) |
| Bobby Armijo / Joseph Financial Inc. | (1,100,042.65) |
| Dale Tenhulzen / Live Wealthy Institute | (1,484,531.29) |
| Elliot Financial Group / Todd Elliot | (805,662.68) |
| Family Tree Estate Planning / Jason Wooten | (3,749,783.61) |
| GIA, LLC / Edgar Lozano | (278,807.24) |
| Greg Talbot | (260,941.89) |
| J. Prickett Agency / Joe Prickett | (187,374.57) |
| James Gray / Seek Insurance Services | (405,286.75) |
| John Friedrichsen | (327,681.69) |
| Lifeline Innovations / John Marques | (822,318.06) |

| Patrick Runninger | (293,599.53) |
|---|---|
| Sterling Group | (478,562.12) |
| The Bertucci Group LLC / Leonardo LLC / Leonardo Bertucci | (139,950.00) |
| Tony Spooner / Rokay Unlimited, LLC | (622,169.05) |
| Wellington Financial, LLC / Jason Jodway | (48,000.00) |
| **TOTAL** | **$ (13,190,236.61)** |

As the foregoing chart shows, the EquiAlt sales agents collected more than $13 million in commissions from sales of the EquiAlt Securities to investors.

34.     Rybicki selected agents who had existing clients with whom they had pre-existing confidential fiduciary relationships of trust and confidence. The sales agents, who were largely unlicensed insurance producers and financial advisors, provided investment advice concerning the EquiAlt Securities, counseling their clients that the debentures were conservative, safe investments providing healthy investment returns with little or no investment risk. The sales agents purported to conduct sufficient analysis to confirm that prospective investors possessed the knowledge and expertise in financial and business matters and the capability to evaluate the merits and risks associated with the EquiAlt Securities. Rather than doing so, however, the EquiAlt sales agents improperly endorsed the EquiAlt Securities as low risk investments and affirmatively encouraged and exhorted their largely unsophisticated clients to invest their life savings and retirement assets in the risky unregistered securities.

35.     A majority of the investors who purchased the unregistered securities issued by the Funds were non-accredited, meaning that their net worth was less than $1 million, their individual income was less than $200,000 in each of the two most recent years (or $300,000 in joint income with their spouse), or they failed to meet the other requirements of 17 CFR § 230.501. In addition,

to be accredited, purchasers must have sufficient knowledge and experience in financial and business matters to make them capable of evaluating the merits and risks of the prospective investment. Under Regulation D, the safe harbor exemption from registration is forfeited if the issuer sells its unregistered securities to more than 35 non-accredited purchasers. When the EquiAlt Securities offerings by the Funds are aggregated, it is clear that EquiAlt had more than 35 non-accredited purchasers because the Form D for the Fund 1 offering discloses 31 non-accredited purchasers and the Form D for Fund II discloses 10 non-accredited purchasers, for a total of at least 41 non-accredited purchasers of EquiAlt Securities.

**B.      Defendants' Active Participation and Assistance in the Offer and Sale of the Unregistered EquiAlt Securities**

36.      As a partner at Fox Rothshild and later as a partner at DLA Piper, Wassgren served as legal counsel for EquiAlt who advised and assisted EquiAlt on numerous matters, including compliance with applicable Federal and State securities laws. In a recent podcast, Wassgren described EquiAlt as "a long-time client of mine."[1] DLA Piper's website notes that Wassgren represented EquiAlt in connection with "[f]und and REIT formations, including a series of private [securities] offerings."[2] According to the DLA Piper website, Wassgren "practices at the intersection of corporate law, real estate and securities."[3] Despite his youthful age, therefore, Wassgren is a highly sophisticated securities lawyer, well-versed in the stringent federal and state law provisions regulating the offer and sale of securities to investors in California, Arizona, Florida, Colorado and Nevada including in particular the prohibitions against public offerings of unqualified or unregistered securities through unlicensed brokers and sales agents.

---

[1] https://podcasts.apple.com/kw/podcast/paul-wassgren-from-youngest-bond-trader-ever-to-oz/id1460212490?i=1000438104456 (last visited June 15, 2020)

[2] https://www.dlapiper.com/en/us/people/w/wassgren-paul/ (last visited June 15, 2020).

[3] *Id.*

37.     Wassgren represented EquiAlt for several years as a partner at Fox Rothschild. Wassgren brought EquiAlt with him as a client when he joined DLA Piper as a partner in 2017. Wassgren had primary responsibility for the EquiAlt engagements of Fox Rothschild and DLA Piper. As recently as 2018, and after defending the Arizona investigation into EquiAlt's operations described below, Wassgren led a team of DLA Piper attorneys assisting EquiAlt in the formation and offering of $500 million fund to purchase and develop properties within Qualified Opportunity Zones.

38.     Over the years, Fox Rothschild and DLA Piper collected hundreds of thousands of dollars in fees from EquiAlt and its affiliates from EquiAlt and the Funds.

39.     Wassgren was deeply involved with EquiAlt and the Funds from their very inception. In his deposition taken in the SEC investigation leading up to the SEC Action, EquiAlt CEO Davison described Wassgren's instrumental role as architect of the EquiAlt business organizations:

> Q:     The second full paragraph on page 3 states … "As the CEO and founder, Mr. Davison … actively works with EquiAlt outside legal and financial advisors to develop and implement strategic ling-term planning for the company…." Is that an accurate description of your responsibilities at EquiAlt?
>
> ***
>
> A:     … I just would like to clarify that my definition of financial advisors is directly related to my job position, which would be Denver, a staff CPA with great experience, *my legal counsel, Paul Wassgren, I deal with quite extensively when the companies interact with each other that he's built for me,* to make sure I'm good on that. But other than that, I would say that paragraph is generally accurate, yes.

Deposition of Brian Davison, excerpt attached as **Exhibit D**, at 21 (emphasis added).

40.     While a partner at Fox Rothschild and later, as a partner at DLA Piper, Wassgren prepared and filed with the Nevada Secretary of State the Articles of Organization for each of the

Funds, listing himself as the "Organizer" and "Registered Agent" for the Funds. Wassgren also drafted the PPMs used by EquiAlt to solicit sales of its unregistered and nonqualified securities. As Davison testified to the SEC:

> Q:    And who developed the concept of raising money for these investment funds through private placement memorandums?
>
> A:    That's me.
>
> ***
>
> Q:    Okay. So who contacted the law firm to help generate those private placement memorandums?
>
> A:    I do.
>
> Q:    Okay. It was you?
>
> A:    It was me.
>
> ***
>
> Q:    And which law firm, and which attorney, and when?
>
> A:    So the individual is Paul Wassgren.
>
> ***
>
> Q:    Fox Rothschild? Does that sound familiar?
>
> A:    He was at Fox Rothschild.
>
> Q:     Which firm is he at now?
>
> A:     I believe he's with DLA Piper.

**Ex. D** at 26–27. Copies of PPMs drafted by Wassgren for each of the Funds are attached as **Composite Exhibit E**.

41.    Indeed, Wassgren drafted the EquiAlt PPMs from the very beginning of its existence. As Davison testified in his deposition that "[g]enerally speaking, on a transactional basis, I created documents like these [PPMs] with counsel about the time period of 2000—I'm

13

AMENDED CLASS ACTION COMPLAINT

sorry—2011, private placement memorandum generally." Pl. Mot. for TRO, Exh. 4, Davison Tr. at 92. **Exhibit D** at 92.

42.     Wassgren also drafted the Subscription Agreements, the EquiAlt Securities, and the Prospective Purchaser Questionnaires ("Investor Questionnaires") used to attest that the investors were "accredited," a requirement for the securities to be exempt from registration as a "private offering" under Rule 506(b) of SEC Regulation D ("Regulation D"). An exemplar Investor Questionnaire is attached as **Exhibit F**. As drafted, the Investor Questionnaires were addressed to Fox Rothschild or DLA Piper, such that prospective investor was directed to complete the questionnaire and send the signed document to the Defendants' offices. Through their receipt of such Investor Questionnaires, and otherwise, Defendants kept themselves informed of the number and level of financial sophistication of the prospective investors to whom the EquiAlt Securities were being offered and sold.

43.     The PPMs and other offering documents prepared by Wassgren contained numerous false and misleading statements and concealed or omitted material information about the use of investors' funds and the risks associated with the Funds. Among other material misrepresentations, the PPMs prepared by Wassgren:

- Falsely stated that "[t]his Offering is being made pursuant to the private offering exemption of Section 4(2) of the [Securities] Act and/or Regulation D promulgated under the Act;"

- Falsely stated that "[t]his Offering is also being made in strict compliance with the applicable state securities laws;"

- Falsely stated that "[u]nder no circumstances will the Company admit more than thirty-five (35) non-accredited Investors as computed under Rule 501 of Regulation D promulgated under the [Securities] Act;"

- Falsely stated that "[t]he Company may utilize the services of one or more registered broker/dealers" to sell the unregistered securities;

- Falsely overstated the percentage of investor funds that would be used to invest

in properties;

- Misleadingly omitted to disclose that millions of dollars would be used to pay undisclosed fees and bonuses to EquiAlt and its principals;

- Misleadingly omitted to disclose that EquiAlt would pocket "discount fees" rather than passing on to the Funds purported savings from listed sale prices; and

- Misleadingly omitted to disclose that monies would be transferred from one Fund to another to pay interest due to investors and failed to adequately disclose that commissions would be paid to unlicensed sales agents.

- Misleadingly omitted to disclose that Davison and Rybicki had both filed bankruptcy proceedings during the years prior to the formation of EquiAlt

44.     Although the PPMs made partial disclosures that Davison and Rybicki would be compensated through management fees and undefined "substantial compensation and benefits" these disclosures were misleading half-truths because the PPMs also assured the prospective investors that the Company "does not anticipate significant operating costs" and the projected sources and uses of cash failed to disclose the exorbitant amounts misappropriated and diverted by Davison and Rybicki. More importantly, the PPMs failed to disclose that, as Davison and Rybicki knew and intended, the exorbitant amounts that they stripped from the EquiAlt Funds quickly rendered the funds insolvent and incapable of paying the amounts due to investors other than with funds raised from new investors through the Ponzi platform.

45.     In addition to drafting and providing information for the PPMs, Wassgren and the law firm Defendants consented to the inclusion of their names in the PPMs and the associated offering materials incorporated in the PPMs. As just noted, while Wassgren was a partner at Fox Rothschild, the Investor Questionnaires attached as exhibits to the PPMs named the law firm and directed the investors to mail the completed questionnaires to the law firm's offices in Nevada. When Wassgren moved to DLA Piper in 2017, the Investor Questionnaires were changed to name DLA Piper and set forth the new law firm's mailing address in California. The PPMs also stated

that: (a) the securities were offered "subject to … [the] approval of counsel;" (b) the fund's "counsel will review certain documents" used to effectuate the real estate transactions by which the Funds intended to acquire properties; (c) the Fund "will rely on the opinion of … its legal counsel with respect to its classification as a limited liability company for Federal income tax purposes;" and (d) the securities could not be transferred unless, among other things, "in the opinion of counsel to the company, registration is not required…." These statements concerning the legal advice to be obtained from EquiAlt's counsel all referred to Wassgren and the law firm Defendants.

46.     Wassgren and the law firm Defendants furthermore prepared false and misleading marketing materials distributed to prospective investors and knowingly allowed EquiAlt to use their names and professional reputations in the marketing materials. While Wassgren was a partner at Fox Rothschild, EquiAlt marketing brochures (an example of which is attached as **Exhibit G**) prominently featured Wassgren and Fox Rothschild as the investment firm's legal counsel, thereby providing comfort to prospective investors that EquiAlt was a legitimate, financially sound investment firm that complied with all applicable regulatory and legal requirements. When Wassgren subsequently became a partner at DLA Piper, the EquiAlt marketing brochure (an example of which is attached as **Exhibit H**) was changed to reflect that Wassgren and DLA Piper served as legal counsel for EquiAlt. Both EquiAlt marketing brochures invited prospective investors to contact Defendants directly, identifying them as "independent" professionals who offered to give the investors "insight into the fund and its activities." *Id.*[4]

---

[4] DLA Piper through numerous press releases also touted to the public the law firm's involvement and major role in assisting EquiAlt, but has since removed these specific website announcements:

> DLA Piper advises EquiAlt on the formation and offering of its
> ...www.dlapiper.com › news › 2018/11 › dla-piper-advises-EquiAlt-on-q...

47.     Wassgren knew the representations in the PPMs that the EquiAlt Securities were exempt from registration under the federal securities laws pursuant to Regulation D and were made "in strict compliance with the applicable state securities laws" were false and misleading. Among other things, Wassgren knew that: (a) EquiAlt intended to sell and did in fact sell its securities to more than 35 non-accredited investors through the Funds, which were all part of a single integrated offering; (b) EquiAlt engaged directly and through its agents in general solicitations and advertising to market its unregistered securities; (c) EquiAlt made commission payments to its unlicensed sales agents not disclosed in its SEC filings claiming the Reg D exemption from registration; and (d) EquiAlt would and did fail to provide investors with information and disclosures required by Regulation D, including audited financial statements.

---

Nov 15, 2018 – DLA Piper represented EquiAlt LLC, in the formation and offering of their recently formed EquiAlt Qualified Opportunity Zone Fund, LP that ...

Paul Wassgren | People | DLA Piper Global Law Firmwww.dlapiper.com › people › wassgren-paul

DLA Piper represented EquiAlt LLC, in the formation and offering of their recently formed EquiAlt Qualified Opportunity Zone Fund, LP that purchases and ...

https://www.leopardsolutions.com/hotspot/ListSummaryDetails.aspx?categoryid=0&month=11&year=2018

DLA Piper advises EquiAlt on the formation and offering of its US$500 million Qualified Opportunity Zone fund

DLA Piper - @DLA_Piper Twitter Profile | Twipuwww.twipu.com › DLA_piper

Explore @DLA_Piper Twitter Profile | DLA Piper, a global law firm operating through ... We advised EquiAlt on the formation and offering of its US$500 million ...

48.     Aware that EquiAlt failed to qualify for its claimed registration exemption yet was offering and selling the unregistered securities using unlicensed sales agents, Wassgren knew that his clients were engaged in multiple ongoing violations of the applicable federal and state securities laws.

49.     Wassgren also actively assisted EquiAlt's ongoing securities law violations by developing a stratagem to mischaracterize the sales agents as mere "Consultants" being paid "finders fees" as a subterfuge to facilitate the offer and sale of the EquiAlt Securities by unlicensed dealers. In furtherance of this unlawful contrivance, Wassgren drafted a so-called "Finder's Fee Agreement" between the applicable investment fund and the unlicensed sales agents, a copy of which is attached as **Exhibit I**. The Finder's Fee Agreement drafted by Wassgren acknowledged that the fund would "compensate" the sales agents for "introducing the Company [fund] to Investors who may be interested in considering a potential investment in the Company." *Id.* at 1. Although Wassgren was-well aware that the sales agents would be providing investment advice to their current and prospective clients (to whom they owed fiduciary duties), Wassgren drafted the Finder's Fee Agreement to falsely represent that each agent would not "make representations concerning the terms, conditions or provision of any possible investment" in the EquiAlt Funds. *Id.* at 2.

50.     Recognizing that the contemplated activities of the EquiAlt sales agents contravened both Federal and State securities laws, Wassgren drafted the Finder's Fee Agreement to provide for indemnification of both the EquiAlt fund and the agent against losses incurred by either of them arising from the "Consultant's failure to register as a broker-dealer with the Securities and Exchange Act of 1934, or as required by applicable state law or Consultant's violation of state or federal securities laws and regulations." *Id.* at 3. Acknowledging Wassgren's

contemplated continued participation in the ongoing securities law violations, the Finder's Fee Agreement provided that any notices required under the agreement, including notice of claims arising from securities laws violations, were to be provided to Wassgren himself on behalf of the EquiAlt Funds. *Id.* at 5.

51.     Rather than disclosing the ongoing securities violations or withdrawing from further representation (as required by the applicable ethical rules), Wassgren instead assisted EquiAlt in its attempt to conceal those violations. To that end, as alleged more fully below, Wassgren orchestrated the creation of multiple purportedly separate investment funds in an attempt to conceal the number of unaccredited investors to whom the unregistered securities were sold. Wassgren also assisted in the preparation of materially false SEC filings which—to conceal EquiAlt's ongoing securities law violations—intentionally understated the number of non-accredited EquiAlt Fund investors and misrepresented the nature and amount of commissions paid to the unlicensed sales agents.

52.     The all-encompassing involvement of Wassgren and the law firm Defendants in the affairs and business operations of EquiAlt was recently described by Rybicki in filings with this Court.  As Rybicki has avowed, attorney Wassgren provided advice and input on virtually all aspects of EquiAlt's operations, including preparation of the false and misleading PPMs and marketing materials used to induce investors into purchasing the EquiAlt securities, compliance with the applicable securities laws and the payment of commissions to unlicensed sales agents:

> Mr. Davison and Mr. Wassgren … drafted and had authority over the PPMs. EquiAlt retained the services of Paul Wassgren in virtually all aspects of EquiAlt's business operations and entrusted him with ensuring EquiAlt complied with securities laws … Mr. Wassgren prepared EquiAlt's marketing materials to investors aware of the purpose for which these materials would be disseminated and used, vetted and participated in approving EquiAlt's PPMs; and provided legal advice to EquiAlt as to the legality of paying commissions to unregistered sales agents for the sale of debentures.  … Mr. Rybicki directed sales agents to speak

with Mr. Wassgren when they had questions regarding the legal requirements for selling EquiAlt Funds.

[ECF No. 152 at 19–20]

53.　In sum, Wassgren (a) was knowing participant in the ongoing illegal sales of securities by the Non-Defendant Promoters, (b) played a substantial role in inducing the illegal sales, and (c) lent substantial assistance to an ongoing scheme to defraud. Wassgren knew or should have known that under the standards of the legal profession, "[A] lawyer has an obligation not knowingly to participate in any violation by the client of the securities laws." ABA Statement of Policy on Lawyer Responses to Auditor Requests for Information.[5] In these circumstances, Wassgren was professionally obligated to terminate its representation to avoid covering-up and assisting the ongoing (and past) fraud perpetrated by the Non-Defendant Promoters. He did not do so.

54.　Not only that, but Wassgren's actions in assistance to and in concert with the Non-Defendant Promoters went far beyond his role as legal counsel to EquiAlt. Wassgren even went so far as to affirmatively provide legal advice to potential and existing *sales agents*, falsely assuring them that EquiAlt complied with all applicable securities laws and that the unlicensed agents could lawfully sell the EquiAlt unregistered and unqualified securities.

55.　Wassgren spoke directly with many of the unlicensed broker-dealer sales agents to provide them with false assurances that EquiAlt complied with all securities laws and that the agents could lawfully offer and sell the EquiAlt Securities, even though they were not registered.

---

[5] *See also In re Am. Cont'l Corp./Lincoln Sav. and Loan Secur. Litig.*, 794 F. Supp. 1424, 1452 (D. Ariz. 1992) ("An attorney may not continue to provide services to corporate clients when the attorney knows the client is engaged in a course of conduct designed to deceive others, and where it is obvious that the attorney's compliant legal services may be a substantial factor in permitting the deceit to continue.").

For example, attorney Wassgren told sales agent Dale Tenhulzen that Wassgren "wrote the PPM" and explained how Tenhulzen would be compensated for selling EquiAlt Securities. Attorney Wassgren advised Tenhulzen that he did not need a license to legally sell and get paid for the sale of the EquiAlt Securities. [ECF No. 152-2 at 27-30]

56.     Another EquiAlt sales agent, John Friedrichsen, received the same advice from attorney Wassgren. When he first began selling the EquiAlt Securities, Rybicki told him that Wassgren had advised that the sales agents did not need to be registered to sell EquiAlt Funds. [ECF No.152-4, ¶ 8]. After Davison and Wassgren created EquiAlt's REIT Fund, Mr. Friedrichsen wondered whether he could receive commissions for selling the REIT Fund and, at Mr. Rybicki's suggestion, called Mr. Wassgren to inquire. *Id.*, ¶ 10. During the call, Mr. Wassgren, who "knew I [Friedrichsen] was a sales agent for EquiAlt Funds… explained that financial agents needed to acquire a Series 7 license to sell debentures for the REIT Fund." *Id.*, ¶ 11.

57.     Yet Attorney Wassgren knew the EquiAlt Securities did not qualify for a public offering exemption under federal or state law. Wassgren also knew that the sales agents selling the EquiAlt Securities were not registered as dealers or salespersons under federal and state securities laws. Nonetheless, in furtherance of the ongoing Ponzi scheme, Wassgren personally, systematically, affirmatively, and falsely represented to the sales agents that they could lawfully sell the unregistered EquiAlt Securities—never disclosing that EquiAlt and the agents were violating the federal and state securities laws by selling unregistered securities and by selling investments for EquiAlt without registering as a securities dealer.

58.     In addition to actively assisting EquiAlt and the Non-Defendant Promoters by drafting false offering documents, preparing organizational documents for the Funds and for other entities in which properties were held, advising and assisting EquiAlt's efforts to avoid registration

under the applicable securities laws and providing false assurances to the sales agents, CEO Davison has testified that Wassgren actively assisted him in developing and implementing strategic long-term planning for EquiAlt, again assistance beyond the scope of the routine rendition of legal services.

### C.   The EquiAlt Securities Are Non-Exempt Unregistered/Unqualified Securities

59.     The EquiAlt Securities are securities within the meaning of the Securities Act of 1933 ("the Federal Act"), which unless exempt must be registered before being offered or sold in the United States. 15 U.S.C. §77e.

60.     The EquiAlt Securities are likewise securities under the Florida Securities and Investor Protection Act (the "FSIPA"), which unless exempt must be qualified before being offered or sold in Florida unless they are exempt from registration under the Federal Act. § 517.07, Fla. Stat.

61.     The EquiAlt Securities are likewise securities under the California Securities Law of 1968 ("CSL"), which unless exempt must be qualified before being offered or sold in California unless they are exempt from registration under the Federal Act. Cal. Corp. Code §25102(o).

62.     The EquiAlt Securities are likewise securities under the Arizona Securities Act ("ASA"), which unless exempt must be qualified before being offered or sold in Arizona unless they are exempt from registration under the Federal Act. § 44-1841, Ariz. Stat.

63.     The EquiAlt Securities are likewise securities under the Colorado Securities Act ("CSA"), which unless exempt must be qualified before being offered or sold in Colorado unless they are exempt from registration under the Federal Act. C.R.S. § 11-51-201.

64.     The EquiAlt Securities are likewise securities under the Nevada Securities Act ("NSA"), which unless exempt must be qualified before being offered or sold in Nevada unless they are exempt from registration under the Federal Act. NRS 90.295 and 90.460.

65.    Defendants prepared the PPMs for the EquiAlt Securities, which acknowledged them as "securities," and which described the raised funds as being used to purchase, improve, lease and sell single-family properties in distressed real estate markets in the U.S. and to participate in "opportunistic loan transactions" in the United States.

66.    Recognizing that the EquiAlt Securities are securities within the meaning of the Federal Act and the FISPA, the CSL, the ASA, and the NSA, Defendants provided legal advice to, drafted documents for, and otherwise actively assisted EquiAlt in falsely claiming an exemption from registration as a "private offering" under Rule 506(b) of SEC Regulation D ("Rule 506").

67.    Rule 506(b) is considered a "safe harbor" under Section 4(a)(2) of the Federal Act. It provides objective standards that a company can rely on to meet the requirements of the Section 4(a)(2) exemption. Companies conducting an offering that qualifies under Rule 506(b) can raise an unlimited amount of money and can sell securities to an unlimited number of accredited investors.

68.    An offering under Rule 506(b) is, however, subject to the following requirements:

- no general solicitation or advertising to market the securities may be conducted; and
- securities may not be sold to more than 35 non-accredited investors (all non-accredited investors, either alone or with a purchaser representative, must meet the legal standard of having sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of the prospective investment).

Furthermore, as a general condition to a Rule 506(b) exemption, all non-accredited investors must be given specific information relating to the offeror's financial condition. 17 C.F.R. § 230.502(b).

69.    Defendants advised EquiAlt with respect to the required filings with the SEC to claim an exemption from registration under Regulation D. Defendants therefore had actual knowledge of the requirements EquiAlt was required to follow in order to exempt the offer and

sale of the EquiAlt Securities from the registration requirements under the Federal and State securities statutes.

70.     However, through their active involvement in the documentation, offering and sales of the EquiAlt Securities, their interactions with EquiAlt and its principals and its interactions with the EquiAlt sales agents and securities regulators, Defendants knew that the EquiAlt Securities were in fact offered and sold in non-compliance with the requirements of Regulation D.

71.     First, Defendants knew that investments in the EquiAlt Securities were being solicited through general solicitations and advertisements, including: (a) newspaper ads such as in the attached **Exhibit J**, and (b) group presentations such as the slideshow attached as **Exhibit K** ; and (c) sales brochures such as the attached **Exhibits G** and **H**. Defendants also knew that in-house employees at EquiAlt were soliciting investments from the general public through cold-calling campaigns, social media, websites, in-person meetings, and info-dinners.

72.     Second, Defendants drafted the subscription materials to be completed by potential investors to confirm the accredited or non-accredited status of the potential investors. Defendants drafted those subscription materials for completion and return directly to their offices for review by Wassgren, and thereby received direct reports of the number, age, geographic location, and financial sophistication of the investors to whom the EquiAlt Securities were being offered and sold. Defendants thus knew that many of the investors had indicated they were unaccredited or unsophisticated in that they lacked knowledge and expertise in financial or business matters, were not capable of evaluating the merits and risks of the investment, and were not otherwise capable of bearing the economic risks of the investment. Defendants also knew that far more than the maximum permitted number of the unaccredited investors had been sold the EquiAlt Securities, a prohibition which they attempted to circumvent through the creation of purportedly distinct Funds.

73.     Third, Defendants knew that EquiAlt has not satisfied the general condition that the offerors supply all non-accredited investors with the EquiAlt financial reports and information required under Rule 502(b).

74.     Fourth, Defendants aware of, and knowingly permitted, EquiAlt's promotion of Wassgren, DLA Piper, and Fox Rothschild as legal counsel who could vouch for EquiAlt and the legality of the unregistered offer and sale of EquiAlt Securities. For example, EquiAlt's general solicitation materials not only identified DLA Piper or Fox Rothschild as its attorney in connection with EquiAlt's offering, but furthermore supplied the address and phone number for their California offices, and explicitly told investors that Defendants would vouch for the legality of EquiAlt's securities offering and its use of the funds raised through it:

> ● **Can I contact EquiAlt's CPA or Attorney?** Absolutely, both are independent from EquiAlt LLC and can give you some insight into the fund and its activities.

**Ex. G**; **Ex. H.**

75.     Defendants continued to permit EquiAlt to promote Wassgren and DLA Piper as "independent" legal counsel who investors could contact to obtain information about the EquiAlt Funds and their activities as the Ponzi scheme unfolded, even during the SEC investigation in 2019. **Exhibit L**.

76.     Defendants thus agreed to actively assist in the offer and sale of the EquiAlt Securities in order to generate fees and enhance their professional reputation. Indeed, DLA Piper specifically touted its relationship with EquiAlt in other online posts, press releases, and tweets. *See supra*, ¶ 41 n.4 (collectively, the "DLA-EquiAlt Posts").

77.     Fifth, Defendants also knew that the EquiAlt Securities were being offered and sold in California, Arizona, Florida, Colorado, Nevada and elsewhere by unlicensed securities broker-

dealers and sales agents who were paid commissions by EquiAlt to do so. But Defendants further knew those commissions were not reported in EquiAlt's SEC filings.

78.    Sixth, Defendants actively assisted the offer and sale of the EquiAlt Securities by unlicensed securities broker-dealers and sales agents by assuring them that such sales complied with the operative securities laws.

### D.    Defendants Intended to Deceive the EquiAlt Investors

79.    In addition to their active participation in the fraudulent scheme by drafting misleading offering documents used to induce investors to purchase the EquiAlt Securities, forming the Funds used to perpetrate the Ponzi scheme, providing false assurances to sales agents and investors and assisting in the ongoing affairs of EquiAlt, Defendants actively assisted EquiAlt and its principals in concealing the ongoing securities law violations from the investors, the SEC and state regulators. These actions were all undertaken to deceive EquiAlt's existing and prospective investors into believing that the sale of unregistered securities by the Funds complied with the securities laws, which Defendants knew was an outright lie, and to conceal that the falsity of the representation in the PPMs that the offerings were "being made in strict compliance with the applicable state securities laws."

#### 1.    *Wassgren Orchestrates Formation of Multiple Funds and False SEC Filings to Conceal EquiAlt's Ongoing Securities Violations*

80.    To qualify for an exemption from registration under Regulation D, issuers must file a submission known as a "Form D" electronically with the SEC no later than 15 days after they first sell securities to the investing public. Form D is a brief notice that includes certain specified details concerning the issuing company's promoters, the total offering amount, commissions paid to agents, the existence of non-accredited investors and similar information.

81.     A person who willfully fails to file a Form D or who willfully makes a false statement in a registration statement is guilty of a felony under the Federal securities laws. *See* 15 USC § 77x. Also, under 17 CFR § 239.500(a)(3(i), an issuer must file an amendment to a previously filed Form D to correct any material errors in any previously filed Form D.

82.     In furtherance of the ongoing fraudulent scheme, Wassgren drafted, reviewed and/or approved numerous Form Ds signed by Davison and submitted to the SEC on behalf of the EquiAlt Funds in order to claim the benefit of an exemption from registration under Regulation D. See **Exhibit Y**. As alleged in the following paragraphs, Wassgren helped orchestrate a pattern of falsified Form D filings with the SEC calculated to paper over and conceal that the EquiAlt Securities did not qualify for an exemption under Regulation D and, accordingly, from its inception EquiAlt was illegally selling unregistered securities using unlicensed sales agents in violation of the federal and state securities laws.

83.     Acting on behalf of EquiAlt, Attorney Wassgren filed the articles of organization for Fund 1 with the Nevada Secretary of State on May 23, 2011. Two months later, on July 19, 2011, EquiAlt Fund 1 filed its initial Form D with the SEC attesting that the securities to be issued by the fund were exempt from registration under Regulation D and that the total offering amount for Fund 1 was $50 million. The initial Form D for Fund 1 also attested that: (a) the first sale of securities issued by the fund had yet to occur; (b) the fund paid no commissions or finders' fees associated with sales of its securities; (c) no amount of the gross proceeds of the offering has been or is proposed to be used for payments to executive officers, directors or promoters; and (d) Brian Davison was the sole related person associated with the fund. By signing the Form D, Davison attested that "[e]ach Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person."

84.     The foregoing attestations in the Fund 1 Form D filing with the SEC were false when made. Contrary to those attestations, the first sale of securities issued by Fund 1 were made in January 2011, months before the Form D was filed with the SEC, Fund 1 had paid commissions to unlicensed sales agents, and, in addition to Davison, Rybicki was a related person associated with Fund 1. Furthermore, although the Fund 1 Form D (and all other subsequent Form D filings) attested that no portion of the offering proceeds would be paid to any related persons, in reality EquiAlt paid Davison and Rybicki tens of millions of dollars raised through the securities offerings through undisclosed due diligence fees, management fees, success fees, auction fees, underwriting fees purchase discount fees, bonuses and outright improper cash distributions.

85.     Wassgren, who actively assisted in the preparation and filing of the Form D, knew that these attestations in the Fund 1 initial Form D filing were false. Among other things, Wassgren knew that proceeds from the sales of securities issued by Fund 1 were being paid as commissions to unlicensed sales agents in contravention of applicable state and federal securities laws. In fact, Wassgren advised the EquiAlt managers to mischaracterize the unlicensed sales agents as "consultants" and to likewise mischaracterize the commission payments as "finders fees." Wassgren knew that the EquiAlt sales agents were unlicensed sales agents who could not possibly qualify as "finders" or mere "consultants" because, among other things, they received transaction-based compensation, provided financial and suitability advice to prospective investors, actively located and solicited prospective investors and distributed PPMs and Subscription Agreements to prospective investors. As a consequence, Wassgren knew that, from the inception of Fund 1, EquiAlt was operating in violation of federal and state securities laws, exposing EquiAlt to civil and criminal penalties, investor claims for rescission, and inexorable ineligibility to participate in further Regulation D exempt offerings.

86.     The Form D also falsely attested that no portion of the offering proceeds would be paid to any of the executive officers or promoters of the fund when, in fact, the EquiAlt managers intended to and did divert millions of dollars of the offering proceeds to themselves.

87.     As a result of its aggressive solicitation of elderly and unsophisticated investors with limited assets and modest income, EquiAlt soon sold fixed rate debentures issued by Fund 1 to far more than 35 unaccredited and unsophisticated investors, thereby forfeiting its claimed registration exemption under Regulation D. EquiAlt further forfeited its registration exemption by soliciting investments from the general public through cold call solicitations, seminar presentations, media advertisements, websites and social media campaigns. As alleged above, Wassgren knew that EquiAlt had exceeded the limit on sales of unregistered securities issued by Fund 1 to unaccredited investors because the Investor Questionnaires were addressed and sent to Fox Rothschild and to DLA Piper.

88.     Knowing that the securities issued by Fund 1 were not exempt from registration because, among other things, the sales to unaccredited investors greatly exceeded the numerical limit permitted by Regulation D and other requirements for the claimed registration exemption, Wassgren hatched a scheme to paper over and conceal the ongoing securities law violations. Based on the advice and with the active and knowing assistance of Wassgren, EquiAlt formed a new investment fund known as EquiAlt Fund II LLC (Fund 2) on April 24, 2013. Wassgren prepared and filed the Articles of Organization for Fund 2 with the Nevada Secretary of State. Fund 2 began selling unregistered securities on May 2, 2013, approximately one week after Fund 2 was formed. However, Fund 2 did not file the required Form D with the SEC until March 31, 2016, nearly three years later. This late-filed Form D was untimely, as Regulation D requires that the necessary notice be filed no later than 15 days after the securities are first sold by the issuer. In the Form D for Fund

2, CEO Davison attested that the securities issued by Fund 2 were exempt from registration under Regulation D.

89.     The Fund 2 Form D attested that the total offering amount for the fund was $20 million and that, as of the filing date, Fund 2 had issued $6 million of unregistered securities to 88 investors. The Form D notice also attested that securities in the offering had been sold to 10 unaccredited investors. The initial Form D for Fund 2 further attested that no sales commissions had been paid to any agents and estimated that $250,000 in "Finders' Fees" had been paid in connection with the unregistered securities issued by Fund 2. The Form D filing attested that no portion of the offering proceeds would be paid to Davison, who was identified as the only any executive officer, director and promotor of Fund 2.

90.     The foregoing attestations in the initial Form D notice for Fund 2 were false in many material respects. Contrary to the representations in the Form D filing, Fund 2 already had sold unregistered securities to far more than 10 unaccredited investors, the fund had paid commissions to its sales agents, those commissions did not qualify as "Finders' Fees," the amount of those commissions was far greater than $250,000 (as sales commissions ranged from 10–12% of the amounts paid by investors), and Davison was not the sole promoter of the fund. Wassgren knew that these attestations in the Form D notice were false and that accordingly the securities issued by Fund 2 were not exempt from registration under the applicable federal and state securities laws.

91.     Moreover, as Wassgren knew, the scheme to split unaccredited investors between Fund 1 and Fund 2 was wholly ineffective to salvage the claimed registration exemption because the unregistered securities were being sold as part of an ongoing, integrated single offering. Among other things, the offerings were part of a single plan of financing, involved issuance of the same

class of security, were made at or about the same time, involved the same type of consideration and were made for the same general purpose. Furthermore, the safe harbor allowed by 17 CFR § 230.502 was not available because the offerings were not made more than six months apart with no offers of the same or similar securities being made in between. Thus, even if the number of unaccredited investors reported for Fund 1 and Fund 2 in the Form D filings were correct (which they were not), Wassgren knew there were at least 41 unaccredited investors in the single integrated offering (31 unaccredited investors in Fund 1 and 10 unaccredited investors in Fund 2), once again confirming that the funds were illegally selling unregistered securities using unlicensed sales agents in violation of the federal and state securities laws.

92. Wassgren was well aware that the integrated serial funds that he advised EquiAlt to form in an attempt to deceive investors into believing that the Funds complied with the federal and state securities laws exposed EquiAlt and its managers to criminal prosecution and civil actions by investors. As Wassgren himself wrote in a 2016 article:

> [M]any developers may still need to turn to other forms of equity. In addition to crowdfunding, issuers may raise capital through more established exemptions such as Rule 506(b) and Rule 506(c). It is critical, however, that such developers or project sponsors seek the advice of securities counsel to ensure each offering complies fully with the associated rules and to prevent integration among multiple offerings, which could render each of them ineffective and, therefore, produce an illegal offering. As I have often counseled clients over the years, no one looks good in an orange jumpsuit. Even if criminal prosecutions for securities law violations are rare, they are best avoided, along with the associated civil actions brought by investors when securities laws have not been strictly followed.

P. Wassgren, "Thinking About Crowdfunding Your Next Syndicated Deal" (February 17, 2016) available at https://dailyproperties.com/real-estate-crowdfunding-rules-regulations/

93. The pattern of false Form D filings by CEO Davison, all made with the knowledge and active assistance of Wassgren, continued over the following years. Fund 2 filed an amended Form D notice on April 26, 2016, less than a month after its initial Form D was filed. The amended

Form D for Fund 2 contained the same false statements as its initial Form D, but eliminated the language contained in the initial notice disclosing that Fund 2 sales agents were actively soliciting sales from investors residing in Arizona, California, Colorado, Massachusetts, Nevada and Utah. Davison amended the Fund 2 Form D in an attempt to withdraw the issuer's admission that sales agents were actively soliciting investors in the fund, which was inconsistent with Wassgren's attempt to evade the securities law violations by falsely characterizing the unlicensed sales agents as "consultants" receiving only "finders' fees."

94. The Fund 2 Form D filing with the SEC was amended again on August 31, 2017 based on advice from attorney Wassgren. According to this new filing, since the prior amendment on April 26, 2017 Fund 2 had sold an additional $15 million of unregistered securities to an additional 121 investors. Yet, according to the new amended Form D, none of these additional investors was non-accredited and Fund D had paid no additional "finder's fees" for any of the new sales. As Wassgren had to know, these representations in the new amended Form D were patently false. Nonetheless, Davison with the approval of Wassgren once again falsely attested when signing that the contents of the Form D notice were true and correct.

95. Wassgren arranged for the formation of another Nevada LLC, known as EquiAlt Fund III, on June 26, 2013. Although no Form D was ever filed for this short-lived fund, EquiAlt sold approximately $2.6 million of unregistered securities in it between July 2013 and December 2015. EquiAlt began to wind down this fund during 2015, when it transferred its properties to Funds 1 and 2, in exchange for payments from Funds 1 and 2 of $1.63 million. This fund was formally closed in June of 2016, using funds diverted from Funds 1 and 2 to redeem its obligations to remaining investors.

96.     On January 20, 2016, EquiAlt formed another Nevada LLC, named EA SIP LLC (Fund 4). EquiAlt began raising capital through the issuance of unregistered EquiAlt Securities by Fund 4 in April 2016. With the knowledge and active assistance of Wassgren, Fund 4 filed an initial Form D on August 5, 2016 for an offering in the total amount of $25 million. Like all the Funds' prior SEC filings, the Fund 4 Form D contained a series of false attestations. Although Fund 4 began selling EquiAlt Securities and paying sales agent commissions four or five months earlier, its Form D represented that the first sale of unregistered securities had yet to occur, that there were no Fund 4 investors and that no commissions or finder's fees had been paid to agents. And, as with the other Form D filings, the initial Form D filed with the SEC for Fund 4 failed to disclose that Rybicki was a related person. Nonetheless, Davison falsely attested when signing that the contents of the Form D notice were true and correct.

97.     As alleged more fully below, in 2019 the SEC commenced an investigation of EquiAlt and its affiliated entities, including the Funds. DLA Piper attorneys, including Wassgren, represented EquiAlt and its managers in connection with the SEC investigation. Realizing that the jig was up, Wassgren assisted in the preparation of yet another amended Form D notice for Fund 1. By this point, according to the amended Form D, Fund 1 had raised funds from 1,089 investors totaling $103 million. The newly amended Form D belatedly disclosed that Rybicki was a related person for Fund 1 (as he always had been), and now disclosed that Fund 1 had paid "finders' fees" totaling $12,300,000.

### 2.     *Wassgren Derails Arizona's Investigation into EquiAlt's Operations*

98.     The SEC investigation was not the first fended off by Wassgren.

99.     In early 2013, the Arizona Securities Division ("ASD") had commenced an investigation into potential securities law violations by EquiAlt and its managers, including EquiAlt's illegal sales of unregistered securities. The ASD was investigating whether the EquiAlt

Securities were investment contracts, and hence securities requiring registration, rather than mere fixed-interest promissory notes.

100.    As part of the ASD investigation regulatory authorities sought documents and testimony from EquiAlt, Rybicki and various sales agents. EquiAlt and Rybicki were represented in the investigation by Fox Rothschild attorneys Wassgren and Ernest Badway. Thus, on January 30, 2013, attorney Ernest Badway informed the ASD that Fox Rothschild was "representing both Mr. Rybicki and EquiAlt Fund" and that documents would be produced in response to outstanding subpoenas on February 27, 2013. *See* Email from Badway to Millecam dated Jan. 30, 2013, attached as **Exhibit M.** Arrangements were thereafter made for Davison to be examined under oath on March 27, 2013 and for Rybicki to be examined by the ASD the following day.

101.    On March 26, 2013, at 1:43 PM, Rybicki sent an email to Fox Rothschild attorneys Badway and Wassgren marked "**Importance:** High." *See* March 26, 2013 Email Chain, attached as **Exhibit N**. Rybicki indicated that he had just spoken to a client and that Davison "wanted me to send the following information:"

> [ASD] Securities officer (Dee Morin) stated to the client that "we (Equialt) should be giving the client a deed of trust on every investment" if not than [sic] ***this is a violation.***
>
> My issue with this is that I am going to be taking a lot of client phone calls in regard to this question. Can you clarify that this is accurate for what we are doing and how to answer this? Also if this is incorrect is there any way of getting a hold of this officer and explaining how this line of questioning and subsequent accusation is not acceptable?

*Id.* (emphasis added). Thus, Wassgren and the other Fox Rothschild attorney representing EquiAlt were on actual notice that, in the view of the Arizona Securities Division, the EquiAlt "Debentures" were, in reality, unregistered securities rather than traditional debt instruments, given the lack of any deed of trust or other collateral arrangement; and, that the issuance or sale of the unregistered securities was a violation of the Arizona Securities Act. Wassgren already knew,

of course, that the EquiAlt "Debentures" qualified as unregistered securities; that the Equialt "Debentures" had been sold by unlicensed sales agents; and also knew that none of the investors had been offered or given deeds of trust to collateralize their investments.

102.   Davison and Rybicki, concerned that Rybicki was "going to taking a lot of client phone calls in regard to this question" by the securities regulators, frantically asked Wassgren whether the ASD's conclusion was "accurate" and sought advice concerning "how [they should] answer this" accusation. *Id.* Wassgren replied to Rybicki's email within 30 minutes, stating that he had discussed Rybicki's concerns with Ernest Badway, and that they had developed the following messaging for the investors:

> Ernie and I spoke briefly, and **suggest that you advise your investors that the State of Arizona does not understand the deal structure**. Perhaps they will after we complete the examinations under oath.
>
> To be clear, the offering that we set up is an unsecured debt or promissory note offering. The company is offering a fixed return to all investors. This debt obligation is not secured by a deed of trust.
>
> **If your investors are in doubt, please feel free to mention that the company is represented by a national law firm that timely filed the securities exemption required under Arizona law.**

*Id.* (emphasis added). As Wassgren recommended, Rybicki passed the message crafted by Wassgren on to EquiAlt sales agents and as well to its investors.

103.   Wassgren's statements, made as part of his continuing, active assistance in EquiAlt's ongoing securities laws violations, falsely represented that the EquiAlt Securities were mere fixed rate promissory notes, when he knew that the EquiAlt debentures in actuality were unregistered securities. Moreover, Wassgren's representations that the EquiAlt Securities were exempt from registration based on timely filed securities exemptions were patently false for the reasons alleged above. Wassgren knew and intended that these false representations would be conveyed to the investors to assuage their concerns about the legality of the EquiAlt offerings, and

even encouraged Rybicki to comfort investors that EquiAlt was represented by the "national law firm" of Fox Rothschild.

104.    Wassgren thereafter continued to assist EquiAlt in furtherance of the ongoing Ponzi scheme. From 2016, Wassgren prepared and filed Articles of Organization in Florida for no less than 15 different limited liability companies formed by EquiAlt to acquire and hold properties purchased using investor funds.

105.    In addition, during 2018 Wassgren represented EquiAlt in the formation of a Real Estate Investment Trust known as the EquiAlt Secured Income Portfolio REIT (the "REIT"), a new entity into which EquiAlt intended to funnel existing investors holding EquiAlt Securities. DLA Piper was paid at nearly $500,00 in legal fees to form the new REIT directly from the bank account containing funds raised from the investors in the other Funds. The draft promotional materials for the REIT, attached as **Exhibit O**, identified "DLA Piper a renowned global law firm as our counsel."

106.    EquiAlt intended to raise funds for the REIT using unlicensed sales agents who were to receive substantial commissions for locating and securing new and existing investors. The offering documents for the REIT, once again prepared by Wassgren, contained misrepresentations and omitted material facts, comparable to those infecting the offering documents Wassgren prepared for the Funds.

107.    In reality, the REIT was formed with the active assistance and based on the advice of Wassgren, in an attempt to sanitize the securities laws violations associated with the prior offerings. Thus, $4.8 million of the $5.9 million raised for the REIT resulted from redemptions of EquiAlt Securities held by existing investors reinvesting in the REIT. And, as the SEC was closing

in on the EquiAlt Ponzi scheme, Wassgren and other DLA attorneys were counseling Davison to terminate and convert the REIT into a private partnership. [ECF No. 164-3, Ex. 2].

108. Also, in 2018, Wassgren assisted the EquiAlt managers in forming yet another entity in furtherance of the fraudulent Ponzi scheme. The new fund, organized as a Qualified Opportunity Zone (the "QOZ") offering, purportedly would provide investors willing to hold for 10 years with a non-taxable compounded return of 6%. Once again, with the knowledge of Wassgren, Rybicki reached out to the network of unlicensed sales agents who were used to market and sell the EquiAlt unregistered securities. Also, like the REIT, the offering materials drafted by Wassgren for the QOZ were riddled with material misrepresentations and omissions concerning Davison and Rybicki, the ongoing securities laws violations (both the prior violations and those associated with the QOZ) and the financial failure of the EquiAlt Funds being operated as an ongoing Ponzi scheme.

109. Indeed, Wassgren and DLA Piper continued to assist EquiAlt in connection with the REIT and QOZ offerings, which were designed to raise additional funds from investors to allow Davison and Rybicki to perpetuate the ongoing Ponzi scheme, even as the SEC investigation was proceeding and at the same time the SEC was securing its injunction against EquiAlt. [ECF No. 164-3 at 2].

E. **The SEC Finally Shuts Down EquiAlt's Illegal Securities Sales**

110. By the Spring of 2019, at the latest, the SEC commenced an investigation into the activities of EquiAlt, the Funds, Davison, and Rybicki styled as "In the Matter of Certain Unregistered Securities Transactions." As part of the investigation, the SEC issued subpoenas to the EquiAlt entities, Davison, and Rybicki, conducted on-site inspections at the EquiAlt offices and, in August of 2019, the SEC issued subpoenas for documents and testimony to various sales agents.

111.     Notwithstanding the fact that Wassgren and other DLA Piper lawyers were material witnesses to the underlying securities law violations, DLA Piper continued to represent EquiAlt, the EquiAlt Funds, Davison and Rybicki in the SEC investigation, with DLA Piper attorney Jessica Masella serving as lead counsel. In early September 2019, Rybicki sent emails to various sales agents who had received SEC subpoenas, recommending that they retain a single lawyer to represent them "so we don't have any issues with multiple representatives while going through this" SEC investigation. *See* Email from Rybicki dated Sept. 6, 2019, attached as **Exhibit P**. Rybicki recommended, based on the advice of DLA Piper, that the agents retain attorney Amy Lester and told them that EquiAlt would "do our best to help with your cost for this but we really need to know how many Advisors have been or will be receiving a subpoena before we can commit to a dollar amount etc." *Id.*

112.     By November of 2019, the SEC had secured documents and other information through the ongoing investigation and was reaching out to investors.   Davison and Rybicki were frantic that the SEC proceedings would cause a run on the bank as additional investors demanded redemptions.   With input and advice from Wassgren, they considered closing Fund I and moving money into the REIT that Wassgren was forming for them.   The following exchange of text messages between Davison and Rybicki confirms Wassgren's deep involvement in the scheme to close the fund that was the subject of ongoing SEC scrutiny and use the REIT (which was to be a registered entity) as a mechanism to sanitize the rampant prior securities law violations and to perpetuate the Ponzi scheme:



[ECF No. 164-1 at 23-24]

113. Lamenting the fact that DLA Piper had turned over too much information to the SEC concerning EquiAlt's use of unlicensed sales agents, Davison and Rybicki turned to Wassgren for "crisis management" and with the hope that he could obtain an injunction to thwart the ongoing SEC investigation:



[ECF No. 164-1 at 24-25]

114.    Davison and Rybicki further lamented that investors were "taking calls from the SEC and then blowing us or the advisors up!" [ECF No. 164-1 at 27].  Davison and Rybicki voiced their frustrations that DLA Piper "should have controlled this [the SEC investigation] better from the start."   Davison and Rybicki blamed EquiAlt's registration violations on Wassgren and confirmed that the DLA lawyers had gained knowledge of EquiAlt's accounting and finances.  *Id.*

115.    On February 11, 2020, the SEC commenced the SEC Action against EquiAlt and others to, among other things, halt the ongoing sale of the EquiAlt Securities, through which EquiAlt had by that time raised over $170 million from Plaintiffs and some 1,100 other investors nationwide, through the efforts of numerous unlicensed sales agents. *See* **Ex. A.**

116.    The EquiAlt Securities purchased by Plaintiffs are now worthless.

117.    Shortly after the SEC complaint against EquiAlt was unsealed and the SEC's allegations made public, DLA Piper scrubbed the DLA-EquiAlt Posts from its website.

**F.    The Non-Defendants Sales Agents Owed Plaintiffs Fiduciary Duties**

118.    Although the EquiAlt sales agents were not registered with the SEC or the Financial Regulatory Authority (FINRA) to sell securities, they have the same fiduciary duties as any FINRA registered financial advisor, broker or other SEC or state registered investment advisor.

119.    EquiAlt solicited and sold EquiAlt unregistered securities through EquiAlt authorized sales agents, who acted as *de facto* investment advisors or brokers or financial advisors.

120.    Each of the EquiAlt sales agents that sold EquiAlt Securities to the Plaintiffs were: (1) engaged in the business of effecting transactions in securities for the account of others, (2) received transaction-based commissions, (3) provided advice and recommendations as to investment in EquiAlt Securities, (4) actively solicited investments in EquiAlt Securities, and (5) held themselves out as investment advisors, so their mere failure to register as a "broker" or "investment advisor" does not excuse them from the fiduciary and other duties which attach to such activities. Indeed, under Fla. Stat. 517.021 (14(a) ), it defines an "investment advisor" as "any person who receives compensation, ... and engages for all or part of her or his time, ... in the business of advising others as to the value of securities or as to the advisability of investments in, purchasing of, or selling of securities"), and similarly, under the SEC Act, 15 U.S.C. § 78c(a)(4), it defines "broker" to be "any person who engaged in the business of effecting transactions in securities for the account of others".

121.    Here, each of the EquiAlt sales agents who sold EquiAlt Securities received transaction based commissions.

122.    Further, the EquiAlt sales agents actively found investors, provided advice or valuation as to the merit of the EquiAlt investment, and received a commission on each sale.

123.     EquiAlt and its sales agents obtained the trust and confidence of the Plaintiffs by purporting to have superior knowledge and expertise in the EquiAlt investments, and, in each instance, in essence advised the Plaintiffs that their investment was backed by real estate, was a safe or secure fixed income investment, and that EquiAlt had a successful track record. The sales agents also gave out EquiAlt brochures to investors which stated that investors could contact EquiAlt's attorney and that it is "independent from EquiAlt LLC and can give you some insight into the fund and its activities." *See, e.g.,* Exs. G & H.

124.     Based on the totality of above information that was disseminated by EquiAlt and its sales agents, their representations of expertise or superior knowledge in EquiAlt investments and the purported safety of the EquiAlt investments, EquiAlt and its financial advisors gained the trust and confidence from the Plaintiffs, and that trust and confidence was reposed in EquiAlt and its financial advisors. This trust and confidence obtained from the Plaintiffs by EquiAlt sales agents and EquiAlt employees created a fiduciary duty owed to the Plaintiffs.

125.     EquiAlt and the EquiAlt financial advisors breached their fiduciary duty to the Plaintiffs via their misconduct, more particularly described throughout this complaint, including, but not limited to:

a.     Failing to disclose that the EquiAlt Securities were not exempt from registration;

b.     Failing to disclose that the EquiAlt Securities were being sold in violation of state and federal securities registration laws;

c.     Failing to disclose that EquiAlt Securities were sold via misrepresentations and omissions of material facts as described in this complaint;

d.   Failing to disclose that the EquiAlt Securities were sold by unlicensed sales agents, aka investment advisors or brokers, who were required by law to be licensed in order to sell EquiAlt Securities;

e.   Failing to disclose that EquiAlt was being operated as a Ponzi scheme, where later investors' monies were being used to pay interest returns and principal to earlier investors;

f.   Failing to disclose that EquiAlt's net income, without new investor money, was insufficient to pay its obligations as they came due in the ordinary course of their business;

g.   Failing to disclose that there were regulatory inquiries from regulators who were investigating the legality of the sale of EquiAlt Securities;

h.   Failing to adequately investigate the EquiAlt operations and investments, such as failing to obtain audited financial statements to confirm the viability of the EquiAlt investments;

i.   Failing to fully explain the risks of the EquiAlt Securities that were part of a Ponzi scheme;

j.   Failing to study the EquiAlt investments so as to be adequately informed as to its nature, price and financial prognosis;

k.   Failing to refrain from self-dealing in that the EquiAlt advisors knew that they did not have verifiable, audited financial information, but yet touted the EquiAlt investments as fully secured by real estate, in order to earn a large commission on each sale;

l.   Failing to contact their state securities regulator, FINRA or the SEC to confirm whether they could legally sell EquiAlt Securities without a license;

m.   Failing to contact their state securities regulator or the SEC to confirm whether EquiAlt Securities could be sold without registration or a proper exemption from registration; and

n. Failing to obtain a securities license or registration as a broker-dealer before selling EquiAlt Securities.

### G. APPLICATION OF THE DISCOVERY RULE, THE FRAUDULENT CONCEALMENT DOCTRINE AND EQUITABLE TOLLING

126. Plaintiffs and the class members had no reason to suspect they had sustained injuries caused by Defendants' wrongful conduct alleged herein until the SEC filed its complaint on February 11, 2020, or later and, despite reasonable investigation, Plaintiffs were unaware until then of a factual basis for the causes of action alleged herein. Plaintiffs and the class members likewise did not and could not reasonably have discovered the alleged breaches of fiduciary duties, misrepresentations and corresponding securities violations and fraud until the SEC filed its complaint, at the earliest.

127. As alleged above, the EquiAlt marketing brochures, sales solicitation documents, PPMs and subscription agreements all made false representations and failed to disclose material information concerning the safety and liquidity of the EquiAlt Securities, the risks associated with investments in the EquiAlt Securities, EquiAlt's compliance with the securities laws, the experience and qualifications of EquiAlt management and the quality and values of the real estate previously acquired and to be acquired by the EquiAlt Funds.

128. EquiAlt and Defendants never disclosed or suggested to Plaintiffs and the class members that EquiAlt and the EquiAlt funds were being operated as part of a massive Ponzi scheme or that the EquiAlt managers were diverting millions of dollars in EquiAlt assets for their own personal gain. Nor did EquiAlt or Defendants disclose to the investors that properties and assets were being transferred between and among the EquiAlt Funds in furtherance of the ongoing Ponzi scheme and breaches of fiduciary duties.

129. Despite their periodic inquiries and efforts to monitor the status of their investments in the EquiAlt Securities, Plaintiffs and the class members lacked any ability to discover the true financial condition of the EquiAlt Funds or the profligate way EquiAlt was being managed and operated. EquiAlt provided no audited or unaudited financial statements to the investors, distributed no written reports describing or summarizing EquiAlt's operations or financial condition, nor did EquiAlt provide any specific information concerning the properties supposedly acquired, appraisals or appraised values of the properties, details concerning the acquisition or sales of the properties supposedly bought and sold by the EquiAlt Funds or any comparable information. To the contrary, all information concerning EquiAlt's operations, financial condition, profits and losses, intra-fund transfers, payments to management and the status of the properties acquired by the EquiAlt Funds and EquiAlt's securities law violations was and remained in the exclusive possession and control of EquiAlt management and/or Defendants.

130. There was simply no possible avenue for Plaintiffs or the class members to pursue or obtain the information necessary for them to discover the wrongdoing alleged herein until the SEC filed its complaint revealing the Ponzi scheme, at the earliest.

131. In addition, Plaintiffs and the class members could not reasonably have discovered the wrongdoing earlier due to the active, ongoing fraudulent concealment of the true facts by EquiAlt and the Defendants. Indeed, in addition to the fraudulent misrepresentations by EquiAlt management, Defendants made affirmative false representations to the investors in the PPMs and other documents drafted by Defendants concerning EquiAlt's compliance with the federal and state securities laws.

132. Under the fraudulent concealment and equitable tolling doctrines applicable to the claims alleged herein, the limitations periods applicable to the claims asserted in this action were

tolled through February 11, 2020, at the earliest, based on the active deception of EquiAlt and the Defendants in concealing Plaintiffs' causes of action.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### Plaintiffs Richard and Phyllis Gleinn

133.    Plaintiffs Richard and Phyllis Gleinn are husband and wife who reside in Sumter County, Florida. The Gleinns invested $50,000 in 2016, which investment matured in 2019. On April 11, 2019, Andre Sears reached out to the Gleinns to solicit them to reinvest with EquiAlt. At or about that time, between April 11, 2019 and April 25, 2019, they were again solicited to "renew" and "add to" their EquiAlt investment. The Gleinns invested $150,000 in EquiAlt Fund II on or about April 25, 2019 and sent their funds to EquiAlt on or about May 1, 2019. The Gleinn's EquiAlt investment contract is attached hereto as **Exhibit Q.**

### Plaintiff Cary Toone

134.    Plaintiff Cary Toone is a resident of Gilbert, Arizona. Following a solicitation by an unlicensed EquiAlt sales agent, Toone purchased $30,000 of Fund 2 on September 26, 2019 and $60,000 of EquiAlt Fund LLC for his IRA on April 8, 2019. Toone's EquiAlt investment contracts are appended hereto as **Exhibit R.** Toone is not an accredited investor.

### Plaintiffs John and Maria Celli

135.    Plaintiffs John and Maria Celli are husband and wife who reside in Prescott, Arizona and invested $50,000 in EquiAlt Securities on August 7, 2019. The Celli's EquiAlt investment contract is appended hereto as **Exhibit S.**

### Plaintiff Eva Meier

136.    Plaintiff Eva Meier is a resident of San Diego County, California and initially solicited to invest $100,000 from her IRA into EquiAlt Fund LLC and made the first investment

in or about September 29, 2017. In or about January 6, 2020, Meier invested additional monies with EquiAlt. On or about January 6, 2020, Meier invested $73,229.81 in EquiAlt Fund II from her beneficiary IRA account, an additional $74,716 in EquiAlt Fund II from her SEP IRA. Meier's EquiAlt investment contract is appended hereto as **Exhibit T.**

### Plaintiff Georgia Murphy

137.    Plaintiff Georgia Murphy funded that $250,000 investment in or about December 21, 2016. Later, in or about January 30, 2018, Murphy was solicited by Armijo to transfer $150,000 from her EquiAlt Fund LLC investment and roll that into the EquiAlt Secured Income Portfolio. Murphy's EquiAlt investment contract is appended hereto as **Exhibit U.**

### Plaintiffs Steven and Tracey Rubinstein

138.    Plaintiffs Steven and Tracey Rubinstein are husband and wife, and serve as co-trustees of the Rubinstein Family Trust dated 6/25/2010. On January 31, 2020, the Rubinsteins purchased a $75,000 investment with Fund 2, at an annual rate of 8.00%, with a 48-month term. The Rubinstein's investment contract is appended hereto as **Exhibit V.**

### Plaintiff Bertram D. Greenberg

139.    Plaintiff Greenberg was on April 3, 2018, sold a $50,000 investment in Fund 1 at his home in Santa Clara County, California. Plaintiff Greenberg was 89 years of age at the time of the offer and sale of the EquiAlt Debenture. Greenberg's EquiAlt investment contract is appended hereto as **Exhibit W.**

### Plaintiffs Bruce R. and Geraldine Hannen

140.    Plaintiffs Bruce R. and Geraldine Mary Hannen are spouses who were introduced to EquiAlt and the EquiAlt Debentures by unlicensed EquiAlt employees Andre Sears and Maria-Antonia Sears d/b/a The Picasso Group. On July 26, 2016, the Hannens purchased their first

EquiAlt Debenture, making a $200,000 investment with EquiAlt Fund II, at an annual rate of 9.25%, with a 36-month term. On July 13, 2019, and at the end of the 36-month term, the Hannens renewed their EquiAlt investment, purchasing an EquiAlt Debentures for $200,000 with EquiAlt Fund II, at an annual rate of 9.00%, with a 36-month term. The Hannens' investment contracts are appended hereto as **Exhibit X**.

### Plaintiffs Rory O'Neal and Marcia O'Neal

141.　　Plaintiffs Rory and Marcia O'Neal are husband and wife who reside in Reno County, Nevada and who were introduced to EquiAlt and the EquiAlt Debentures by Bobby Armijo of Joseph Financial.　On August 21, 2017, the O'Neals invested $200,000 from Marcia O'Neal's IRA in EquiAlt Fund 1 through the acquisition of a debenture security with an annual interest rate of 12%, with a 36-month term.　Then, on January 18, 2018, Marcia O'Neal transferred the $200,000 investment from Fund 1 to Fund 4. In exchange, Marcia O'Neal received Stock Certificate Number 16, with a floor rate of 7% annually with bonus dividend paid in first quarter of the following year and quarterly payments to being in January 2019 and every quarter thereafter. On October 26, 2017, the O'Neals invested $50,000 from Rory O'Neal's IRA in EquiAlt Fund 1 through the acquisition of a debenture security with a 12% interest rate and a 36-month term. On January 18, 2018, Rory O'Neal transferred the $50,000 investment from Fund 1 to Fund 4.　In exchange, Marcia O'Neal received Stock Certificate Number 17, with a floor rate of 7% annually with bonus dividend paid in first quarter of the following year and quarterly payments to being in January 2019 and every quarter thereafter. On　The O'Neals' investment contracts are appended hereto as **Exhibit Z**.

AMENDED CLASS ACTION COMPLAINT

## Plaintiff Sean O'Neal

142.    Plaintiff Sean O'Neal resides in Reno County, Nevada and was introduced to EquiAlt and the EquiAlt Debentures by Bobby Armijo of Joseph Financial.. On or about December 8, 2016, Sean O'Neal invested $1,000,000 as trustee of The O'Neal Family Trust Dated April 6, 2004, as amended, in Fund 1, with a 10% annual interest rate and a 36-month term. On or about October 3, 2017, Sean O'Neal invested $1,000,000 as trustee of The O'Neal Family Trust Dated April 6, 2004, as amended, in Fund 1, with a 12% annual interest rate and a 36-month term. On or about October 18, 2017, Sean O'Neal invested $1,000,000 as trustee of The O'Neal Family Trust Dated April 6, 2004, as amended, in Fund 1, with a 12% annual interest rate and a 36-month term. On January 18, 2018, Sean O'Neal transferred a $1,000,000 investment from Fund 1 to Fund 4. In exchange, Sean O'Neal received Stock certificate number 22, with a with a floor rate of 7% annually with bonus dividend paid in first quarter of the following year and quarterly payments to being in April 2019 and every quarter thereafter. On May 15, 2018, Sean O'Neal transferred a $2,000,000 investment from Fund 1 to Fund 4. In exchange, Sean O'Neal received Stock certificates number 5, with a with a floor rate of 7% annually with bonus dividend paid in first quarter of the following year and quarterly payments to being in April 2019 and every quarter thereafter. O'Neal's investment contracts are appended hereto as **Exhibit AA**.

## Plaintiff Robert Cobleigh

143.    Plaintiff Robert Cobleigh resides in El Centro, California. On September 20, 2019, Robert Cobleigh invested $270,000 of his savings in EquiAlt Fund 2, purchasing a debenture with a 48-month term and 8.00% interest. Two months later, Cobleigh invested another $250,000 in EquiAlt Fund 1, purchasing a debenture with a 48-month term and 8.00% interest. Cobleigh's investment contracts are appended hereto as **Exhibit BB**.

## CLASS ALLEGATIONS

144.    Plaintiffs bring assert their claims on behalf of themselves and the following four

classes of similarly situated investors in Florida, California, Arizona, Colorado, and Nevada:

>  **The Florida Class**: All persons who purchased an EquiAlt Security: (a)
>  while they were a resident of Florida; or (b) from or through agent or other
>  seller operating in or from Florida.
>
>  **The California Class**: All persons who purchased an EquiAlt Security: (a)
>  while they were a resident of California; or (b) from or through agent or
>  other seller operating in or from California.
>
>  **The California Elder Subclass**: All California residents who were at least
>  65 years of age when sold an EquiAlt Security.
>
>  **The Arizona Class**: All persons who purchased an EquiAlt Security: (a)
>  while they were a resident of Arizona; or (b) from or through agent or other
>  seller operating in or from Arizona.
>
>  **The Colorado Class**: All persons who purchased an EquiAlt Security: (a)
>  while they were a resident of Colorado; or (b) from or through agent or other
>  seller operating in or from Colorado.
>
>  **The Nevada Class:** All persons who purchased an EquiAlt Security: (a)
>  while they were a resident of Nevada; or (b) from or through agent or other
>  seller operating in or from Nevada.

(collectively, "the Classes"). Excluded from the Classes are Defendants and EquiAlt, their officers,

directors and employees, any broker-dealer or sales agent who sold an EquiAlt Security to any

member of the Classes, and any member of the Classes who has initiated individual litigation

against the Defendants predicated on the same facts alleged herein.

145.    *Size of Classes:* EquiAlt Securities were sold to approximately 1,100 investors

nationwide, with hundreds of investors located in Florida, California, Arizona, Colorado, and

Nevada. Because there are hundreds of members of each of the Classes described in the foregoing

paragraph, joinder of all members is impracticable. The identities and addresses of the members

of these Classes can be readily ascertained from business records maintained by EquiAlt.

146. ***Adequacy of Representation***: Plaintiffs are willing and prepared to serve the Court and the proposed Classes in a representative capacity. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interests that are adverse to, or which materially and irreconcilably conflict with, the interests of the other members of the Classes. The self-interests of Plaintiffs are co-extensive with and not antagonistic to those of absent Class members. Plaintiffs will undertake to represent and protect the interests of absent Class members. Plaintiffs have engaged the services of counsel indicated below who are experienced in complex class litigation and life insurance matters, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and the putative Class members.

147. ***The Commonality of Questions of the Law and Fact***: The claims of Plaintiffs and putative Class Members involve common questions of law and fact., including

    a. Whether the EquiAlt Securities constituted "securities" with the meaning of the Federal securities statutes;

    b. Whether the EquiAlt Securities were exempt from registration under the federal securities statutes;

    c. Whether the EquiAlt Securities constituted "securities" with the meaning of the pertinent State securities statutes;

    d. Whether the EquiAlt Securities were exempt from registration under the pertinent State securities statutes;

    e. Whether the sale of the EquiAlt Securities though the Funds constituted an integrated offering;

    f. Whether EquiAlt intended to sell and did in fact sell its securities to more than 35 non-accredited investors through the Funds;

g.  Whether EquiAlt engaged directly and through its agents in general solicitations and advertising to market its unregistered securities;

h.  Whether EquiAlt made commission payments to its unlicensed sales agents not disclosed in its SEC filings claiming the Reg D exemption from registration;

i.  Whether EquiAlt would and did fail to provide investors with information and disclosures required by Regulation D, including audited financial statements;

j.  Whether the EquiAlt PPMs contained materially false and misleading statements;

k.  Whether the EquiAlt Form D filings contained materially false and misleading statements;

l.  Whether Defendants were knowing participants in the ongoing illegal sales of securities by EquiAlt and the Non-Defendant Promoters;

m.  Whether Defendants played a substantial role in inducing the illegal sales of EquiAlt Securities;

n.  Whether Defendants lent substantial assistance to an ongoing scheme to defraud Plaintiffs and the other members of the Classes;

o.  Whether Defendants were professionally obligated to terminate their representation of EquiAlt to avoid covering-up and assisting the ongoing (and past) fraud perpetrated by it and the Non-Defendant Promoters;

p.  Whether Defendants' actions constitute primary violations of the pertinent State securities statutes;

q.  Whether Defendants' actions constitute secondary violations of the pertinent State securities statutes;

r.   Whether Defendants' actions constitute aiding and abetting of violations of the pertinent State securities statutes;

s.   Whether Defendants' actions constitute aiding and abetting fraud;

t.   Whether Defendants' actions constitute aiding and abetting breach of fiduciary duty;

u.   Whether Defendants' actions constitute civil conspiracy;

v.   Whether Defendants' actions constitute statutory Elder Abuse under California law;

w.   Whether Defendants' actions constitute a violation of any prong of California's unfair Competition Law;

x.   Whether Plaintiffs and members the Classes have been damaged, and if so, are eligible for and entitled to compensatory and punitive damages;

y.    Whether EquiAlt sales agents were required to be licensed under state or federal securities laws;

z.   Whether EquiAlt was operating as an unlicensed broker-dealer; and

aa.  Whether Plaintiffs and Members of the Classes are entitled to other, equitable relief.

148.   ***Typicality of the Claims or Defenses of the Class Representatives***: Plaintiffs' claims and defenses are typical of the claims and defenses of the putative Class Members.

149.   ***Rule 23(b)(3)***: This action is appropriate as a class action pursuant to Federal Rule of Civil Procedure 23 (b)(3). The common questions of law and fact listed above predominate over any individualized questions. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, for the following reasons:

a.  Given the age of Class Members, many of whom are elderly and have limited resources, the complexity of the issues involved in this action and the expense of litigating the claims, few, if any, Class Members could afford to seek legal redress individually for the wrongs that Defendants have committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

b.  Once Defendants' liability has been adjudicated respecting the EquiAlt Securities, claims of all Class Members can be determined by the Court;

c.  This action will ensure an orderly and expeditious administration of the Class's claims and foster economies of time, effort, and expense, and ensure uniformity of decisions; and

d.  This action does not present any undue difficulties that would impede its management by the Court as a class action.

A class action is thus superior to other available means for the fair and efficient adjudication of this controversy.

150.  ***Nature of Notice to the Proposed Classes.*** The names and addresses of all Class Members are contained in the business records maintained by Defendant and are readily available to Defendant. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## CLAIMS FOR RELIEF

## THE FLORIDA CLAIMS

## COUNT I

### Aiding and Abetting Fraud
### (Individually and on behalf of the Florida Class)

151.   Plaintiffs Gleinn repeat and re-allege the allegations contained in paragraphs 1–150 above, as if fully set forth herein.

152.   EquiAlt and its sales agents, consistent with the brochures, told Plaintiffs words to the effect that that their investment was backed by real estate, was a safe or secure fixed income investment, and that EquiAlt had a successful track record. The sales agents also gave out EquiAlt brochures to investors which stated that investors could contact EquiAlt's attorney and that it is "independent from EquiAlt LLC and can give you some insight into the fund and its activities.

153.   EquiAlt and the EquiAlt financial advisors made misrepresentations and omitted material facts to the Plaintiffs via their misconduct.

154.   The Defendants substantially assisted or encouraged the wrongdoing that constituted the Ponzi scheme fraud conducted EquiAlt and its unlicensed sales agents; further, Defendants had knowledge of such fraud, because they actively participated in the making the sale by their actions or by stepping outside of their normal role as attorneys providing routine legal advice, under the totality of the events as more fully described in this complaint.

155.   Defendants stepped out of their normal role as attorneys and participated in the fraud, by participating in the creation of documents which contain clear misstatements and omit material facts that should have been disclosed to the Plaintiffs, and by other actions described in this complaint.

156.    Defendants' aiding and abetting the EquiAlt fraud caused damages to the Plaintiffs in the amount of their lost investments, believed to be $170 million dollars, less interest payments.

<div align="center">

**COUNT II**

**Aiding and Abetting Breach of Fiduciary Duty**
**(Individually and on behalf of the Florida Class)**

</div>

157.    Plaintiffs Gleinns repeat and re-allege the allegations contained in paragraphs 1–150 above, as if fully set forth herein.

158.    As alleged above, EquiAlt and the EquiAlt sales agents breached their fiduciary duties to the Plaintiffs.

159.    The Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by the EquiAlt and its sales agents; further, Defendants had knowledge of such breach, because they actively participated in the making the sale by their actions or by stepping outside of their normal role as attorneys providing routine legal advice, under the totality of the events as more fully described in this complaint.

160.    Defendants' aiding and abetting the breach of fiduciary duty cannot be excused by a "see no evil, hear no evil" approach, as that would otherwise encourage attorneys to aid clients in fraud by willful blindness.

161.    Defendants' aiding and abetting the breach of fiduciary duty caused damages to the Plaintiffs in the amount of their lost investments, believed to be $170 million dollars, less interest payments.

## COUNT III

### Civil Conspiracy
### (Individually and on behalf of the Florida Class)

162.     Plaintiffs Gleinn repeat and re-allege the allegations contained in paragraphs 1–150 above, as if fully set forth herein.

163.     EquiAlt and its sales agents, consistent with the brochures, told Plaintiffs that their investment was backed by real estate, was a safe or secure fixed income investment, and that EquiAlt had a successful track record. The sales agents also gave out EquiAlt brochures to investors. The sales agents also gave out EquiAlt brochures to investors which stated that investors could contact EquiAlt's attorney and that it is "independent from EquiAlt LLC and can give you some insight into the fund and its activities."

164.     EquiAlt's CEO entered into one or more agreements with Defendants to create various private placements to raise money for EquiAlt. That agreement included the drafting of indentures, finder fee contracts, subscription agreements and Private Placement Memoranda for each of the offerings.

165.     Defendants engaged in unlawful acts with EquiAlt, namely, the misrepresentation of EquiAlt private placements as properly exempt under the securities laws, and the use of unlicensed sales agents, which Defendants knew were not allowed to sell private placements without a proper securities license with state and federal regulators.

166.     The Defendants' conspiracy substantially assisted or encouraged the wrongdoing that constituted the Ponzi scheme fraud conducted by EquiAlt and its unlicensed sales agents; further, Defendants had knowledge of such fraud, because they actively participated in the making the sale by their actions or by stepping outside of their normal role as attorneys providing routine legal advice, under the totality of the events as more fully described in this complaint.

167.    Defendants' conspiracy with EquiAlt to evade the securities laws with respect to registration, exemption from registration and the use of unlicensed sales agents caused damages to the Plaintiffs.

168.    Defendants conspiracy with EquiAlt to commit fraud cannot be excused by a "see no evil, hear no evil" approach, as that would otherwise encourage attorneys to aid clients in fraud by willful blindness. Plaintiffs allege that the Defendants had actual knowledge, which can be inferred from the totality of the circumstances of the events plead in this complaint. Plaintiffs lack access to the very discovery materials which would illuminate the Defendants' state of mind. But participants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud. Intent to commit fraud is to be divined from surrounding circumstances, and in this case, the Plaintiffs plead that the Defendants stepped out of their normal role as attorneys and participated in the fraud, by participating in the creation of documents which contain clear misstatements and omit material facts that should have been disclosed to the Plaintiffs, and by other actions described in this complaint.

169.    Defendants' conspiracy with EquiAlt to commit fraud caused damages to the Plaintiffs in the amount of their lost investments, believed to be $170 million dollars, less interest payments.

## THE CALIFORNIA CLAIMS

### COUNT IV

**Violations of the CSL**
**(Individually and on behalf of the California Class)**

170.    Plaintiffs Murphy, Meier,  Greenberg, and Cobleigh repeat and re-allege the allegations contained in paragraphs 1–150 above, as if fully set forth herein.

171.    California Corp. Code § 25110 prohibits the offer or sale by any person in California of securities that are not qualified through registration. California Corp. Code § 25503 affords a statutory cause of action to victimized investors for violations of Section 25110. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25110 and makes them jointly and severally liable with any other person liable under Section 25503.

172.    EquiAlt with Defendants' material assistance offered and sold the EquiAlt Securities in California without being properly registered or qualified for offer or sale either with any federal or California regulator.

173.    Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of Section 25110 does not require proof that Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in EquiAlt's non-compliance with the CSL establishes their intent to deceive investors regarding the purported exemption of the EquiAlt Securities from the qualification and licensing requirements of the CSL.

174.    California Corp. Code § 25210(b) provides:

> No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

175.    Defendants breached Section 25210(b) by encouraging Lifeline and other broker-dealers and agents to offer and sell the EquiAlt Securities despite the fact that (a) such securities were not qualified under the CSL and (b) such broker-dealers and agents were not licensed under the CSL.

176.    California Corp. Code § 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

177.    California Corp. Code § 25401 prohibits fraud in the offer or sale by any person in California of securities. California Corp. Code § 25501 affords a statutory cause of action to victimized investors for violations of Section 25401. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25401 with the intent to deceive or defraud, and makes them jointly and severally liable with any other person liable under Section 25503.

178.    EquiAlt, with Defendants' material assistance, offered and sold the EquiAlt Securities in California by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

179.    Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under Cal. Corp. Code. § 25504.1.

180.    Plaintiffs hereby conditionally tender their EquiAlt Securities in accordance with Cal. Corp. Code § 25503.

<u>**COUNT V**</u>

**Aiding and Abetting Breach of Fiduciary Duty**
**(Individually and on behalf of the California Class)**

181.    Plaintiffs Murphy, Meier, Greenberg and Cobleigh repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

182.    Based on (a) their respective sales agent's assumption of the role of a securities broker advising Plaintiffs about their retirement and investment decisions and (b) the confidential relationship the agent engendered in completing Plaintiffs' applications, transmitting them and

60
AMENDED CLASS ACTION COMPLAINT

Plaintiffs' funds to EquiAlt for investment, those sales agents owed Plaintiffs fiduciary duties of loyalty and full disclosure, which were breached by their receipt of commissions in connection unlawful offer and sale to Plaintiffs of unqualified securities through unlicensed broker-dealers and sales agents.

183.    Defendants had actual knowledge of the breaches of such fiduciary duties by the sales agent and the other unlicensed broker-dealers EquiAlt utilized to solicit investment in the EquiAlt Securities, rendered substantial assistance or encouragement to the breaches, and their conduct was a substantial factor in causing harm to Plaintiff.

184.    Defendants acted with the specific intent to facilitate the wrongful conduct by EquiAlt and its broker-dealers and sales agents, particularly in connect with its efforts to deter regulatory investigations by the SEC and the State of Arizona.

185.    Defendants are therefore liable for common law aiding and abetting the breach of fiduciary duties.

## COUNT VI

### Aiding and Abetting Fraud and Deceit
### (Individually and on behalf of the California Class)

186.    Plaintiffs Murphy, Meier,  Greenberg and Cobleigh repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

187.    The Non-Defendant Promoters made uniform false representations and concealed or failed to disclose material facts concerning the Funds' compliance with the Federal and State securities laws, the safety and risks of the EquiAlt Securities and the financial performance and solvency of EquiAlt and the Funds, all with the intent to deceive prospective investors.

188.    Plaintiffs and the members of the California Class justifiably relied on the foregoing false representations and material omissions, were unaware of the falsity of the representations or

the material omissions and would not have invested in the EquiAlt Securities had they known the true facts. As a consequence, Plaintiffs and the members of the California Class sustained damages.

189.    Defendants had actual knowledge of some or all of the false statements and material omissions used to solicit investment in the EquiAlt Securities, rendered substantial assistance or encouragement to the fraudulent conduct, and their conduct was a substantial factor in causing harm to Plaintiffs and the members of the California Class.

190.    Defendants acted with the specific intent to facilitate the foregoing wrongful conduct.

191.    Defendants are therefore liable for common law aiding and abetting the fraud and deceit committed by the Non-Defendant Promotors.

192.    The foregoing actions by Defendants were done maliciously, oppressively, and with intent to defraud, thereby entitling Plaintiffs and members of the California Class to punitive and exemplary damages.

<u>**COUNT VII**</u>

**Financial Abuse under the Elder Abuse Act**
**(Individually and on behalf of the California Subclass)**

193.    Plaintiffs Greenberg and Cobleigh repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

194.    This cause of action is brought under California's Welfare and Institutions Code § 15610, et seq.

195.    As alleged above, Plaintiff Greenberg was 89 years or older at all times relevant to this claim. Plaintiff Cobleigh was 80 years old at the time of this claim.

196.    California's Elder Abuse Act, Cal. Welf. & Ins. Code § 15610.07, affords a cause of action to person over 65 years of age to recover for "financial abuse."

197.    Financial abuse is in turn defined as follows:

"Financial abuse" of an elder or dependent adult occurs when a person or entity does any of the following:

1.    Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

2.    Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

***

California Welf. & Ins. Code § 15610.30(a).

198.    A person takes property "for a wrongful use" when he, she or it knew or should have known its conduct was likely to be harmful to the elder. Welf. & Ins. Code § 15610.30(b).

199.    The sale of unregistered securities by unlicensed broker-dealers and agents is specifically prohibited in California, for the very reason that it is conduct likely to be harmful to the investor.

200.    Through the sale to Plaintiffs Greenberg and Cobleigh of unqualified securities through unlicensed brokers and agents, Defendants engaged in conduct that took, appropriated, obtained and retained Plaintiffs Greenberg's personal property ($50,000 in cash) and Plaintiff Cobleigh's personal property ($520,000) for a wrongful use in violation of Section 15610.30(a)(1).

201.    Alternatively, through their participation in the offer and sale to Plaintiffs Greenberg and Cobleigh of unqualified securities through unlicensed brokers and agents, Defendants at a minimum assisted in conduct that took, appropriated, obtained and retained Plaintiff Greenberg's personal property ($50,000 in cash) and Plaintiff Cobleigh's personal property ($520,000) for a wrongful use in violation of § 15610.30(a)(2).

202.     Defendants are accordingly liable to Plaintiff for "compensatory damages and all other remedies otherwise provided by law," including reasonable attorney fees and costs. Welf. & Ins. Code § 15657.5(a).

## COUNT VIII

### Violation of Unfair Competition Law Business & Professions Code § 17200, et seq.
### (Individually and on behalf of the California Class)

203.     Plaintiffs Murphy, Meier,   Greenberg and Cobleigh repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

204.     California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq.* (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

205.     Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

206.     The conduct of Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

207.     Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the California Class.

# THE ARIZONA CLAIMS

## COUNT IX
### Violation of A.R.S. § 44-1841
### (Individually and on behalf of the Arizona Class)

208.    Plaintiffs Rubinstein, Toone, and Celli, repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

209.    The investments sold by the Non-Promotor Defendants were securities as defined by the Arizona Securities Act ("the ASA").

210.    The sale of non-exempt unregistered securities in Arizona is prohibited by A.R.S. § 44-1841.

211.    Section 44–2001(A) creates a private cause of action for rescission or damages for violations of § 44–1841.

212.    The ASA extends civil liability beyond the immediate parties to the sale, to all persons "who made, participated in or induced the unlawful sale or purchase." A.R.S. § 44–2003(A).

213.    Defendants "participated in or induced" the unlawful sale of unregistered EquiAlt Securities, by encouraging their offer and sale, among other things preparing the offering documents designed to unlawfully solicit purchasers of the unregistered EquiAlt Securities knowing they were not exempt from registration under the federal and State securities laws, and deterring state regulators from terminating the offering in Arizona.

214.    Defendants are thus jointly and severally liable to Plaintiffs under A.R.S. § 44-2003(A), to the same extent as the Non-Promoter Defendants for the unlawful sale and violations of A.R.S. § 44-1841.

215. Plaintiffs accordingly demand rescission with interest and attorneys' fees as provided in A.R.S. § 44-2001(A).

216. Subject to the recovery of full relief, Plaintiffs tender to Defendants all consideration received in connection with the securities that Plaintiffs purchased and offer to do any other acts necessary for rescission under the common law or A.R.S. § 44-2001(A).

## COUNT X

### Violation of A.R.S. §44-1842
### (Individually and on behalf of the Arizona Class)

217. Plaintiffs Rubinstein, Toone, and Celli, repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

218. The investments sold by the Non-Promotor Defendants were securities as defined by the ASA.

219. The sale of securities in Arizona by an unregistered dealer is prohibited by A.R.S. § 44-1842.

220. Section 44–2001(A) creates a private cause of action for rescission or damages for violations of § 44–1842.

221. The ASA extends civil liability beyond the immediate parties to the sale, to all persons "who made, participated in or induced the unlawful sale or purchase." A.R.S. § 44–2003(A).

222. Defendants "participated in or induced" the unlawful sale of EquiAlt Securities by unregistered dealers, by encouraging such sales in Arizona, by among other things covering for the Non-Defendant Promoters' use of the Non-Defendants sales agents to solicit purchasers of the EquiAlt Securities in Arizona.

66
AMENDED CLASS ACTION COMPLAINT

223. Defendants are thus jointly and severally liable to Plaintiffs under A.R.S. § 44-2003(A), to the same extent as the Non-Promoter Defendants for the unlawful sale and violations of A.R.S. § 44-1842.

224. Plaintiffs accordingly demand rescission with interest and attorneys' fees as provided in A.R.S. § 44-2001(A).

225. Subject to the recovery of full relief, Plaintiffs tender to Defendants all consideration received in connection with the securities that Plaintiffs purchased and offer to do any other acts necessary for rescission under the common law or A.R.S. § 44-2001(A).

## COUNT XI

### Violation of A.R.S. §§ 44-1991(A)
### (Individually and on behalf of the Arizona Class)

226. Plaintiffs Rubinstein, Toone, and Celli, repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

227. The investments sold by the Non-Promotor Defendants were securities as defined by the ASA.

228. Under the ASA, it is unlawful to (1) "[e]mploy any device, scheme or artifice to defraud[;]" (2) "[m]ake any untrue statement of material fact, or omit to state any material act necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[;]" or to (3) "[e]ngage in any transaction, practice or course of business which operates or would operate as a fraud or deceit." A.R.S. § 44-1991(A).

229. Section 44–2001(A) creates a private cause of action for rescission or damages for violations of § 44–1991(A). The ASA extends civil liability beyond the immediate parties to the sale, to all persons "who made, participated in or induced the unlawful sale or purchase." A.R.S. § 44–2003(A).

230.     The Non-Promoter Defendants conducted a massive Ponzi scheme raising more than $170 million from over 1,000 investors nationwide, many of them elderly, through the fraudulent sale of unregistered securities. The scheme was perpetuated through material misrepresentations and omissions concerning the Funds' compliance with the federal and State securities laws, the safety and risks of the EquiAlt Securities, and the financial performance and solvency of EquiAlt and the Funds, all with the intent to deceive prospective investors, causing Plaintiffs' damages. In particular, the Non-Defendant Promotors in the PPM made the following materially false misrepresentations and omissions, among others:

a.   Falsely stated that "[t]his Offering is being made pursuant to the private offering exemption of Section 4(2) of the [Securities] Act and/or Regulation D promulgated under the Act;"

b.   Falsely stated that "[t]his Offering is also being made in strict compliance with the applicable state securities laws;"

c.   Falsely stated that "[u]nder no circumstances will the Company admit more than thirty-five (35) non-accredited Investors as computed under Rule 501 of Regulation D promulgated under the [Securities] Act;"

d.   Falsely stated that "[t]he Company may utilize the services of one or more registered broker/dealers" to sell the unregistered EquiAlt Securities;

e.   Falsely overstated the percentage of investor funds that would be used to invest in properties;

f.   Misleadingly omitted to disclose that millions of dollars would be used to pay undisclosed fees and bonuses to EquiAlt and its principals;

g. Misleadingly omitted to disclose that EquiAlt would pocket "discount fees" rather than passing on to the Funds purported savings from listed sale prices;

h. Misleadingly omitted to disclose that monies would be transferred from one Fund to another to pay interest due to investors and failed to adequately disclose that commissions would be paid to unlicensed sales agents; and

i. Misleadingly omitted to disclose that Davison and Rybicki had both filed bankruptcy proceedings during the years prior to the formation of EquiAlt.

231.    Defendants "participated in or induced" the unlawful sale of EquiAlt Securities, by encouraging their offer and sale in Arizona, by among other things preparing the offering documents designed to unlawfully solicit purchasers of the unregistered EquiAlt Securities, by adding a patina of legitimacy to the otherwise unlawful operation, and by concealing the lack of any exemption to registration under either the federal or State securities laws, all of which enabled the scheme to unfold to the detriment of Plaintiffs and the Arizona Class.

232.    Defendants acted with the specific intent to facilitate the Non-Defendant Promoters' foregoing wrongful conduct, and knowingly or recklessly misrepresented or omitted facts regarding the need to register the securities that rendered their statements, representations, and documents materially false or misleading.

233.    Defendants are thus jointly and severally liable to Plaintiffs within the meaning of A.R.S. § 44-2003(A), to the same extent as the Non-Promoter Defendants for the unlawful sale and violations of A.R.S. § 44-1991(A).

234.    Plaintiffs accordingly demand rescission with interest and attorneys' fees as provided in A.R.S. § 44-2001(A).

235. Subject to the recovery of full relief, Plaintiffs tender to Defendants all consideration received in connection with the securities that Plaintiffs purchased and offer to do any other acts necessary for rescission under the common law or A.R.S. § 44-2001(A).

<div align="center">

**COUNT XII**

**Aiding and Abetting Fraud**
**(Individually and on behalf of the Arizona Class)**

</div>

236. Plaintiffs Rubinstein, Toone, and Celli, repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

237. The Non-Defendant Promoters made uniform and materially false representations and concealed or failed to disclose material facts concerning the Funds' compliance with the federal and State securities laws, the safety and risks of the EquiAlt Securities, the use of funds raised through the EquiAlt Securities, and the financial performance and solvency of EquiAlt and the Funds, all with the intent to deceive prospective investors, causing Plaintiffs' damages.

238. In particular, the Non-Defendant Promotors in the PPM made the following materially false misrepresentations and omissions, among others:

a. Falsely stated that "[t]his Offering is being made pursuant to the private offering exemption of Section 4(2) of the [Securities] Act and/or Regulation D promulgated under the Act;"

b. Falsely stated that "[t]his Offering is also being made in strict compliance with the applicable state securities laws;"

c. Falsely stated that "[u]nder no circumstances will the Company admit more than thirty-five (35) non-accredited Investors as computed under Rule 501 of Regulation D promulgated under the [Securities] Act;"

<div align="center">

70
AMENDED CLASS ACTION COMPLAINT

</div>

    d.  Falsely stated that "[t]he Company may utilize the services of one or more registered broker/dealers" to sell the unregistered EquiAlt Securities;

    e.  Falsely overstated the percentage of investor funds that would be used to invest in properties;

    f.  Misleadingly omitted to disclose that millions of dollars would be used to pay undisclosed fees and bonuses to EquiAlt and its principals;

    g.  Misleadingly omitted to disclose that EquiAlt would pocket "discount fees" rather than passing on to the Funds purported savings from listed sale prices;

    h.  Misleadingly omitted to disclose that monies would be transferred from one Fund to another to pay interest due to investors and failed to adequately disclose that commissions would be paid to unlicensed sales agents; and

    i.  Misleadingly omitted to disclose that Davison and Rybicki had both filed bankruptcy proceedings during the years prior to the formation of EquiAlt.

239.    Defendants were for all times material hereto aware that the information being disseminated by the Non-Defendant Promoters was materially false.

240.    Defendants nevertheless rendered substantial assistance and encouragement to the Non-Defendant Promoters' fraudulent conduct, including but not limited to the drafting of the operative PPMs, Subscription Agreements, the EquiAlt Securities, and related organizational and operational agreements and other various regulatory filings, and their several corresponding acts to conceal, omit, and misrepresent material facts to cover up the illicit nature of the Ponzi scheme, all as alleged above with specificity.

241.    Defendants thereby aided and abetting the fraud and deceit committed by the Non-Defendant Promotors.

242.    Defendants are accordingly jointly and severally liable to Plaintiffs for the fraudulent actions of the Non-Defendant Promoters.

## COUNT XIII

### Aiding and Abetting Breach of Fiduciary Duty
### (Individually and on behalf of the Arizona Class)

243.    Plaintiffs Rubinstein, Toone, and Celli, repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

244.    The Non-Defendant EquiAlt sales agents who solicited Plaintiffs' investments owed fiduciary duties to Plaintiffs, which derived from their confidential and principal-agent relationship.

245.    Given the unbalance of knowledge, Plaintiffs relied heavily upon the Non-Defendant EquiAlt sales agents' representations and advice, and reposed significant trust in the Non-Defendant EquiAlt sales agents.

246.    As alleged above, the Non-Defendant EquiAlt sales agents breached their duties to Plaintiffs, including through their receipt of undisclosed and illegal commissions in connection with the unlawful offer and sale to Plaintiffs of unregistered securities through unlicensed broker-dealers and sales agents, causing Plaintiffs damages.

247.    Defendants had actual knowledge of the Non-Defendant EquiAlt sales agents' breaches of fiduciary duties.

248.    Defendants rendered substantial assistance and encouragement to the Non-Defendant EquiAlt sales agents' breaches and acted to conceal material facts attendant to those breaches, by encouraging them to offer and sell the EquiAlt Securities despite knowing of (a) the lack of registration under either federal or State law, and (b) the lack of any applicable exemption to registration under federal or State law.

249.     Defendants are accordingly jointly and severally liable to Plaintiffs for the breach of fiduciary duties by the Non-Defendant Promoters' sales agents.

250.     The Non-Defendant Promoters themselves owed fiduciary duties to Plaintiffs under Arizona law.

251.     As alleged above, the Non-Defendant Promoters breached their fiduciary obligations to Plaintiffs, including the use through uniform and materially false representations and concealment of material facts concerning the Funds' compliance with the Federal and State securities laws, the safety and risks of the EquiAlt Securities, and the financial performance and solvency of EquiAlt and the Funds, all with the intent to deceive prospective investors, causing Plaintiffs damages.

252.     The Non-Defendant Promoters' breaches of fiduciary duties caused Plaintiffs' damages.

253.     Defendants had actual knowledge of the Non-Defendant Promoters' breaches of fiduciary duties and knew the misrepresentations and omissions were materially misleading and would result in harm.

254.     Defendants rendered substantial assistance and encouragement to the Non-Defendant Promoters' breaches of fiduciary obligations, including but not limited to the drafting of the operative PPMs, Subscription Agreements, the EquiAlt Securities, and related operational agreements and regulatory filings, and their several corresponding acts to conceal, omit, and misrepresent material facts as set forth in those documents to cover up the illicit nature of the Ponzi scheme, all as alleged with specificity herein.

255.     Defendants are accordingly jointly and severally liable to Plaintiffs for the breach of fiduciary duties by the Non-Defendant Promoters.

# THE COLORADO CLAIMS

## COUNT XIV

### Statutory Aiding and Abetting Anti-Fraud Violations under the CSA
### (Individually and on behalf of the Colorado Class)

256.    Plaintiffs Hannen repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

257.    The EquiAlt Securities are securities within as defined by C.R.S. § 11-51-201.

258.    C.R.S. § 11-51-501 ("Section 501") prohibits fraud in the offer or sale of securities in Colorado. C.R.S. § 11-51-604 ("Section 604") affords a statutory cause of action to victimized investors for violations of Section 501. Finally, C.R.S. § 11-51-604(5)(c) extends liability under Section 501 to "[a]ny person who knows that another person liable under subsection (3) or (4) of this section is engaged in conduct which constitutes a violation of [Section 501] and who gives substantial assistance to such conduct is jointly and severally liable to the same extent as such other person."

259.    The Non-Defendant Promoters sold the EquiAlt Securities by employing devices, schemes, and/or artifices to defraud; by making untrue statements of material facts and/or omitting to state material facts; and/or by engaging in acts, practices, and/or courses of business which operated as a fraud or deceit upon Plaintiffs and the other members of the Colorado Class, in violation of Section 501. Accordingly, Plaintiffs were the purchasers of a "security" in Colorado, the Non-Promoters acted in violation of Section 501with the requisite scienter in connection with the offer and sale of that security, and Plaintiffs relied upon their conduct to their detriment, causing the Plaintiffs' injury.

260.    Defendants encouraged EquiAlt and its broker-dealers and agents to offer and sell the EquiAlt Securities in Colorado despite the fact that (a) such securities were not registered under the CSA and (b) such broker-dealers and agents were not licensed under the CSA.

261.    Defendants knew that the Non-Defendant Promoters were engaged in conduct which constituted a violation of Section 501, and gave substantial assistance to such conduct, and are therefore jointly and severally liable to Plaintiff Hannen and the Colorado Class.

262.    *Respondeat superior* is proper basis for liability under the CSA.

263.    Defendants are liable to Plaintiffs and the other members of the Colorado Class under Section 604(3) and (4) for rescission or rescissionary damages.

264.    Plaintiffs hereby conditionally tender their EquiAlt Securities in accordance with Section 604(6).

## COUNT XV

### Aiding and Abetting Registration Violations under the CSA
### (Individually and on behalf of the Colorado Class)

265.    Plaintiffs Hannens repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

266.    C.R.S. § 11-51-301 ("Section 310") prohibits the offer or sale by any person in Colorado of securities that are not registration in accordance with C.R.S. Art. 51. C.R.S. § 11-51-604 ("Section 604") affords a statutory cause of action to victimized investors for violations of Section 301.

267.    The EquiAlt Securities were required to be registered under Article 51 of Tile 11 of the Colorado revised Statute, pursuant to Section 301.

268.    Neither the EquiAlt Securities nor the transactions were exempted under any pertinent Colorado statute.

269.    The Non-Defendant Promoters with Defendants' material assistance offered and sold the EquiAlt Securities in Colorado without being properly registered for offer or sale either with any federal or Colorado regulator.

270.    Defendants breached Section 301 by encouraging broker-dealers and agents to offer and sell the EquiAlt Securities in Colorado despite the fact that (a) such securities were not registered under the CSA, and (b) such broker-dealers and agents were not licensed under the CSA.

271.    Section 604 specifically provides that statutory liability under that rights and remedies provided by the CSA are in addition to any other rights or remedies that may exist at law or in equity.

272.    Respondeat superior is a proper basis for claim under the CSA.

273.    Defendants are accordingly joint and severally liable to Plaintiffs and the other members of the Colorado Class for rescission or rescissionary damages.

274.    Plaintiffs hereby conditionally tender their EquiAlt Securities in accordance with Section 604(6).

### COUNT XVI

**Aiding and Abetting Breach of Fiduciary Duty**
**(Individually and on behalf of the Colorado Class)**

275.    Plaintiffs Hannen repeat and re-allege the allegations contained paragraphs 1–150 above, as if fully set forth herein.

276.    As alleged above, based on (a) their respective sales agent's assumption of the role of a securities broker advising Plaintiffs about their retirement and investment decisions and (b) the confidential relationship the agent engendered in completing Plaintiffs' applications, transmitting them and Plaintiffs' funds to EquiAlt for investment, those sales agents owed Plaintiffs fiduciary duties, which were breached as alleged above, including by their receipt of

commissions in connection unlawful offer and sale to Plaintiffs of unqualified securities through unlicensed broker-dealers and sales agents.

277.    Defendants had actual knowledge of the breaches of such fiduciary duties by the sales agent and the other unlicensed broker-dealers EquiAlt utilized to solicit investment in the EquiAlt Securities, rendered substantial assistance or encouragement to the breaches, and their conduct was a substantial factor in causing harm to Plaintiff.

278.    Defendants acted with the specific intent to facilitate the wrongful conduct by EquiAlt and its broker-dealers and sales agents, particularly in connect with its efforts to deter regulatory investigations by the SEC and the State of Arizona.

279.    Defendants are therefore liable for common law aiding and abetting the breach of fiduciary duties.

## COUNT XVII

### Aiding and Abetting Fraud and Deceit
### (Individually and on behalf of the Colorado Class)

280.    Plaintiffs Hannen repeat and re-allege the allegations paragraphs 1–150 above, as if fully set forth herein.

281.    The Non-Defendant Promoters made uniform false representations and concealed or failed to disclose material facts concerning the Funds' compliance with the Federal and State securities laws, the safety and risks of the EquiAlt Securities and the financial performance and solvency of EquiAlt and the Funds, all with the intent to deceive prospective investors.

282.    Plaintiffs and the members of the Colorado Class justifiably relied on the foregoing false representations and material omissions, were unaware of the falsity of the representations or the material omissions and would not have invested in the EquiAlt Securities had they known the true facts. As a consequence, Plaintiffs and the members of the Colorado Class sustained damages.

283.     Defendants had actual knowledge of some or all of the false statements and material omissions used to solicit investment in the EquiAlt Securities, rendered substantial assistance or encouragement to the fraudulent conduct, and their conduct was a substantial factor in causing harm to Plaintiffs and the members of the Colorado Class.

284.     Defendants acted with the specific intent to facilitate the foregoing wrongful conduct.

285.     Defendants are therefore liable for common law aiding and abetting the fraud and deceit committed by the Non-Defendant Promotors.

286.     The foregoing actions by Defendants were done maliciously, oppressively, and with intent to defraud, thereby entitling Plaintiffs and members of the Colorado Class to punitive and exemplary damages.

## COUNT XVIII

### Aiding and Abetting Intentional Misrepresentation
### (Individually and on behalf of the Colorado Class)

287.     Plaintiffs Hannen repeat and re-allege the allegations contained paragraphs 1–150 above,  as if fully set forth herein.

288.     The Non-Defendant Promoters made uniform false representations and concealed or failed to disclose material facts concerning the Funds' compliance with the Federal and State securities laws, the safety and risks of the EquiAlt Securities and the financial performance and solvency of EquiAlt and the Funds.

289.     The Non-Defendant Promotors knew the statements were false when made or were made recklessly and without regard to their truth, and intended that Plaintiffs and the members of the Colorado Class would rely on the representations.

290.    Plaintiffs and the members of the Colorado Class justifiably relied on the false statements and sustained damages as a result.

291.    Defendants had actual knowledge of some or all of the false statements and material omissions used to solicit investment in the EquiAlt Securities, rendered substantial assistance or encouragement to the fraudulent conduct, and their conduct was a substantial factor in causing harm to Plaintiffs and the members of the Colorado Class.

292.    Defendants are therefore liable for common law aiding and abetting the intentional misrepresentations by the Non-Defendant Promotors.

293.    The foregoing actions by Defendants were done maliciously, oppressively, and with intent to defraud, thereby entitling Plaintiffs and members of the Colorado Class to punitive and exemplary damages.

## THE NEVADA CLAIMS

### COUNT XIX

**(Statutory Secondary Liability under the Nevada Securities Act, individually and on behalf of the Nevada Class)**

294.    Plaintiffs Rory and Marcia O'Neal and Sean O'Neal repeat and re-allege the allegations contained in paragraphs 1-150 as if fully set forth herein.

295.    The EquiAlt Securities are securities as defined by NRS 90.295.

296.    NRS 90.310 ("Section 301") prohibits any person from transacting business in Nevada as a broker-dealer or sales representative unless licensed or exempt from licensing under the Nevada Securities Act ("NSA").

297.    NRS 90.460 ("Section 460") prohibits any person from offering to sell or selling any security in Nevada unless the security is registered or the security or transaction is exempt under the NSA.

AMENDED CLASS ACTION COMPLAINT

298.    NRS 90.570 ("Section 570") prohibits  any person from, in connection with the offer to sell, sale, offer to purchase or purchase of a security in Nevada, directly or indirectly (1) employing any device, scheme or artifice to defraud; (2) making an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading in the light of the circumstances under which they are made; or (3) engaging in an act, practice or course of business which operates or would operate as a fraud or deceit upon a person.

299.    NRS 90.660 ("Section 660") affords a statutory cause of action to victimized investors for violations of Sections 301, 460 and 570.  In addition, Section 660(4) extends joint and several liability under Section 660 to "any agent of the person liable."

300.    As alleged above, the Non-Defendant Promoters sold the EquiAlt Securities in violation of Sections 301, 460 and 570.

301.    As a consequence of the forgoing statutory violations, Plaintiffs and the other members of the Nevada Class have suffered damages in an amount to be proven at trial, including the loss of money invested in the EquiAlt securities.

302.    Defendants acted as the agent of the Non-Defendant Promoters in connection with the foregoing violations of the NSA, by among other things, drafting the PPMs and other offering materials containing the false statements and misrepresentations used to solicit sales of the unregistered EquiAlt Securities, receiving signed investor questionnaires on behalf of EquiAlt, authorizing EquiAlt to identify Defendants as "independent" legal counsel who would provide "insight into the fund and its activities" upon request from investors, drafting submissions to the SEC falsely claiming that the EquiAlt Securities were exempt from registration, authorizing the use of their names on brochures that were used to promote and make sales of Equialt Securities, preparing organizational and transactional documents used in furtherance of the EquiAlt Ponzi

scheme, formulating and drafting "Consulting Agreements" falsely characterizing agent commissions as "finder's fees" to circumvent the securities laws, advising non-client unlicensed sales agents that they could lawfully sell the unregistered EquiAlt securities and responding to inquiries from the unlicensed sales agents concerning purported compliance with the applicable securities laws and encouraging the EquiAlt managers to invoke their names and professional standing to deflect inquiries by sales agents or investors about regulatory investigations of EquiAlt. . Through these acts, among others, Defendants intentionally stepped outside their normal role as attorneys providing routine legal advice and instead acted as the agent of the Non-Defendant Promoters.

303. Defendants are accordingly liable to Plaintiffs and the other members of the Nevada Class under Section 660 for rescission or rescissionary damages.

304. Plaintiffs hereby conditionally tender their EquiAlt Securities in accordance with the NSA.

## COUNT XX

### (Aiding and Abetting Breach of Fiduciary Duty, individually and on behalf of the Nevada Class)

305. Plaintiffs Rory and Marcia O'Neal and Sean O'Neal repeat and re-allege the allegations contained in the paragraphs 1-150 as if fully set forth herein.

306. NRS 90.575 provides: "A broker-dealer, sales representative, investment adviser or representative of an investment adviser shall not violate the fiduciary duty toward a client imposed by NRS 628A.020." NRS 628A.020 in turn provides:

> A financial planner has the duty of a fiduciary toward a client. A financial planner shall disclose to a client, at the time advice is given, any gain the financial planner may receive, such as profit or commission, if the advice is followed. A financial planner shall make diligent inquiry of each client to ascertain initially, and keep currently informed concerning, the client's financial circumstances and obligations and the client's present and anticipated obligations to and goals for his or her family.

307.    The Non-Defendant Promoters and their sales agents in addition owed Plaintiffs and the other members of the Nevada Class fiduciary duties of loyalty and full disclosure, based on (a) their respective sales agent's assumption of the role of a securities broker and financial planner advising Plaintiffs about their retirement and investment decisions and (b) the confidential relationship the agent engendered in completing Plaintiffs' applications, transmitting them and Plaintiffs' funds to EquiAlt for investment.  These fiduciary duties which were breached by, among other things, the payment and receipt of undisclosed commissions in connection unlawful offer and sale to Plaintiffs of unregistered securities through unlicensed broker-dealers and sales agents, the failure to exercise due diligence to confirm the representations in the EquiAlt sales solicitation materials or to investigate or evaluate EquiAlt's financial condition and purported business operations, the failure to independently evaluate or confirm EquiAlt's compliance with the securities laws or the need for the unlicensed broker-dealers and sales agents to procure required licensures and the other actions and inactions alleged above. .

308.    As a consequence of the forgoing breaches of fiduciary duty, Plaintiffs and the other members of the Nevada Class have suffered damages in an amount to be proven at trial, including the loss of money invested in the EquiAlt securities.

309.    Under Nevada law, "liability attaches for civil aiding and abetting if the defendant substantially assists or encourages another's conduct in breaching a duty to a third person." *Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 112 (Nev. 1998), o*verruled in part on other grounds by GES, Inc. v. Corbitt*, 21 P.3d 11, 15 (Nev. 2001).

310.    The Defendants were aware at the time of their role in promoting the foregoing alleged primary breach of fiduciary duties by the Non-Defendant Promoters and their sales agents, and knowingly and substantially assisted the Non-Defendant Promoters and their sales agents in

committing the primary breaches through direct communications with them and with their sales agents.

311.    Defendants acted with the specific intent to facilitate the wrongful conduct by EquiAlt and its sales agents, particularly in connect with its efforts to deter regulatory investigations by the SEC and the State of Arizona.

312.    Defendants are therefore liable for common law aiding and abetting the breach of fiduciary duties.

## COUNT XXI

### (Aiding and Abetting Fraud/Fraudulent Concealment, Individually and on behalf of the Nevada Class)

313.    Plaintiffs Rory and Marcia O'Neal and Sean O'Neal repeat and re-allege the allegations contained in the paragraphs 1-150 as if fully set forth herein.

314.    The Non-Defendant Promoters knowingly made uniform false representations and concealed or failed to disclose material facts concerning the Funds' compliance with the Federal and State securities laws, the safety and risks of the EquiAlt Securities and the financial performance and solvency of EquiAlt and the Funds, all with the intent to induce Plaintiff and the other members of the Nevada Class to act or to refrain from acting in reliance upon the misrepresentation and omission.

315.    Plaintiffs and the members of the Nevada Class justifiably relied on the foregoing false representations and material omissions, were unaware of the falsity of the representations or the material omissions and would not have invested in the EquiAlt Securities had they known the true facts.

316.    As a consequence of the forgoing acts of fraud and fraudulent omission, Plaintiffs and the other members of the Nevada Class have suffered damages in an amount to be proven at trial, including the loss of money invested in the EquiAlt securities.

317.    Under Nevada law, "liability attaches for civil aiding and abetting if the defendant substantially assists or encourages another's conduct in breaching a duty to a third person." *Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 112 (Nev. 1998), *overruled in part on other grounds by GES, Inc. v. Corbitt*, 21 P.3d 11, 15 (Nev. 2001).

318.    The Defendants were aware at the time of their role in promoting the foregoing alleged primary fraudulent conduct by the Non-Defendant Promoters and their sales agents, and knowingly and substantially assisted the Non-Defendant Promoters and their sales agents in committing the primary fraud through direct communications with them and with their sales agents.

319.    Defendants acted with the specific intent to facilitate the foregoing wrongful conduct.

320.    Defendants are therefore liable for common law aiding and abetting the fraud and deceit committed by the Non-Defendant Promotors.

**COUNT XXII**

**(Violation of the Nevada Trade Practices Act, N.R.S. 41.600
Individually and on behalf of the Nevada Class)**

321.    Plaintiffs Rory and Marcia O'Neal and Sean O'Neal repeat and re-allege the allegations contained in the paragraphs 1-150 as if fully set forth herein.

322.    NRS 41.600 ("Section 600") provides a statutory cause of action by "any person who is a victim of consumer fraud," which is in turn defined to include any deceptive trade practice as defined in NRS 598.092 ("Section 092"). *Holmquist v. Exotic Cars at Caesars Palace, LLC*,

No.: 2:07–cv–00298–RLH–GWF, 2009 WL 10692730 (D. Nev. Jan. 13, 2009) (finding plaintiffs stated claim for deceptive trade practices under Section 092 regarding the sale of securities).

323.    Section 092(8) provides that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she … [k]nowingly misrepresents the legal rights, obligations or remedies of a party to a transaction."

324.    As alleged above, Defendants knowingly misrepresented "the legal rights" and "remedies" to Plaintiffs when through their drafting of the PPM and their representations made to the sales agents that the EquiAlt Securities were exempt from registration under Federal and State securities laws and could be sold by unlicensed broker-dealers and sales representatives.

325.    As a consequence of the forgoing deceptive trade practices, Plaintiffs and the other members of the Nevada Class have suffered damages in an amount to be proven at trial, including the loss of money invested in the EquiAlt securities.

## COUNT XXIII

### (Aiding and Abetting Violation of Nevada Trade Practices Act, NRS 41.600 Individually and on behalf of the Nevada Class)

326.    Plaintiffs Rory and Marcia O'Neal and Sean O'Neal repeat and re-allege the allegations contained in the paragraphs 1-150 as if fully set forth herein.

327.    Under NRS 41.600 ("Section 600") a statutory cause of action may be brought by "any person who is a victim of consumer fraud," which is in turn defined to include any deceptive trade practice as defined in NRS 598.092 ("Section 092").

328.    Section 092(5) provides that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she … [a]dvertises or offers an opportunity for investment" and:

(a) Represents that the investment is guaranteed, secured or protected in a manner which he or she knows or has reason to know is false or misleading;

(b) Represents that the investment will earn a rate of return which he or she knows or has reason to know is false or misleading;

(c) Makes any untrue statement of a material fact or omits to state a material fact which is necessary to make another statement, considering the circumstances under which it is made, not misleading;

(d) Fails to maintain adequate records so that an investor may determine how his or her money is invested;

(e) Fails to provide information to an investor after a reasonable request for information concerning his or her investment;

(f) Fails to comply with any law or regulation for the marketing of securities or other investments; or

(g) Represents that he or she is licensed by an agency of the State to sell or offer for sale investments or services for investments if he or she is not so licensed.

329. As alleged above, the Non-Defendant Promoters and their sales agents engaged in each of these "deceptive trade practices" with respect to the offer and sale of the EquiAlt Securities in Nevada, breaching a statutory duty that injured Plaintiffs and the other members of the Nevada Class.

330. As a consequence of the forgoing deceptive trade practices, Plaintiffs and the other members of the Nevada Class have suffered damages in an amount to be proven at trial, including the loss of money invested in the EquiAlt securities

331.    Under Nevada law, "liability attaches for civil aiding and abetting if the defendant substantially assists or encourages another's conduct in breaching a duty to a third person." *Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 112 (Nev. 1998), *overruled in part on other grounds by GES, Inc. v. Corbitt*, 21 P.3d 11, 15 (Nev. 2001).

332.    The Defendants were aware at the time of their role in promoting the foregoing alleged primary violations by the Non-Defendant Promoters and their sales agents, and knowingly and substantially assisted the Non-Defendant Promoters and their sales agents in committing the primary violations through direct communications with them and with their sales agents.

333.    Defendants' conduct was a substantial factor in causing harm to Plaintiffs and the members of the Nevada Class.

334.    Defendants are therefore liable for common law aiding and abetting the statutory deceptive trade practices of the Non-Defendant Promotors.

## PRAYER

Based on the foregoing, Plaintiffs request the Court enter a judgment:

A.    certifying the Classes;

B.    awarding such declaratory, injunctive and other equitable relief as warranted under the claims asserted;

C.    awarding compensatory damages and punitive damages to Plaintiffs and the Classes, in an amount to be determined at trial;

D.    awarding Plaintiffs and the Classes the costs of this action, including reasonable attorneys' fees and expenses, including pursuant to the Elder Abuse Act; and

E.    awarding such further relief as may be just and proper.

RESPECTFULLY SUBMITTED this 3rd day of August, 2020.

By: *s/ Adam M. Moskowitz*
Adam M. Moskowitz, Esq.
Fla. Bar No. 984280
Adam@moskowitz-law.com
Howard M. Bushman
Howard@moskowitz-law.com
Fla. Bar No. 0364230
Adam A. Schwartzbaum
Fla. Bar No. 93014
Adams@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601 Coral Gables,
Florida 33134 Telephone: (305) 740-1423
Facsimile: (786) 298-5737


Andrew S. Friedman, Esq.
(to be admitted *pro hac vice*)
afriedman@BFFB.com
**Francis J. Balint, Jr., Esq.**
(to be admitted pro hac vice)
fbalint@BFFB.com
William F. King
(to be admitted pro hac vice)
bking@bffb.com
**BONNETT FAIRBOURN
FRIEDMAN & BALINT, P.C.**
2325 E. Camelback Rd., Suite 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199


Jeffrey R. Sonn, Esq. Fla. Bar. No. 773514
**SONN LAW GROUP PA**
One Turnberry Place
19495 Biscayne Blvd. Suite 607
Aventura, FL 33180
Tel. 305-912-3000
Fax: 786-485-1501
jsonn@sonnlaw.com

Leonard B. Simon
(*to be admitted pro hac vice*)
LenS@rgrdlaw.com
**LAW OFFICES OF LEONARD B. SIMON**
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: 619-818-0644

David S. Casey, Jr.
*dcasey@cglaw.com*
(*to be admitted pro hac vice*)
Gayle M. Blatt
*gmb@cglaw.com*
(*to be admitted pro hac vice*)
Jeremy Robinson
*jrobinson@cglaw.com*
(*to be admitted pro hac vice*)
James M. Davis
*jdavis@cglaw.com*
(*to be admitted pro hac vice*)
**CASEY GERRY SCHENK
FRANCAVILLA BLATT &
PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

Herman J. Russomanno
Fla. Bar No. 240346
hrussomanno@russomanno.com
Robert J. Borrello
Fla. Bar No. 764485
rborrello@russomanno.com
Herman J. Russomanno III
Fla. Bar No. 21249
herman2@russomanno.com
**RUSSOMANNO & BORRELLO, P.A.**
Museum Tower – Penthouse 2800
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 373-2101
Facsimile: (305) 373-2103
*Attorneys for Plaintiffs*

# EXHIBIT C

ORIGINAL

1 | DIAMOND MCCARTHY LLP
Kathy Bazoian Phelps (State Bar No. 155564)
2 | kphelps@diamondmccarthy.com
3 | 1999 Avenue of the Stars, Suite 1100
Los Angeles, California 90067-4402
4 | Tel: (310) 651-2997 / Fax: (310) 278-2339

5 | Attorneys for Plaintiffs
BURTON W. WIAND, as Receiver on behalf of
6 | EQUIALT FUND, LLC; EQUIALT FUND II, LLC;
EQUIALT FUND III, LLC; EA SIP, LLC; EQUIALT QUALIFIED
7 | OPPORTUNITY ZONE FUND, LP; EQUIALT SECURED INCOME
PORTFOLIO REIT, INC.; and their Investors
8 |

9

**FILED**
Superior Court of California
County of Los Angeles

**DEC 30 2020**

Sherri R. Carter, Executive Officer/Clerk of Court
By_____ S. DREW _____ Deputy

10 | **SUPERIOR COURT OF CALIFORNIA**

11 | **COUNTY OF LOS ANGELES - CENTRAL DISTRICT**

12 | BURTON W. WIAND, as Receiver on behalf
of EQUIALT FUND, LLC;
13 | EQUIALT FUND II, LLC;
EQUIALT FUND III, LLC;
14 | EA SIP, LLC; EQUIALT QUALIFIED
OPPORTUNITY ZONE FUND, LP;
15 | EQUIALT SECURED INCOME
PORTFOLIO REIT, INC.; and their investors,
16 |

17 |              Plaintiffs,

18 |       v.

19 | PAUL R. WASSGREN;
FOX ROTHSCHILD LLP; and
20 | DLA PIPER LLP (US),

21 |              Defendants.

Case No. **20STCV49670**

**COMPLAINT**

**(DEMAND FOR JURY TRIAL)**

22
23
24
25
26
27
28

COMPLAINT

154

1    This Complaint is filed by BURTON W. WIAND ("the Receiver") in his capacity as the

2    Court-appointed Receiver for EQUIALT FUND, LLC ("Fund 1"); EQUIALT FUND II, LLC

3    ("Fund 2"); EQUIALT FUND III, LLC ("Fund 3"); and EA SIP, LLC ("EA SIP Fund"); EQUIALT

4    QUALIFIED OPPORTUNITY ZONE FUND, LP (QOZ Fund); and EQUIALT SECURED

5    INCOME PORTFOLIO REIT, INC. (REIT) (collectively referred to as "The Investment Funds" or

6    "The Funds").

7    The Receiver, on behalf of The Funds and their Investors, sues Defendants PAUL R.

8    WASSGREN ("Wassgren"); FOX ROTHSCHILD LLP ("Fox Rothschild"); and DLA PIPER LLP

9    (US) ("DLA Piper") (collectively, "Defendants"), as set forth more fully below.

10                                              **OVERVIEW**

11    On February 14, 2020, the United States District Court for the Middle District of Florida

12    unsealed an emergency enforcement action filed by the Securities and Exchange Commission

13    ("S.E.C.") against a Florida-based private real estate firm, EQUIALT LLC ("EquiAlt").  That action

14    ("the Enforcement Action") is styled S.E.C. v. Davison et al., and is assigned Case No. 8:20-cv-

15    00325-T-35AEP.  It is pending in the United States District Court for the Middle District of Florida,

16    Tampa Division (the "Court") and the Court has appointed Mr. Wiand as the Receiver for various

17    EquiAlt Defendants.

18    The Defendants named in the Enforcement Action are EquiAlt's CEO Brian Davison

19    ("Davison"), Managing Director Barry Rybicki ("Rybicki"), and the first four EquiAlt Investment

20    Funds listed above.  On August 17, 2020, the Court expanded the Receivership to include the QOZ

21    Fund and the REIT.

22    The S.E.C. and the Receiver have found that Fund 1, Fund 2, Fund 3 and the EA SIP Fund

23    were operating as a classic "Ponzi scheme", which continued with the establishment and operation

24    of the QOZ Fund and the REIT.  On February 14, 2020, the Court in the Enforcement Action

25    appointed Burton W. Wiand as the Receiver and granted him broad authority to institute actions

26    and legal proceedings on behalf of the Funds and their Investors.  On July 1, 2020, the Court

27    authorized the Receiver to retain the undersigned counsel to pursue claims against law firms that

28    provided services to EquiAlt and The Funds, resulting in this suit.

COMPLAINT

1    Wassgren, as an attorney working first at Fox Rothschild and later at DLA Piper, either was

2    grossly negligent or he knowingly aided, abetted and conspired with EquiAlt and the "EquiAlt

3    Insiders" (Davison, Rybicki and BR Support Services, LLC) in the creation  and perpetration of the

4    fraudulent and illegal investment scheme, by preparing inadequate security disclosure and

5    compliance materials and other sales documents, and by aiding in the operation of an illegal sales

6    program and otherwise providing legal services to EquiAlt and its principals, in order to further

7    their Ponzi scheme.

8    EquiAlt and the EquiAlt Insiders raised more than $170 million from at least 1,100

9    unsuspecting investors around the country, including numerous California residents, by selling

10   them fraudulent, unregistered securities, and then comingling and diverting Investors funds for

11   improper purposes.  The Defendants knew or should have known that these unregistered securities

12   were being issued and sold in violation of applicable securities laws, and that the Fund's assets were

13   being used for improper and fraudulent purposes.  This operation was a classic "Ponzi scheme"

14   operation:  the promised returns on investments were inadequate, so investors were paid with the

15   money of other, subsequent investors.  Along the way, EquiAlt and the EquiAlt Insiders enriched

16   themselves by looting multi-millions of dollars from The Funds for things such as personal real

17   estate, luxury cars, jewelry, jets, and the like, and by charging fees, commissions and expenses that

18   were not disclosed and were not earned.

19   The Receiver now seeks relief against Wassgren, Fox Rothschild and DLA Piper for their

20   actions and participation in the fraudulent and illegal EquiAlt investment scheme.

21                              **THE PARTIES, JURISDICTION, AND VENUE**

22   1.    The Receiver is an attorney practicing in Tampa, Florida and as set forth above, was

23   appointed on February 14, 2020 pursuant to a Federal Court Order, giving the Receiver the full and

24   exclusive power, duty and authority to investigate all manner in which the affairs of the Funds were

25   conducted, and to institute actions and legal proceedings on behalf of the Funds and their Investors.

26   2.    Fund 1 is a Nevada limited liability company formed by Wassgren on May 23, 2011.

27   Fund 1 raised approximately $110 million from 733 Investors from January 2011 through

28   November 2019.

2

COMPLAINT

3.   Fund 2 is a Nevada limited liability company formed by Wassgren on April 24, 2013. Fund 2 raised approximately $39 million from 266 Investors from 2013 through November 2019.

4.   Fund 3 is a Nevada limited liability company formed by Wassgren on June 26, 2013. Fund 3 raised approximately $2.6 million from Investors from July 2013 through December 2015.

5.   The EA SIP Fund is a Nevada limited liability company formed by Wassgren on May 23, 2016, and it raised 21.7 million from 138 Investors from April 2016 through November 2019.

6.   The QOZ fund is a Delaware Limited Partnership formed by Wassgren on August 10, 2018 and it began raising money from Investors thereafter.

7.   The REIT is a Maryland corporation formed by Wassgren on June 27, 2017 and it began raising money from Investors immediately, including exchanging debentures in the earlier Funds for shares of the REIT without any proper exchange valuations taking place.

8.   Wassgren is an attorney licensed in California and Nevada, who worked at, and was an agent of, Fox Rothschild from approximately July of 2010 through May of 2017, following which he began work as an attorney and agent for DLA Piper, where he is still employed, as of the filing of this Complaint.

9.   During the period of July 2010 through May 2017, Fox Rothschild was responsible for the supervision of Wassgren and for any improper, negligent or illegal actions taken by Wassgren.

10.   During the period of May 2017 through the present, DLA Piper was responsible for the supervision of Wassgren and for any improper, negligent or illegal actions taken by Wassgren.

11.   Fox Rothschild is a 900 +/- attorney law firm headquartered in Philadelphia, Pennsylvania, and it has partners in multiple offices throughout the United States, including Los Angeles, California and Las Vegas, Nevada.

12.   DLA Piper LLP (US) is a United States affiliate of a global law firm headquartered in London, the United Kingdom with approximately 4,200 attorneys; DLA Piper LLP (US) is headquartered in Baltimore, Maryland and it has partners in multiple offices, including offices located in Los Angeles, California.

13.   Wassgren acted as the attorney for The Investment Funds and also for both EquiAlt and the EquiAlt Insiders during the time he was employed in California at both Fox Rothschild and

1   DLA Piper.

2       14.  The actions of Wassgren as described in this Complaint emanated primarily from the

3   Los Angeles, California offices of Fox Rothschild and DLA Piper.

4       15.  The Receiver has standing to bring this action pursuant to the Court Order described

5   above.

6       16.  This Court has jurisdiction over this cause and over the parties, and venue is also proper

7   in this Court.

8                   **ADDITIONAL ALLEGATIONS COMMON TO ALL COUNTS**

9       17.  Beginning in 2011 and up through and including February of 2020, The Funds were

10  operated as a Ponzi scheme, raising more than $170 million from over 1,100 Investors nationwide,

11  including Investors in California, through fraudulent and unregistered securities.

12      18.  The primary operators of this Ponzi scheme were the EquiAlt Insiders, acting with the

13  aid and assistance of Defendants.

14      19.  EquiAlt was the entity that issued debentures to Investors, and EquiAlt was used by

15  Davison and Rybicki as a management entity to further their fraudulent scheme.

16      20.  While both Davison and Rybicki were listed as managers of EquiAlt, EquiAlt was

17  primarily under the direct day to day management of Davison, who was located in Tampa, Florida.

18      21.  Davison took the lead concerning the day-to-day operation of EquiAlt and The Funds,

19  while Rybicki took the lead regarding sales and marketing efforts for the solicitation of investments

20  from the public, through BR Support Services, LLC ("BR Support").

21      22.  Rybicki managed BR Support, and he acted as the head of marketing and sales for The

22  Funds, with the aid and assistance of Defendants.

23      23.  Wassgren, from his offices in Los Angeles County, California, regularly gave legal

24  advice to and helped structure the operation of both EquiAlt and BR Support, and Wassgren well

25  knew, or should have known, that both entities were operating illegally and in violation of

26  applicable securities laws and were operating as fraudulent enterprises.

27      24.  Rybicki and BR Support were based in Arizona and the sales and marketing efforts for

28  The Funds were directed by Rybicki from his office in Arizona.

COMPLAINT

25. The sales of investments in The Funds were made to Investors in numerous states, including California, through a network of unlicensed and unregistered selling agents.

26. In the Private Placement Memoranda that Wassgren drafted for The Investment Funds, Investors were falsely promised that 90% of their money would be used to purchase real estate. Instead, their money was systematically looted for the personal benefit and use of the EquiAlt Insiders, and pay returns to previous investors, facts well known to Wassgren.

27. Selling compensation paid to Rybicki and/or BR Support at the rate of 12%, which made the 90% representation of the amount to be invested in real estate a false statement. When added to other administrative and operational costs, the 90% representation only becomes more outlandish.

28. Wassgren also consulted directly with Rybicki and directly with the unlicensed and unregistered sales agents who were selling investments in the Funds; Wassgren advised Rybicki and these unlicensed agents in ways to attempt to disguise and mischaracterize the illegal selling fees.

29. Wassgren, first at Fox Rothschild, and later at DLA Piper, from their Los Angeles County offices, provided legal representation and acted as counsel to EquiAlt, the EquiAlt Insiders and to the Funds for compensation; this included the drafting and revision of private placement memoranda, other sales documents, and rendering advice on regulatory compliance, selling practices, and numerous legal matters.

30. Wassgren, through his offices at Fox Rothschild and DLA Piper in Los Angeles County, California, participated in the selling process by receiving and approving questionnaires and subscription documents from Investors before they were issued investment securities, thus making Wassgren the gatekeeper for the fraudulent scheme to admit new Investors.

31. The Defendants, as the attorneys for The Investment Funds, owed a duty to each of The Funds to protect their respective legal interests and to assure the Funds operated in compliance with applicable laws.

32. The interests of the EquiAlt Insiders and EquiAlt were in conflict with the interests of The Investment Funds and their Investors, and Wassgren regularly counseled the EquiAlt Insiders

COMPLAINT

1    and EquiAlt regarding transactions that resulted in the improper payment or diversion of The Funds'

2    assets for the benefit of EquiAlt and the EquiAlt Insiders, and their affiliated entities.

3        33.  The Defendants, in the course of their representation of The Investment Funds, failed

4    to conduct an adequate due diligence investigation into the EquiAlt Insiders, EquiAlt and/or the

5    operation of The Investment Funds.

6        34.  Fox Rothschild and DLA Piper owed their Investment Fund clients a fiduciary duty to

7    provide competent legal representation and protect the interest of The Funds, and they failed in this

8    duty.

9        35.  The conduct of Defendants as described in this Complaint was material and resulted in

10   a significant loss to The Investment Funds, and their Investors.

11       36.  By their actions and inactions, the Defendants knowingly allowed and/or aided and

12   abetted the EquiAlt Insiders and EquiAlt in fraudulent, improper and illegal activities, thereby

13   defrauding the Funds and its Investors.

14       37.  Davison and Rybicki improperly diverted money from The Investment Funds to

15   themselves, EquiAlt, BR Services and other affiliated entities, often with the knowledge, aid and

16   assistance of Wassgren.

17       38.  A legitimate investment fund usually has an audit performed by an independent

18   certified public accounting firm in order to verify the accuracy of the books and accounts of the

19   fund; a legitimate fund also has other checks and balances in place.  Many of these financial

20   verifications or normal checks, balances and safeguards were not in place for The Investment Funds,

21   a fact well known to Defendants.

22       39.  In representing the interests of The Investment Funds, the Defendants should have

23   recommended and insisted on the establishment of these checks, balances and safeguards.

24       40.  Defendants held themselves out as highly experienced attorneys who are experts and

25   specialists in the legal, regulatory and customary compliance aspects of the investment fund

26   business, and as such they should have recognized the lack of financial controls and checks and

27   balance to be a "red flag" for fraudulent activity.

28       41.  The standard of care owed by and expected from expert, specialized counsel is greater

6

COMPLAINT

1    than that which would be expected from an attorney without such specialized expertise.

2        42.  The Defendants never acquired any waivers of the multiple conflicts of interest existing

3    between The Investment Funds, EquiAlt and the EquiAlt Insiders, and in any event, the existing

4    conflicts of interest were unwaivable.

5        43.  During the course of the representation of The Investment Funds, the Defendants knew,

6    or should have discovered, that The Funds were being illegally sold and marketed.

7        44.  Both Fox Rothschild and DLA Piper failed in their respective duties to properly

8    supervise Wassgren, and otherwise provide quality and uncompromised legal advice and legal

9    services to The Investment Funds, in at least the following manner:

10           A.  Fox Rothschild and DLA Piper failed to advise and protect The Investment
                 Funds by recommending or structuring proper checks and balances in the
11               operation of The Funds, and by allowing EquiAlt and the EquiAlt Insiders
                 to operate The Investment Funds without the customary checks, balances
12               and oversights routinely employed in the operation of an investment
                 company such as The Funds;

13
             B.  Fox Rothschild and DLA Piper failed to conduct an adequate review of the
14               controls and practices in place for The Investment Funds;

15           C.  Fox Rothschild and DLA Piper were operating with irreconcilable conflicts
                 of interest;
16
             D.  Fox Rothschild and DLA Piper failed to have a system of supervision in
17               place to prevent Wassgren from undertaking representation that had
                 conflicts of interest.
18
             E.  Fox Rothschild and DLA Piper failed to have a system of supervision in
19               place to deter and prevent Wassgren from giving illegal advice and from
                 aiding and abetting the fraudulent scheme described in this Complaint.
20
             F.  Fox Rothschild and DLA Piper failed to exercise due diligence in their
21               preparation of investment disclosure materials prepared for and utilized by
                 EquiAlt and the EquiAlt Insiders in soliciting investments from the public;
22               these disclosure materials contain material misrepresentations as well as
                 omissions of material facts;
23
             G.  Fox Rothschild and DLA Piper failed to advise The Investment Funds (and
24               their Investors) that Davison and Rybicki were selling and operating .The
                 Funds illegally; and
25
             H.  Fox Rothschild and DLA Piper failed to advise and protect The Investment
26               Funds from being sold through illegal solicitation and sales activities and
                 paying illegal compensation to unregistered brokers and dealers.
27

28

---

COMPLAINT

45. Additional conflicts and failings of Fox Rothschild and DLA Piper are likely to be uncovered through discovery.

46. Fox Rothschild and DLA Piper, while failing to take proper actions to protect the interests of The Investment Funds and make adequate and appropriate disclosures, charged hundreds of thousands of dollars in legal fees that were paid from The Investment Funds' money.

47. Fox Rothschild and DLA Piper did not protect the interests of its clients, The Investment Funds, but rather chose to favor the interests of EquiAlt, the EquiAlt Insiders and their affiliated entities.

48. Theft and diversion of invested money from The Investment Funds by EquiAlt and the EquiAlt Insiders could have been avoided had Defendants done an adequate job of properly representing the interests of The Investment Funds, as they were paid to do.

49. The Investment Funds, through the appointment of the Receiver, have been cleansed of any wrongdoing otherwise imputed to The Investment Funds through the doctrine of *in pari delicto*, or any similar theory.

50. The delayed discovery doctrine, the continuing violations doctrine, and equitable tolling apply to this cause of action.

51. The facts and details outlined in this Complaint were discovered upon and after the S.E.C. filed its enforcement action in February 2020.

52. The activities and breaches of duty by Defendants have caused multi-millions of dollars of damage to The Funds and their Investors, including money stolen, improperly diverted, improperly charged as fees, commissions and in paying legal fees for which no value was received.

53. By December of 2020, Investors in The Funds will be owed approximately $170 million in principal, with interest accruing at over $900,000 per month; however, The Funds have nowhere near sufficient assets to meet the obligations owed to the Investors.

54. Damages in this dispute are expected to be in excess of $100,000,000.

55. The Enforcement Action filed in the United States District Court for the Middle District of Florida by the S.E.C. enumerates numerous entities designated as "Relief Defendants." These Relief Defendants were all under the ownership and/or control of EquiAlt or one or more of the

COMPLAINT

EquiAlt Insiders and many of them improperly received funds and assets from The Investment Funds to the detriment of their Investors.  These Relief Defendant entities were established and formed by Wassgren and he assisted, aided and abetted in many of the transactions by which money was improperly diverted from The Investment Funds in favor of the Relief Defendants.

56.  Wassgren, from the Defendants' offices in Los Angeles County, California, prepared all of the offering documents used by The Investment Funds to improperly solicit investments. These disclosure documents in the form of Private Placement Memoranda (the "PPMs") were deficient in various and numerous respects.

57. The PPMs made misrepresentations of material fact and omitted facts which were necessary in order to make an informed investment decision.  Among the failure of the PPMs and the sales of The Investment Funds, are the following:

A. Prior to starting The Funds, both Rybicki and Davison filed for personal bankruptcy.  The PPMs all describe Davison and Rybicki's business experience in glowing terms, and their previously failed business careers involving real estate and mortgage financing (the business of the Funds) but the PPMs omitted from disclosure the facts that both Davison's and Rybicki's prior real estate ventures ended in personal bankruptcy for each of them.

B. The investments were improperly sold without either state or federal securities registration.  The Funds purportedly were sold under a Regulation D ("Reg D") exemption from registration, however, none of The Funds qualified for a Reg D exemption or any other exemption from registration.

C. The Funds were offered and sold as one continuous integrated offering such that the offering of all The Funds are, under the securities laws, a single offering, negating any attempt to construe or interpret the offerings as separate and distinct.

D. The Offering Memoranda for The Funds failed to disclose the nature and amount of commissions that would be paid for selling agents.  The Offering Memoranda for Fund 1 states "Securities are being offered directly through the Company.  No commissions of any kind will be paid to selling agents or brokers." That representation drafted by Wassgren was false and was known by Wassgren to be false.  The Funds paid a 12% commission to Rybicki and/or BR Support, who, in turn, paid a least one-half of that commission to various unlicensed sales agents.  All of this was known by Wassgren, who was often in direct contact with these unlicensed sales agents.

E. All of the PPMs use of proceeds charts show that at least 90% of the Investor's money would be placed in real estate and investment assets.  This was a false representation and Wassgren, who was involved in monitoring real estate transactions, knew that the acquisitions for real estate were no where near 90% of the investment funds.

9

F. Wassgren regularly was in contact with selling agents for The Funds. None of these selling agents were registered or licensed to sell securities and could not legally engage in the transactions of selling these securities to the Investors. This fact is well known to Wassgren.

G. Wassgren advised Rybicki, who was in charge of sales efforts, as well as numerous selling agents, that they were allowed to sell these investments without license or registration, in violation of securities laws.

H. Additionally, Wassgren advised Rybicki and selling agents as to methods and manners in which they could operate in order to accept commissions as "finder's fees," "seminar expenses" or other classifications that were intended to falsely characterize selling compensation so as to improperly avoid the securities laws licensing requirements.

I. Wassgren designed the investments to purportedly be exempt from registration under Regulation D of the securities laws. Under Regulation D, one of the requirements for qualification is that there be no more than 35 unaccredited investors. In addition, unaccredited investors, to the extent admitted into the investment, are required to receive the heightened degree of financial disclosure. All of the Investors submitted questionnaires and subscription documents to Wassgren who would review them and advise the company as to whether that investor should be accepted into The Funds. As a result, Wassgren knew the integrated funds had well in excess of 35 unaccredited investors. This process placed Wassgren as an active participant in this program to illegally sell unregulated securities through unlicensed agents to unaccredited investors.

J. It appears that in each and every instance an Investor was accepted, and no Investors were rejected. Well in excess of 35 Investors into this continuous integrated offering were non-accredited Investors thereby violating the Regulation D offering exemption. Because Wassgren was the gatekeeper for the Subscription Agreements, he well knew that the number of accredited Investors had been exceeded.

K. Additionally, Wassgren well knew that there was virtually no financial disclosure or performance track records given to Investors, including the unaccredited Investors thereby omitting from disclosure material and required information.

L. Wassgren knew and omitted from any disclosures that funds would be transferred from one fund to another to pay interest and expenses between The Funds.

M. Wassgren knew and failed to disclose that the amount of selling commission compensation that was being paid by The Funds which, in and of itself, prevented The Funds from allocating at least 90% of The Funds invested money in real estate, and that other expenses would further reduce the funds available for real estate investment.

N. The Memoranda and disclosure documents prepared by Wassgren failed to disclose that substantial assets in The Funds were in fact being improperly diverted to, or were being used of the benefit of the EquiAlt Defendants and the Relief Defendants and were not being used for legitimate fund purposes.

COMPLAINT

O. Defendants knew that the EquiAlt securities were being offered through a pattern of general solicitation in violation of the applicable securities laws, and they aided, abetted and participated in those general solicitations.

P. In addition to preparing and drafting the Private Placement Memoranda, Wassgren consented to the inclusion of his name, along with the law firm Defendants, in various offering materials utilized by Davison and Rybicki to promote The Funds, and he assisted, aided and abetted the illegal sales activities.

In 2018, the EquiAlt Insiders, with the assistance of Wassgren, established two new Funds, the Qualified Opportunity Zone ("QOZ") and the EquiAlt Security Income Portfolio REIT ("REIT"). These funds were formed by diverting investor's money from the existing EquiAlt Funds into QOZ and REIT. The redemption of certain Investors' debentures from the existing Funds at full value and then reinvesting the proceeds with QOZ and the REIT constitute fraudulent transactions without sufficient disclosure and to the detriment to the existing Funds and their Investors. This created a dramatic conflict, because moving investors and their funds from old funds to new ones defrauded the old funds and created liabilities for the new ones.

58. Each of the deficiencies listed above constitute violations of both Federal and State securities laws and they also constitute a pattern of fraudulent activity perpetrated by EquiAlt and the EquiAlt Insiders, all of which was aided and abetted by Defendants.

59. Disclosure materials prepared by Wassgren failed to disclose that the funds of new investors were necessary to continue to pay interest to existing investors.

60. There are a myriad of federal and state laws and regulations involving the sale of securities to the public and the rendering of investment advice for a fee. Strict compliance with these laws is required, unless the transactions, persons or activities are specifically exempted.

61. The securities laws applicable to or implicated in the operations of The Investment Funds and the activities of the managers of those Funds included, at least, the following:

A. The Securities Act of 1933 and Its Accompanying Rules and Regulations. Compliance with this law requires that securities offered to the public, unless exempt from registration, be registered, and that there be no material misstatements or omissions in the registration documents.

B. The Securities and Exchange Act of 1934 and Its Accompanying Rules and Regulations. This law requires that all offerings made to the public, including all ongoing disclosures made to the public regarding securities, must be free of material misstatements or omissions whether or not such securities are registered.

C. State Securities laws including those in California and the other states where The Funds were sold also require full and complete disclosure of all material facts and other material omissions.

11

62. These illegal securities were continuously sold from May, 2011 through November, 2019 – a period of 8½ years.  As time went on, it is clear that the Defendants gained actual knowledge of the illegal activities of Davison, and/or should have known of them, and by failing to act, knowingly aided and abetted those fraudulent activities.

63. An exemption to the 1933 Securities Act's registration requirements exists when an issuer can satisfy the requirements of an exemption.  In this case The Investment Funds were sold under the purported exemption of the Act's Regulation D ("Reg D"); however, under Reg D's Rule 502.c. (codified at 17 C.F.R. §230.502), a "general solicitation" of the investment in question destroys an otherwise valid 1933 Act exemption.  "General solicitation" is defined under that Reg D Rule to include any "communication published in any newspaper, magazine, or similar media….".

64. In order to qualify for Reg D exemption, the shares or units in The Investment Funds could not be offered to the public under a general solicitation, but rather the solicitation had to be targeted, by way of private placement, only to Investors who were known or believed to be accredited Investors.  An accredited investor is one with certain minimum levels of income and/or net worth.  Reg D allows up to 35 non-accredited investors, provided however that no general solicitation of investors is made.

65. With Wassgren acting as the Investors' gatekeeper, the Defendants knew or should have known that The Investment Funds had been sold to more than the allowable 35 "unaccredited investors."

66. The sale of securities to unaccredited investors, even if such securities are otherwise exempt from registration, triggers a requirement that investors be furnished with audited or other full and complete financial statements.  Even if a Reg D exemption had been available to The Funds, the financial disclosure requirements of the 1933 Securities Act were required to be met, because The Funds were being offered and sold to many non-accredited Investors.

67. The Investment Funds were sold as purported "private placements" but in fact the sale of the securities was conducted as a general public solicitation with the use of advertisements and solicitation practices prohibited in private placements, all of which was well known to Defendants.

12

68.  The Defendants knew, or should have known, that The Funds would legally be treated as "integrated," meaning that the investment funds were one continuous offering.

69.  Wassgren, from the Defendants' offices in Los Angeles County, California, regularly improperly counseled and advised EquiAlt and the EquiAlt Insiders that the unlicensed and unregistered sales force selling The Investment Funds could legally be treated as "finders" and thereby avoid the necessity of obtaining legal licenses for the sale of securities.

70.  The combination of these sales practices, that were approved by Wassgren and in which he participated, constitute a pattern and practice of selling investment securities in violation of applicable securities laws and regulations.

71.  The lack of adequate financial statements over an 8½ year period should have put Defendants on notice that the performance of The Funds was unreliable, which is in itself a disclosure requirement.

72.  The provisions of the Securities and Exchange Act of 1934 require that no misstatements of material fact, and no omissions of any necessary facts, be made in conjunction with the sale of securities, whether or not those securities are entitled to any registration exemption.

73.  The Defendants knew or should have known that misstatements and omissions of material fact had been made in the offering documents they prepared and those misstatements and omissions were continuing to be made in conjunction with the past and ongoing sales of The Funds; the Defendants knowingly aided and abetted EquiAlt and the EquiAlt Insiders in these continuing violations, by failing to alert any of the shareholders or appropriate authorities as to these ongoing activities, and by continuing to assist, aid and abet the ongoing investments into The Funds.

74.  The securities law violations set forth in this Complaint are evidence of Defendants willful, intentional or grossly negligent conduct and participation the fraudulent EquiAlt scheme.

75.  All conditions precedent have occurred, or been satisfied or waived.

76.  The Receiver reserves the right to amend this Complaint as appropriate.

### COUNT I

### **Breach of Fiduciary Duty**

77.  All prior allegations are realleged and incorporated by reference.

COMPLAINT

78. Wassgren, Fox Rothschild and DLA Piper, as the attorneys for each of The Investment Funds, owed a continuing fiduciary duty to each Fund.

79. This fiduciary duty required the Defendants to act in the best interest of The Funds.

80. The Defendants also represented EquiAlt and the EquiAlt Insiders, creating an ongoing conflict of interest.

81. The Defendants breached the fiduciary duties they owed to The Investment Funds.

82. As a result of those fiduciary duty breaches, each of The Investment Funds and their Investors have been damaged.

83. The actions of the Defendants in breaching their fiduciary duty to each of The Investment Funds was intentional or grossly negligent.

WHEREFORE, the named Plaintiffs herein respectfully request judgment against the Defendants for damages, punitive damages, prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems appropriate.

**COUNT II**

**Negligence/Gross Negligence/Professional Malpractice**

84. All allegations prior to Count I are realleged and incorporated by reference.

85. Wassgren, Fox Rothschild and DLA Piper were attorneys employed by The Investment Funds, for compensation.

86. The Defendants owed but neglected their reasonable professional duties and responsibilities owed to The Investment Funds.

87. The Defendants, as attorneys for The Funds, had unavoidable conflicts of interest because they also represented the EquiAlt Insiders and EquiAlt.

88. The conduct described above fell below the standard of care expected from independent and experienced counsel.

89. The Defendants breached the duties they owed to The Investment Funds of Investors and committed negligence, gross negligence and/or malpractice, and proximately caused damage

14

1    to The Investment Funds and its Investors.

2      90. The Defendants' actions constituted gross negligence.

3      WHEREFORE, the Plaintiffs request judgment against Defendants for damages, punitive

4    damages, prejudgment interest, attorneys' fees, the costs of this action, and such other and further

5    relief this Court deems appropriate.

6                  **COUNT III**

7          **Common Law Aiding and Abetting of Fraud**

8      91. All allegations prior to Count I are realleged and are incorporated herein by reference.

9      92. There existed an underlying fraud in the sale of investments in The Funds, and in the

10    operation of The Funds.

11      93. The Defendants knew that EquiAlt and the EquiAlt Insiders actions, activities and

12    operations violated the securities laws.

13      94. The actions of EquiAlt and the EquiAlt Insiders constituted an ongoing fraudulent

14    investment scheme.

15      95. The Defendants knew they had irreconcilable conflicts of interest and intentionally

16    chose to ignore those conflicts and to render legal advice and assistance that knowingly aided and

17    abetted EquiAlt and the EquiAlt Insiders in continuing their fraudulent scheme.

18      96. The Defendants gave substantial assistance to EquiAlt and the EquiAlt Insiders in the

19    advancement and commission of their fraud relating to The Investment Funds.

20      97. In exchange for aiding and turning a blind eye to the fraudulent activities of EquiAlt

21    and the EquiAlt Insiders, the Defendants received hundreds of thousands of dollars in fees.

22      98. The Defendants' conduct allowed, and knowingly aided and abetted EquiAlt and the

23    EquiAlt Insiders in committing and continuing their fraudulent scheme, all to the detriment of The

24    Investment Funds and their Investors.

25      WHEREFORE, the Plaintiffs request judgment against Defendants for damages,

26    prejudgment interest, punitive damages, attorneys' fees, the costs of this action, and such other and

27    further relief this Court deems appropriate.

28

COMPLAINT

**COUNT IV**

**Common Law Aiding and Abetting of Breach of Fiduciary Duty**

99. All allegations prior to Count I are realleged and are incorporated by reference.

100. EquiAlt and each of the EquiAlt Insiders owed a fiduciary duty to The Investment Funds and their Investors.

101. EquiAlt and the EquiAlt Insiders breached their fiduciary duties to The Funds and their Investors.

102. The Defendants knew EquiAlt and the EquiAlt Insiders owed fiduciary duties to The Investment Funds and their Investors.

103. The Defendants knew or should have known that EquiAlt and the EquiAlt Insiders were operating in a manner that breached their fiduciary duties to The Investment Funds.

104. The Defendants gave substantial aid and assistance to EquiAlt and the EquiAlt Insiders in the furtherance of their continued breach of fiduciary duties.

105. The Defendants knew that it had conflicts of interest and intentionally chose to ignore those conflicts and to render legal advice and assistance that knowingly aided and abetted EquiAlt and the EquiAlt Insiders in continuing this fraudulent scheme, and in exchange for aiding and turning a blind eye to EquiAlt and the EquiAlt Insiders' activities, the Defendants received hundreds of thousands of dollars in legal fees.

106. The Defendants' substantial assistance to EquiAlt and the EquiAlt Insiders knowingly aided and abetted their fraudulent scheme, to the detriment of The Investment Funds and their Investors.

///

///

///

///

///

///

///

16

1      WHEREFORE, the Plaintiffs request judgment against Defendants for damages,

2  prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this

3  Court deems appropriate.

4

5  Dated:    December 30, 2020            DIAMOND MCCARTHY LLP

6

7

8                                   Kathy Bazoian Phelps
                                 Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs demand trial by jury on all issues so triable.

3

4    Dated:    December 30, 2020                          DIAMOND MCCARTHY LLP

5

6

7                                                         Kathy Bazoian Phelps
                                                          Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18

COMPLAINT

**CM-010**

Case 2:24-cv-00635-AB-AJR Document 6-3 Filed 12/07/22 Page 150 of 303 Page ID #:255

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>Kevin V. DeSantis, Esq. (SBN 137963) / James A. McFaul, Esq. (SBN 248670)<br>Dunn DeSantis Walt & Kendrick LLP, 750 B Street, Suite 2620, San Diego, CA 92101 | FOR COURT USE ONLY |

TELEPHONE NO.: 619-573-4488     FAX NO. (Optional):

E-MAIL ADDRESS: kdesantis@ddwklaw.com; jmcfaul@ddwklaw.com

ATTORNEY FOR (Name): Plaintiff Robert Joseph Armijo

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

STREET ADDRESS: 111 North Hill Street

MAILING ADDRESS: 111 North Hill Street

CITY AND ZIP CODE: Los Angeles, CA 90012

BRANCH NAME: Central District - Stanley Mosk Courthouse

CASE NAME:
Robert Joseph Armijo v. Paul R. Wassgren, et al.

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | | CASE NUMBER:<br>22STCV32793 |
|---|---|---|---|---|
| [x] **Unlimited**<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] **Limited**<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter   [ ] Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22)<br>[ ] Uninsured motorist (46)<br>**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**<br>[ ] Asbestos (04)<br>[ ] Product liability (24)<br>[ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23)<br>**Non-PI/PD/WD (Other) Tort**<br>[ ] Business tort/unfair business practice (07)<br>[ ] Civil rights (08)<br>[ ] Defamation (13)<br>[ ] Fraud (16)<br>[ ] Intellectual property (19)<br>[x] Professional negligence (25)<br>[ ] Other non-PI/PD/WD tort (35)<br>**Employment**<br>[ ] Wrongful termination (36)<br>[ ] Other employment (15) | [ ] Breach of contract/warranty (06)<br>[ ] Rule 3.740 collections (09)<br>[ ] Other collections (09)<br>[ ] Insurance coverage (18)<br>[ ] Other contract (37)<br>**Real Property**<br>[ ] Eminent domain/Inverse condemnation (14)<br>[ ] Wrongful eviction (33)<br>[ ] Other real property (26)<br>**Unlawful Detainer**<br>[ ] Commercial (31)<br>[ ] Residential (32)<br>[ ] Drugs (38)<br>**Judicial Review**<br>[ ] Asset forfeiture (05)<br>[ ] Petition re: arbitration award (11)<br>[ ] Writ of mandate (02)<br>[ ] Other judicial review (39) | [ ] Antitrust/Trade regulation (03)<br>[ ] Construction defect (10)<br>[ ] Mass tort (40)<br>[ ] Securities litigation (28)<br>[ ] Environmental/Toxic tort (30)<br>[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)<br>**Enforcement of Judgment**<br>[ ] Enforcement of judgment (20)<br>**Miscellaneous Civil Complaint**<br>[ ] RICO (27)<br>[ ] Other complaint (not specified above) (42)<br>**Miscellaneous Civil Petition**<br>[ ] Partnership and corporate governance (21)<br>[ ] Other petition (not specified above) (43) |

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:

   a. [ ] Large number of separately represented parties    d. [ ] Large number of witnesses

   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court

   c. [ ] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive

4. Number of causes of action (specify): Six

5. This case [ ] is [x] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: October 6, 2022

James A. McFaul, Esq.

(TYPE OR PRINT NAME)         ▶         (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. September 1, 2021] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courts.ca.gov |

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET** CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice– Physicians & Surgeons
   Other Professional Health Care Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip and fall)
   Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
   Intentional Infliction of Emotional Distress
   Negligent Infliction of Emotional Distress
   Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
   Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/ Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court Case Matter
   Writ–Other Limited Court Case Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of County)
   Confession of Judgment *(non-domestic relations)*
   Sister State Judgment
   Administrative Agency Award *(not unpaid taxes)*
   Petition/Certification of Entry of Judgment on Unpaid Taxes
   Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-harassment)*
   Mechanics Lien
   Other Commercial Complaint Case *(non-tort/non-complex)*
   Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late Claim
   Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| Robert Joseph Armijo v. Paul R. Wassgren, et al. | 22STCV32793 |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

| This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court |
|---|

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|

| | | | |
|---|---|---|---|
| 1. | Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. | Location where petitioner lives. |
| 2. | Permissive filing in Central District. | 8. | Location wherein defendant/respondent functions wholly. |
| 3. | Location where cause of action arose. | 9. | Location where one or more of the parties reside. |
| 4. | Mandatory personal injury filing in North District. | 10. | Location of Labor Commissioner Office. |
| 5. | Location where performance required, or defendant resides. | 11. | Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury). |
| 6. | Location of property or permanently garaged vehicle. | | |

| A<br>Civil Case Cover Sheet<br>Case Type | | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| **Personal Injury Cases Assigned to the Personal Injury Hub Courts** | | | |
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4, 11 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4, 11 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | | ☐ 2307 Construction Accidents | 1, 4, 11 |

LASC CIV 109 Rev. 05/22
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| Robert Joseph Armijo v. Paul R. Wassgren, et al. | |

| | A<br>Civil Case Cover Sheet<br>Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| **Personal Injury Cases Assigned to the Independent Calendar Courts** | | | |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 3, 5 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 3, 5 |
| | | ☐ 4502 Other Professional Health Case Malpractice | 1, 3, 5 |
| | Other Personal Injury / Property Damage / Wrongful Death (23) | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 3, 5 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 3, 5 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 3, 5 |
| **Other Civil Cases Assigned to Independent Calendar Courts** | | | |
| Non-Personal Injury/Property Damage /Wrongful Death Tort | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☑ 2501 Legal Malpractice | 1, 2, ③ |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| Employment | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| Contract | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| Robert Joseph Armijo v. Paul R. Wassgren, et al. | |

| | A<br>Civil Case Cover Sheet<br>Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br>                    Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |

LASC CIV 109 Rev. 05/22
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| Robert Joseph Armijo v. Paul R. Wassgren, et al. | |

| | A<br>Civil Case Cover Sheet<br>Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| **Judicial Review** | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |
| | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2003 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ 4304 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| Robert Joseph Armijo v. Paul R. Wassgren, et al. | |

| | A<br>Civil Case Cover Sheet<br>Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| Miscellaneous Civil Petitions | Other Petitions<br>(not specified above) (43) | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

**Step 4:  Statement of Reason and Address:**  Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected.  Enter the address, which is the basis for the filing location including zip code.  (No address required for class action cases).

| REASON:<br>☐ 1. ☐ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | ADDRESS:<br>550 South Hope Street, Suite 2400 |
|---|---|
| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90071 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Central District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated:  10/06/2022

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1.  Original Complaint or Petition.

2.  If filing a Complaint, a completed Summons form for issuance by the Clerk.

3.  Civil Case Cover Sheet Judicial Council form CM-010.

4.  Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (05/22).

5.  Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.

6.  A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.

7.  Additional copies of documents to be conformed by the Clerk.  Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 05/22
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

Electronically FILED by Superior Court of California, County of Los Angeles on 10/06/2022 10:59 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez, Deputy Clerk

Case 2:22-cv-08851-AB-PVC    Document 1    Filed 12/07/22    Page 157 of 303    Page ID #:290

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
PAUL R. WASSGREN, an individual; DLA PIPER LLP (US); FOX ROTHSCHILD LLP; and DOES 1 through 50, inclusive.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
ROBERT JOSEPH ARMIJO, an individual.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court, Central District
111 North Hill Street
Los Angeles, CA 90012

**CASE NUMBER:** *(Número del Caso):*
22STCV32793

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Kevin V. DeSantis, Esq. and James A. McFaul, Esq. / Dunn DeSantis Walt & Kendrick; 750 B Street, Suite 2620, San Diego, CA 92101

DATE: 10/06/2022    Sherri R. Carter Executive Officer / Clerk of Court    Clerk, by    R. Perez    , Deputy
*(Fecha)*    *(Secretario)*    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

Electronically FILED by Superior Court of California, County of Los Angeles on 10/06/2022 03:05 PM Sherri R. Carter, Executive Officer/Clerk of Court, by A. Sanchez, Deputy Clerk

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Kevin V. DeSantis (SBN 137963) / James A. McFaul (SBN 248670)<br>Dunn DeSantis Walt & Kendrick LLP<br>750 B Street, Suite 2620<br>San Diego, CA 92101<br>TELEPHONE NO.: 619-573-4488      FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* kdesantis@ddwklaw.com; jmcfaul@ddwklaw.com<br>ATTORNEY FOR *(Name):* Plaintiff Robert Joseph Armijo | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES |
|---|
| STREET ADDRESS: 111 North Hill Street |
| MAILING ADDRESS: 111 North Hill Street |
| CITY AND ZIP CODE: Los Angeles, CA 90012 |
| BRANCH NAME: Central District - Stanley Mosk Courthouse |

| PLAINTIFF/PETITIONER: Robert Joseph Armijo | CASE NUMBER:<br>22STCV32793 |
|---|---|
| DEFENDANT/RESPONDENT: Paul R. Wassgren, et al. | JUDICIAL OFFICER:<br>Hon. Lia Martin |
| **NOTICE OF RELATED CASE** | DEPT.:<br>16 |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Richard Gleinn, et al. v. Paul Wassgren, et al.
   b. Case number: 8:20-cv-01677-VMC-CPT
   c. Court: ☐ same as above
      ☑ other state or federal court *(name and address):* USDC Middle District of Florida, Tampa Division
   d. Department:
   e. Case type: ☐ limited civil ☑ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*
   f. Filing date: July 21, 2020
   g. Has this case been designated or determined as "complex?" ☐ Yes ☑ No
   h. Relationship of this case to the case referenced above *(check all that apply):*
      ☐ involves the same parties and is based on the same or similar claims.
      ☑ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      ☐ involves claims against, title to, possession of, or damages to the same property.
      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
         ☐ Additional explanation is attached in attachment 1h
   i. Status of case:
      ☑ pending
      ☐ dismissed ☐ with ☐ without prejudice
      ☐ disposed of by judgment

2. a. Title:
   b. Case number:
   c. Court: ☐ same as above
      ☐ other state or federal court *(name and address):*
   d. Department:

Page 1 of 3

| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>*www.courtinfo.ca.gov* |
|---|---|---|

CM-015

| PLAINTIFF/PETITIONER: Robert Joseph Armijo | CASE NUMBER: |
| DEFENDANT/RESPONDENT: Paul R. Wassgren, et al. | 22STCV32793 |

2. *(continued)*

   e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f.  Filing date:

   g.  Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h.  Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

        ☐ Additional explanation is attached in attachment 2h

   i.  Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

3.  a.  Title:

   b.  Case number:

   c.  Court: ☐ same as above

      ☐ other state or federal court *(name and address):*

   d.  Department:

   e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f.  Filing date:

   g.  Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h.  Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

        ☐ Additional explanation is attached in attachment 3h

   i.  Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

4.  ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: October 6, 2022

James A. McFaul, Esq.
_____
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

**NOTICE OF RELATED CASE**

**CM-015**

| PLAINTIFF/PETITIONER:  Robert Joseph Armijo | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:  Paul R. Wassgren, et al. | 22STCV32793 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party to this action. The person who served the notice must complete this proof of service.  The notice must be served on all known parties in each related action or proceeding.)*

1.  I am at least 18 years old and **not a party to this action.**  I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2.  I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

   a. ☐  deposited the sealed envelope with the United States Postal Service.

   b. ☐  placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3.  The *Notice of Related Case* was mailed:

   a.  on *(date):*

   b.  from *(city and state):*

4.  The envelope was addressed and mailed as follows:

   a.  Name of person served:          c.  Name of person served:

      Street address:                 Street address:

      City:                         City:

      State and zip code:         State and zip code:

   b.  Name of person served:          d.  Name of person served:

      Street address:                 Street address:

      City:                         City:

      State and zip code:         State and zip code:

☐  Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____   ▶   _____
   (TYPE OR PRINT NAME OF DECLARANT)                 (SIGNATURE OF DECLARANT)

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>10/06/2022<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ R. Perez _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>22STCV32793 |

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Lia  Martin | 16 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on  10/06/2022
　　　(Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By R. Perez_____, Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

184

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION

The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES

The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS

Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS

All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS

Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE

A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE

The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions

Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases

Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

# Superior Court of California, County of Los Angeles

<div style="border: 2px solid black; background: #d3d3d3; padding: 10px;">

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

</div>

## What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

## Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

## Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

## Main Types of ADR

1. **Negotiation**: Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation**: In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may <u>not</u> be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

LASC CIV 271 Rev. 02/22
For Mandatory Use

Page 1 of 2

**How to Arrange Mediation in Los Angeles County**

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
   If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

   - **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com (949) 863-9800
   - **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

**These organizations cannot accept every case and they may decline cases at their discretion**. They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.**

b. **Los Angeles County Dispute Resolution Programs**
   https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

   Day of trial mediation programs have been paused until further notice.

   **Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration**: Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC)**: MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

MAY 0 3 2019

Sherri R. Carter, Executive Officer/Clerk

By_____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| IN RE LOS ANGELES SUPERIOR COURT ) | FIRST AMENDED GENERAL ORDER |
| — MANDATORY ELECTRONIC FILING ) | |
| FOR CIVIL ) | |
| ) | |
| ) | |
| ) | |

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

    a) **"Bookmark"** A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

    b) **"Efiling Portal"** The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

    c) **"Electronic Envelope"** A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

    d) **"Electronic Filing"** Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

1

e)   **"Electronic Filing Service Provider"**   An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f)   **"Electronic Signature"**   For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g)   **"Hyperlink"**   An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h)   **"Portable Document Format"**   A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2)  MANDATORY ELECTRONIC FILING

   a)  Trial Court Records

   Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

   b)  Represented Litigants

   Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

   c)  Public Notice

   The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

a) The following documents shall not be filed electronically:

i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

ii) Bonds/Undertaking documents;

iii) Trial and Evidentiary Hearing Exhibits

iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image**.**

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4). Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked. Examples include, but are not limited to, the following:

   i) Depositions;

   ii) Declarations;

   iii) Exhibits (including exhibits to declarations);

   iv) Transcripts (including excerpts within transcripts);

   v) Points and Authorities;

   vi) Citations; and

   vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted. (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day <u>before</u> the ex parte hearing.

2019-GEN-014-00

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing. A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled. If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

   i) Any printed document required pursuant to a Standing or General Order;

   ii) Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

   iii) Pleadings and motions that include points and authorities;

   iv) Demurrers;

   v) Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

   vi) Motions for Summary Judgment/Adjudication; and

   vii) Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents. Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

1  11) SIGNATURES ON ELECTRONIC FILING

2      For purposes of this General Order, all electronic filings must be in compliance with California

3      Rules of Court, rule 2.257.  This General Order applies to documents filed within the Civil

4      Division of the Los Angeles County Superior Court.

5

6          This First Amended General Order supersedes any previous order related to electronic filing,

7  and is effective immediately, and is to remain in effect until otherwise ordered by the Civil

8  Supervising Judge and/or Presiding Judge.

9

10  DATED:  May 3, 2019



11                                                                          KEVIN C. BRAZILE

12                                                                          Presiding Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California County of Los Angeles**



**Los Angeles County Bar Association Litigation Section**

**Los Angeles County Bar Association Labor and Employment Law Section**



**Consumer Attorneys Association of Los Angeles**



**Southern California Defense Counsel**



**Association of Business Trial Lawyers**



**California Employment Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

| | | |
|---|---|---|
| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

    a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

    b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

    c. Exchange of names and contact information of witnesses;

    d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

    e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

    f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

    g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

**STIPULATION – EARLY ORGANIZATIONAL MEETING**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h.  Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i.  Whether the case is suitable for the Expedited Jury Trial procedures (see information at **_www.lacourt.org_** under "*Civil*" and then under "*General Information*").

2.  The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the  complaint, and _____ for the cross-complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

<div align="center">(INSERT DATE)          (INSERT DATE)</div>

3.  The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case.  The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.  References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____            ➢   _____
(TYPE OR PRINT NAME)                                        (ATTORNEY FOR PLAINTIFF)

Date:

_____            ➢   _____
(TYPE OR PRINT NAME)                                        (ATTORNEY FOR DEFENDANT)

Date:

_____            ➢   _____
(TYPE OR PRINT NAME)                                        (ATTORNEY FOR DEFENDANT)

Date:

_____            ➢   _____
(TYPE OR PRINT NAME)                                        (ATTORNEY FOR DEFENDANT)

Date:

_____            ➢   _____
(TYPE OR PRINT NAME)                                        (ATTORNEY FOR _____)

Date:

_____            ➢   _____
(TYPE OR PRINT NAME)                                        (ATTORNEY FOR _____)

Date:

_____            ➢   _____
(TYPE OR PRINT NAME)                                        (ATTORNEY FOR _____)

| LACIV 229 (Rev 02/15)<br>LASC Approved 04/11 | **STIPULATION – EARLY ORGANIZATIONAL MEETING** | Page 2 of 2 |
|---|---|---|

| Print | Save | | Clear |
|---|---|---|---|

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:                    FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

Page 1 of 3

198

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

      iii.    Be filed within two (2) court days of receipt of the Request; and

      iv.    Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

Page 2 of 3

199

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date: _____

&#10148; _____
_____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR PLAINTIFF)

Date: _____

&#10148; _____
_____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date: _____

&#10148; _____
_____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date: _____

&#10148; _____
_____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date: _____

&#10148; _____
_____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)

Date: _____

&#10148; _____
_____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)

Date: _____

&#10148; _____
_____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)

| Print | Save |   | Clear |
|---|---|---|---|

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

Page 3 of 3

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:

   ☐   Request for Informal Discovery Conference
   ☐   Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

Print     Save     Clear

<table>
<tr><td>NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY:</td><td>STATE BAR NUMBER</td><td>Reserved for Clerk's File Stamp</td></tr>
</table>

| | |
|---|---|
| TELEPHONE NO.: | FAX NO. (Optional): |
| E-MAIL ADDRESS (Optional): | |
| ATTORNEY FOR (Name): | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

LACIV 075 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION AND ORDER – MOTIONS IN LIMINE**

Page 1 of 2

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

## The following parties stipulate:

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                      (ATTORNEY FOR PLAINTIFF)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                      (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                      (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                      (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                      (ATTORNEY FOR _____)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                      (ATTORNEY FOR _____)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                                      (ATTORNEY FOR _____)

## THE COURT SO ORDERS.

Date:   _____          _____
                                                                                JUDICIAL OFFICER

[ Print ]        [ Save ]                                                    [ Clear ]

1

2

3

4

5

6

**FILED**

LOS ANGELES SUPERIOR COURT

MAY 1 1 2011

JOHN A. CLARKE, CLERK

*N. Navarro*

BY NANCY NAVARRO, DEPUTY

7    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8    **FOR THE COUNTY OF LOS ANGELES**

9

10   General Order Re                    )    ORDER PURSUANT TO CCP 1054(a),
     Use of Voluntary Efficient Litigation  )    EXTENDING TIME TO RESPOND BY
11   Stipulations                         )    30 DAYS WHEN PARTIES AGREE
                                          )    TO EARLY ORGANIZATIONAL
12                                        )    MEETING STIPULATION
                                          )
13   ─────────────────────────────        )

14         Whereas the Los Angeles Superior Court and the Executive Committee of the

15
     Litigation Section of the Los Angeles County Bar Association have cooperated in
16
     drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for
17
18   use in general jurisdiction civil litigation in Los Angeles County;

19         Whereas the Los Angeles County Bar Association Litigation Section; the Los

20
     Angeles County Bar Association Labor and Employment Law Section; the Consumer
21
     Attorneys Association of Los Angeles; the Association of Southern California Defense
22
23   Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California

24   Employment Lawyers Association all "endorse the goal of promoting efficiency in

25
     litigation, and ask that counsel consider using these stipulations as a voluntary way to
26
     promote communications and procedures among counsel and with the court to fairly
27
28   resolve issues in their cases;"

-1-

ORDER PURSUANT TO CCP 1054(a)

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation.  This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

-2-

ORDER PURSUANT TO CCP 1054(a)

1  by Code of Civil Procedure section 1054(a) without further need of a specific court

2  order.

3

4  DATED: _May 11, 2011_

5                                        Carolyn B. Kuhl, Supervising Judge of the
                                         Civil Departments, Los Angeles Superior Court
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

ORDER PURSUANT TO CCP 1054(a)

# EXHIBIT B

Alise Johnson, Esq.
Email: johnsonali@sec.gov
Attorney for Plaintiff
Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300
Florida Bar No. 0003270

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

                                    Plaintiff,

v.

ROBERT JOSEPH ARMIJO AND
JOSEPH FINANCIAL, INC.,

                                    Defendants.

Case No.: **'21 CV 1107 TWR RBB**

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## INTRODUCTION

1. From approximately February 2016 through February 2020, Defendants Robert Joseph Armijo ("Armijo") and his company Joseph Financial, Inc. ("Joseph Financial") acted as unregistered brokers on behalf of investment funds ("EquiAlt Funds") managed by EquiAlt, LLC ("EquiAlt"). They raised at least $4.85 million from the unregistered offer and sale of securities of the EquiAlt Funds to more than 50 retail investors located in Arizona, California, Texas, and Oregon. From these sales, the Defendants received approximately $1.1 million in transaction-based sales commissions.

2. At all relevant times, the Defendants were not registered as broker-dealers with the Commission or associated with a registered broker-dealer. EquiAlt's securities

COMPLAINT                                    1

offerings were not registered with the Commission and there was no applicable exemption from registration for these offerings.

3.    By engaging in this conduct, the Defendants each violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), [15 U.S.C. §§ 77e(a) and 77e(c)], and Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), [15 U.S.C. § 78o(a)(1)].  Unless enjoined, the Defendants are reasonably likely to continue to violate the federal securities laws.  The Commission also seeks against all Defendants disgorgement of ill-gotten gains along with prejudgment interest thereon, and civil money penalties.

## **DEFENDANTS**

4.    **Robert Joseph Armijo,** 40, is a resident of La Mesa, California.  During the relevant period, Armijo operated and controlled Joseph Financial.  Armijo is not currently registered with the Commission or the Financial Industry Regulatory Authority ("FINRA"), nor was he during the time period relevant to the allegations contained herein.

5.    **Joseph Financial, Inc.** is a California corporation located in San Diego, California.  During the relevant period, Armijo owned and controlled Joseph Financial, and treated it as his alter ego.  Joseph Financial has never been registered with the Commission or FINRA.

## **JURISDICTION**

6.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

7.    This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of California because Defendants transacted business in this District relating to the sale of the EquiAlt Funds.

8.    In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, made use of the means or

COMPLAINT                                                    2

instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## FACTUAL ALLEGATIONS

9.    From at least 2016 through February 11, 2020 (when the Commission filed an emergency action against EquiAlt and others), EquiAlt orchestrated a massive Ponzi scheme relating to its management of the EquiAlt Funds.  The scheme involved at least 1,100 investors who invested approximately $170 million in the EquiAlt Funds.

### A.    The EquiAlt Ponzi Scheme and Other Fraudulent Conduct

10.    At all relevant times, Brian Davison controlled EquiAlt, whose primary business purpose was the management of the EquiAlt Funds.  Davison, along with EquiAlt's Vice President Barry Rybicki, told investors that the EquiAlt Funds would use their money to purchase real estate in distressed markets throughout the United States and that these real estate investments would generate revenues sufficient to pay investors interest rates of 8% to 10% per annum on their investments.  The EquiAlt Funds, however, were unprofitable almost from inception.

11.    Without sufficient revenues to pay the money owed to investors, EquiAlt soon resorted to fraud, using new investor money to pay the interest promised to existing investors in a Ponzi like scheme.  EquiAlt perpetuated this fraud for several years until the Commission filed its emergency action in February 2020 and the Court entered a temporary restraining order, an asset freeze, and appointed a receiver over the EquiAlt Funds.

12.    In furtherance of this fraudulent scheme, EquiAlt, Rybicki, and Davison also made numerous material misrepresentations and omissions to investors in connection with the offer and sale of investments in the EquiAlt Funds.

### B.    EquiAlt Made Material Misrepresentations to Investors

13.    EquiAlt, through a network of unregistered sale agents including the Defendants in this action, sold investors 3-year or 4-year term debentures issued by the EquiAlt Funds providing a fixed annual return of 8% to 10%.  Many of the investors

COMPLAINT                                          3

were elderly, retired, and used their IRAs to invest in the EquiAlt Funds. Moreover, many of the investors were unaccredited or unsophisticated in that they lacked knowledge or expertise in financial matters, were not capable of evaluating the merits or risks of the investment, and were not otherwise capable of bearing the economic risks of the investment. Many of the investors in this Ponzi scheme were attracted to investments in the EquiAlt Funds by representations that the investments were secure, low risk, and conservative.

14.     In addition to the misrepresentations about the safety and security of investing in the EquiAlt Funds, EquiAlt made numerous other misrepresentations and omissions concerning the use of investor proceeds, registration with the Commission, compliance with applicable laws, and management of the EquiAlt Funds. In particular, EquiAlt misrepresented, or failed to disclose adequately to investors, that their investment proceeds were being used to pay substantial commissions to unregistered sales agents. Moreover, investors were told that 90% of their funds would be used to invest "in property." Yet, less than 50% of investor funds were actually used for that purpose. In fact, most of the remaining funds were used for improper purposes such as the payment of millions of dollars in undisclosed fees and bonuses to EquiAlt, Davison and Rybicki.

### C.     Defendants Offered and Sold EquiAlt Securities

15.     Over a period of several years, EquiAlt recruited a network of unregistered sales agents throughout the United States to sell the fixed rate debentures issued by the EquiAlt Funds. EquiAlt paid these unregistered sales agents, including the Defendants, commissions ranging from 6-12% of the amount invested in the EquiAlt Funds.

16.     EquiAlt's debentures are securities within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act which defines a "security" to include, among other things, "any note, . . . bond, [or] debenture." Moreover, EquiAlt's debentures fall under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act which define "security" to include, among other things, "investment

COMPLAINT                                    4

contracts." In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946), the Supreme Court defined an investment contract as (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits produced solely by the efforts of others. EquiAlt's investments clearly involve an "investment of money." Here, the investors had no role in selecting or analyzing the underlying properties and the expected profitability of the investments was derived solely from the efforts of EquiAlt, Davison, and Rybicki. Once investors sent their money, they had no control over how EquiAlt would use it. As such, EquiAlt's investments are securities within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

17. Armijo first became involved with EquiAlt in 2013 when he and another California based sales agent, who was also acting as an unregistered broker, agreed to share commissions paid by EquiAlt in connection with the sale of EquiAlt Funds' securities. This commission sharing arrangement continued for several years until Armijo and this other sales agent terminated their business relationship in early 2016.

18. Shortly thereafter, Armijo contacted Rybicki to discuss the possibility of Armijo selling EquiAlt Funds' securities on his own. Rybicki agreed to work directly with Armijo to market and sell EquiAlt Funds' securities. Pursuant to their agreement, Armijo's company, Joseph Financial, began receiving commissions of 10% for selling EquiAlt Funds' securities. Armijo also received bonuses if his sales of EquiAlt Funds' securities exceeded a specific amount during a particular month. Armijo also received commissions of up to 6% when investors he had solicited renewed their investments in the EquiAlt Funds.

19. Between February 2016 through February 2020, Armijo regularly participated in multiple securities transactions involving the EquiAlt Funds at key points in the chain of distribution. More specifically, Armijo repeatedly solicited investors for EquiAlt's Funds; communicated directly with investors about EquiAlt's Funds; described the merits of the EquiAlt Funds' securities to investors; reassured investors about the risk

COMPLAINT                                    5

212

1   of investing in the Funds or of EquiAlt's business model; and received transaction-based

2   compensation.

3       20.     In fact, after reviewing their assets and investment time horizon, Armijo

4   described the merits of investing in the EquiAlt Funds to investors, frequently describing

5   the investments as low-risk.  In addition to describing the investment as low-risk, Armijo

6   explained important facts concerning EquiAlt's business model as well as other material

7   aspects of the investment, such as the annual interest rate paid to investors and the

8   investment options offered by the EquiAlt Funds (which included a monthly interest

9   payment option or a growth option offering a higher return on investment).  While acting

10  as an unregistered broker, Armijo repeatedly recommended the EquiAlt Funds to his

11  clients claiming that the investment supposedly offered liquidity in three years, provided

12  monthly income, and involved a "debt-free real estate fund."

13      21.     In addition to recommending investments in the EquiAlt Funds, Armijo also

14  assisted investors with most aspects of the securities sales transactions.  Among other

15  things, he provided offering documents and marketing materials prepared by EquiAlt to

16  prospective investors and helped process the paperwork necessary to complete the

17  investment such as the subscription agreements executed by investors.  He also

18  participated in joint telephone calls between prospective investors and representatives of

19  EquiAlt concerning the investment opportunity and even attempted to negotiate higher

20  interest rates from EquiAlt for his clients. Ultimately, Defendants raised about $4.85

21  million from the unregistered offer and sale of securities of the EquiAlt Funds to more

22  than 50 retail investors.  From these sales, the Defendants received approximately $1.1

23  million in transaction-based sales commissions.

24      22.     Although EquiAlt purportedly offered its securities under Rule 506(b) of

25  Regulation D, a "safe harbor" under Section 4(a)(2) of the Securities Act, the safe harbor

26  did not apply because EquiAlt engaged in general solicitation or advertised to market the

27  securities. Furthermore, EquiAlt did not provide an audited balance sheet or financial

28  statements to the unaccredited EquiAlt investors, and the information provided was false

COMPLAINT                        6

213

and misleading. Consequently, the Defendants engaged in unregistered securities transactions for which an exemption from registration did not apply.

23.    Moreover, when the Defendants sold the EquiAlt Funds' securities they held no securities licenses, were not registered with the Commission as broker-dealers, and were not associated with a registered broker-dealer.

## CLAIMS FOR RELIEF

## COUNT I

### Violations of Sections 5(a) and 5(c) of the Securities Act

24.    The Commission repeats and realleges paragraphs 1 through 23 of this Complaint as if fully set forth herein.

25.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities offered and sold by the Defendants as described in this Complaint and no exemption from registration existed with respect to these securities.

26.    From approximately 2016 and continuing through approximately February 2020, the Defendants directly and indirectly:

(a)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

(b)    carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security;

without a registration statement having been filed or being in effect with the Commission as to such securities.

27.     By reason of the foregoing the Defendants violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

### Violations of Section 15(a)(1) of the Exchange Act

28.     The Commission repeats and realleges Paragraphs 1 through 23 of this Complaint as if fully set forth herein.

29.     From approximately 2016 and continuing through approximately February 2020, the Defendants, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the Commission as a broker or dealer or when they were not associated with an entity registered with the Commission as a broker-dealer.

30.     By reason of the foregoing, the Defendants, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A.

### Permanent Injunctive Relief

Issue a Permanent Injunction enjoining the Defendants from violating Sections 5(a) and 5(c) of the Securities Act and Section 15(a)(1) of the Exchange Act.

### B.

### Disgorgement and Prejudgment Interest

Issue an Order directing Defendants Armijo and Joseph Financial to disgorge on a joint and several basis all ill-gotten gains or proceeds received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

COMPLAINT                                               8

## C.

## <u>Civil Money Penalties</u>

Issue an Order directing the Defendants Armijo and Joseph Financial to pay civil money penalties on a joint and several basis pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.

## D.

## <u>Further Relief</u>

Funding such other and further relief as may be necessary and appropriate.

## E.

## <u>Retention of Jurisdiction</u>

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## <u>DEMAND FOR JURY TRIAL</u>

The Commission hereby demands a trial by jury in this case.

Dated:  June 14, 2021

Respectfully submitted,

s/ Alise Johnson
Alise Johnson
Attorney for Plaintiff
Securities and Exchange Commission
Email:  johnsonali@sec.gov
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300
Florida Bar No. 0003270

# EXHIBIT C

WRIGHT, L'ESTRANGE & ERGASTOLO
  Robert C. Wright (SBN 051864)
  rwright@wlelaw.com
402 West Broadway, Suite 1800
San Diego, CA  92101
(619) 231-4844
(619) 231-6710 (Facsimile)

Attorneys for Defendants Robert Joseph
Armijo and Joseph Financial, Inc.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.: 3:21-cv-01107-TWR-RBB |
| Plaintiff, | **ANSWER TO COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND DEMAND FOR JURY TRIAL** |
| v. | |
| ROBERT JOSEPH ARMIJO AND JOSEPH FINANCIAL, INC., | Complaint filed: June 14, 2021 |
| Defendants. | |

Defendants Joseph Financial, Inc. ("Joseph Financial") and Robert Joseph Armijo ("Armijo") (collectively, the "Defendants"), by and through their undersigned counsel, submit this Answer to Complaint for Injunctive and Other Relief and Demand for Jury Trial, and state as follows:

/ / /

/ / /

/ / /

1.   Defendants admit that Joseph Financial received approximately $1.1 million in connection with the purchase of EquiAlt-related investments and otherwise deny the allegations contained in this paragraph.

2.   Defendants admit that at all relevant times they were not registered as broker-dealers with the Commission or associated with a registered broker-dealer.  Defendants lack knowledge or information sufficient to form a belief about he truth of the allegations contained in the remainder of this paragraph and, therefore, deny these allegations.

3.   Defendants deny the allegations contained in this paragraph.

4.   Armijo was, at all relevant times, an insurance agent and California Investment Advisor Representative.  He had a Series 65 securities license.  He does not reside in La Mesa, California.  Armijo otherwise admits the allegations contained in this paragraph.

5.   Defendants deny that Joseph Financial was the alter ego of Armijo, and otherwise admit the allegations contained in this paragraph.

6.   Defendants admit the allegations contained in this paragraph.

7.   Defendants admit the allegations contained in this paragraph.

8.   Defendants admit the allegations contained in this paragraph.

9.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and, therefore, deny these allegations.

10.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and, therefore, deny these allegations.

11.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first and second sentences of this paragraph relating to the creation of a Ponzi scheme and perpetuation of fraud.  Defendants allege that if such conduct occurred, it was without the

knowledge of Joseph Financial or Armijo. Defendants otherwise admit the allegations contained in this paragraph.

12.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and, therefore, deny these allegations. Defendants further allege that if the alleged material misrepresentations and omissions were made to investors in connection with the offer and sale of investments in EquiAlt funds, numerous similar material misrepresentations and omissions were made by EquiAlt to Joseph Financial and Armijo.

13.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph regarding alleged unknown "sales agents" or unknown EquiAlt investors, and, therefore, deny these allegations.  With respect to these answering Defendants, they admit that they participated in the sale of EquiAlt securities and signed a Selected Dealer Agreement with EquiAlt; and deny that many of the persons who purchased EquiAlt securities were elderly or unsophisticated.   Defendants deny that Armijo ever represented that EquiAlt investments were "secure, low-risk and conservative."

14.   Defendants deny ever making misrepresentations about the safety and security of investing in EquiAlt Funds.  Defendants admit that some investors were told by EquiAlt that 90% of their funds would be used to invest "in property."   Defendants further allege that if the alleged material misrepresentations and omissions were made by EquiAlt to investors in connection with the offering and sale of investments in EquiAlt Funds, numerous similar material misrepresentations and omissions by EquiAlt were made to Joseph Financial and Armijo.   Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and, therefore, deny these allegations.

15.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph with respect to other persons and, therefore, deny these allegations.  Joseph Financial admits that it received transaction-based compensation with BR Support Services, LLC.  Defendants also admit that EquiAlt, through its Vice-President, Barry Rybicki, and legal counsel, Paul Wassgren ("Wassgren"), advised Armijo that he was allowed to sell EquiAlt Funds without a Series 7 license or registration.

16.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and, therefore, deny these allegations.

17.     Defendants deny that compensation received in connection with EquiAlt sales was a "commission," deny that from 2013 to 2016 they were "sales agents" or acting as unregistered brokers, and lack information sufficient to form a belief about the truth of the allegations contained in this paragraph concerning whether the other California-based person was acting as an unregistered broker.  Defendants admit that Armijo's business relationship with the other person ended in early 2016.

18.     Defendants admit that Joseph Financial received transaction-based compensation from BR Support Services, LLC, in connection with the sale of EquiAlt Funds.  Defendants admit that Armijo and Rybicki orally agreed that Armijo would assist in the sale of EquiAlt Funds' securities and that Joseph Financial would receive between 6% and 10% in compensation from BR Support Services, LLC in connection with the sales.  The compensation was not a commission because it did not reduce the amount of the investment. Defendants further allege that all of the foregoing compensation was cleared by EquiAlt's legal counsel and an EquiAlt representative.  Defendants deny receiving bonuses in connection with sales.

19.    Defendants admit that between February 2016 through February 2020, Armijo occasionally participated in securities transactions involving EquiAlt Funds; communicated directly with and solicited some investors; that Armijo informed investors about the merits and substantial risk of investing in the Funds and EquiAlt's business model; and that Joseph Financial received transaction-based compensation.

20.    Defendants admit that Armijo discussed investing in EquiAlt Funds with potential investors and the risks of investing, as described by EquiAlt's legal counsel and an EquiAlt representative.  Armijo categorically denies ever describing the investments as low-risk and contends that to the extent EquiAlt investors have testified to such information in declarations, the testimony is false.  Defendants admit that Armijo described the material aspects of the investment to some investors; and that the facts were as represented by EquiAlt to Armijo, consistent with EquiAlt Private Placement Memoranda and other investment documents.  Defendants admit that they were not registered as brokers.  Armijo otherwise admits the allegations contained in the last sentence of this paragraph, and alleges that representations made to clients were consistent with EquiAlt Private Placement Memoranda and other investment documents.

21.    Defendants admit that Armijo assisted investors with paperwork, which is standard practice for an Investment Advisor Representative; denies that he participated in most aspects of securities sales transactions; and admits the allegations contained in the second and third sentences of this paragraph.  Defendants also admit that Armijo attempted to negotiate higher interest rates from EquiAlt on behalf of his clients to earn more money. Defendants deny raising about $4.85 million; admit that more than 50 investors participated in purchasing EquiAlt securities through these Defendants; and admit that Joseph Financial received approximately $1.1 million in transaction-

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

based compensation.  Defendants deny that the compensation was a "sales commission."

22.   Defendants admit that EquiAlt purportedly offered its securities under Rule 506(b) of Regulation D.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and, therefore, deny these allegations.

23.   Defendants deny that Joseph Financial participated in the sale of EquiAlt securities, except to the extent that it received transaction-based compensation.  Defendants admit that Armijo participated in the sale of EquiAlt securities; contend that Armijo had a Series 65 securities license; admit that they were not registered with the Commission as broker-dealers and were not associated with a registered broker-dealer; and allege that they never represented themselves as being broker-dealers or registered representatives of broker-dealers.

24.   Defendants repeat and reallege their responses to paragraphs 1 through 23 as if set forth fully at this point.

25.   Defendants admit that no registration statement was filed or in effect with respect to EquiAlt securities offered and sold and otherwise deny the remaining allegation in this paragraph.

26.   Defendants admit the allegations contained in this paragraph.

27.   This paragraph contains legal conclusions.   To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph, and, therefore, deny these allegations.  Armijo was informed by EquiAlt that EquiAlt securities qualified for exemption from registration under Regulation D. Defendants deny that an injunction is required to prevent further violations of securities laws.

28.     Defendants repeat and reallege their responses to paragraphs 1 through 23 as if set forth fully at this point.

29.     Defendants admit the allegations contained in this paragraph.

30.     This paragraph contains legal conclusions.  To the extent that a response is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and, therefore, deny these allegations.  EquiAlt and its legal counsel, Wassgren, represented to Armijo that his Series 65 license was sufficient, and a Series 7 license was unnecessary, to participate in the sale of EquiAlt securities. Defendants deny that an injunction is required to prevent further violations of securities laws.

## **AFFIRMATIVE DEFENSES**

Defendants assert the following Affirmative Defenses to the Complaint:

1.     The SEC has failed to state a claim against Defendants upon which relief may be granted.

2.     On information and belief, the SEC lacks standing to seek disgorgement against Defendants because the EquiAlt Receiver already has assets, including claims against EquiAlt's former legal counsel, Wassgren, sufficient to pay EquiAlt creditors and investors.

3.     Defendants did not knowingly or recklessly commit a violation of the securities laws and did not otherwise act with any requisite scienter.

4.     The SEC's claims are time-barred by the applicable five-year statute of limitations, as tolled by agreement between the parties.

5.     Investors' damages, if any, were caused by the acts of others, intervening, superseding or otherwise, including but not limited to the acts of EquiAlt and/or EquiAlt's principals, over whom Defendants have no control, and for whose acts Defendants are not legally answerable.

6.     The SEC is barred from obtaining disgorgement because the EquiAlt Receiver is pursuing the same recovery against these Defendants for the benefit of EquiAlt investors, and the SEC may not obtain double recovery.

7.     The SEC is barred from any recovery exceeding the net gain of these Defendants when both monies received and expenses are taken into account. *Liu v. Securities & Exchange Commission*, 140 S.Ct. 1936 (2020).

8.     Any recovery by the SEC against these Defendants must be offset against Defendants' losses caused by the fraudulent misrepresentations of EquiAlt as follows:

- On January 19, 2016, Armijo and Barry Rybicki ("Rybicki"), EquiAlt's Managing Director, had a lengthy telephone conversation about the possibility of Armijo becoming involved in the sale of EquiAlt Fund I debentures.  During the conversation that lasted over an hour, Armijo and Rybicki discussed numerous topics, including how the Fund worked, how Rybicki paid his advisors, and whether it was legal to pay advisors from the marketing account. Rybicki intentionally or negligently misrepresented to Armijo that he already had approval from EquiAlt's legal counsel to pay advisors from the marketing account, and that Armijo's licensing (Series 65 but not Series 7) was not an issue.  The Series 7 (registered representative) license was unnecessary.

- On November 21, 2017, after Armijo again raised the question with Rybicki in a text message of whether Armijo needed a Series 7 license to become involved in the sale of the EquiAlt REIT, which was then being introduced, Rybicki fraudulently or negligently mispresented to Armijo, in a November 21, 2017 text message, that he did not need a Series 7 license.  "Series 65 is good to go!"

A true and correct copy of this text exchange is attached as Exhibit A and incorporated by reference.

- On March 7, 2019, Rybicki again intentionally or negligently misrepresented to Armijo in a text message that his Series 65 license was "good." A true and correct copy of this text exchange is attached as Exhibit B and incorporated by reference.

- On or about July 5, 2017, Rybicki provided Armijo with contact information regarding EquiAlt attorney, Wassgren, so that Armijo could contact him. A true and correct copy of the contact information is attached as Exhibit C and incorporated by reference. On or about the same day, Armijo had a telephone conversation with Wassgren, during which time Armijo asked Wassgren whether he needed a Series 7 license to participate in the sale of EquiAlt securities. In the conversation, Wassgren intentionally or negligently misrepresented to Armijo that, if there was any problem with Armijo's licensing (Series 65), Wassgren would let Rybicki know, and Rybicki would tell Armijo. No such communication was later made to Armijo.

- On or about May 14, 2019, Armijo had another telephone call with Wassgren, with Rybicki's permission, and Wassgren intentionally or negligently misrepresented to Armijo on the telephone call that his Series 65 license was sufficient to be involved in the sale of EquiAlt REIT stock. A true and correct copy of a text exchange between Armijo and Rybicki wherein Rybicki gives Armijo permission to communicate with Wassgren regarding licensing is attached as Exhibit D and incorporated by reference.

- When making these misrepresentations, Rybicki and Wassgren intended that Armijo would rely upon them, which he reasonably

did in participating in the sale of EquiAlt securities without obtaining a Series 7 license.  The misrepresentations were false when made and were a substantial factor in causing persons purchasing EquiAlt securities through Armijo to bring a class action for securities fraud (now subject to a tolling agreement) against Armijo and Joseph Financial Investment Advisors, LLC; investigation and pending litigation by the SEC against the Defendants in federal district court, San Diego, California, including a request for civil penalties and disgorgement; the Receiver's claims in this case; the destruction of Armijo's reputation among his clients in the insurance and financial advising industry; the incurring of significant attorneys' fees to respond to the foregoing matters; and Armijo's decision to leave the financial advising industry.  Armijo has incurred attorneys' fees and financial damages as a result.  He has also sustained serious physical harm and pain and suffering, including heart problems and depression.

9.  Any recovery against these Defendants must be offset against the Defendants' losses caused by fraudulent concealment of material facts by EquiAlt and Rybicki as follows:

- On January 19, 2016, Armijo had a lengthy conversation with Rybicki about the possibility of Armijo becoming involved in the sale of EquiAlt debentures.  During that conversation, Rybicki discussed how EquiAlt Fund I worked, how Rybicki paid advisors from a marketing account, and that Rybicki had approval from EquiAlt's legal counsel (Wassgren) to pay advisors that way.  He also told Armijo that Armijo's licensing (Series 65 but not Series 7) was not an issue.  The Series 7 registered representative license was unnecessary.

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

- In the period between January 19, 2016, and February 2020, when a Receiver was appointed for EquiAlt, Armijo had numerous telephone and text message communications with Rybicki about EquiAlt business.

- The SEC and the Receiver contend that EquiAlt President, Brian Davison, and Rybicki conducted EquiAlt business as a classic Ponzi scheme; misappropriated investor funds to personal use; and misrepresented in private placement memoranda how investor funds would be used.

- If these facts are true, Rybicki failed to disclose to Armijo on January 19, 2016, and on multiple dates thereafter, in text messages and telephone conversations, that EquiAlt was being operated illegally, something that Defendants neither knew nor could reasonably have discovered.

- Rybicki concealed these facts with the intent to deceive Armijo. Had the omitted information been disclosed in January 2016, Armijo would never have become involved, or continue to be involved, in the sale of EquiAlt debentures or securities.

- The fraudulent concealment was a substantial factor in causing persons purchasing EquiAlt securities through Armijo to bring a class action for securities fraud (now subject to a tolling agreement) against them; investigation and pending litigation by the SEC against the Defendants in federal district court, San Diego, California, including a request for civil penalties and disgorgement; the Receiver's claims; the destruction of Armijo's reputation among his clients in the insurance and financial advising industry; the incurring of significant attorneys' fees to respond to the foregoing matters, and Armijo's decision to leave the financial advising

industry. Armijo has incurred attorneys' fees and financial damages as a result. He has also sustained serious physical harm and pain and suffering, including heart problems and depression.

10. Any recovery against the Defendants must be offset against Defendants' claims for losses caused by breach of contract as follows:

- On April 29, 2018, Armijo signed and sent to Rybicki a written contract with EquiAlt Secured Income Portfolio REIT, Inc. The contract – the Selected Dealer Agreement – is attached as Exhibit E and incorporated by reference.

- Armijo has performed all the conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the agreement.

- If the results of the investigations made by the SEC and the Receiver of EquiAlt are accurate, EquiAlt breached the agreement in that the Section VII warranties about compliance of the Private Placement Memorandum with Regulation D were incorrect: The Private Placement Memorandum for the REIT at least omitted material facts about the Ponzi scheme needed to make the facts stated not misleading. The execution and delivery of the agreement violated the warranties that securities laws, rules, and regulations (including the requirement that Armijo have a Series 7 license) would be complied with and that the Private Placement Memorandum not contain inaccuracies. EquiAlt also breached the agreement by failing to promptly correct inaccuracies in the Private Placement Memorandum.

- The breach of contract was a substantial factor in causing persons purchasing EquiAlt securities through Armijo to bring a class action for securities fraud (now subject to a tolling agreement) against

them; investigation and pending litigation by the SEC against the Defendants in federal district court, San Diego, California, including a request for civil penalties and disgorgement; the Receiver's claims; the destruction of Armijo's reputation among his clients in the insurance and financial advising industry; the incurring of significant attorneys' fees to respond to the foregoing matters, and Armijo's decision to leave the financial advising industry. Armijo has incurred attorneys' fees and financial damages as a result.

- The Selected Dealer Agreement also provides in Section XI that EquiAlt will indemnify and hold harmless the Dealer from any and all losses to which the indemnified person may be subject.

- EquiAlt has thus far breached the agreement by failing to compensate Armijo for any of the losses caused by the materially false statements and material omissions in the Private Placement Memorandum for the REIT, including legal and other expenses reasonably incurred in investigating or defending against any loss.

11. Any recovery against the Defendants must be offset against Defendants' claims for losses caused by EquiAlt's promissory fraud as follows:

- On April 29, 2018, Armijo signed and sent to Rybicki a written contract with EquiAlt Secured Income Portfolio REIT, Inc. The contract – the Selected Dealer Agreement – has been previously attached as Exhibit E and incorporated by reference.

- Armijo has performed all the conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the Agreement.

- Section VII, paragraph 2, of the Selected Dealer Agreement represents and warrants to the Dealer in pertinent part as follows: "The Private Placement Memorandum . . . does not contain any

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

untrue statements of material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. . . ."

- If the results of the investigations made by the SEC and the Receiver of EquiAlt are accurate, EquiAlt did not intend to perform this promise when EquiAlt made it.

- EquiAlt intended that Armijo rely on this promise, and he reasonably did so.

- If the results of the investigation made by the SEC and the Receiver of EquiAlt are accurate, EquiAlt breached this representation:  The Private Placement Memorandum for the REIT at least omitted material facts about the Ponzi scheme required to make the facts stated not misleading.

- Had the promissory fraud not occurred, Armijo would never have become involved, or continue to be involved, in the sale of EquiAlt debentures or REIT securities.

- The promissory fraud was a substantial factor in causing persons purchasing EquiAlt securities through Armijo to bring a class action for securities fraud (now subject to a tolling agreement) against Armijo and Joseph Financial Investment Advisors, LLC; investigation and pending litigation by the SEC against the Defendants in federal court, San Diego, California, including a request for civil penalties and disgorgement; the Receiver's claims; the destruction of Armijo's reputation among his clients in the insurance and financial advising industry; the incurring of significant attorneys' fees to respond to the foregoing matters, and Armijo's decision to leave the financial advising industry.  Armijo has

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

incurred attorneys' fees and financial damages as a result. He has also sustained serious physical harm and pain and suffering, including heart problems and depression.

12. Any recovery against these Defendants must be offset against the Defendants' losses caused by EquiAlt, through its agents Rybicki and Wassgren, under the theory of tort of another, as follows:

- EquiAlt, through its agents Rybicki and Wassgren, have engaged in tortious conduct, and breach of contract, as described in paragraphs 8 through 11 above, incorporated by reference, including: (1) fraudulent misrepresentations (Affirmative Defense No. 8); (2) fraudulent concealment (Affirmative Defense No. 9); (3) breach of contract (Affirmative Defense No. 10); and (4) promissory fraud (Affirmative Defense No. 11).

- EquiAlt's tortious conduct and breach of contract have forced Defendants to incur the expense of defending this action and defending against the actions filed against Defendants by harmed investors and the SEC.

- Under third party tort of another theory, as discussed and set forth in *Prentice v. N. Am. Title Guar. Corp.*, 59 Cal.2d 618, 620 (1963), "[a] person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorneys' fees, and other expenditures thereby suffered or incurred."

- As a direct, proximate and foreseeable result of the tortious conduct and breach of contract by EquiAlt, as alleged here, Defendants have been damaged in that they have lost time and

incurred attorneys' fees and costs in an amount according to proof at trial.

13.   No injunction is required to prevent future securities laws violations because (i) the alleged violations by the Defendants are technical in nature, based on the advice of legal counsel and (ii) Defendants are also intending to leave the securities industry.

14.   No civil penalties should be imposed on the Defendants because their violations, if any, were (i) technical in nature, based on the advice of legal counsel; (ii) EquiAlt's fraud against these Defendants has already caused substantial financial harm; and (iii) the Defendants have fully cooperated with the SEC and the EquiAlt Receiver in their investigations.

15.   Defendants reserve all other defenses (whether procedural, substantive, or otherwise), limitations, and specific provisions of the Federal Rules of Civil Procedure, which may prove applicable to the facts of the matter as disclosed through the discovery process or otherwise.

WHEREFORE, Defendants request that judgment be entered in their favor and against the plaintiff, that they recover their costs of suit incurred, and that they obtain all of the proper relief.

WRIGHT, L'ESTRANGE & ERGASTOLO
Attorneys for Defendants Robert Joseph Armijo and Joseph Financial, Inc.

Dated: September 3, 2021        By:   /s/ Robert C. Wright
                                          Robert C. Wright
                                          rwright@wlelaw.com

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

# DEMAND FOR JURY TRIAL

Defendants demand a trial by jury of all issues so triable.

Date: September 3, 2021          Respectfully submitted,

/s/ Robert C. Wright_____
Robert C. Wright
Cal. Bar No.: 051864
Wright, L'Estrange & Ergastolo
402 West Broadway, Suite 1800
San Diego, California 92101
T: (619) 231-4844
F: (619) 231-6710
E: rwright@wlelaw.com
*Lead Counsel for Defendants*
*Joseph Financial, Inc.*
*and Robert Joseph Armijo*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on September 3, 2021, the foregoing document was filed using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ Robert C. Wright_____
Robert C. Wright

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

*Securities and Exchange Commission v. Robert Joseph Armijo
and Joseph Financial, Inc.*

United States District Court, Southern District of California
Case No. 3:21-cv-01107-TWR-RBB

**TABLE OF CONTENTS OF EXHIBITS**

**EXHIBITS ATTACHED TO ANSWER TO COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF AND DEMAND FOR JURY TRIAL:**

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | 11/19/2017 Text exchange between Barry Rybicki and Robert Armijo re Armijo inquiring of EquiAlt counsel whether his Series 65 license was sufficient. | 1 |
| B | 03/07/2019 Text exchange between Barry Rybicki and Robert Armijo re Rybicki telling Armijo that counsel for EquiAlt (Wassgren) said the Series 65 license is good. | 3 |
| C | Barry Rybicki e-mail to Robert Armijo with contact information for EquiAlt's counsel, Paul Wassgren. | 4 |
| D | 05/14/2019 text exchange between Barry Rybicki and Robert Armijo re Armijo inquiring if it was okay if Armijo could call Paul Wassgren regarding his licensing. | 5 |
| E | April 29, 2018 EquiAlt Secured Income Portfolio REIT, Inc. -- Selected Dealer Agreement signed by Robert Armijo | 6 |

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**
235

# EXHIBIT A



EXHIBIT A, PAGE 1

different address for him?

Nov 21, 2017, 6:16 AM

Thanks! Sorry I forgot to respond. I was in mid appt and blanked out after

Seddigh funds available as of today per vantage

Nov 21, 2017, 7:26 AM

No worries and I will get the paperwork to them. Thx

Nov 21, 2017, 9:38 AM

Thank you

Nov 21, 2017, 4:08 PM

Series 65 is good to go!



EXHIBIT A, PAGE 2

# EXHIBIT B

I have an email out. Will let you know as soon as I can

Thank you

You know this

Mar 7, 2019, 12:53 PM

Call me when you can. Thanks

We're good. He said it's general inquiry and the 65 is good

Mar 8, 2019, 1:44 PM

Sending in new client paperwork for $25k

REIT

Mar 8, 2019, 2:49 PM

Sounds great, thank you!

# EXHIBIT C

**From:** Barry Rybicki <barry@equialt.com>
**Subject: Our attorney**
**Date:** July 5, 2017 at 2:23:19 PM PDT
**To:** Bobby Armijo <bobby@josephfinancialinc.com>

**Paul R. Wassgren**
Partner
P + 1 310 595 3035
M + 1 617 461 4061
F +1 310.595.3335
E paul.wassgren@dlapiper.com



DLA Piper LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
United States
www.dlapiper.com

Cordially,



1

EXHIBIT C, PAGE 4

# EXHIBIT D



**Barry >**

Nothing yet. I will follow up this upcoming week

Ok thanks. Have a good weekend

Thanks and you too

May 14, 2019, 10:32 AM

Oh I meant to ask if I can call your attorney again regarding my licensing etc. Just so I can hear it again

Paul at DLA piper

Sure

Thank you



May 16, 2019, 11:49 AM



# EXHIBIT E

EQUIALT SECURED INCOME PORTFOLIO REIT, INC.

Up to $100,000,000 of Class A Shares of Common Stock
Offered to accredited investors only

SELECTED DEALER AGREEMENT

Ladies and Gentlemen:

EquiAlt Secured Income Portfolio REIT, Inc. (the "**Company**"), a Maryland corporation, invites you (the "**Dealer**") to participate in the distribution of Class A shares of common stock (the "**Shares**") of the Company (the "**Offering**") subject to the following terms. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Company's Confidential Private Placement Memorandum dated December 7, 2017, as it may be amended or supplemented from time to time (the "**Private Placement Memorandum**").

I.      **Appointment and Obligations of the Dealer**

On the basis of the representations, warranties and covenants herein contained, but subject to the terms and conditions herein set forth, the Dealer is hereby appointed to sell the Shares on a "best efforts" basis through a private, limited offering exempt from registration pursuant to: (i) Rule 506(b) of Regulation D ("**Rule 506**") promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"); and (ii) applicable state blue sky exemptions.

The Dealer hereby agrees to use its best efforts to sell the Shares for cash on the terms and conditions stated herein and in the Company's Private Placement Memorandum.

The Dealer shall have no authority to appoint any person or other entity as an agent or sub-agent of the Dealer or the Company. The Dealer acknowledges and agrees that the Company may (a) enter into agreements with other broker-dealers and registered investment advisors (collectively with Dealer, the "**Dealers**") for the offer and sale of Shares in the Offering and (b) sell Shares directly as an issuer-dealer.

II.     **Submission of Orders**

In order to purchase Shares in the Offering, the subscriber must complete and execute a subscription agreement substantially in the form included as an appendix to the Private Placement Memorandum (a "**Subscription Agreement**") together with a check or wire transfer ("**instruments of payment**") in the amount of such person's purchase as described below. Those persons who purchase Shares will be instructed by the Dealer to make their instruments of payment payable to or for the benefit of "UMB Bank, N.A., as escrow agent for EquiAlt Secured Income Portfolio REIT, Inc." or, after the Company has raised gross proceeds of

EXHIBIT E, PAGE 6

$2,000,000 from the sale of its common stock whether in this Offering or in a separate private transaction outside of this Offering, including from persons who are affiliated with the Company, its sponsor or its advisor (the "**Minimum Offering**"), to the Company, except with respect to Benefit Plan investors. Instruments of payment from Benefit Plan investors must be made payable to or for the benefit of "UMB Bank, N.A., as escrow agent for EquiAlt Secured Income Portfolio REIT, Inc." until the Company determines that it is no longer necessary to limit participation by Benefit Plan investors as described in the Private Placement Memorandum (the "**Benefit Plan Determination**"). The Dealer will return any instrument of payment it receives not conforming to the foregoing instructions directly to such subscriber not later than the end of the next business day following its receipt. Instruments of payment received by the Dealer that conform to the foregoing instructions shall be transmitted for deposit pursuant to one of the following methods:

Where, pursuant to the Dealer's internal supervisory procedures, internal supervisory review is conducted at the same location at which subscription documents and instruments of payment are received from subscribers, instruments of payment will be transmitted by the end of the next business day following receipt by the Dealer for deposit to the escrow agent for the Company or, after the Minimum Offering has been achieved, to the Company or its agent, except for investments from Benefit Plan investors. The Dealer will transmit instruments of payment from Benefit Plan investors for deposit to the escrow agent for the Company or, after the Benefit Plan Determination has been made, to the Company or its agent.

Where, pursuant to the Dealer's internal supervisory procedures, final internal supervisory review is conducted at a different location, instruments of payment will be transmitted by the end of the next business day following receipt by the Dealer to the office of the Dealer conducting such final internal supervisory review (the "**Final Review Office**"). The Final Review Office will in turn by the end of the next business day following receipt by the Final Review Office transmit such instruments of payment for deposit to the escrow agent for the Company or, after the Minimum Offering has been achieved, to the Company or its agent, except for investments from Benefit Plan investors. The Final Review Office will transmit instruments of payment from Benefit Plan investors for deposit to the escrow agent for the Company or, after the Benefit Plan Determination has been made, to the Company or its agent.

## III.    Pricing

The Shares will be offered at the offering prices and upon the terms and conditions set forth in the Private Placement Memorandum (as amended and supplemented).

## IV.    Dealer's Compensation

Except for any discounts described in or as otherwise provided in the "Plan of Distribution" section of the Private Placement Memorandum (as amended and supplemented) and subject to the conditions below, in consideration of the Dealer's services hereunder, the

WEST\278929533.2                                                2

**EXHIBIT E, PAGE 7**

selling commissions and marketing allowances payable to the Dealer by the Company are as follows:

4.1     The Dealer will receive selling commissions of 6.5% of the purchase price of the Shares sold by the Dealer in the Offering; provided, however, that this amount will be reduced to the extent a lower commission rate is agreed upon in writing between the Company and the Dealer (the above being referred to as the "**Commissions**").

4.2     The Dealer will receive a non-accountable marketing and due diligence allowance of 1.0% of the purchase price of the Shares sold by the Dealer in the Offering; provided, however, that this amount will be reduced to the extent a lower allowance rate is agreed upon in writing between the Company and the Dealer (the "**Allowances**").

All Commissions and Allowances shall be based on Shares sold by Dealer and accepted and confirmed by the Company, which Commission and Allowance will be paid by the Company.  For these purposes, a "sale of Shares" shall occur if and only if a transaction has closed with a subscriber for Shares pursuant to all applicable offering and subscription documents, payment for the Shares has been received by the Company in full in the manner provided in Section II hereof, the Company has accepted the Subscription Agreement of such subscriber, the Minimum Offering has been achieved and, with respect to Benefit Plan investors, subscription funds have been released to the Company from escrow as described in the Private Placement Memorandum.

The parties hereby agree that the foregoing Commissions and Allowances are not in excess of the usual and customary distributors' or sellers' commission received in the sale of securities similar to the Shares, that Dealer's interest in the offering is limited to such Commission and any Allowance from the Company and Dealer's indemnity referred to in Section XI of this Agreement.

4.3     The Company will pay or reimburse bona fide invoiced due diligence expenses of Dealer, and may, in its discretion, pay or reimburse for additional items of underwriting compensation referenced in the Private Placement Memorandum to the extent the Private Placement Memorandum indicates that they may be paid by the Company.  All other expenses incurred by you in the performance of your obligations hereunder, including but not limited to expenses related to the Offering and any attorneys' fees, shall be at your sole cost and expense, and the foregoing shall apply notwithstanding the fact that the Offering is not consummated for any reason.

V.     **Payment**

Payment of Commissions or Allowances will be made by the Company to the Dealer within 30 days of the receipt by the Company of the gross proceeds of the applicable sale of Shares by the Dealer.

WEST\278929533.2                                  3

**EXHIBIT E, PAGE 8**

**VI.    Right to Reject Orders or Cancel Sales**

All orders, whether initial or additional, are subject to acceptance by and shall only become effective upon confirmation by the Company.  The Dealer agrees that the Company, in its sole and absolute discretion, may accept or reject any subscription, in whole or in part, for any reason whatsoever, and no Commission or Allowance will be paid to the Dealer with respect to the portion of any subscription that is rejected.  Orders not accompanied by a Subscription Agreement with the signature page and the required instrument of payment in payment for the Shares may be rejected.  Issuance and delivery of the Shares will be made only after actual receipt of payment therefor.  If any instrument of payment is not paid upon presentment, or if the Company is not in actual receipt of clearinghouse funds or cash, certified or cashier's check or the equivalent in payment for the Shares, the Company reserves the right to cancel the sale without notice.  In the event an order is rejected, canceled or rescinded for any reason, the Dealer agrees to return to the Company any Commission or Allowance theretofore paid with respect to such order within 30 days thereafter and, failing to do so, the Company shall have the right to offset amounts owed against future Commissions or Allowances due and otherwise payable to the Dealer.

**VII. Representations, Covenants and Agreements of the Company**

As an inducement to the Dealer to enter into this Agreement, the Company represents and warrants to the Dealer that:

1.      The Company has been duly and validly organized and formed as a corporation under the laws of the State of Maryland, with the power and authority to conduct its business as described in the Private Placement Memorandum.

2.      The Private Placement Memorandum with respect to the Offering has been prepared by the Company.  The Private Placement Memorandum complies with the Securities Act for offerings solely to accredited investors pursuant to Rule 506(b) of Regulation D promulgated thereunder and does not contain any untrue statements of material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading; provided, however, that the foregoing provisions of this Section 7.2 will not extend to such statements contained in or omitted from the Private Placement Memorandum that are primarily within the knowledge of any of the Dealers. Copies of the Private Placement Memorandum and each amendment and supplement thereto have been or will be delivered to the Dealer.

3.      The Company intends to use the funds received from the sale of the Shares as set forth in the Private Placement Memorandum.

4.      The Company has full legal right, power and authority to enter into this Agreement and to perform the transactions contemplated hereby, except to the extent that the

**EXHIBIT E, PAGE 9**

enforceability of the indemnity provisions contained in Section XI of this Agreement may be limited under applicable securities laws and to the extent that the enforceability of this Agreement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws that affect creditors' rights generally or by equitable principles relating to the availability of remedies.

5.      The execution and delivery of this Agreement, the consummation of the transactions contemplated herein and compliance with the terms of this Agreement by the Company will not conflict with or constitute a default or violation under any charter, bylaw, contract, indenture, mortgage, deed of trust, lease, rule, regulation, writ, injunction or decree of any government, governmental instrumentality or court, domestic or foreign, having jurisdiction over the Company, except to the extent that the enforceability of the indemnity provisions contained in Section XI of this Agreement may be limited under applicable securities laws and to the extent that the enforceability of this Agreement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws that affect creditors' rights generally or by equitable principles relating to the availability of remedies.

6.      No consent, approval, authorization or other order of any governmental authority is required in connection with the execution or delivery by the Company of this Agreement or the issuance and sale by the Company of the Shares, except as may be required under the Securities Act and the rules and regulations (the **"Rules and Regulations"**) of the Securities and Exchange Commission (**"SEC"**) promulgated thereunder or under applicable state securities laws.

7.      The Shares have been duly authorized and, when issued and sold as contemplated by the Private Placement Memorandum and upon payment therefor as provided in the Private Placement Memorandum and this Agreement, the Shares will be validly issued, fully paid and nonassessable and will conform to the description thereof contained in the Private Placement Memorandum.

8.      The Company will, at no expense to the Dealer, furnish the Dealer with such number of printed copies of the Private Placement Memorandum, including all amendments, supplements and exhibits thereto, as the Dealer may reasonably request. It will similarly furnish to the Dealer as many copies of Authorized Sales Materials (as defined in Section IX below) as the Dealer may reasonably request in connection with the Offering.

9.      If at any time during the Offering any event occurs as a result of which, in the opinion of the Company, the Private Placement Memorandum would include an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in view of the circumstances under which they were made, not misleading, the Company will notify the Dealer thereof (unless the information shall have been received from the Dealer) and will effect the preparation of an amended or

WEST\278929533.2                                      5

**EXHIBIT E, PAGE 10**

supplemental Private Placement Memorandum that will correct such statement or omission.

10.     None of the Company, any of its predecessors, any affiliated issuer, any director, executive officer, other officer of the Company participating in the Offering, any beneficial owner (as that term is defined under Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")) of 20% or more of the Company's outstanding voting equity securities, calculated on the basis of voting power, nor any promoter (as that term is defined in Rule 405 under the Securities Act) connected with the Company in any capacity at the time of sale (each, a "**Company Covered Person**" and, together, "**Company Covered Persons**") is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (a "**Disqualification Event**"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3) under the Securities Act. The Company has exercised, and during the term of the Offering will continue to exercise, reasonable care to determine whether any Company Covered Person, any Dealer Covered Person (as defined in Section 8.9 below) is subject to a Disqualification Event.  The Company will immediately comply, to the extent applicable, with its disclosure obligations under Rule 506(e), and will immediately effect the preparation of an amended or supplemented Private Placement Memorandum that will contain any such required disclosure and will, at no expense to the Dealer, promptly furnish the Dealer with such number of printed copies of such amended or supplemented Private Placement Memorandum containing any such required disclosure, including any exhibits thereto, as the Dealer may reasonably request.

11.     The Company is not aware of any person (other than any Company Covered Person or Dealer Covered Person) that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of any Shares.

12.     With respect to each Company Covered Person, the Company has established procedures reasonably designed to ensure that the Company receives notice from each such Company Covered Person of (i) any Disqualification Event relating to that Company Covered Person, and (ii) any event that would, with the passage of time, become a Disqualification Event relating to that Company Covered Person.

13.     The representations and warranties in Sections 7.10 through 7.12 are and shall be continuing representations and warranties throughout the term of the Offering. The Company will promptly notify the Dealer in writing upon becoming aware of any fact which makes any such representation or warranty untrue.

## VIII.  Covenants and Agreements of the Dealer

Dealer covenants and agrees with the Company that:

**EXHIBIT E, PAGE 11**

1.      Dealer will use its best efforts to sell the Shares for cash on the terms and conditions set forth in this Agreement and the Private Placement Memorandum.

2.      In connection with the Dealer's participation in the offer and sale of Shares (including, without limitation, all initial and additional subscriptions for Shares and any resales and transfers of Shares), the Dealer will comply with all requirements and obligations imposed upon it by (a) the Securities Act, the Exchange Act, and the Rules and Regulations of the SEC promulgated under both such acts; (b) all applicable state securities laws and regulations as from time to time in effect; (c) the applicable rules of the Financial Industry Regulatory Authority, Inc. ("**FINRA**"), including, but not in any way limited to, FINRA Rule 2040, FINRA Rule 2121 and FINRA Rule 5141; (d) all applicable rules and regulations relating to the suitability of investors; (e) any other state and federal laws and regulations applicable to the Offering, the sale of Shares or the activities of the Dealer pursuant to this Agreement, including without limitation the privacy standards and requirements of state and federal laws, including the Gramm-Leach-Bliley Act of 1999, and the laws governing money laundering abatement and anti-terrorist financing efforts, including the applicable rules of the SEC and FINRA, the Bank Secrecy Act, as amended, the USA Patriot Act of 2001, and regulations administered by the Office of Foreign Asset Control at the Department of the Treasury; and (f) this Agreement and the Private Placement Memorandum as amended and supplemented.

3.      The Dealer will not offer Shares in any jurisdiction unless and until (a) the Dealer has been advised in writing by the Company that the Shares are exempt from the securities laws of such jurisdiction and (b) the Dealer has all required licenses and registrations to offer shares in that jurisdiction.

4.      The Dealer will offer Shares (both at the time of an initial subscription and at the time of any additional subscription) only to persons who meet the financial qualifications and suitability standards set forth in the Private Placement Memorandum as amended or supplemented or in any suitability letter or memorandum sent to the Dealer by the Company.  In offering Shares, the Dealer will comply with the provisions of all applicable rules and regulations relating to suitability of investors, including without limitation, the provisions of Regulation D, Rule 506 promulgated under the Securities Act and FINRA Rule 2111.

**EXHIBIT E, PAGE 12**

5.      The Dealer agrees to maintain a record of the information obtained to determine that an investor meets the financial qualification and suitability standards imposed on the offer and sale of the Shares (both at the time of the initial subscription and at the time of any additional subscriptions) (the "**Suitability Records**"), for a period of six years from the date of the sale of the Shares. The Dealer further agrees to make the Suitability Records available to the Company upon request and to make them available to representatives of the SEC and FINRA and applicable state securities administrators upon the Dealer's receipt of a subpoena or other appropriate document request from such agency.

6.      If requested by the Company, the Dealer shall obtain from subscribers for the Shares, other documentation reasonably deemed by the Company to be required under applicable law or as may be necessary to reflect the policies of the Company. Such documentation may include, without limitation, subscribers' written acknowledgement and agreement to the privacy policies of the Company.

7.      The Dealer will provide the Company with such information relating to the offer and sale of the Shares by it as the Company may from time to time reasonably request or as may be requested to enable the Company, as the case may be, to prepare such reports of sale as may be required to be filed under applicable federal or state securities laws and the rules and regulations thereunder.

8.      Further, the Dealer specifically agrees as set forth below:

(a) Shares shall not be offered and/or sold by the Dealer by means of any form of general solicitation or general advertising, including, but not limited to, the following:

> (1)     any advertisement, article, notice, or other communication published in any newspaper, magazine or similar media, cold mass mailings, broadcasts over television or radio, material contained on a website available to the public or an e-mail message sent to a large number of previously unknown persons;
>
> (2)     any seminar or meeting whose attendees have been invited by any general solicitation or general advertising; or
>
> (3)     any letter, circular, notice, or other written communication constituting a form of general solicitation or general advertising.

(b) In connection with any offer or sale of the Shares, the Dealer agrees to the following:

> (1)     to comply in all respects with statements set forth in the Private Placement Memorandum and any supplements or amendments to the Private Placement Memorandum;

WEST\278929533.2                              8

**EXHIBIT E, PAGE 13**

(2) not to make any statement inconsistent with the statements in the Private Placement Memorandum and any supplements or amendments to the Private Placement Memorandum;

(3) not to make any untrue or misleading statements of a material fact in connection with the Shares; and

(4) not to provide any written information, statements, or sales materials other than the Private Placement Memorandum and any supplements or amendments thereto and any supplemental information, unless approved in writing by the Company.

(c) The Dealer:

(1) acknowledges that any Registration Statement on Form S-11 or any draft registration statement submitted confidentially to the SEC pursuant to Section 6(e) of the Securities Act for an initial public offering of the shares of common stock of the Company (the "**Registration Statement**") relates only to the initial public offering of shares of common stock of the Company and not to this Offering;

(2) agrees that it will not utilize the Registration Statement or the prospectus that forms a part thereof in connection with the marketing of this Offering; and

(3) agrees that it will not offer or sell Shares in this Offering to any person who contacts the Dealer as a result of reviewing or receiving the Registration Statement or the prospectus that forms a part thereof.

(d) The Dealer shall advise each offeree of Shares in the Company at the time of the initial offering to such offeree that the Company shall, during the course of the Offering and a reasonable time before sale, accord offeree and offeree's agents or representatives, if any, the opportunity to ask questions and receive answers concerning the terms and conditions of the Offering and to obtain any additional information, to the extent possessed or obtainable by the Company without unreasonable effort or expense, that is necessary to verify the accuracy of the information contained in the Private Placement Memorandum.

(e) Before the sale of any of the Shares, the Dealer shall make reasonable inquiry to determine if the offeree is acquiring the Shares for offeree's own account or on behalf of other persons, and that the offeree understands the limitations on the

**EXHIBIT E, PAGE 14**

offeree's disposition of the Shares set forth in Rule 502(d) of Regulation D. This includes a determination by the Dealer that the offeree understands that he must bear the economic risk of the investment for an indefinite period of time because the Shares have not been registered under the Securities Act and, thus, cannot be sold unless the Shares are subsequently registered under the Securities Act or an exemption from registration under the Securities Act is available.

(f)     Before the sale of any of the Shares, the Dealer shall:

    (1)     have reasonable grounds to believe that each subscriber is an "accredited investor" as that term is then defined in Rule 501(a) of Regulation D; and

    (2)     have sufficient information concerning the offeree to determine that the offeree has such knowledge and experience in financial and business matters that the offeree is capable of evaluating the merits and risks of an investment in the Company.

(g)     The Dealer shall not distribute a Private Placement Memorandum, supplement or amendment thereto or any supplemental information to any offeree with whom the Dealer does not have a pre-existing substantive relationship, as defined from time to time by the SEC. The SEC makes this determination on a case-by-case basis, taking into account all relevant facts and circumstances. However, generally, such relationship must exist before the date on which the Dealer enters into this Agreement and must allow the Dealer to determine and understand the prospective investor's investment objectives, sophistication and financial situation and whether an investment in the Shares is suitable for such prospective investor.

(h)     The Dealer shall complete and deliver to the Company such certifications or other documentation requested by such parties regarding the Dealer's determinations referenced in paragraphs (d) through (g) above, including, without limitation, a certificate stating the number of each Private Placement Memorandum delivered to each offeree, and a confirmation that the Dealer reasonably believes that each such offeree is an "accredited investor" as that term is then defined in Rule 501(a) of Regulation D.

(i)     Shares shall not be sold by the Dealer to any non-accredited investors.

9.     The Dealer represents that neither it, nor any of its directors, executive officers, general partners, managing members or other officers participating in the offering of Shares, nor any of the directors, executive officers or other officers participating in the offering of Shares of any such general partner or managing member, nor any other officers, employees or associated persons of the Dealer or any such general partner or managing member that have been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of any Shares (each, a "**Dealer**

Covered Person" and, together, "**Dealer Covered Persons**"), is subject to any Disqualification Event except for a Disqualification Event (i) contemplated by Rule 506(d)(2) of the Securities Act and (ii) a description of which has been furnished in writing to the Company prior to the date hereof.

10. The Dealer represents that it is not a party to any agreement other than this Agreement regarding the payment (directly or indirectly) of remuneration for solicitation of purchasers in connection with the sale of any Shares. The Dealer will notify the Company of any such agreement entered into between the Dealer and any other person.

11. The representations and warranties in Sections 8.9 and 8.10 above are and shall be continuing representations and warranties throughout the term of the Offering. The Dealer will notify the Company in writing promptly upon the occurrence of (i) any Disqualification Event relating to any Dealer Covered Person not previously disclosed to the Company in accordance with Section 8.9 above, and (ii) any event that would, with the passage of time, become a Disqualification Event relating to any Dealer Covered Person.

12. The Dealer shall provide to the Company such certifications, documentation and other information as reasonably requested from time to time by the Company as such parties deem necessary or advisable to carry out the exercise of reasonable care under Rule 506(d) and (e) under the Securities Act in connection with this Offering.

13. The Dealer shall notify the Company of Subscription Agreements it receives within two (2) business days of receipt so that the Company may make any required federal or state law filings.

14. The Dealer will furnish to the Company upon request a complete list of all persons who have been offered the Shares (including the corresponding number of the Private Placement Memorandum delivered to such persons) and such persons' places of residence.

15. The Dealer will immediately bring to the attention of the Company any circumstance or fact which causes the Dealer to believe that the Private Placement Memorandum, or any Authorized Sales Materials (as defined in Section IX below), or any information supplied to prospective subscribers in their subscription materials, may be inaccurate or misleading.

16. The Dealer agrees to be bound by the terms of the Escrow Agreement dated December 7, 2017, among UMB Bank, N.A., as escrow agent, and the Company, a copy of which is attached hereto as **Exhibit B**, and the Dealer further agrees that it will not represent or imply that UMB Bank, N.A., as the escrow agent identified in the Private Placement Memorandum, has investigated the desirability or advisability of an investment in the Company or has approved, endorsed or passed upon the merits of the Shares or of the Company, nor will the Dealer use the name of said escrow agent in any manner whatsoever in connection with the offer or sale of the Shares other than by acknowledgment that it has agreed to serve as escrow agent.

WEST\278929533.2                    11

**EXHIBIT E, PAGE 16**

17. The Dealer has submitted (or will submit within 15 days of the first sale in the Offering) to FINRA a copy of the Private Placement Memorandum and any other related offering documents, including any materially amended versions thereof in accordance with the requirements of FINRA Rule 5123.

## IX.  Private Placement Memorandum and Sales Literature

Dealer is not authorized or permitted to give, and will not give, any information or make any representation (written or oral) concerning the Shares except as set forth in the Private Placement Memorandum as amended and supplemented or in the printed sales literature or other materials authorized by the Company for delivery to investors in this Offering ("**Authorized Sales Materials**"). The Company will supply Dealer with reasonable quantities of the Private Placement Memorandum, including amendments of and supplements to the Private Placement Memorandum, and any Authorized Sales Materials, for delivery to investors, with each such initial Private Placement Memorandum and any amended Private Placement Memorandum being numbered.  Dealer will deliver a copy of the Private Placement Memorandum, including any amendments and supplements thereto, each identified by number, to each investor to whom an offer is made prior to or simultaneously with the first solicitation of an offer to sell the Shares to an investor. When a supplement or amendment to the Private Placement Memorandum is prepared and delivered to the Dealer by the Company after delivery of the Private Placement Memorandum to an investor, the Dealer shall distribute each such supplement or amendment to the Private Placement Memorandum to every person who has previously received a copy of the Private Placement Memorandum from the Dealer. The Dealer shall keep memoranda in its records indicating to whom each Private Placement Memorandum, supplement or amendment thereto, and supplemental material was delivered, which memoranda shall further indicate by number to whom each initial Private Placement Memorandum and any amended and restated Private Placement Memorandum was delivered.  The Dealer further agrees to make such records available to the Company upon request and to make them available to representatives of the SEC and FINRA and applicable state securities administrators upon the Dealer's receipt of a subpoena or other appropriate document request from such agency.  Dealer will not send or give any Authorized Sales Materials to an investor unless the Authorized Sales Materials are accompanied by or preceded by the Private Placement Memorandum as amended and supplemented.

Except for the Authorized Sales Materials, the Company has not authorized the use of any supplemental literature or sales materials in connection with the Offering and the Dealer agrees not to use any material unless it has been authorized by the Company and provided to the Dealer by the Company.  Dealer agrees that it will not show or give to any investor or prospective investor or reproduce any material or writing that is supplied to it by the Company and marked "broker-dealer use only" or otherwise bearing a legend denoting that it is not to be used in connection with the sale of Shares to members of the public. Dealer agrees that it will not show or give to any investor or prospective investor in a particular jurisdiction any material or writing that is supplied to it by the Company if such material bears a legend denoting that it is not to be used in connection with the sale of Shares to members of the public in such jurisdiction.

WEST\278929533.2                        12

**EXHIBIT E, PAGE 17**

257

Dealer agrees that it will not use in connection with the offer or sale of Shares any material or writing that relates to another company supplied to it by the Company bearing a legend that states that such material may not be used in connection with the offer or sale of any securities of the Company. On becoming a Dealer, and in offering and selling Shares, the Dealer agrees to comply with all the applicable requirements under the Securities Act, the Exchange Act, applicable rules and regulations promulgated by the SEC, including Regulation D promulgated under the Securities Act, and applicable state securities laws and regulations.

## X. License and Association Membership

Dealer represents and warrants to the Company that it is a properly registered or licensed broker-dealer, duly authorized to offer and sell Shares under federal securities laws and regulations and the securities laws and regulations of all states where it offers or sells Shares and that it is a member of FINRA in good standing. This Agreement shall automatically terminate if the Dealer ceases to be a member of FINRA in good standing or is subject to a FINRA suspension or if the Dealer's registration or license under the Exchange Act or any state securities laws or regulations is terminated or suspended; the Dealer agrees to notify the Company immediately if any of these events occur.

## XI. Indemnification

1. The Company will indemnify and hold harmless the Dealer, its officers and directors and each person, if any, who controls the Dealer within the meaning of Section 15 of the Securities Act (collectively, the "**Indemnified Persons**") from and against any losses, claims, damages or liabilities, joint or several (collectively, the "**Losses**"), to which such Indemnified Persons may become subject, under the Securities Act, the Exchange Act or otherwise, insofar as such Losses (or actions in respect thereof) arise out of or are based upon (a) any untrue statement or alleged untrue statement of a material fact contained (i) in the Private Placement Memorandum or any amendment or supplement thereto or (ii) in any federal or state securities filing or other document executed by the Company or on its behalf specifically for the purpose of exempting any or all of the Shares from the registration requirements under the securities laws of any jurisdiction or based upon information furnished by the Company under the securities laws thereof (any such application, document or information being hereinafter called a "**Filing**"), or (iii) in any Authorized Sales Materials, or (b) the omission or alleged omission to state in the Private Placement Memorandum or any amendment or supplement thereto, or in any Filing or Authorized Sales Materials, a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading. The Company will reimburse each Indemnified Person for any legal or other expenses reasonably incurred by such Indemnified Person in connection with investigating or defending such Loss.

Notwithstanding the foregoing provisions of this Section 11.1, the Company will not be liable in any such case to the extent that any such Loss or expense arises out of or is based upon

WEST\278929533.2                    13

**EXHIBIT E, PAGE 18**

an untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with written information furnished to the Company by or on behalf of the Dealer, specifically for use in the preparation of the Private Placement Memorandum or any such amendment or supplement thereto, any such Filing or any Authorized Sales Material; and further, the Company will not be liable in any such case if it is determined that the Dealer was at fault in connection with the Loss, expense or action.

The foregoing indemnity agreement of this Section 11.1 is subject to the further condition that, insofar as it relates to any untrue statement, alleged untrue statement, omission or alleged omission made in the Private Placement Memorandum (or amendment or supplement thereto) that was eliminated or remedied in any subsequent amendment or supplement thereto, such indemnity agreement shall not inure to the benefit of an Indemnified Person from whom the person asserting any Losses purchased the Shares that are the subject thereof, if a copy of the Private Placement Memorandum as so amended or supplemented was not sent or given to such person at or prior to the time the subscription of such person was accepted by the Company, but only if a copy of the Private Placement Memorandum as so amended or supplemented had been supplied to the Dealer prior to such acceptance.

2.  The Dealer will indemnify and hold harmless the Company, each of its officers and directors, and each person, if any, who controls the Company within the meaning of Section 15 of the Securities Act (the "**Dealer Indemnified Persons**") from and against any Losses to which a Dealer Indemnified Person may become subject, under the Securities Act, the Exchange Act or otherwise, insofar as such Losses (or actions in respect thereof) arise out of or are based upon (a) any untrue statement or alleged untrue statement of a material fact contained (i) in the Private Placement Memorandum or any amendment or supplement thereto, (ii) in any Filing, or (iii) in any Authorized Sales Materials; (b) the omission or alleged omission to state in the Private Placement Memorandum or any such amendment or supplement thereto, in any Filing or in any Authorized Sales Materials, a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, provided that clauses (a) and (b) apply to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company by or on behalf of the Dealer specifically for use with reference to the Dealer in the preparation of the Private Placement Memorandum or any such amendment or supplement thereto or any such Filing or Authorized Sales Materials; (c) any use of sales literature not authorized or approved by the Company or any use of "broker-dealer use only" materials with members of the public by the Dealer in the offer and sale of the Shares or any use of sales literature in a particular jurisdiction if such material bears a legend denoting that it is not to be used in connection with the sale of Shares to members of the public in such jurisdiction; (d) any untrue statement made by the Dealer or its representatives or agents or omission to state a fact necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading in connection with the offer and sale of the Shares; (e) any material violation of this Agreement; (f) any failure to comply with applicable laws governing privacy issues, money laundering abatement and anti-terrorist financing efforts, including applicable rules of the SEC, FINRA and the USA PATRIOT Act of 2001 and the regulations and programs administered by the OFAC at the U.S. Department of the Treasury; (g) any other failure to comply with applicable rules of FINRA or federal or state securities laws and the rules and regulations promulgated thereunder; or (h) the failure by any subscriber of a Share to comply with the Investor Suitability Requirements set forth in the section captioned "Who May Invest" in the Private Placement Memorandum.  The Dealer will reimburse each Dealer Indemnified Person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such Loss, expense or action.  This indemnity agreement will be in addition to any liability that the Dealer may otherwise have.

3.      Promptly after receipt by an indemnified party under this Section XI of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section XI, notify in writing the indemnifying party of the commencement thereof. The failure of an indemnified party to so notify the indemnifying party will relieve such indemnifying party from any liability under this Section XI as to the particular item for which indemnification is then being sought, but not from any other liability that it may have to any indemnified party. In case any such action is brought against any indemnified party, and it notifies an indemnifying party of the commencement thereof, the indemnifying party will be entitled, to the extent it may wish, jointly with any other indemnifying party similarly notified, to participate in the defense thereof, with separate counsel. Such participation shall not relieve such indemnifying party of the obligation to reimburse the indemnified party for reasonable legal and other expenses (subject to Section 11.4) incurred by such indemnified party in defending itself, except for such expenses incurred after the indemnifying party has deposited funds sufficient to effect the settlement, with prejudice, of the claim in respect of which indemnity is sought. Any such indemnifying party shall not be liable to any such indemnified party on account of any settlement of any claim or action effected without the consent of such indemnifying party. Any indemnified party shall not be bound to perform or refrain from performing any act pursuant to the terms of any settlement of any claim or action effected without the consent of such indemnified party.

4.      The indemnifying party shall pay all legal fees and expenses of the indemnified party in the defense of such claims or actions for which indemnification is sought pursuant to this Section XI; provided, however, that the indemnifying party shall not be obligated to pay legal expenses and fees to more than one law firm in connection with the defense of similar claims arising out of the same alleged acts or omissions giving rise to such claims notwithstanding that such actions or claims are alleged or brought by one or more parties against more than one indemnified party. If such claims or actions are

**EXHIBIT E, PAGE 20**

alleged or brought against more than one indemnified party, then the indemnifying party shall only be obliged to reimburse the expenses and fees of the one law firm that has been selected by a majority of the indemnified parties against which such action is finally brought; and in the event a majority of such indemnified parties is unable to agree on which law firm for which expenses or fees will be reimbursable by the indemnifying party, then payment shall be made to the first law firm of record representing an indemnified party against the action or claim. Such law firm shall be paid only to the extent of services performed by such law firm and no reimbursement shall be payable to such law firm on account of legal services performed by another law firm.

## XII.  Anti-Money Laundering Compliance Programs

Dealer's acceptance of this Agreement constitutes a representation to the Company that the Dealer has established and implemented an anti-money laundering and customer identification compliance program ("**AML Program**") in accordance with applicable laws and regulations, including federal and state securities laws, applicable rules of FINRA, and the Bank Secrecy Act, Title 31 U.S.C. Sections 5311-5355, as amended by the USA Patriot Act of 2001, and related regulations (31 C.F.R. Part 103), and will continue to maintain its AML Program consistent with applicable laws and regulations during the term of this Agreement.

In accordance with these applicable laws and regulations and its AML Program, Dealer agrees to verify the identity of its new customers; to maintain customer records; to check the names of new customers against government watch lists, including the Office of Foreign Asset Control's (OFAC) list of Specially Designated Nationals and Blocked Persons. Additionally, Dealer will monitor account activity to identify patterns of unusual size or volume, geographic factors and any other "red flags" described in the USA Patriot Act as potential signals of money laundering or terrorist financing. Dealer will submit to the Financial Crimes Enforcement Network any required suspicious activity reports about such activity and further will disclose such activity to applicable federal and state law enforcement when required by law. Upon request by the Company at any time, the Dealer hereby agrees to furnish (a) a copy of its AML Program to the Company for review, and (b) a copy of the findings and any remedial actions taken in connection with Dealer's most recent independent testing of its AML Program.

EXHIBIT E, PAGE 21

## XIII.   Effectiveness, Termination and Amendment

This Agreement shall become effective upon the execution hereof by the Dealer and the receipt of this executed Agreement by the Company. Dealer will immediately suspend or terminate its offer and sale of Shares upon the request of the Company at any time and will resume its offer and sale of Shares hereunder upon subsequent request of the Company. In addition to termination pursuant to Section X, any party may terminate this Agreement by written notice, which termination shall be effective 48 hours after such notice is given. Upon the sale of all of the Shares, this Agreement shall terminate without obligation on the part of the Dealer or the Company, except as set forth in this Agreement. The respective agreements and obligations of the Company and the Dealer set forth in Sections IV, V, VI, 8.2, 8.5, 8.6, 8.7, IX, XI and XIII through XXV of this Agreement shall remain operative and in full force and effect regardless of the termination of this Agreement.

This Agreement may be amended at any time by the Company by written notice to the Dealer. Any such amendment shall be deemed accepted by the Dealer upon the Dealer placing an order for the sale of Shares after it has received such notice.

## XIV.   Privacy Laws

The Dealer agrees as follows:

1.      The Dealer agrees to abide by and comply in all respects with (a) the privacy standards and requirements of the Gramm-Leach-Bliley Act of 1999 ("**GLBA**") and applicable regulations promulgated thereunder, (b) the privacy standards and requirements of any other applicable federal or state law, including the Fair Credit Reporting Act ("**FCRA**") and (c) its own internal privacy policies and procedures, each as may be amended from time to time;

2.      Dealer shall not disclose nonpublic personal information (as defined under the GLBA) of all customers who have opted out of such disclosures, except to service providers (when necessary and as permitted under the GLBA) or as otherwise required by applicable law;

3.      Except as expressly permitted under the FCRA, Dealer shall not disclose any information that would be considered a "consumer report" under the FCRA; and

4.      Dealer shall be responsible for determining which customers have opted out of the disclosure of nonpublic personal information by periodically reviewing and, if necessary, retrieving a list of such customers (the "**List**") to identify customers that have exercised their opt-out rights. In the event either party expects to use or disclose nonpublic personal information of any customer for purposes other than servicing the customer, or as otherwise required by applicable law, that party must first consult the List to determine whether the affected customer has exercised his or her opt-out rights. Each party understands that it is prohibited from using or disclosing any nonpublic personal

EXHIBIT E, PAGE 22

information of any customer that is identified on the List as having opted out of such disclosures.

## XV.  Customer Complaints

The Dealer agrees to promptly provide to the Company copies of any written or otherwise documented complaints from customers of the Dealer received by the Dealer relating in any way to the Offering (including, but not limited to, the manner in which the Shares are offered by the Dealer).

## XVI.  Notice

All notices to the Company shall be in writing addressed to the Company at the address set forth below.  All notices to Dealer shall be in writing addressed to the Dealer at the address specified by the Dealer at the end of this Agreement.  Notices addressed to the intended recipient as described above will be duly given (a) when personally delivered or by commercial messenger, (b) one business day following deposit with a recognized overnight courier service, provided such deposit occurs prior to the deadline imposed by such service for overnight delivery; or (c) when transmitted, if sent by facsimile copy, provided confirmation of receipt is received by sender and such notice is sent by an additional method provided hereunder.

To the Company:     EquiAlt Secured Income Portfolio REIT, Inc.
                    720 E. Henderson Avenue
                    Tampa, Florida 33602

## XVII.  Confidentiality

In connection with the Dealer's due diligence review of the Offering, the Dealer (or its agent performing due diligence) may request receipt of confidential information regarding the Offering, the Company, the Company's sponsor or the sponsor's affiliates.  The Company will reasonably cooperate with the Dealer to accommodate such request; provided, however, any such information provided to Dealer or its agent will be subject to the terms of the confidentiality agreement attached as Appendix A to this Agreement. **The parties hereto acknowledge and agree that the terms of the confidentiality agreement attached as Appendix A hereto are also intended to directly benefit the Company and EquiAlt Capital Advisors LLC ("EquiAlt CA"), its subsidiaries and/or affiliates (which group includes, but is not limited to, EquiAlt Holdings LLC ("EquiAlt Holdings"), and investment programs sponsored by EquiAlt Holdings and/or its respective subsidiaries and/or affiliates (whether such programs are sponsored directly or through joint ventures)), and joint venture partners of EquiAlt Holdings and EquiAlt CA and their affiliates, all of which are intended third-party beneficiaries of the Dealer's obligations under the confidentiality agreement attached as Appendix A hereto and each of which has the right to enforce its terms at law or at equity,**

**EXHIBIT E, PAGE 23**

including the right to seek injunctive relief, against the Dealer.

## XVIII. Entire Agreement

This Agreement and the exhibits hereto are the entire agreement of the parties and supersede all prior agreements, if any, relating to the subject matter hereof between the parties hereto.

## XIX. Successors and Assigns

No party shall assign this Agreement or any right, interest or benefit under this Agreement without the prior written consent of the other party. This Agreement shall be binding upon the Company and the Dealer and their respective successors and permitted assigns.

## XX. Dispute Resolution and Applicable Law

20.1    Any dispute, claim, controversy or difference which may arise between or among any two or more parties having rights under this Agreement shall, if possible, be settled by mutual consultation in good faith between the parties. Such mutual consultation shall take place as soon as practicable after the receipt by one party or a written notice from another party describing the dispute, controversy or difference between them. In the event that the dispute is not resolved to the satisfaction of all involved parties by such consultation within fortyfive (45) days of the written notice given to one party pursuant to this Section 20.1, a party to the dispute may initiate the arbitration procedure set forth below. Such arbitration shall be the exclusive method for resolving any such unresolved disputes.

20.2    Any unresolved dispute, controversy, difference or claim will be subject to binding arbitration in New York City, New York, before a single arbitrator (the "**Arbitrator**"), in accordance with the rules and procedures of the American Arbitration Association and consistent with the provisions of this Section XX. The Arbitrator shall be independent and shall be selected by mutual agreement of the parties involved or, in the absence of such agreement, by two other arbitrators, one of each selected by the disputing parties in their discretion. The parties acknowledge that the following conditions apply to such arbitration: (1) arbitration is final and binding on the parties; (2) the parties are waiving their right to seek remedies in court, including the right to jury trial; (3) prearbitration discovery is generally more limited than and different from court proceedings; and (4) the Arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings is strictly limited. Judgment upon such arbitration award may be entered in any court having jurisdiction over the parties or their assets.

20.3    If any arbitration, legal action or other proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the substantially prevailing party (as determined by the arbitrator) shall be entitled to recover reasonable

EXHIBIT E, PAGE 24

attorneys' fees and other costs incurred in that action or proceeding (and any additional proceeding for the enforcement of a judgment) in addition to any other relief to which it or they may be entitled.

20.4    This Agreement shall be construed under the laws of the State of New York, without regard to its conflict of law provisions; provided, however, that the governing law for causes of action for violations of federal or state securities law shall be governed by the applicable federal or state securities law.

## XXI.    Severability

The invalidity or unenforceability of any provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted.

## XXII.    Counterparts

This Agreement may be executed in any number of counterparts.  Each counterpart, when executed and delivered, shall be an original contract, but all counterparts, when taken together, shall constitute one and the same agreement.

## XXIII. ERISA Matters.

The Dealer acknowledges and agrees as follows:

1.    The Company, EquiAlt CA, the sponsor of the Company and each of their respective affiliates and related parties (collectively, the "**EquiAlt Parties**"), may engage in sales and marketing activities with the Dealers.  These activities may include, without limitation, attending meetings, conferences and forums, as well as making offering materials, sales literature, educational materials and other resources available in connection with sales and marketing activities regarding the Company to the Dealers and their respective affiliates.

2.    With respect to any of the Dealer's customers which is a plan, plan fiduciary, plan participant or beneficiary, individual retirement account ("**IRA**") or IRA owner subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") or Section 4975 of the Internal Revenue Code of 1986, as amended (the "**Code**") (collectively, "**Retirement Customers**"), the EquiAlt Parties are not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with any transaction in the Company ("**Transaction**").

3.    Certain of the EquiAlt Parties have financial interests associated with the purchase of Shares of the Company, including the fees, expense reimbursements

WEST\278929533.2                                     20

**EXHIBIT E, PAGE 25**

and other payments they anticipate receiving in connection with the purchase of Shares of the Company, as described in the Private Placement Memorandum.

4.  The EquiAlt Parties are not receiving a fee or other compensation directly from the Dealer or any of their Retirement Customers for the provision of investment advice (as opposed to other services) in connection with any Transaction.

5.  By continuing to advise the Dealer's Retirement Customers with respect to any Transaction in the Company, the Dealer represents and warrants that:

    (a)  The Dealer is a broker dealer registered under the Exchange Act;

    (b)  There is no financial interest, ownership interest, or other relationship, agreement, or understanding that would limit the Dealer's ability to carry out its fiduciary responsibility to any of its Retirement Customers beyond the control, direction, or influence of other persons involved in the Transaction;

    (c)  The Dealer is capable of evaluating investment risk independently, both in general and with regard to particular transactions and investment strategies; and

    (d)  The Dealer is a fiduciary under ERISA or the Code, or both, with respect to the Transaction, and the Dealer is responsible for exercising independent judgment in evaluating the Transaction, with respect to its Retirement Customers.

**XXIV. No Partnership**

Nothing in this Agreement shall be construed or interpreted to constitute the Dealer as an employee, agent or representative of, or in association with or in partnership with the Company or the other Dealers; instead, this Agreement shall only constitute the Dealer as a dealer authorized to sell the Shares according to the terms set forth in the Private Placement Memorandum as amended and supplemented and in this Agreement.

**XXV.  Confirmation**

The Company agrees to confirm all orders for the purchase of Shares that are accepted by the Company.

*[signature page follows]*

WEST\278929533.2                    21

EXHIBIT E, PAGE 26

Attest:

THE COMPANY:

EQUIALT SECURED INCOME PORTFOLIO
REIT, INC.

By: _____

Name

By: _____

Name

_____

Title

_____

Title

We have read the foregoing Agreement and we hereby accept and agree to the terms and conditions set forth therein. We hereby represent that the list below of jurisdictions in which we are registered or licensed as a broker or dealer and are fully authorized to sell securities is true and correct, and we agree to advise you of any change in such list during the term of this Agreement.

1.    Identity of Dealer:

Name: _____Robert Armijo_____

Type of entity: _____LLC_____
                 (corporation, partnership or proprietorship)

Organized in the State of: _____CA_____
                            (State)

Licensed as broker-dealer in the following States: _____N/A series 65_____

_____

Tax I.D. #: _____

**EXHIBIT E, PAGE 27**

2.	Person to receive notice pursuant to Section XVI:

Name:_____

Company:_____

Address:_____

City, State and Zip Code:_____

Telephone No.:   (____)_____

Telefax No.:	(____)_____

E-mail Address:   _____


AGREED TO AND ACCEPTED BY THE DEALER:


_____
	(Dealer's Firm Name)

By:_____
	Authorized Signature

Title:_____

EXHIBIT E, PAGE 28

APPENDIX A

Dealer Confidentiality Agreement

EquiAlt Capital Advisors LLC ("EquiAlt CA"), its subsidiaries and/or affiliates (which group includes, but is not limited to, EquiAlt Holdings LLC ("EquiAlt Holdings") and investment programs sponsored by EquiAlt Holdings and/or its respective subsidiaries and/or affiliates (whether such programs are sponsored directly or through joint ventures)), and joint venture partners of EquiAlt Holdings and EquiAlt CA and their affiliates (collectively, "EquiAlt"), may disclose Confidential Information (as defined below) to Dealer and its Representatives (as defined below), in connection with their due diligence efforts in respect of one or more offerings of securities sponsored by EquiAlt (the "Offerings"). This Appendix A constitutes part of the Selected Dealer Agreement between the Company and Dealer (the "Selected Dealer Agreement") and sets forth the agreements and understandings among the Company, Dealer and EquiAlt with respect to the disclosure of Confidential Information.

      1.    _General_. As a condition to receiving such Confidential Information, Dealer hereby agrees that it and its Representatives will: (i) hold all such Confidential Information in trust and in the strictest confidence, (ii) protect such Confidential Information from disclosure in accordance with a standard of care that shall be no less than the care such party uses to protect its own confidential information of like importance but in no event with less than reasonable care, (iii) treat all such Confidential Information in accordance with the provisions of this Appendix A and (iv) take or abstain from taking certain other actions hereinafter set forth.

      Prior to the receipt of any Confidential Information, each Representative shall have been made aware of and have agreed to be bound by the terms set forth in this Appendix A. Neither the Dealer nor any of its Representatives shall use, copy, disclose, disseminate, or permit any unauthorized person access to, any Confidential Information without EquiAlt's prior written consent. The Dealer and its Representatives may, with EquiAlt's prior written consent, communicate Confidential Information to another broker-dealer that has entered into a separately-negotiated confidentiality agreement with EquiAlt (which agreement with EquiAlt shall be in substantially the form hereof). Any such Confidential Information disseminated pursuant to the immediately preceding sentence shall remain confidential notwithstanding any such communication to another person. To the extent Confidential Information is provided by Dealer pursuant to the terms hereof, the Dealer and each Representative shall ensure that any existing confidentiality notices included on or with the Confidential Information are included in any such disclosures or, if no such notices are included, "Confidential" or some similar notice is stamped on the Confidential Information.

      For purposes of this Appendix A, the term "Representative" shall include an officer, director, manager, employee, owner, member or partner of Dealer performing a due diligence review of EquiAlt, a consultant, due diligence provider, accountant or attorney of Dealer

**EXHIBIT E, PAGE 29**

performing a due diligence review of EquiAlt on behalf of Dealer, and any person or committee, as the case may be, responsible for determining whether Dealer will participate in the Offerings, provided that in each case, such person has a need to know such information; provided further that, in no event, may such information be shared with any person involved in retail selling efforts related to any Offerings.

2. _Confidential Information._ For purposes hereof, "Confidential Information" means all information concerning the business, financial condition, operations, prospects, assets and liabilities of EquiAlt (including materials and matters provided to and discussed by the board of directors of EquiAlt and the committees of the board) that EquiAlt believes is either confidential, proprietary or otherwise not generally available to the public, whether prepared by EquiAlt, its advisors or otherwise (including information received by EquiAlt from third parties under confidential conditions) and which is furnished to Dealer or any of its Representatives in writing, orally or by any other means in connection with the Offerings, and includes all analyses, notes, compilations, summaries, studies or other documents, records or data prepared by Dealer or its Representatives which contain, reflect or are generated from, such information. However, Confidential Information shall not include information that: (A) is generally available to the public other than as a result of a disclosure by the Dealer or its Representatives in breach of this Appendix A; (B) is known to the Dealer or its Representatives prior to the date of the Selected Dealer Agreement; provided, that, such information is not known by the Dealer or its Representatives to be subject to another confidentiality agreement with, or other obligation or undertaking of secrecy to EquiAlt; (C) is independently disclosed to the Dealer or its Representatives by a third-party which the Dealer or its Representative reasonably believes has a bona fide right to do so without violating any obligation of confidentiality or (D) is developed by the Dealer or any of its Representatives completely independent of any information disclosed to the Dealer or any of its Representatives in connection with their due diligence review.

3. _Legally Required Disclosures._ In the event that the Dealer or any of its Representatives is requested or required (by deposition, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) by any court or governmental agency or authority or other supervisory body, or by application of law, regulation or legal or regulatory process to disclose any of the Confidential Information, the Dealer shall: (A) provide EquiAlt with prompt written notice of any such request or requirement so that EquiAlt may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Appendix A, (B) if the Dealer or any of its Representatives is required based upon the advice of their respective legal counsel, to disclose Confidential Information, the Dealer or such Representative may, without liability hereunder, disclose only that portion of the Confidential Information which such legal counsel advises is legally required to be disclosed; provided, that, the Dealer or such Representative exercises reasonable efforts to otherwise preserve the confidentiality of the Confidential Information and (C) upon reasonable notice, the Dealer and its Representatives will cooperate with EquiAlt in obtaining a protective order or other appropriate remedy reasonably limiting disclosure to appropriate parties relating to the applicable proceeding; provided, that, the foregoing (i) shall

EXHIBIT E, PAGE 30

not require the Dealer or its Representatives to delay production of any Confidential Information and (ii) shall apply only to the extent that EquiAlt bears all costs and expenses of such cooperation, including, but not limited to, payment to the Dealer or its Representative, as applicable, for time expended by its staff relating to any such efforts at its then current billing rates and reimbursement of all reasonable attorney's fees and costs of legal counsel associated therewith.   Neither the Dealer nor any of its Representatives is required to take any action pursuant to clause (C) of the immediately preceding sentence without reasonable assurances from EquiAlt that such payment and reimbursement will be provided.

4.   <u>Ownership of Confidential Information</u>.  Confidential Information, including any copies, printouts and summaries thereof, shall remain the property of EquiAlt and all applicable rights in patents, copyrights, trade secrets and similar intellectual property rights embodied in the Confidential Information shall remain in EquiAlt.

5.   <u>Return of Confidential Information</u>.   Except for due diligence files and copies maintained to comply with applicable rules and regulations upon advice of counsel, Dealer agrees promptly upon EquiAlt's written request to return all written material, including copies or printouts and summaries thereof, and destroy all material held by Dealer or any of its Representatives in electronic form (including material on disks or tapes) containing Confidential Information, submitted to Dealer or its Representatives or prepared by Dealer or its Representatives based upon such Confidential Information.   Notwithstanding the return or destruction of Confidential Information, Dealer and its Representatives will continue to hold in confidence all Confidential Information and be bound by their respective obligations under the terms of this <u>Appendix A</u>.

6.   <u>Remedies</u>.  Each party agrees that the obligations hereunder are necessary and reasonable in order to protect EquiAlt and its business, and expressly agrees that monetary damages would not be a sufficient remedy for any violation of the terms of this <u>Appendix A</u> and, accordingly, EquiAlt shall be entitled to seek equitable relief, including, but not limited to, specific performance and injunctive relief as remedies for any violation, including, without limitation, the actual or threatened disclosure of Confidential Information without the prior written consent of EquiAlt.   Such remedies shall not be deemed to be exclusive remedies for a violation of the terms of this <u>Appendix A</u>, but shall be in addition to all other remedies available to EquiAlt at law or equity.   The Dealer agrees that neither it nor any of its Representatives will raise the defense of an adequate remedy at law in any action seeking equitable relief.   The Dealer shall indemnify and hold harmless EquiAlt from and against all liabilities, obligations, claims, damages, penalties, causes of action costs and expenses (including reasonable attorneys' fees and expenses actually incurred) imposed upon or incurred by or asserted against EquiAlt by reason of a violation of the terms of this <u>Appendix A</u> by the Dealer or any of its Representatives.

7.   <u>Waiver</u>.  No delay or failure in exercising any rights hereunder shall be construed to be a waiver of such rights, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right hereunder.

WEST\278929533.2                          26

**EXHIBIT E, PAGE 31**

8.   <u>Governing Law</u>.   THIS <u>APPENDIX A</u> SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.   EACH OF THE PARTIES HEREBY AGREE AND SUBMIT TO THE PERSONAL JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED WITHIN THE STATE OF CALIFORNIA FOR THE RESOLUTION OF ANY DISPUTE THAT MAY ARISE UNDER THIS <u>APPENDIX A</u>, AND THAT THE STATE AND FEDERAL COURTS LOCATED WITHIN THE STATE OF CALIFORNIA HAVE EXCLUSIVE JURISDICTION FOR ANY SUCH DISPUTES.

9.   <u>Severability</u>.  If for any reason any provision of this <u>Appendix A</u> shall be declared void or invalid, such declaration shall not affect the validity of the remainder of this <u>Appendix A</u> which shall remain in full force and effect as if executed with the void or invalid provision eliminated.

10.   <u>Binding Agreement</u>.  This <u>Appendix A</u> shall be binding upon, and shall inure to the benefit of EquiAlt (including each of the entities included in the definition of "EquiAlt" in the preamble to this Agreement), the Dealer and their respective successors in interest.

11.   <u>Non-Assignment</u>.   This <u>Appendix A</u>, and the rights and obligations hereby created, may not be assigned by the Dealer without the express written consent of EquiAlt.

12.   <u>Entire Agreement</u>.   This <u>Appendix A</u> constitutes the entire agreement and supersedes and replaces any prior or existing agreement relating to treatment of Confidential Information relating to EquiAlt and the Offerings.

13.   <u>Captions</u>.  The captions contained in this <u>Appendix A</u> are for convenience only, form no part of this <u>Appendix A</u> and shall not in any manner amplify, limit, modify or otherwise affect the interpretation of this <u>Appendix A</u>.

EXHIBIT E, PAGE 32

# EXHIBIT D

Cory C. Kirchert (*pro hac vice*)
Adriaen M. Morse Jr. (SBN 188358)
SECIL Law PLLC
1701 Pennsylvania Ave., NW, Suite 200
Washington, DC 20006
T: (202) 417-8232
E: ckirchert@secillaw.com
E: amorse@secillaw.com

WRIGHT, L'ESTRANGE & ERGASTOLO
Robert C. Wright (SBN 051864)
rwright@wlelaw.com
Andrew E. Schouten (SBN 263684)
aschouten@wlelaw.com
402 West Broadway, Suite 1800
San Diego, California 92101
Telephone:  (619) 231-4844
Facsimile:   (619) 231-6710

Counsel for Defendants Joseph Financial, Inc.
and Robert Joseph Armijo

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    vs.<br><br>ROBERT JOSEPH ARMIJO, and JOSEPH FINANCIAL, INC.,<br><br>    Defendants. | Case No. 3:21-cv-01107-TWR-AHG<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, TO STAY ACTION**<br><br>Date:    January 19, 2023<br>Time:   1:30 p.m .<br>Judge:  The Hon. Todd W. Robinson<br>Courtroom:   3A (3rd Floor)<br><br>Complaint Filed:  June 14, 2021 |

Case No. 3:21-cv-01107-TWR-AHG

# **TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................ 2

    A. Defendants Are Deemed Absolutely Liable On The Section 5 Claim ............................................................................................... 2

    B. Defendants Acted Only As An Offering Agent Of The Issuers .......... 3

    C. The Issuers' Insiders Defrauded Defendants And Investors ............... 4

    D. Plaintiff Has Already Succeeded In Tarnishing Armijo's Reputation ....................................................................................... 4

II. STATEMENT OF FACTS ........................................................................... 6

    A. Relevant Issuers ............................................................................... 6

    B. The Insiders ...................................................................................... 6

    C. Davison and Wassgren Chose a Regulation D Offering ..................... 7

    D. Rule 506(b) was Allegedly Unavailable and the Offering Disqualified ...................................................................................... 7

    E. Defendants Acted As Offering Agents .............................................. 8

    F. Defendants Were Unaware of Insiders' Violations ........................... 10

III. ARGUMENT ........................................................................................... 11

    A. Legal Standard ............................................................................... 11

    B. Defendants Did Not Violate Section 5(a) ........................................ 11

    C. The Section 5 Litigation Algorithm Violates Due Process ............... 12

        1. The Litigation Algorithm of the "Section 5 Violation"..........14

        2. The Prima Facie, Automatic-Violation Rule......................16

        3. The Burden-Shifting Rule……………………………………..17

        4. The All-or-Nothing Exemption-Qualification Rule…………..18

        5. Automatic Exemption Disqualification is also a Rule…… …18

        6. The Irrefutable Presumption of Defendants' Violation…… ..19

i          Case No. 3:21-cv-01107-TWR-AHG

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

D.    The Section 5 Litigation Algorithm and Remedies Violate Equal Protection ............................................. 20

E.    Defendants were Not "Brokers" under the Exchange Act .................. 20

F.    Relief in this Action is Unwarranted ................................. 22

    1.    Defendants Relied in Good Faith on Counsel ..................... 22

    2.    Disgorgement is Unwarranted as a Matter of Law ............... 24

    3.    Civil Money Penalties are Not Warranted as a Matter of Law .. 26

    4.    Injunction is Not Warranted as a Matter of Law ................. 26

    5.    Alternatively, the First-To-File Rule Requires That This Case Be Stayed Because an Earlier Case is Pending in the U.S. District Court for the Middle District of Florida on Substantially the Same Issues ..................... 27

IV.    CONCLUSION ............................................. 29

1

## TABLE OF AUTHORITIES

2

3

**Cases**

4

*Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017) ........................ 16

5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................... 11

*Animal Legal Def. Fund v. U.S. FDA*, 836 F.3d 987 (2016)................................. 28

6

*Brown v. Gardner*, 513 U.S. 115 (1994) ................................................................ 15

7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................... 11

8

*Church of Scientology v. United States Dep't of Army*, 611 F.2d 738 (9th Cir. 1979) 28

9

*Davis v. Michigan Dep't of Treasury*, 489 U.S. 803 (1989)................................... 15

10

*ESG Capital Partners, L.P. v. Stratos*, 828 F.3d 1023 (9th Cir. 2016).................. 25

11

*ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023  (9th Cir. 2016).................. 25

12

*Federal Express Corp. v. Dep't of Commerce*, 39 F.4th 756 (2017) ..................... 12

13

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ................. 24

*Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767 (9th Cir. 1984) ........................ 20

14

*Holdridge v. U.S.*, 282 F.2d 302 (8th Cir.1960) ................................................... 12

15

*In re ChinaCast Education Corp. Sec. Litig.*, 809 F.3d 471 (9th Cir. 2015) ........... 19

16

*Liu v. SEC*, ____U.S. ____,140 S.Ct. 1936 (2020) .............................................. 1

17

*Nakash v. Marciano*, 882 F.2d 1411 (9th Cir. 1989) ......................................... 28

18

*Ollis v. Shulkin*, 857 F.3d 1338 (Fed. Cir. 2017)................................................ 15

19

*Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93 (9th Cir. 1982) .................. 28

20

*Parvin v. Davis Oil Co.*, 524 F.2d 112 (9th Cir. 1975) ...................................... 18

*Pennaluna & Co v. SEC*, 410 F.2d 861 (9th Cir. 1969) ...................................... 17

21

*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014).............................. 16

22

*Princess Cruises, Inc. v. United States*, 201 F.3d 1352 (Fed. Cir. 2000)................ 16

23

*Quinn & Co. v. SEC*, 452 F.2d 943 (10th Cir. 1971) .......................................... 17

24

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979)................................................... 16

25

*Roper v. Nicholson*, 20 Vet.App. 173 (2006) ..................................................... 16

26

*Schlemmer v. Buffalo, R. & P.R. Co.*, 205 U.S. 1 (1907)..................................... 17

27

*SEC v. Alliance Leasing Corp.*, 28 F.Appx. 648 (9th Cir. 2002)........................... 23

28

*SEC v. Apartments Am. LLC*, No. SA cv 12-0754 Doc (ANx) 2014 U.S. Dist. LEXIS 27633 (C.D. Cal. Mar. 3, 2014)......................................................................... 23

*SEC v. Blazon Corp.,* 609 F.2d 960 (9th Cir. 1979)......................................................17

*SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248 (9th Cir. 2013) ..............................22

*SEC v. Fitzgerald*, 135 F. Supp.2d 992 (N.D. Cal. 2001) ...........................................23

*SEC v. Ginsburg*, 362 F.3d 1292 (11th Cir. 2004)........................................................27

*SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459 (9th Cir. 1985)..............23

*SEC v. M & A West, Inc.*, No. C-01-3376 VER, 2005 U.S. Dist. LEXIS 2245  (N.D. Cal. June 20, 2005) ..............................................................................................27

SEC v. *M&A West, Inc.*, 538 F.3d 1043 (9th Cir. 2008).................................................23

*SEC v. M&A West, Inc.*, No. C-01-3376 VRW, No. 2005 U.S. Dist. LEXIS 30297 (N.D. Cal. Oct. 31, 2005)..............................................................................................23

*SEC v. Murphy*, 626 F.2d 633 (9th Cir.1980) ....................................14, 16, 17, 26, 27

*SEC v. North American Research & Development Corp.*, 424 F.2d 63, 81 (2d Cir. 1970) ...............................................................................................................................16

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ........................................................17

*SEC v. Savoy Industries, Inc.*, 665 F.2d 1310 (D.C. Cir. 1981)..................................23

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) .......................................................23

*SEC v. Texas Gulf Sulphur Co.*, 312 F. Supp. 77 (S.D.N.Y. 1970) ............................13

*SEC v. Zouvas*, No. CV-17-00427-PHX-SPL, 2019  U.S. Dist. LEXIS 145606 (D. Ariz. Aug. 26, 2019) ......................................................................................................23

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626 (9th Cir. 1987). .........................................................................................................................................11

*Texaco, Inc. v. Short*, 454 U.S. 516  (1982) ................................................................12

*U.S. v. Bronstein*, 849 F.3d 1101 (D.C. Cir. 2017) .....................................................12

*U.S. v. Crosby,* 294 F.2d 928 (2d Cir. 1961) .................................................................5

*U.S. v. Nguyen*, 73 F.3d 887  (9th Cir. 1995) ..............................................................12

*Walker v. Progressive Cas. Ins. Co.*, No. C03-656R, 2003 U.S. Dist. LEXIS 7871 (W.D. Wash. May 9, 2003)............................................................................................28

**Statutes**

§ 15(a)(1) .........................................................................................................................1

§ 230.152 .........................................................................................................................8

§ 77b(a)(11) ...................................................................................................................21

§ 77b(a)(3) .....................................................................................................................11

§ 77b(a)(4) .......................................................................................................................8

§ 77d ..............................................................................................................................13

§ 77d(a)(2) .................................................................................................. 7

§ 77e ........................................................................................................... 7

§ 77e(a) ..................................................................................................... 11

§ 77e(a)(1) .................................................................................................. 1

§ 77e(c) .................................................................................................. 1, 15

§ 77h ......................................................................................................... 16

§ 77t(b) ...................................................................................................... 26

§ 77t(d) ...................................................................................................... 24

§ 77t(d)(1) .................................................................................................. 26

§ 78c(a)(4)(A) .............................................................................................. 3

§ 78c(a)(5)(A) ............................................................................................ 21

§ 78o(a)(1) ............................................................................................. 1, 21

§ 78o(b)(4)(D) ............................................................................................ 20

§ 78u(d)(1) ................................................................................................. 13

§ 78u(d)(2) ................................................................................................. 26

§ 78u(d)(3) ................................................................................................. 26

§ 78u(d)(3)(A)(ii) ...................................................................................... 24

**Rules**

Rule 506 ....................................................................................................... 7

Rule 506(b) ............................................................................. 2, 7, 8, 26, 27

**Regulations**

§ 227.100 .................................................................................................... 17

§ 230.251 .................................................................................................... 16

§ 230.500 .................................................................................................... 17

§ 506(b) ....................................................................................................... 7

§ 77c(b) ...................................................................................................... 16

17 C.F.R. § 230.506(b)], ........................................................................ 2, 7

Fed. R. Civ. P. 56(c) ................................................................................. 11

Defendants, Robert Joseph Armijo ("Armijo") and Joseph Financial, Inc. ("JFI"), move for an order under Fed. R. Civ. P. 56(c) dismissing, as a matter of law, the two claims of the Plaintiff Securities and Exchange Commission ("SEC"). The SEC alleges that, from 2016 to 2019, Defendants: (1) offered, sold, and delivered unregistered securities and thereby violated §§ 56(c), 5(a)(1), and (2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(c) and 77e(a)(1) and (2)] ("Section 5" or "Section 5 Claim"), respectively; and (2) sold securities as an unregistered broker and thereby violated § 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)] ( "Section 15(a)(1) Claim"). Defendants alternatively move for an order denying, as a matter of law, Plaintiff's requested relief of disgorgement, civil money penalties, or injunction on these claims.

Alternatively, Armijo moves to stay this action on the grounds that it substantially overlaps and duplicates an action earlier filed by the Receiver appointed at the SEC's request for Equialt LLC and related entities, *Burton Wiand, as Receiver for Equialt LLC, et al. v. Family Tree Estate Planning, LLC, et al.*, Case No. 8:21-cv-00361, filed on  February 13, 2021, and pending in the U.S. District Court for the Middle District of Florida.  The Receiver and the SEC use the same expert (Maria Yip, CPA) in both cases to calculate the claim for disgorgement against Armijo.  Ms. Yip has confirmed in deposition testimony to the overlap in the disgorgement claims in these cases.

Armijo first raised this issue in the Joint Case Management Statement (Doc. 13) in this case, but the SEC denied that the claim has merit.  Under the landmark case of *Liu v. SEC*, ____U.S. ____,140 S.Ct. 1936 (2020), the only legally supportable claim can be for the disgorgement of the net profits from Armijo for the benefit of investors, if needed.  This stay is required to avoid potential double recovery.

## I.    INTRODUCTION

In February 2020, the SEC filed an action to place EquiAlt LLC and related entities into receivership, alleging that the insiders of the company, Brian Davison and Barry Rybicki, had conducted a Ponzi scheme since 2011 in which investors bought debentures or REIT shares on the representation that most of the funds would be invested in Florida real estate—distressed residential properties purchased at low prices, rehabilitated, and rented or sold. Armijo (and many others) were induced to participate in the sale of EquiAlt debentures and REIT shares based on numerous misrepresentations by Rybicki and EquiAlt's outside legal counsel, Paul Wassgren, a securities expert and partner with DLA Piper and Fox Rothschild, that Armijo was properly licensed as an Investment Adviser Representative with a Series 65 license without the need for having a Series 7 securities license. All of the offerings were represented as being private placements sold under Regulation D, compliance with which exempts the issuer from securities registration.  In this case, the SEC has sued Armijo for selling unregistered securities and engaging in the business of an unlicensed securities broker.

## A.    Defendants Are Deemed Absolutely Liable On The Section 5 Claim

The Section 5 Claim is premised on the undisputed fact that the issuers of the relevant securities had not filed registration statements with the SEC. Plaintiff alleges that one or more conditions of the issuers' offering exemptions under Securities Act § 4(a)(2) and the "safe harbor" Rule 506(b) of Regulation D [17 C.F.R. § 230.506(b)], promulgated thereunder, had not been satisfied. (Doc. 1, Compl. ¶ 22). This, according to Plaintiff, caused the exemptions to registration to become disqualified and thereby caused Defendants to become strictly liable.

The judicial framework that interprets Section 5 renders a defendant's innocent mental state and conduct irrelevant and imposes on him potentially significant money penalties that punish him for past innocent conduct and deter him from future

innocent conduct.[1]   This transforms persons in Defendants' positions into uncompensated insurers of *others' culpable conduct* (mistakes, misrepresentations, or misappropriations) and even *others' innocent conduct* if that conduct invalidates an exemption from registration.

In the context of any non-bank securities offering,[2]  the framework makes *everyone* using or trying to use a Securities Act Section 4-based transactional exemption a violator of Section 5 and imposes on any SEC-selected defendant the impossible burden of obtaining from non-party sources, and then presenting at trial, if permitted, a potentially enormous volume of testimony and documents required to prove that the issuer and every one of its underwriting agents satisfied, in every transaction, each condition of the exemption for an offering that likely occurred in many states and sometimes, over *many* years. The impossibility of this burden of proof and presentation converts strict liability into absolute liability.

## B.   Defendants Acted Only As An Offering Agent Of The Issuers

The Section 15(a)(1) Claim is predicated on the undisputed fact that JFI did not register as a broker with the Financial Industry Regulatory Authority ("FINRA") and Armijo did not register with FINRA as an associated person.  The SEC assumes that Defendants' actions as an offering agent for the issuers rendered them brokers, which Exchange Act § 3(a)(4)(A) [15 U.S.C. § 78c(a)(4)(A)] defines as one

---

[1]  As noted by the Supreme Court in *Liu,* 140 S.Ct. at 1936,

> [o]ver the years, however, courts have occasionally awarded disgorgement in three main ways that test the bounds of equity practice: by ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims, imposing joint-and-several disgorgement liability, and declining to deduct even legitimate expenses from the receipts of fraud. The SEC's disgorgement remedy in such incarnations is in considerable tension with equity practices.

*Id.* at 1946.  The Court observed that the SEC had reasoned that the "function of depriving *wrongdoers* of profits is to deny them the fruits of their ill-gotten gains, *not to return the funds to victims as a kind of restitution." Id.* at 1948 (emphasis added).  Under Section 5, of course, the "doer" need not be a "wrongdoer."

[2]  Securities Act § 3 generally exempts bank-issued securities from registration.

"engaged in the business of *effecting transactions* in securities for the account of others" (*emphasis added*).   To the contrary, Defendants' authority was limited to soliciting offers from potential investors to purchase the securities of their principals, the fund-issuers. They *could not* and *did not* negotiate terms, accept offers, or "effect" securities transactions on behalf of any issuer.  A higher-ranking agent of the issuers performed that role.  Neither JFI nor Armijo could, nor did they, accept any investor's offer to purchase or consummate for either the issuer or the prospective investor any transaction.  Defendants lacked actual or apparent authority to set or modify offering terms, consummate any transaction, or commit the issuer to accept the prospective investors' offers to buy.

## C.     The Issuers' Insiders Defrauded Defendants And Investors

As an agent of the issuers, Defendants—like the investors—relied in good faith on the integrity of the issuers' principals, Brian Davison and Barry Rybicki, and their securities counsel, Paul Wassgren, Esq., and Wassgren's law firms, Fox Rothschild, LLP (2011-2017), and DLA Piper LLP (2017-2020).

Defendants did not know or have reason to know that the issuers' insiders, and their counsel, had made material misrepresentations or omissions to him about the exemptions, the qualifications needed to act as an offering agent, or the issuers' operations in the period he performed his responsibilities as an offering agent.

## D.     Plaintiff Has Already Succeeded In Tarnishing Armijo's Reputation

The SEC has publicly linked Armijo to an alleged Ponzi scheme and seriously damaged his reputation. On June 14, 2021, the SEC filed its Complaint and issued a press release on the Internet that alleged Armijo and JFI committed securities violations.  In so doing, Plaintiff publicly linked Defendants to a purported "massive Ponzi scheme."  Predictably, since most reporters and news readers are not securities lawyers, the fact that these claims alleged no actual knowledge or intent and mechanically imposed strict liability on Defendants, Armijo's reputation nevertheless became that of a fraudster.

One article, published three days after the SEC's announcement, was titled, "Yet Another Unregistered Broker Charged in EquiAlt Scam."[3]    The article misleadingly reports that Defendant sold "unregistered 'distressed market' real estate funds in what regulators say was a Ponzi-like scam."[4]    Another article lifts a paragraph from the SEC's complaint that states Defendants "sold $4.85 million in these securities to more than 50 investors in Arizona, California, Texas and Oregon, receiving commissions on the deals of about $1.1 million," leaving one to calculate a commission of 22.6%.[5]    This allegation is false,[6] but it promotes the deliberately crafted illusion that Armijo was in on a front-to-back "Ponzi scheme" in which he took almost $1 of every $4 from a portion of the "snared 1,100 investors." The SEC's conclusory allegations have significantly damaged Armijo's reputation, business opportunities, and customer relationships with financial service-providers. (Armijo Decl. ¶ 31.)  Even though the SEC attempted to mitigate these effects with a post-complaint e-mail, the effect on Armijo has been devastating.

One appellate court has noted the "tremendous potential for collateral prejudice inherent in these [securities fraud and unregistered securities] cases," cautioning that "the courts must be extremely scrupulous in sorting out the evidence against single defendants and weighing the same—divorced from the all-too-often damning influence of the background conspiracy."  *U.S. v. Crosby,* 294 F.2d 928, 942 (2d Cir. 1961). The Second Circuit's observation and admonition apply in this

---

[3] Patrick Donachie, *Yet Another Unregistered Broker Charged in EquiAlt Scam*, WEALTHMANAGEMENT.COM (June 17, 2021), https://www.wealthmanagement.com/regulation-compliance/yet-another-unregistered-broker-charged-equialt-scam.

[4] The funds purchased real estate that was distressed which they improved for gain or revenue; the unregistered securities were not distressed.

[5] Mike Freeman,  *SEC sues La Mesa financial adviser over selling investments linked to a Ponzi scheme*, SAN DIEGO UNION-TRIBUNE (Jun. 16, 2021), https://www.sandiegouniontribune.com/business/story/2021-06-16/sec-files-civil-charges-against-la-mesa-financial-advisor-over-real-estate-ponzi-scheme.

[6] Defendant solicited offers to purchase resulting in sales of approximately $10 million of issuers' securities; his compensation was approximately 11%.

1  action.

2  **II.    STATEMENT OF FACTS**

3  **A.    Relevant Issuers**

4      Defendants offered prospective investors the opportunity to submit offers to

5  purchase the securities of three different issuers, all organized in Nevada.   They

6  included: (1) EquiAlt Fund, LLC ("Fund I"); (2) EquiAlt Fund II, LLC ("Fund II");

7  and (3) EquiAlt Secured Income Portfolio REIT, LLC ("REIT") (collectively,

8  "Funds" or "Issuers").[7]

9  **B.    The Insiders**

10      The insiders, Brian Davison and Barry Rybicki, and their counsel, Paul

11  Wassgren (collectively, "Insiders"), misrepresented or failed to disclose to the

12  offering agents, and through them, to potential investors, the actual uses of the funds'

13  offering proceeds ($170 million), compensation paid to Davison and Rybicki, or the

14  anticipated or actual cash transfers made among the Funds' accounts. Davison and

15  Wassgren filed the Funds' Forms D with the SEC and prepared the Funds' offering

16  documents. All three Insiders intentionally or recklessly misled Defendants (and

17  other offering agents) to believe that the Funds were complying with the Regulation

18  D exemption requirements and other federal and state securities laws. Specifically,

19  Defendants understood that the Insiders were monitoring the Funds' compliance with

20  the conditions required for the offering exemptions and that the broker's license was

21  not necessary for his role as offering agent in the Funds' securities offerings. (Armijo

22  Decl. ¶¶ 9-14, 18-21, 23-45.)

23      Davison was the chief executive officer of EquiAlt, LLC, a private real estate

24  investment company, which he operated from Las Vegas, Nevada.  In 2011, Davison

25  hired attorney Wassgren, a partner with the Fox Rothschild law firm, to assist him in

26

27  ───────────────

28  [7] Another issuer, EquiAlt Fund III, LLC, referenced in the complaint as Fund III,
was formed on June 26, 2013, but dissolved on June 27, 2016, with no liabilities.
Defendant sold no securities from Fund III.

1   organizing, operating, and capitalizing real estate funds that became the Issuers.[8]
2   Davison's business model involved raising capital by selling debentures, buying
3   distressed, typically foreclosed, real estate (Wright Decl. ¶ 3, Ex. A, at p. 4; ¶ 5, Ex.
4   C, at p. 31), and improving the real estate for rental or resale (Wright Decl. ¶ 4, Ex.
5   B, at p. 17; ¶ 6, Ex. D).  On May 23, 2011, the two formed a management company,
6   EquiAlt, LLC ("EquiAlt" or "Manager") and Fund I.

7   **C.      Davison and Wassgren Chose a Regulation D Offering**

8          Wassgren used the offering exemption under Rule 506(b) of Regulation D [17
9   C.F.R. §§ 230,506(b)],[9] derived from the transaction-based exemption of Securities
10  Act § 4(a)(2): "[t]he provisions of section 5 [15 U.S.C. § 77e] shall not apply to— . .
11  . (2) transactions by an issuer not involving any public offering." 15 U.S.C. §
12  77d(a)(2). Regulation D provides specific conditions to enable issuers to avoid the
13  uncertain boundaries of the private placement exemption, hence the term "safe
14  harbor." Wassgren prepared and filed each Issuer's Form D for its Rule 506(b)
15  exemption[10] and the offering materials, including an accredited investor and
16  suitability questionnaire; investor subscription agreement; debenture form; and
17  private placement memorandum ("PPM"), which disclosed risks and the securities-
18  distribution model.[11]

19  **D.      Rule 506(b) was Allegedly Unavailable and the Offering Disqualified**

20         The SEC's complaint defines EquiAlt, LLC, the manager of the Funds, as
21  "EquiAlt" (Doc. 1, Compl. ¶ 1), yet asserts that "*EquiAlt* purportedly offered *its*

22

23  _____

    [8] Wassgren was licensed in California and Nevada. Wassgren remained counsel for
24  Davison after moving to DLA Piper LLP in May 2017. (Wright Decl. ¶ 7, Ex. E, at
    p. 56.)

25  [9] Rule 506 was enacted in 1982 (47 FR 11251, Mar. 16, 1982), amended in 1989
26  (54 FR 11369, Mar. 20, 1989) and again in 2013 (78 FR 44770, 44804, July 24,
    2013) and 2021 (86 FR 3598, Jan. 14, 2021). The 2013 version had to be that upon
    which the Funds relied.

27  [10] Wright Decl. ¶ 7, Ex. E, at pp. 57-58.

28  [11] Wright Decl. ¶ 5, Ex. C at p. 31.

                                    7          Case No. 3:21-cv-01107-TWR-AHG

*securities* under Rule 506(b) of Regulation D, a 'safe harbor' under Section 4(a)(2) of the Securities Act." (Doc. 1, Compl. ¶ 22, emphasis added.)  This collapses separate Fund-Issuers into a single issuer,[12] and it reduces multiple offerings into one offering of one security[13] sold under a single exemption.[14] The SEC then asserts that "*the* safe harbor did not apply" to this offering because EquiAlt: (1) "engaged in general solicitation or advertised to market the securities;" (2) "did not provide an audited balance sheet or financial statements to the unaccredited EquiAlt [sic] investors;" and (3) provided information that was "false and misleading." (*Id.*) (emphasis added).

The conclusion that the no-solicitation condition was violated has no supporting evidence in the Complaint, including Fund offering(s), date(s), content, or source(s).  The claim that unaccredited investors of the Fund Offerings received no financial statements similarly fails to identify the specific investors, number of total unaccredited investors, Fund security(ies) purchased, timing of the purchase(s), or offering agent(s) who were involved. Plaintiff also fails to characterize it as material, specify the information, or identify the timing of its distribution.[15]

**E.    Defendants Acted As Offering Agents**

As underwriter, Rybicki recruited individuals to offer Fund securities to investors.   He contacted registered investment advisers ("RIAs") and insurance

---

[12]  Securities Act § 2(a)(4) [15 U.S.C. § 77b(a)(4)] defines "issuer" as "every person who issues or proposes to issue any security." EquiAlt, LLC, the manager of the Funds' investments, did not issue securities in any offering.

[13]  The SEC's Rule 152 on the integration of registered or exempted offerings, 17 C.F.R. § 230.152, refers to offerings of "the issuer." In this matter, each Fund was a separate issuer.

[14]   The SEC's Receiver, Wiand, conclusorily asserts: "none of the first four [EquiAlt] Funds qualified for a Regulation D exemption or any other exemption from registration. The offerings appear to be one continuous fraudulent offering of unregistered securities." He does not indicate why "one continuous fraudulent offering" was fraudulent.  *See Wiand v. Family Tree Estate Planning, LLC, et al.*, at ¶ 79.

[15]  Although fraud may provide the basis for a violation of various provisions of the securities laws, false and misleading information in offering materials does not "un-

8                        Case No. 3:21-cv-01107-TWR-AHG

agents, offering to pay them a commission on a percentage-of-investment basis. (Armijo Decl. ¶ 7.)  On January 19, 2016, he telephoned Armijo, who owned JFI, a California-based RIA, and persuaded Armijo, who holds a FINRA Series 65 license, to sell Fund I securities. (Armijo Decl. at ¶¶ 7-10.)  After having reviewed the Form D and conducted other due diligence, Armijo agreed to sell Fund I's debentures. (*Id.* at ¶¶ 15-17.)  According to Wassgren's PPMs, the "financial intermediaries" who would sell each Fund's securities included RIAs or finders. (Wright Decl. ¶ 5, Ex. C, at p. 33; ¶ 7, Ex. E, at pp. 59-60.)

Wassgren's PPMs referred to Rybicki's agents (2013-2015) and, later, the Funds' agents (2016-2019), as "sales agents." This term is misleading and overstates the agents' authority in the contracting process and transaction. By 2016, agents: (1) contacted potential offerees about Fund offering(s), often by email or telephone; (2) discussed the Fund's security, rate of return, maturity date, payment schedule, and source of revenue (*see*, Doc 1, Compl. ¶ 20); and (3) sent by email or mail, if requested, the PPM and its exhibits (accredited investor questionnaire, blank subscription agreement, and blank debenture form).  (Armijo Decl. ¶¶ 15-17.)  If interested, the offeree would complete, sign, and date the accredited investor questionnaire, and the subscription agreement—now, as the offeror—and deliver the documents along with payment for the security either directly to the Fund's agent, Rybicki, or back to the offering agent.  (*Id.*)  The SEC asserts that Armijo "assisted invested investors with most aspects of the securities sales transactions" by (1) "offering documents and marketing materials"; (2) helping "process the paperwork"; (3) participating in "joint telephone calls between prospective investors and representatives of EquiAlt"; and (4) attempting "to negotiate higher interest rates from EquiAlt for his clients." (Doc. 1, Compl. ¶ 21.)

Armijo did not negotiate terms such as the price, the rate of return, or the maturity date.  The price of the Fund's debenture was par inasmuch as the face value

register" registered securities or "un-exempt" an otherwise qualified exemption.

of the note equaled the buyer-investor's purchase price.  The rate of return was preset and varied from 8% to 10%, and the maturity date was also set.  The agent had no authority to alter, accept, or reject any proposed terms and, in this regard, Armijo made it clear that he was not a decision-maker for the Fund.  (Armijo Decl. ¶ 14.) The agent did not—on behalf of the Fund or the investor-offeree—sign any sales documentation, including the subscription agreement or the debenture, on behalf of the Fund or the investor-offeree or accept any offer or counteroffer.

Upon receipt of the Offeree's offer to purchase the security, the agent forwarded the Offeree's executed offer to Rybicki who would accept (or not accept) the offer by (1) reviewing and approving the Offeree's Accredited-Investor Questionnaire; (2) signing and dating the subscription agreement; (3) signing and dating the security.  (*See SEC v. Davison,* Case No. 8:20-cv-00325-MSS-AEP, Doc. 1, Compl., ¶ 11), typically a debenture; and (4) depositing the Offeree's (now, Investor's) purchase money in the Manager's or Fund's account. (*Id*. at ¶¶ 4, 11.) Rybicki would complete execution of the subscription agreement (sale-and-purchase contract) by delivering the counter-signed materials, including the security he created for the issuer, directly to the Offeree. (Armijo Decl. ¶ 17.)  At this time the contract of sale was executed and the contracting component of the transaction or, in a narrower sense, the "sales transaction," was complete.  The Fund, in performing its continuous obligations under the security or subscription agreement, would and did pay the interest directly to the Investor and this obligation continued until the Investor redeemed the security or received payment of the principal with accrued interest. (*Id.*)  At that time, the transaction would close.

## F.    Defendants Were Unaware of Insiders' Violations

While an agent for Rybicki and the Funds, Defendants were unaware of any past, ongoing, or potential fraud.  They had no way of knowing about movement of cash in bank accounts and title to property that the Funds had obtained through sales of securities and business operations.  They had no access to this information.

(Armijo Decl. at ¶¶ 18-20, 23-26).   The Insiders did not share this type of information with those not in a "need-to-know" position. Plaintiff has neither alleged nor provided evidence to refute that Defendants were ignorant of the Insiders' unlawful activities.

## III.   ARGUMENT

### A.   Legal Standard

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by either: (1) presenting evidence that negates an essential element of the nonmoving party's case; or (2) demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

### B.   Defendants Did Not Violate Section 5(a)

Securities Act § 5(a) makes it unlawful for a person to use interstate commerce to sell or deliver an unregistered security. 15 U.S.C. § 77e(a).[16]  Defendants present undisputed evidence that they did not execute any contract of sale or contract to

---

[16] "Sale" or "sell" includes "every *contract of sale* or *disposition* of a security or interest in a security, for value." Securities Act § 2(a)(3) [15 U.S.C. § 77b(a)(3))] (emphasis added).

1  dispose of any of the Funds' securities and Plaintiff has failed to allege any facts that
2  they did. (Armijo Dec. ¶¶ 15-17).  Accordingly, Plaintiff's Section 5 claim, to the
3  extent it includes § 5(a), should be dismissed as a matter of law.

**C.      The Section 5 Litigation Algorithm Violates Due Process**

5       The Fifth Amendment states that no person "shall . . . be deprived of . . .
6  property, without due process of law" and the Fourth Amendment states that no
7  person shall be denied "equal protection of the laws."  "The Due Process Clause's
8  fair notice requirement generally requires only that the government make the
9  requirements of the law public 'and afford the citizenry a reasonable opportunity to
10 familiarize itself with its terms and to comply.'"  *Federal Express Corp. v. Dep't of*
11 *Commerce*, 39 F.4th 756, 773 (quoting *U.S. v. Bronstein*, 849 F.3d 1101, 1107 (D.C.
12 Cir. 2017) (quoting, in turn, *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982))).  The
13 terms of a law may be sufficiently familiar, but notice is irrelevant if one's
14 "compliance" is simply a function, not of one's otherwise lawful conduct, but of a
15 separate party's independent action that renders otherwise lawful conduct unlawful,
16 particularly when those actions are completely outside of the defendant's knowledge
17 and control, as in this case.

18      Most strict liability statutes that have received judicial approval address
19 *conduct* proscribed *independently* of the purported "legal" reality in which such
20 conduct occurs.  In *Holdridge v. U.S.*, 282 F.2d 302, 310 (8th Cir.1960) (cited in *U.S.*
21 *v. Nguyen*, 73 F.3d 887, 890-91 (9th Cir. 1995)), the Court created a rule to
22 determine whether a strict liability statute (a crime not found in common law)
23 violated due process.  There, the Court held that, if the statute involves a matter of
24 policy, imposes reasonable standards to which adherence can be expected, does not
25 "gravely besmirch" one's reputation, and imposes a relatively small penalty, then it
26 does not violate due process.  (*Id.*).

27      The litigation algorithm of a Section 5 Claim — the set of judicial rules

28

created to prosecute or defend a Section 5 Claim — focuses exclusively on Section 5's language and mostly ignores Securities Act § 4, which immediately precedes it but seems—in this context—to be mere surplusage.[17]  The algorithm includes a set of inflexible rules, including: (1) the SEC's *prima facie* rule; (2) the automatic-violation rule; (3) the burden-shifting rule; (4) the narrow-construction-of-exemption rule; and (5) the all-or-nothing exemption-qualification rule.  At the SEC's prompting, federal courts formulated these rules at a time when the SEC's sole remedy for *any* violation, fraud or non-fraud, was limited to an injunction.[18]

The slow but steady accretion of SEC punitive powers, first for antifraud (scienter-based) violations and later for strict liability violations, began with the judicial recognition of the Agency's then-novel disgorgement remedy, originally for fraud,[19] in the 1980s,[20] which Congress thereafter sanctioned and augmented,[21] culminating in the Securities Enforcement Remedies and Penny Stock Reform Act of

---

[17] Section 4 exempts from registration what constitutes the vast majority of securities offers and sales, including offers and sales on the secondary market, and it is the provision under which the SEC has promulgated a number of bright-line "safe harbor" rules. 15 U.S.C. § 77d.

[18] Although negative injunctions are a type of equitable remedy, Exchange Act Section 21 originally made no reference to equity generally or disgorgement specifically.  It granted the SEC no ability to impose a penalty. Section 21 simply provided that, "[w]henever it shall appear to the Commission that any person is engaged or is about to engage in" violations of the federal securities laws, the SEC may bring an action "to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted." 15 U.S.C. § 78u(d)(1).

[19] Until 2020, the SEC took the position that it had no obligation to return 'disgorged' funds to the investors whose money the defendant had "engorged." As the Supreme Court noted in *Kokesh v. SEC* while "[s]ome disgorged funds are paid to victims; other funds are dispersed to the United States Treasury," and "[e]ven though district courts may distribute the funds to the victims, they have not identified any statutory command that they do so." 137 S. Ct. 1635, 1644 (2017).

[20] The SEC first obtained disgorgement in *SEC v. Texas Gulf Sulphur Co.*, 312 F. Supp. 77, 92–94 (S.D.N.Y. 1970), *aff'd in part and rev'd in part*, 446 F.2d 1301, 1307–08 (2d Cir. 1971).  *See generally*, John D. Ellsworth, "Disgorgement in Securities Fraud Actions Brought by the SEC," 1977 DUKE L. J. 641, 641–42 n.3 (1977).

[21] The Insider Trading Sanctions Act of 1984 (ITSA) and the Insider Trading and Securities Fraud Enforcement of 1988 (ITSFEA).

1   1990.[22]   This latter Act permitted recoveries to include nominally distinct "civil"

2   money penalties.   The accretion and cumulation of these ever more severe

3   consequences are now routinely requested by the SEC to be imposed on *an agent* for

4   *the issuer's* decision to use, successfully or not, one or more of the exemptions in lieu

5   of registration.

6   Coupling the Section 5 strict liability litigation algorithm with the increasing

7   penalization of any violation of the federal securities laws or regulations has resulted

8   in the offensive outcome this action presents: severe punishment regardless of a non-

9   culpable state of mind or absence of any violative conduct, in which the defendant

10   conducted due diligence and relied on his principals' legal counsel.   It is aggravated

11   by the fact that the SEC's aggressive actions against Defendants contrast sharply

12   with its failure to pursue one of the Insiders—Wassgren—who knew or had reason to

13   know that he and the other Insiders were defrauding Defendants and similarly

14   situated individuals and, of course, investors.

15   Defendants submit that the SEC's Section 5 Claim, as alleged, fails to state a

16   claim upon which relief can be granted; it: (1) ignores Defendants' non-culpable

17   conduct or state of mind; (2) recognizes no defense to a "violation," converting strict

18   liability into absolute liability; (3) seeks two substantial "civil" financial penalties

19   against them (disgorgement and civil money penalties); (4) creates excessive

20   punishment for non-culpable conduct; (5) imposes the same punishment for absolute

21   liability as it does for fraudulent conduct that requires proof of scienter; and (6)

22   serves no deterrent or punitive function.

### 1.   The Litigation Algorithm of the "Section 5 Violation"

24   The Securities Act makes it unlawful for an issuer, agent, or other participant[23]

25   to offer for sale or sell a security in a transaction that is neither exempted under

---

27   [22] Pub. L. No. 101-429, 104 Stat. 931.

28   [23]   Anyone having "a necessary role in the transaction" violates Section 5 and is
liable.  *SEC v. Murphy*, 626 F.2d 633, 650-51 (9th Cir. 1980).

1 Section 4 nor registered under Section 6.  In contrast, the judicial interpretation looks

2 *only* to the language in §§ 5(a) and 5(c), specifically, the conditional language that

3 "[u]nless a registration statement is in effect … it shall be unlawful" to offer or sell

4 the security.[24]  As explained below, because the courts have (at the SEC's urging)

5 read Section 5 in isolation from the rest of the Securities Act, the effect has been to

6 render *every* offer and sale in *every* unregistered offering a violation of Section 5

7 without regard to culpability of mind or conduct, if the SEC chooses to bring an

8 action alleging a violation of the registration requirement.

9      Such a reading, where Section 5 is applied to the exclusion of the immediately

10 preceding language in Section 4, ignores several canons of statutory construction

11 which should guide a court's review of the statute's plain language.

12      First, it is a "fundamental canon of statutory construction that the words of a

13 statute must be read in their context and with a view to their place in the overall

14 statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989).

15 "Ambiguity is a creature not of definitional possibilities but of statutory context."

16 *Brown v. Gardner*, 513 U.S. 115, 118 (1994), *superseded by statute on other grounds*

17 in *Ollis v. Shulkin,* 857 F.3d 1338 (Fed. Cir. 2017*)*.  Thus, in assessing the language

18 of a statute, courts review the overall statutory scheme "so that effect is given to all

19 its provisions, so that no part will be inoperative or superfluous, void or insignificant,

20 and so that one section will not destroy another unless the provision is the result of

---

22 [24] Section 5(a) [15 U.S.C. § 77e(a)(1)] makes it "unlawful for any person, directly or

23 indirectly—(1) to make use of any means or instruments of transportation or

24 communication in interstate commerce or of the mails to sell such security through

  the use or medium of any prospectus or otherwise; or (2) to carry or cause to be

25 carried through the mails or in interstate commerce, by any means or instruments of

  transportation, any such security for the purpose of sale or for delivery after sale."

26 Section 5(c) [15 U.S.C. § 77e(c)] makes it "unlawful for any person, directly or

27 indirectly, to make use of any means or instruments of transportation or

  communication in interstate commerce or of the mails to offer to sell or offer to buy

  through the use or medium of any prospectus or otherwise any security, unless a

  registration statement has been filed as to such security, or while the registration

28 statement is the subject of a refusal order or stop order or (prior to the effective date

  of the registration statement) any public proceeding or examination" under section

1  obvious mistake or error."  *Roper v. Nicholson*, 20 Vet.App. 173, 178 (2006)

2  (quoting 2A N. Singer & Singer, Sutherland on Statutory Construction § 46:06 (6th

3  ed. 2000)), *aff'd*, 240 F. App'x 422 (Fed. Cir. 2007).

4       Related canons caution against a construction that would nullify or impliedly

5  repeal other statutory requirements.  Under "the so-called surplusage canon [a court

6  should presume] that each word Congress uses is there for a reason," *Advocate*

7  *Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017), and the courts are

8  "obliged to give effect, if possible, to every word Congress used," *Reiter v. Sonotone*

9  *Corp.*, 442 U.S. 330, 339 (1979).  Thus, "one section of a law should not be

10  interpreted so as to render another section meaningless."  *Princess Cruises, Inc. v.*

11  *United States*, 201 F.3d 1352, 1362 (Fed. Cir. 2000).  Similarly, "[w]hen two statutes

12  complement each other, it would show disregard for the congressional design to hold

13  that Congress nonetheless intended one federal statute to preclude the operation of

14  the other." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 115 (2014).  This

15  is even more the case when the adjoining sections of the same statute are read as

16  though the second section invalidates or overrides the preceding section.

17               **2.**    **The *Prima Facie*, Automatic-Violation Rule**

18       Section 5's conditional language is the foundation of the "litigation algorithm"

19  and enables the SEC to impose liability by alleging that: (1) the agent offered to sell

20  or sold, directly or indirectly, a security to another; (2) the issuer or agent used

21  interstate commerce; and (3) the issuer had not filed a registration statement for the

22  security.  *Murphy*, 626 F.2d at 650-51; *SEC v. North American Research &*

23  *Development Corp.*, 424 F.2d 63, 81 (2d Cir. 1970).  This completely ignores

24  available exemptions from registration under other provisions of the Securities Act,

25  both statutory and regulatory, including the regulatory exemptions to registration

26  under Regulation A,[25] Regulation D,[26] and Regulation CF,[27] among other potential

27

28  77h of this title.
  [25]  17 C.F.R. § 230.251. Regulation A implements a safe-harbor exemption under
Securities Act § 3(b) [15 U.S.C. § 77c(b)].

1    exemptions.

2    **3.    The Burden-Shifting Rule**

3        In *Murphy*, the court states: "Once the SEC introduces evidence that *a*

4    *defendant has violated* the registration provisions, the defendant then has the burden

5    of proof in showing entitlement to an exemption." *Murphy*, 626 F.2d, at 641 (citing

6    *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *Pennaluna & Co v. SEC*, 410

7    F.2d 861, 865 (9th Cir. 1969), *cert. denied*, 396 U.S. 1007 (1970)) (emphasis added).

8    Accordingly, every unregistered offering necessarily constitutes a *prima facie*

9    violation of Section 5. This does not reveal how an applicable Section 4 exemption

10   would "undo" the *per se* violation of non-registration.  The litigation algorithm

11   implicitly treats Section 5 as preempting Section 4, as if the two provisions were

12   incompatible.

13       Once the SEC satisfies Section 5's simple *prima facie* requirement, courts shift

14   the burden of production and proof to the defendant issuer or agent to demonstrate a

15   qualified exemption to registration.  *See, e.g.*, *Ralston Purina*, 346 U.S. at 126;

16   *Pennaluna & Co.,* 410 F.2d at 865.  To enhance this burden and make a rebuttable

17   presumption more difficult to overcome, the exemption is "construed narrowly,"

18   *SEC v. Blazon Corp.,* 609 F.2d 960, 968 (9th Cir. 1979), or "strictly" against the

19   person asserting the exemption.  *Quinn & Co. v. SEC*, 452 F.2d 943, 946 (10th Cir.

20   1971).  In *SEC v Ralston Purina*, in which the SEC sued only the issuer—the only

21   entity capable of registering securities—and not the issuer's individual agents, the

22   Supreme Court justified the burden-shifting rule, noting that "the broadly remedial

23   purposes of federal securities legislation [justify] imposition of the burden of proof

24   *on an issuer* who would plead the exemption . . . ." *Ralston Purina*, 346 U.S. at 126

25   (citing *Schlemmer v. Buffalo, R. & P.R. Co.*, 205 U.S. 1, 10 (1907) (emphasis

26

27   [26] 17 C.F.R. § 230.500. Regulation D implements a safe-harbor exemption under
     Securities Act § 5 [15 U.S.C. § 77e].

28

     [27] 17 C.F.R. § 227.100. Regulation CF ("Crowd-Funding") implements safe-harbor

added)). In this case, of course, Defendants are <u>not</u> *the issuer*.

### 4.    The All-or-Nothing Exemption-Qualification Rule

The all-or-nothing qualification rule for exemptions holds that an offering exemption is either qualified or not. Unless all exemptive conditions are strictly satisfied during the offering, the offering is disqualified retrospectively and prospectively.  An agent's (as distinct from an issuer's) lack of knowledge of Section 5, the exemption's conditions, and the exemption's disqualification and its reasons or timing, are irrelevant.  Also irrelevant is the actor's conduct.

Combining the presumption-of-violation rule with the all-or-nothing rule generates unjust and absurd outcomes.  First, agents participating in ostensibly exempted offerings are presumptively in violation of Section 5, as noted above.  If an exemption condition fails and causes the exemption to be disqualified, the agent is a definitive violator, regardless of state of mind or conduct.  If this disqualification occurs *before or during* the agent's participation period, the offering is prospectively disqualified, and the agent is absolutely liable; more absurdly, if the disqualification occurs *after* the agent's lawful participation in an exempted offering, the offering is retrospectively disqualified and absolute liability still attaches to the agent.

### 5.    Automatic Exemption Disqualification is also a Rule

In determining whether a Section 4 exemption applies, the court purportedly reviews the issuer, the specifics of the offering, the offerees, and the relationships between the issuer and offerees.  *Parvin v. Davis Oil Co.*, 524 F.2d 112, 118 (9th Cir. 1975).  Such a review is *pro forma*: the automatic violation rule, the all-or-nothing exemption qualification rule, the narrow-construction rule, and any actual attempt to demonstrate strict or even material compliance with an exemption's conditions reveal this *de facto* affirmative defense to be strictly theoretical and incapable of proof, whether the exemption was actually qualified or not.

The imposition on the defendant of the burden to obtain evidence showing that

---

exemptions under Securities Act § 4(a)(6) [15 U.S.C. § 77d(a)(6)].

<center>18          Case No. 3:21-cv-01107-TWR-AHG</center>

1   for *every* offering and *every* sale of potentially hundreds or thousands of such

2   transactions, executed over months or years and across multiple states, is prohibitive

3   and impracticable.[28]   Moreover, it is hard to imagine a district court tolerating a

4   defendant's examination of thousands of offerees and investors—in discovery or at

5   trial—to prove that no condition was unsatisfied. This unsustainable burden converts

6   strict liability into absolute liability for any defendant selected for an enforcement

7   action.

8   ## 6.   The Irrefutable Presumption of Defendants' Violation

9   In the present action, the absence of allegations and the undisputed evidence

10  demonstrate that Armijo: (1) was aware of and relied upon the integrity of the

11  Insiders (managers and outside counsel) who controlled and operated the issuers;[29]

12  (2) was aware of and relied upon the Forms D filed with the SEC as evidence of valid

13  exemptions; (3) did not violate any condition of the applicable offering exemptions

14  from registration for any of the issuer-funds for which he offered securities for sale;

15  (4) did not know or have reason to know that the Insiders had issued false or

16  incomplete offering materials or were misappropriating money from one or more

17  Funds; and (5) did not know or have reason to know that the manager of the issuer-

18  fund, the issuer-fund, or another offering agent had possibly caused that issuer-fund's

19  applicable exemption to become disqualified.[30] Imposition of a financial penalty

20

---

21  [28] Despite the efficiency of examining offering materials, statements and omissions of underwriting agents outside those materials may have invalidated the exemption.

22
23  [29] The specific fraudulent misrepresentations and misconduct of the Insiders, principals, should not be imputed to Defendant, an agent. Cf., *In re ChinaCast Education Corp. Sec. Litig.*, 809 F.3d 471, 476-79 (9th Cir. 2015) (imputation of corporate agent's scienter, even if conduct is adverse to the employer, is imputable to the corporation).

24
25  [30] The "inapplicability of an exemption" is an ambiguous phrase, as it can mean that: (1) the issuer did not attempt to apply an exemption or the exemption could not have been applied anyway; or (2) the issuer did attempt, or ostensibly attempt, to apply an exemption but it failed for one reason or another.  The first meaning suggests that the issuer was either unaware of or unconcerned about the Securities Act, while the second meaning suggests that the issuer knew of and was concerned about the securities laws and made an effort, whether effective or not, to comply with the Securities Act.

26
27
28

1  against Defendants violates due process inasmuch as neither Armijo's state of mind

2  nor conduct warrants punishment or deterrence.[31]

3  **D.   The Section 5 Litigation Algorithm and Remedies Violate Equal**

4  **Protection**

5  If the SEC is granted the relief it seeks, it will receive the same relief as it

6  would if it had been required to prove a scienter-based antifraud violation. First, it

7  has already and publicly linked Defendants' name to a "massive" Ponzi scheme, and

8  all but a small numbers of securities lawyers who read such complaints carefully

9  consider him "involved" in such fraud. The reputational harm has been done, and the

10 remaining forms of "relief"—disgorgement, civil money penalties, and injunction—

11 serve to accentuate the ruining of Defendants' reputation. Imposing the same

12 consequences for two claims, one in which Defendants are absolutely liable and

13 another for which the SEC would have the difficult evidentiary burden of proving

14 scienter, lacks any rational basis and violates equal protection.

15 Under Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], a plaintiff normally

16 must prove that the specific violation, whether a misrepresentation or an omission,

17 caused the alleged harm.  *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th

18 Cir. 1984). Here, Defendants' alleged registration violations did not cause, enable, or

19 further any economic harm to investors.

20 **E.   Defendants were Not "Brokers" under the Exchange Act**

21 The SEC claims Defendants' solicitation of offers to buy securities made them

22 brokers. Because they were not registered as such (Doc.1, Compl. ¶¶ 1, 2, 17, 20, 23,

23

24

---

25 [31] The SEC has made no allegations of Defendants' willfulness pursuant to

26 Exchange Act § 15(b)(4)(D), which authorizes the Agency, if deemed to be in public interest, to bring administrative proceedings to impose sanctions on a broker who

27 willfully violated or aided and abetted violations of the Exchange Act, Securities Act, Investment Advisers Act,  Investment Company Act, Commodity Exchange

28 Act, underlying rules and regulations of these statutes, or the rules of the Municipal Securities Rulemaking Board. 15 U.S.C. § 78o(b)(4)(D).

20          Case No. 3:21-cv-01107-TWR-AHG

29), the SEC claims they violated Exchange Act § 15(a)(1).[32] (Doc. 1, Compl. ¶¶ 28-30).

The sole question is whether Armijo or JFI qualified as a broker when they induced or attempted to induce the purchase of any security: the structure of the federal securities laws and the Exchange Act's definition of "broker" confirm that they did not. Generally, the Securities Act concerns primary markets and the Exchange Act secondary markets. This action is about the EquiAlt Funds' offerings in a primary market, while a broker is a secondary market professional, which explains why the Securities Act does not define "broker," but does define "issuer," "underwriter," and "dealer." Under the Securities Act, Defendants' offering activities in the primary markets warrant, perhaps, characterization as an "underwriter" or "dealer."[33]

Exchange Act § 3(a)(4)(A) [15 U.S.C. § 78c(a)(4)(A)], however, defines a "broker" as one "engaged in the business of effecting transactions in securities for the account of others."[34] A broker, as an agent for the securities owner-seller (when acting as selling agent) or a prospective buyer (when acting as buying agent), bids

---

[32] This section, entitled "Registration of all persons utilizing exchange facilities to effect transactions; exemptions," states:

> (1) It shall be unlawful for any broker or dealer which is ... a natural person not associated with a [non–natural person that is a] broker or dealer... to make [use of interstate means] to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security . . .) unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1).

[33] An underwriter is one who "*offers* or sells for an issuer in connection with, the distribution of any security" and a "dealer" is one who engages ". . . in the business of *offering*, buying, selling, or otherwise dealing or trading in securities issued by another person." Securities Act §§ 2(a)(11) and (a)(12), respectively [15 U.S.C. §§ 77b(a)(11) and (a)(12)] (emphasis added).

[34] The Exchange Act defines "dealer," much more restrictively than the Securities Act as one "engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." Unlike the Securities Act definition, offering activities do not make one a "dealer" in the secondary market. *Id.* at 15 U.S.C. § 78c(a)(5)(A).

1   out securities the client owns or buys securities the client wants. Issuer sales on the

2   primary market generally involve underwriters who are owner-sellers or dealers in

3   firm commitment offerings or the issuer's selling agents in best-efforts offerings.

4   When a client makes an order, the broker has the authority to create and execute a

5   contract of purchase or sale for the client and cause the deal to be consummated.

6       Defendants did not act as a broker as they were not in "the business of

7   effecting transactions in securities for the account of others." The verb "to effect"

8   means to perfect, to complete, or to accomplish. To complete a "transaction in

9   securities" requires that one execute the contract at the core of the transaction and

10  complete the parties' performances under that contract. Defendants, as offering

11  agents of the issuer, lacked any authority: (1) to negotiate for the issuer; (2) to bind

12  the issuer to any terms; (3) to accept a proposed contract of purchase; (4) to execute

13  any contract on behalf of an issuer; (5) to perform for the issuer, by issuing the

14  security; or (6) to compel the purchaser to pay.

15  **F.    Relief in this Action is Unwarranted**

16      If one or both of Plaintiff's claims survive, Defendants submit that the relief

17  the SEC seeks for such claims should be denied as a matter of law.

18                    **1.    Defendants Relied in Good Faith on Counsel**

19      Armijo and Wassgren were agents of the same principal, namely, the Fund

20  manager EquiAlt and its owner-manager, Davison. Defendants relied on actions and

21  representations of counsel, Wassgren, who was knowledgeable about the federal

22  securities laws, to ensure his own compliance.[35]

23      Although reliance on counsel is definitively or conditionally insufficient, by

24  itself, to avoid a determination that Defendants violated Securities Act Section 5 or

25  Exchange Act Section 15(a)(1), or both, *SEC v. CMKM Diamonds, Inc.*, 729 F.3d

26  1248, 1256 (9th Cir. 2013), it may be used as a factor in determining the need for,

27

28  [35] See,  Hawes Sherrard, Reliance on Advice of Counsel as a Defense in Corporate
and Securities Cases, 62 Va. L. Rev. 1, 19-37 (1976).

1  type of, and amount of SEC relief granted, including disgorgement and civil money
2  penalties.  *E.g.*, *SEC v. Apartments Am. LLC*, No. SA cv 12-0754 Doc (ANx) 2014
3  U.S. Dist. LEXIS 27633, at *17-20 (C.D. Cal. Mar. 3, 2014); *SEC v. M&A West,*
4  *Inc.*, No. C-01-3376 VRW, No. 2005 U.S. Dist. LEXIS 30297, at *8-15 (N.D. Cal.
5  Oct. 31, 2005), *rev'd in part on other grounds*, SEC v. *M&A West, Inc.*, 538 F.3d
6  1043, 1054-55 (9th Cir. 2008); *SEC v. Alliance Leasing Corp.*, 28 F.Appx. 648, 652-
7  53 (9th Cir. 2002).  It is also a factor in injunctive actions. *E.g.*, *SEC v. Goldfield*
8  *Deep Mines Co. of Nevada*, 758 F.2d 459, 467 (9th Cir. 1985); *SEC v. Fitzgerald*,
9  135 F. Supp.2d 992, 1023-24 & n.8 (N.D. Cal. 2001); *SEC v. Steadman*, 967 F.2d
10  636, 648 (D.C. Cir. 1992).  A good faith reliance on advice of counsel requires that
11  defendant show that he or she "(1) made a complete disclosure to counsel; (2)
12  requested counsel's advice as to the legality of the contemplated action; (3) received
13  advice that it was legal; and (4) relied in good faith on that advice." *Goldfield Deep*
14  *Mines Co. of Nevada*, 758 F.2d at 467 (quoting *SEC v. Savoy Industries, Inc.*, 665
15  F.2d 1310, 1314, n.28 (D.C. Cir. 1981)).

16      In the present action, Defendant relied on EquiAlt Funds' taking the legally
17  required steps for a Regulation D offering, inquired of Rybicki and received
18  assurances that the numbers of unaccredited investors were within the limitations for
19  the issuers pursuant to the applicable exemptions from registration.  As to his
20  licensing, Defendant specifically asked Wassgren, directly and through another
21  agent, Rybicki, whether his qualifications—which he truthfully and completely
22  disclosed—were sufficient. Counsel responded affirmatively several times. These
23  facts are substantiated by the undisputed testimonial evidence of Armijo and
24  Wassgren and documentary evidence, which includes emails between and among
25  Armijo, Rybicki, and Wassgren, and which confirms that counsel responded to
26  Defendant's specific questions about licensing. *See*, *SEC v. Zouvas*, No. CV-17-
27  00427-PHX-SPL, 2019  U.S. Dist. LEXIS 145606, at *28-29 (D. Ariz. Aug. 26,
28  2019) (finding that the requirement of "complete disclosure to counsel" for an advice

of counsel defense is met when "there is specific documentation showing" what defendant asked of counsel).

### 2.    Disgorgement is Unwarranted as a Matter of Law

Securities Act § 20(d) [15 U.S.C. § 77t(d)] and Exchange Act § 21(d)(3) [15 U.S.C. § 78u(d)(3)] authorize the SEC to request and the court to impose disgorgement against a defendant.  Defendants request that the court deny this relief, as a matter of law and judicial discretion, because the SEC cannot satisfy the statutory requirements for disgorgement.

Since 1970, the SEC has employed disgorgement to prevent "unjust enrichment" or to obtain restitution for investors.[36]  In *SEC v. Kokesh*, 137 S.Ct. at 1635, the unanimous Supreme Court held that SEC disgorgement is a penalty imposed on the defendant that "is imposed as a consequence of violating a public law and it is intended to deter, not to compensate."  *Id.* at 1644. Whatever the theoretical basis or bases for disgorgement, for over 50 years, the SEC has considered and treated amounts it recovered as disgorgement to be property of the U.S. government, not of the investors from whom it likely came.  The Court, in *Liu v. SEC*, held a dim view of that practice.  *See*, 140 S. Ct. at 1947-48.

Exchange Act § 21(d)(3)(A)(ii) authorizes the SEC to bring a district court action and grants the court jurisdiction to "require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment *as a result of such violation*."  15 U.S.C. § 78u(d)(3)(A)(ii) (emphasis added). The SEC, as a matter of law, cannot demonstrate that Defendants' absolute liability "violations" caused them any "unjust enrichment."  "Unjust enrichment" can occur when one party enjoys the benefits of the other party's contractual performance while

---

[36] The disgorgement the SEC seeks in this action would not be *restitution in equity,* as *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213-14 (2002), defines it, because the SEC is not seeking *specific* money or property belonging to the investor. Instead, it would be *restitution in law*, giving the SEC a money judgment (legal remedy).    Russell G. Ryan, *The Equity Façade of SEC Disgorgement*, HARVARD BUS. L. REVIEW ONLINE 6-7 (Nov. 15, 2013), www.hblr.org/2013/11/the-equity-facade-of-sec-disgorgement.

1  not reciprocating performance, induces another into a contract fraudulently, or finds a
2  large sum of money that someone lost.   The modifier "unjust" means that the
3  recipient unfairly or fraudulently obtained a benefit not due.  *See, e.g.*, *ESG Capital*
4  *Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) ("To allege unjust
5  enrichment as an independent cause of action, a plaintiff must show that the
6  defendant received and unjustly retained a benefit at the plaintiff's expense.").

7      Defendants contracted with Rybicki, an agent of the principal manager,
8  EquiAlt, to act as an agent for three issuer-funds. Defendants performed the work
9  they were asked to perform, with integrity and thoroughness. The offerees who they
10 identified to make an offer to purchase the Funds' securities had no reason to believe
11 that Defendants were acting as a buyer's agent or broker. The issuers, through their
12 agent Rybicki and BR Support Services' marketing program, paid Defendants
13 compensation for their efforts.

14      Defendants' conduct was not "unjust." The SEC has not alleged a culpable
15 state of mind or facts indicating that Defendants received and unjustly retained any
16 benefits at the expense of the Plaintiff or, indeed, investors. Any losses to Fund
17 investors were caused by one or both of the following factors: losses due to *business*
18 *judgments and economic conditions* and losses due to *Insider fraud*, namely
19 significant misappropriations of the Funds' assets, about which Defendants had no
20 knowledge or reason to know and in which they played no part.

21      Nor was Defendants' compensation "unjust." Other than overstate, by at least
22 200%, Defendants' compensation, the SEC has made no allegations about why and
23 by how much Defendants' compensation as an offering agent or finder exceeds the
24 general market rate, nor does it take into consideration the "absolute liability" risks
25 of loss that Defendants have realized in this action.  Also, the SEC ignores the fact
26 that many investors who Defendants introduced to the funds earned interest of 8% to
27 10% on their entire purchase amount, exceeding the compensation that the issuers
28 paid Defendants within one year.

Finally, neither of Defendants' alleged "violations" *caused* Defendants any unjust enrichment. Armijo's liability is based neither on his state of mind nor his conduct, so his payment for services cannot be unjust. The fact that Defendants were compensated, without context, is not "evidence" of any wrongdoing. Defendants' absolute liability for the Securities Act Section 5 "violation" was a consequence of others' actions about which Armijo had no knowledge; these disqualifying events and states of affairs may cause Defendants' liability, but did not cause them to be "enriched," let alone unjustly enriched. Similarly, Defendants' purported Exchange Act Section 15(a)(1) "violation," a consequence of bad legal advice, was not "unjust," nor did it enrich them at another's expense.

### 3.  Civil Money Penalties are Not Warranted as a Matter of Law

Securities Act § 20(d) [15 U.S.C. § 77t(d)(1)] and Exchange Act § 21(d)(3) [15 U.S.C. § 78u-1(d)(3))] authorize the SEC to request that the court impose civil money penalties on Defendant. These provisions provide that if one "has violated any provision of this [subchapter], the rules or regulations thereunder . . . other than by committing a violation subject to a penalty pursuant to [section 78u–1 of this title]," the SEC may seek and the court has jurisdiction to impose a civil penalty to be paid by the person who committed such violation "upon a proper showing." Defendants' conduct only became a violation because Armijo was ignorant about the status of the issuers' Securities Act Section 4(a)(2) and Rule 506(b) offering exemptions under Regulation D, and a civil money penalty would serve no deterrent purpose.

### 4.  Injunction is Not Warranted as a Matter of Law

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and § 21(d) of the Exchange Act [§ 78u-1(d)(2)] authorize the SEC to seek a permanent injunction to prevent a defendant from engaging in future violations of the federal securities laws. To obtain a permanent injunction, the SEC must show that the defendant: (1) violated the securities law; and (2) will violate the law in the future, if not enjoined, with "reasonable probability." *Murphy*, 626 F.2d at 655. This requires a review of the

"totality of the circumstances surrounding the defendant and his violations." *Id.*
"Injunctive relief is reserved for willful law-breakers or those whose operations are
so extremely or persistently sloppy as to pose a continuing danger to the investing
public." *Steadman*, 967 F.2d at 648; *SEC v. Ginsburg*, 362 F.3d 1292, 1305 (11th
Cir. 2004).  As another court held: "[I]njunctive relief and civil monetary penalties
must be based on a concern that the defendant will continue to violate the securities
laws and therefore must be restrained or deterred from doing so." *SEC v. M & A
West, Inc.*, No. C-01-3376 VRW, 2005 U.S. Dist. LEXIS 22452, at *24 (N.D. Cal.
June 20, 2005).

Defendants' conduct only became a violation because Armijo was ill-informed
or un-informed by his principal's key agent, Wassgren, about the status of the
issuers' Securities Act Section 4(a)(2) and Rule 506(b)  offering exemptions under
Regulation D, and an injunction would serve no deterrent purpose.  Plaintiff has not
alleged that Defendants are willful law breakers or that they operated in an
"extremely or persistently sloppy" manner.  They do not pose a continuing danger to
investors.  Accordingly, neither civil penalties nor injunctive relief would be
appropriate under these circumstances.

### 5. Alternatively, the First-To-File Rule Requires That This Case Be Stayed Because an Earlier Case is Pending in the U.S. District Court for the Middle District of Florida on Substantially the Same Issues

In early February 2020, the SEC filed an action in the U.S. District Court for
the Middle District of Florida, *SEC v. Brian Davison, et al.,* Case No. 8:20-CV-325-
MSS-AEP, alleging that EquiAlt, LLC, and related entities were involved in a Ponzi
scheme, and seeking the appointment of a Receiver for the companies.  Burton
Wiand was appointed Receiver.

On February 13, 2021, Wiand commenced an action against Armijo and
Joseph Financial, Inc., and many other "sales agent" defendants who were involved
in the sale of EquiAlt debentures and/or REIT shares seeking the return of
compensation they received in connection with sale of EquiAlt securities.  The

1   theories of recovery are a violation of Florida's Uniform Fraudulent Transfer Act and

2   unjust enrichment.

3       Four months later, the SEC brought this action against Armijo and JFI also

4   seeking, among other things, return of compensation received in connection with the

5   sale of EquiAlt securities.   The Receiver and the SEC use the same expert,

6   accountant Maria Yip, who has confirmed in deposition that she is calculating

7   substantially the same amount in both cases (Wright Decl. ¶¶ 8-10, Exs. F-H).

8   Complete overlap exists for EquiAlt Fund I and Fund II compensation.  For unknown

9   reasons, the SEC decided not to include REIT stock sale—a small part of Armijo's

10   activity-- in this case.

11       In its Answer to the SEC complaint, Armijo raised as an affirmative defense to

12   the Receiver's case and the issue of double recovery if both cases are allowed to

13   proceed (Doc. 7, p. 28, para. 6).   Armijo also raised the issue in the Joint Case

14   Management Statement (Doc. 13, p. 4, para. 14).

15       One district court explained the first-to-file rule as follows:

16       The first-to-file rule is a generally recognized doctrine of federal comity that
   permits a district court to decline jurisdiction over an action when a complaint
17   involving the same parties and issues has already been filed in another district.
   *Pacesetter Sys., Inc. v. Medtronic, Inc.,* 678 F.2d 93, 94-95 (9th Cir. 1982).
18   The rule was developed to "serve[] the purpose of promoting efficiency well
   and should not be disregarded lightly." *Church of Scientology v. United States
19   Dep't of Army,* 611 F.2d 738, 750 (9th Cir. 1979) *overruled in part on other
   grounds* in *Animal Legal Def. Fund v. U.S. FDA,* 836 F.3d 987, 990 (2016).
20   Exact parallelism between the two actions need not exist; it is enough if the
   parties and issues in the two actions are "substantially similar."  *Nakash v.*
21   *Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989).

22
   *Walker v. Progressive Cas. Ins. Co.*, No. C03-656R, 2003 U.S. Dist. LEXIS 7871, at
23
   *4-5 (W.D. Wash. May 9, 2003).
24
       This Court should stay or dismiss this case to avoid double recovery.
25

26

27

28

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court order summary judgment in their favor dismissing both of Plaintiff's claims and the forms of relief sought.

Date: October 19, 2022                    Respectfully submitted,

                                        ____/s/Robert C. Wright
                                        Robert C. Wright (Cal. Bar No.: 051864)
                                        Wright, L'Estrange & Ergastolo
                                        402 West Broadway, Suite 1800
                                        San Diego, California 92101
                                        T: (619) 231-4844
                                        F: (619) 231-6710
                                        E: rwright@wlelaw.com

                                        ____ /s/Cory C. Kirchert
                                        Cory C. Kirchert (*pro hac vice*)
                                        Adriaen M. Morse Jr. (Cal. Bar No. 188358)
                                        SECIL Law PLLC
                                        1701 Pennsylvania Ave., NW, Suite 200
                                        Washington, DC 20006
                                        T: (202) 417-8232
                                        E: ckirchert@secillaw.com
                                        E: amorse@secillaw.com

                                        *Counsel for Defendants*
                                        *Joseph Financial, Inc.*
                                        *and Robert Joseph Armijo*

# EXHIBIT E

SWANSON & MCNAMARA LLP
Edward W. Swanson (SBN 159859)
ed@smllp.com
Britt Evangelist (SBN 260457)
britt@smllp.com
300 Montgomery Street, Suite 1100
San Francisco, CA 94104
(415) 447-3800 / FAX (415) 477-9010

*Attorneys for Defendant Paul R. Wassgren*

KLINEDINST PC
Heather L. Rosing (SBN 183986)
hrosing@klinedinstlaw.com
Daniel S. Agle (SBN 251090)
dagle@klinedinstlaw.com
Amara S. Barbará (SBN 323332)
abarbara@klinedinstlaw.com
501 West Broadway, Suite 600
San Diego, California 92101
(619) 239-8131 / FAX (619) 238-8707

WILLIAMS & CONNOLLY LLP
John K. Villa (pro hac vice application forthcoming)
jvilla@wc.com
Vidya Atre Mirmira (pro hac vice application forthcoming)
vmirmira@wc.com
Joseph Bayerl (SBN 330085)
jbayerl@wc.com
(202) 434-5000 / FAX (202) 434-5029

*Attorneys for Defendant DLA Piper LLP (US)*

JENNER & BLOCK LLP
Michael McNamara (SBN 106079)
MMcNamara@jenner.com
Effiong Dampha (SBN 323554)
EDampha@jenner.com
515 South Flower Street Suite 3300
Los Angeles, CA 90071
(213) 239-5100 / FAX (213) 239-5199

*Attorneys for Defendant Fox Rothschild LLP*

1

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER        Case No.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT JOSEPH ARMIJO, | **CASE NO.** |
| Plaintiff, | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO TRANSFER VENUE** |
| v. | |
| PAUL R. WASSGREN, DLA PIPER LLP (US), FOX ROTHSCHILD LLP, and DOES 1 through 50, inclusive, | |
| Defendants. | |

2

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

311

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................... 6

BACKGROUND ............................................................................................. 7

ARGUMENT ................................................................................................. 10

    I.      The Court should transfer this case to the Middle District of Florida....................................................................................... 11

          A.    Justice demands that this case be transferred to the same venue as the ongoing related cases. ...................... 12

          B.    Armijo agreed to bring all related claims in the Middle District of Florida.......................................................... 13

          C.    Armijo's choice of forum is entitled to only minimal weight.................................................................................... 13

          D.    Other interest of justice factors weigh in favor of transfer.................................................................................. 14

CONCLUSION .............................................................................................. 15

Certificate of Compliance ........................................................................... 17

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Baird v. Cal. Fac. Ass'n*, No. C-00-0628, 2000 WL 516378 (N.D. Cal. Apr. 24, 2000) ............................................................................................7

*Deputy v. Long-Term Disability Plan of Sponsor Aventis Pharmas.*, No. C02-2010, 2002 WL 31655328 (N.D. Cal. Nov. 21, 2002) .................9

*Echologics LLC v. Orbis Intelligent Sys. Inc.*, No. 21-cv-01147, 2021 WL 5203283 (C.D. Cal. Nov. 9, 2021)....................................................6, 9

*In re LimitNone, LLC*, 551 F.3d 572 (7th Cir. 2008).................................1

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495 (9th Cir. 2000) ...............9

*Kasey v. Molybdenum Corp. of Am.*, 408 F.2d 16 (9th Cir. 1969) ...........6

*Madovax, Inc. v. AOL LLC*, No. CV 08-05914 SJO (PJWx), 2009 U.S. Dist. LEXIS 40977 (C.D. Cal. Apr. 14, 2009)........................................7, 8

*Medical Dev. Int'l v. Cal. Dep't of Corrections and Rehabilitation*, No. CIV 2:07-2199 WBS EFB, 2010 WL 347901 (E.D. Cal. Jan. 22, 2010) ..................6

*Metz v. U.S. Life Ins. Co.*, 674 F. Supp. 2d 1141 (C.D. Cal. 2009).....................8, 9

*Pub. Emps. Ret. Sys. of Miss. v. Stanley*, 605 F. Supp. 2d 1073 (C.D. Cal. 2009) ......................................................................................1

*Ravelo Monegro v. Rosa*, 211 F.3d 509 (9th Cir. 2000)..........................10

*Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152 (S.D. Cal. 2005) ..................9

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007) ............1

*Szegedy v. Keystone Food Prods.*, No. CV 08-5369 CAS (FFMx), 2009 WL 2767683 (C.D. Cal. Aug. 26, 2009)......................................................9

*Thermolife Intl., LLC v. Vital Pharms., Inc.*, No. CV 14-2449 RSWL (AGRx), 2014 WL 12235190 (C.D. Cal. Aug. 15, 2014) ...................9

*U.S. ex rel. Adrian v. Regents of Univ. of Cal.*, No. C 99-3864 TEH, 2002 WL 334915 (N.D. Cal. Feb. 25, 2002) ..................................................9

4

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

313

*Vital Pharms., Inc. v. Monster Energy Co.*, No. EDCV 20-1127 JGB (SPx), 2020 WL 6162796 (C.D. Cal. Aug. 27, 2020) ...........................................6, 7, 10

*Wash. Pub. Utilities. Grp. v. U.S. Dist. Ct. for W. Dist. Wash.*, 843 F.2d 319 (9th Cir. 1987)...........................................................................................9

*Wireless Consumers Alliance v. T-Mobile USA, Inc.*, No. 03-3711, 2003 WL 22387598 (N.D. Cal. Oct. 14, 2003).......................................................6

## OTHER AUTHORITIES

28 U.S.C. §§ 84(c)(2)...........................................................................................5

28 U.S.C. § 1331 ..................................................................................................1

28 U.S.C. § 1391(a)(2)..........................................................................................5

28 U.S.C. § 1404(a) .....................................................................................passim

28 U.S.C. § 1441(a) ..............................................................................................5

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

Defendants Paul R. Wassgren, DLA Piper LLP (US) ("DLA"), and Fox Rothschild LLP ("Fox") (collectively with Wassgren and DLA, "Defendants"), by undersigned counsel, respectfully submit this memorandum of law in support of their motion to transfer venue to the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1404(a).

## PRELIMINARY STATEMENT

Defendants removed Plaintiff Robert Armijo's lawsuit to this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331. Notice of Removal at 8–14. Defendants now move to transfer Armijo's lawsuit to the Middle District of Florida so that this case, including any remand motion, may be litigated and tried alongside the several other related cases that are currently pending in that district. As a result of these cases, many of which are presided over by District Judge Mary S. Scriven, the Middle District of Florida would be particularly knowledgeable about the extent to which federal securities issues are central to Armijo's claims in this lawsuit. This case thus presents the classic circumstance in which the motion to transfer should be granted on its merits as well as to allow the transferee court to decide any removal/remand issues should Armijo seek remand. In fact, the jurisprudence contemplates just such a result.

First, "[t]his Court need not address the propriety of removal before ruling on the motion to transfer" because transfer under § 1404(a) "is simply 'a determination that the merits should be adjudicated elsewhere.'" *Pub. Emps. Ret. Sys. of Miss. v. Stanley*, 605 F. Supp. 2d 1073, 1074 (C.D. Cal. 2009) (quoting *In re LimitNone, LLC*, 551 F.3d 572, 576–77 (7th Cir. 2008) (per curiam)). It does not require a finding of jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007).

Second, this lawsuit belongs in the Middle District of Florida. It is one of several ongoing related cases concerning a Florida-based company called EquiAlt, LLC ("EquiAlt"); EquiAlt's principals, Brian Davison and Barry Rybicki; and investment advisors who sold EquiAlt securities, including Armijo. EquiAlt is in a court-imposed receivership being supervised by the Middle District of Florida. EquiAlt's receiver is

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

based in the Middle District of Florida. Ex. _ (Declaration of Simon Gaugush). And most of these related cases—including several in which Armijo is a defendant—are pending in the Middle District of Florida. *See Wiand v. Fam. Tree Est. Planning LLC*, No. 8:21-cv-00361-SDM-AAS [hereinafter "Receiver Case"]; *Gleinn v. Wassgren, et al*, No. 8:20-cv-01677-MSS-CPT [hereinafter "Gleinn Case"].[1]

Armijo concedes at least one of those cases is "related" to this case. Notice of Removal Ex. A at 158 (Notice of Related Case). He is correct: the cases involve the same parties, same issues, and same theories of liability as this action. Armijo admits as much in his Notice of Related cases, and he previously agreed to litigate claims he might have arising from the EquiAlt controversy in the Middle District of Florida in his proof of claim form he filed with the Receivership. Ex. _ (Proof of Claim Form).

He should be made to do just that here. In this suit, Armijo is seeking indemnification from the law firms for any judgments entered in the cases brought by the Receiver in the Middle District of Florida. This case is going to involve the same discovery and many of the same issues that are being litigated in that matter. Instead of filing this lawsuit in Florida, however, Armijo filed suit in California state court—a far more inconvenient forum. Key witnesses in this matter reside in Florida, and none of the individual parties in this case lives in the Central District of California. Most importantly, the interests of justice weigh heavily in favor of transfer. This Court should immediately transfer venue to the Middle District of Florida pursuant to the Court's broad authority under 28 U.S.C. § 1404(a).

## BACKGROUND[2]

EquiAlt is a Nevada company with its principal place of business and operations in Tampa, Florida. Notice of Removal Ex. A at 6 (Compl. ¶ 24). It was managed by

---

[1] In addition, until recently, Armijo was a defendant in another lawsuit in the Middle District of Florida, *O'Neal v. Joseph Fin., Inc.*, No.: 8:22-cv-00939-MSS-JSS [hereinafter "O'Neal Case"], in which his former clients sued him for securities fraud arising out of the sale of EquiAlt securities.

[2] All facts are assumed true for purposes of this motion only, and Defendants reserve the right to contest these facts.

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

Davison, its CEO, and Rybicki, its Managing Director. *Id.* Davison is a resident of Florida, and Rybicki is a resident of Arizona. Receiver Case (Dkt. No. 81) (Receiver Amended Compl. ¶¶ 61–62). EquiAlt bought and sold distressed properties in Florida and other states. O'Neal Case (Dkt. No. 1) (O'Neal Compl. ¶ 18). In 2011, EquiAlt retained Wassgren, who worked at Fox at the time, to provide legal advice concerning the sale of securities relating to the company. Notice of Removal Ex. A at 5 (Compl. ¶ 16). In 2017, Wassgren joined DLA and began working at its Los Angeles office, where he continued to provide advice to EquiAlt. *Id.* Wassgren has since moved to Florida. Ex. _ (Gaugush Declaration). Armijo was a licensed investment advisor representative in San Diego, California who marketed and sold EquiAlt securities. Notice of Removal Ex. A at 4 (Compl. ¶ 12).

In February 2020, Judge Mary S. Scriven of the United States District Court for the Middle District of Florida unsealed a U.S. Securities and Exchange Commission ("SEC") enforcement action against EquiAlt and its principals, Davison and Rybicki, in which the SEC alleged that EquiAlt operated as a Ponzi scheme and sold securities in violation of various provisions of the federal securities laws. *Securities and Exchange Commission v. Davison et al.*, No 8:20-cv-00325-MSS-MRM (M.D. Fla.) (Compl. ¶¶ 1–3). One such violation involved the payment of transaction-based commissions to non-brokers, like Armijo, who marketed and sold EquiAlt securities to their clients. *Id.* Judge Scriven appointed Burton Wiand as the Receiver for EquiAlt, and he filed suit against non-brokers, including Armijo and Armijo's company, Joseph Financial Inc., in the Middle District of Florida. Receiver Case (Dkt. No. 81) (Receiver Amended Compl. ¶¶ 22–23).[3]

---

[3] Additionally, many investors in EquiAlt—former clients of Armijo's—filed a class action lawsuit in the Middle District of Florida against Armijo for securities fraud. Armijo answered and did not contest personal jurisdiction in the Middle District of Florida. The parties have since jointly stipulated to a voluntary dismissal without prejudice "in recognition of the Tolling Agreement between [them] and the pendency of other actions against [Armijo] brought by the Securities and Exchange Commission (the "SEC Action") and the Court-appointed receiver in the SEC Action." O'Neal Case (Dkt. Nos. 1, 31, 34, 41).

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

Armijo is actively involved in defending these Florida cases. Not only has Armijo engaged in discovery and recently been deposed, he has also engaged in motions practice. *See, e.g.*, Receiver Case (Dkt. No. 195). Nor is his motions practice limited to discovery—Armijo is contesting summary judgment in at least one of the cases. Receiver Case (Dkt. No. 199). What's more, Armijo's complaint before this Court raises the same claims he has already asserted as affirmative defenses in Florida. Receiver Case (Dkt. No. 87 Armijo Answer to Receiver Compl. at 24–33) (listing affirmative defenses materially the same as the claims at issue here).

Armijo has also affirmatively consented to the jurisdiction of the Middle District of Florida for this litigation. He filed a proof of claim form with the Receiver in which he claims relief from the Receiver and made many of the same arguments he now brings against Wassgren, DLA, and Fox in this action. Ex. _ (Proof of Claim Ex. A). In that form, Armijo recognized that "[a]ll [of his claims] arise out of the fraudulent investment scheme alleged in the SEC complaint and recognized by law as resulting from those activities." Ex. _ (Proof of Claim at 6). He also "submit[ed] to the exclusive jurisdiction of the [Middle District of Florida] for all purposes, including, without limitation, as to any claims, objections, defenses, or counterclaims that could be or have been asserted by the Receiver against such Claimant or the holder of such claim in connection with this Receivership, including, those arising out of (1) any dealing or business transacted by or with any Receivership Entity and/or (2) any dealing or business transacted that relates in any way to any Receivership property." Ex. _ (Proof of Claim at 2). Despite his submission to the exclusive jurisdiction of the Middle District of Florida and the existence of several pending, related lawsuits in that district, Armijo filed this suit in California state court in Los Angeles, which is not even the city or county of his residence. *See* Notice of Removal at 7, Ex. A at 4 (Compl. ¶ 12).

In this lawsuit, Armijo seeks to turn EquiAlt's former lawyers into his indemnitors. He alleges, as he did in his proof of claim form submitted to the Receiver in the Middle District of Florida, that Wassgren and Wassgren's former employers, Fox

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

and DLA, gave Armijo incompetent legal advice which caused him to violate federal securities laws and incur damages. Armijo claims that Defendants' actions were "substantial factor[s] in causing," among other things, the pending lawsuit by EquiAlt's Receiver in the Middle District of Florida and the then-pending lawsuit by Armijo's former clients for securities fraud in that same district. Notice of Removal Ex. A at 25 (Compl. ¶ 85). Armijo seeks to recover various forms of damages from Defendants, including the costs of defending against the aforementioned actions and any judgments Armijo is ordered to pay. *Id.* at Prayer for Relief.   None of the parties or key witnesses in this action live in the Central District of California. Wassgren lives in Florida, Ex. _ (Gaugush Declaration), as do other former and current employees of EquiAlt, including Davison, and Rybicki lives in Arizona. *Securities and Exchange Commission v. Davison et al.*, No 8:20-cv-00325-MSS-MRM (M.D. Fla.) (Dkt. No. 84, Receiver's First Quarterly Status Report, at 43). Even Armijo does not live in this district; rather, he lives either in San Diego (Notice of Removal Ex. A at 4 (Compl. ¶ 12)) and/or in Nevada. *See Securities and Exchange Commission v. Armijo*, No. 3:21-cv-01107-TWR-AHG (S.D. Cal.) (Dkt. No. 26, Ex. A Decl. of Robert Joseph Armijo).

## ARGUMENT

Under 28 U.S.C. § 1404(a), this Court may transfer actions from a plaintiff's chosen forum to a different venue in which the action "could have been brought."[4] Section 1404(a) empowers this court to transfer the case if: (1) the interests of justice; (2) the convenience of the witnesses; and (3) the convenience of the parties weigh in

---

[4] Venue is proper in this Court under 28 U.S.C. § 1441(a) because Defendants removed this case from the Superior Court of the State of California in and for the County of Los Angeles, which is within the Western Division of the Central District of California. *See* 28 U.S.C. §§ 84(c)(2), 1441(a). Venue is also proper in the Middle District of Florida under 28 U.S.C. § 1391(a)(2) because substantial acts or omissions giving rise to the claim allegedly took place in the Tampa, Florida offices of EquiAlt. *See* Notice of Removal Ex. A at 9–27 (Compl. ¶¶ 38–88) (detailing the alleged involvement of EquiAlt and its officers in the events giving rise to Armijo's claims). Both courts have subject matter jurisdiction over the case for the reasons explained in Defendants' Notice of Removal. Finally, Defendants do not contest personal jurisdiction in the Middle District of Florida. Nor, in the *O'Neal* case, did Armijo contest jurisdiction in the Middle District of Florida. *See* O'Neal Case (Dkt. No. 31). Thus, the Middle District of Florida is a district in which the action "could have been brought." *See* 28 U.S.C. § 1404(a).

---

10

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

319

favor of transfer. *See* 28 U.S.C. § 1404(a); *see also Kasey v. Molybdenum Corp. of Am.*, 408 F.2d 16, 20 (9th Cir. 1969). In determining whether transfer is appropriate, "[t]he question of which forum will better serve the interest of justice is of predominant importance." *Medical Dev. Int'l v. Cal. Dep't of Corrections and Rehabilitation*, No. CIV 2:07-2199 WBS EFB, 2010 WL 347901, at *5 (E.D. Cal. Jan. 22, 2010) (quoting *Wireless Consumers Alliance v. T-Mobile USA, Inc.*, No. 03-3711, 2003 WL 22387598, at *4 (N.D. Cal. Oct. 14, 2003)). The interests of justice weigh heavily in favor of transfer to the Middle District of Florida, and Florida is the more convenient forum for the witnesses and parties.

## I.   The Court should transfer this case to the Middle District of Florida.

This suit is nothing new—at least not to these parties. Armijo has already made the same arguments he makes here several times in various, related lawsuits in Florida. *See* Receiver Case (Dkt. No. 87 Armijo Answer to Receiver Compl. at 24–33) (listing affirmative defenses materially the same as the claims at issue here). In fact, his complaint is largely a copy of one of the other complaints. *See* Gleinn Case (Dkt. No. 1). This suit is nothing more than an end-run around the Florida litigation in an attempt to seek indemnification in a supposedly more favorable forum. All this despite the fact that Armijo agreed to bring any related claims he might have in the Middle District of Florida. Ex. _ (Proof of Claim). As discussed below, the interests of justice weigh heavily in favor of transfer. *See Vital Pharms., Inc. v. Monster Energy Co.*, No. EDCV 20-1127 JGB (SPx), 2020 WL 6162796, at *2–3 (C.D. Cal. Aug. 27, 2020) (granting motion to transfer because there was a related action in the transferee forum, the transferee judge was familiar with the facts and legal issues likely leading to a more expeditious outcome, and transfer reduced the likelihood of inconsistent results); *see also Echologics LLC v. Orbis Intelligent Sys. Inc.*, No. 21-cv-01147, 2021 WL 5203283, at *4 (C.D. Cal. Nov. 9, 2021) (discussing the various interests of justice).

**A.    Justice demands that this case be transferred to the same venue as the ongoing related cases.**

"Related litigation pending in the proposed transferee forum is a factor that weighs heavily in favor of transfer." *Baird v. Cal. Fac. Ass'n*, No. C-00-0628, 2000 WL 516378, *1 (N.D. Cal. Apr. 24, 2000). Transfer of related cases to the same venue avoids inconsistent results, duplicative litigation, waste of time and money, and forum shopping. *See id.*; *see also Vital Pharms.*, 2020 WL 6162796, at *3.

The related actions in the Middle District of Florida involve the same parties; the same witnesses; the same facts; and the same issues. Ex. _ (Proof of Claim at Ex. A); Receiver Case (Dkt. No. 87 Armijo Answer to Receiver Compl. at 23–34). These cases are not just "related," they are tied at the hip. In this suit, Armijo seeks indemnification, in particular from any losses he might suffer in the Receiver's case in the Middle District of Florida. *See* Notice of Removal Ex. A.

And those related cases are not fledgling as this one is; rather each side has undertaken extensive discovery and motions practice. The extent of the litigation already undertaken in those related cases weighs particularly heavy in favor of transfer because of the possibility of inconsistent results if Armijo is given a chance to re-litigate the motions practice he has already done in Florida. *See Vital Pharms.*, 2020 WL 6162796, at *3.

Armijo has participated in and litigated (and lost) contested issues that impact Defendants.  *See* Receiver Case (Dkt. No. 186) (order denying Armijo's motion to compel the Receiver to answer an interrogatory regarding the Defendants' insurance coverage); Receiver Case (Dkt. No. 195) (order denying Armijo's motion to compel the Receiver to answer questions about law firm defendants' mediation with the Receivership). Armijo's attempted do-over here is classic forum shopping and weighs heavily in favor of transfer. *Vital Pharms.*, 2020 WL 6162796, at *2–3. "[T]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

1  that § 1404(a) was designed to prevent." *Madovax, Inc. v. AOL LLC*, No. CV 08-05914

2  SJO (PJWx), 2009 U.S. Dist. LEXIS 40977, at *19 (C.D. Cal. Apr. 14, 2009).

3  ## B. Armijo agreed to bring all related claims in the Middle District of Florida.

4

5  Not only has Armijo already raised all the issues he asserts in his complaint in

6  Florida, Armijo submitted to the exclusive jurisdiction of the Middle District of Florida

7  when he submitted his proof of claim form in the Receiver case pending in that district.

8  Ex. _ (Proof of Claim form). The claim form was not narrowly limited to the Receiver

9  action. Rather, it bound Armijo for all related claims. Ex. _ at 2. Given the fact that

10  Armijo raises the same claims now as he did in the proof of claim form, he should

11  litigate those claims in the Middle District of Florida as he agreed to do.

12  ## C. Armijo's choice of forum is entitled to only minimal weight.

13  The Central District of California is not Armijo's home forum and does not have

14  any obvious link to the controversy, other than the fact that Wassgren used to work in

15  Los Angeles and the law firm defendants maintain offices there. *See generally* Notice

16  of Removal Ex. A; Ex. _ (Gaugush Declaration). Given these facts, Armijo's choice of

17  forum is entitled only to minimal weight. *Metz v. U.S. Life Ins. Co.*, 674 F. Supp. 2d

18  1141, 1147 (C.D. Cal. 2009) (granting transfer when, "with the sole exception of [the]

19  Plaintiff, there [wa]s . . . not . . . anyone with testimony relevant to the matter located in

20  the State of California"). Florida, on the other hand, is where the vast majority of

21  witnesses with relevant testimony reside. *See, e.g.*, *Securities and Exchange

22  Commission v. Davison et al.*, No 8:20-cv-00325-MSS-MRM (M.D. Fla.) (Dkt. No. 84,

23  Receiver's First Quarterly Status Report, at 41–47). Thus, the strong interests in trying

24  this case in Florida with other related litigation outweigh Armijo's choice to bring suit

25  here.[5] *See Metz*, 674 F. Supp. 2d at 1147.

26  ---
[5] For these same reasons, the convenience of the parties factor of a § 1404(a) analysis

27  also favors transfer. Not a single individual party in this case lives in the Central District of California. Meanwhile, Wassgren lives in Florida, and Armijo is already a party to

28  or involved in several proceedings in Florida. Ex. _ (Gaugush Declaration); *see, e.g.*, Receiver Case. Transfer to Florida would make litigation significantly more efficient overall. *Thermolife Intl., LLC v. Vital Pharms., Inc.*, No. CV 14-2449 RSWL (AGRx),

13

### D.    Other interest of justice factors weigh in favor of transfer.

The remaining interest of justice factors that courts commonly consider while analyzing motions to transfer all weigh in favor of transfer. *See Echologics*, 2021 WL 5203283, at *4 (listing for example the ease of access to proof, familiarity of each forum with the applicable law, and any local interest in the controversy).

First, the interest of justice is served by litigating a matter in the place where all the pertinent documents are located. *See Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000); *U.S. ex rel. Adrian v. Regents of Univ. of Cal.*, No. C 99-3864 TEH, 2002 WL 334915, at *4 (N.D. Cal. Feb. 25, 2002). Virtually all the EquiAlt documents are likely in Florida, leaving Florida as the more convenient forum for access to evidence. *See Securities and Exchange Commission v. Davison et al.*, No 8:20-cv-00325-MSS-MRM (M.D. Fla.) (Dkt. No. 84, Receiver's First Quarterly Status Report, at 17). This is especially compelling given the fact that DLA, Fox, and EquiAlt—not to mention Armijo—have all been engaged in discovery in Florida.

Second, access to and the convenience of witnesses weighs heavily in favor of transfer because the majority of relevant, non-party witnesses are in Florida, and transfer would make compulsory process available over them.[6] *See, e.g.*, *Securities and Exchange Commission v. Davison et al.*, No 8:20-cv-00325-MSS-MRM (M.D. Fla.) (Dkt. No. 84, Receiver's First Quarterly Status Report, at 41–47); *see also Deputy v. Long-Term Disability Plan of Sponsor Aventis Pharmas.*, No. C02-2010, 2002 WL 31655328, at *3–4 (N.D. Cal. Nov. 21, 2002) (granting the defendant's request to transfer venue when witnesses did not reside in the plaintiff's forum of choice, but did

---

2014 WL 12235190, at *5 (C.D. Cal. Aug. 15, 2014) (granting transfer because "plaintiffs [we]re not seeking to litigate in their home forum, at least two parties w[ould] be inconvenienced wherever th[e] case [wa]s litigated, and Defendant ha[d] shown that it w[ould] not be inconvenienced if th[e] matter [wa]s litigated" in the transferee forum).

[6] For this same reason, the "convenience of the witnesses" factor of a § 1404(a) analysis also weighs in favor of transfer. *See Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1160 (S.D. Cal. 2005) (placing great importance on the convenience of non-party witnesses); *see also Wash. Pub. Utilities. Grp. v. U.S. Dist. Ct. for W. Dist. Wash.*, 843 F.2d 319, 326 (9th Cir. 1987); *Metz*, 674 F. Supp. 2d at 1147–48; *Szegedy v. Keystone Food Prods.*, No. CV 08-5369 CAS (FFMx), 2009 WL 2767683, at *3 (C.D. Cal. Aug. 26, 2009).

14

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

323

reside within reach of the transferee forum's subpoena power)*; see also Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000) (noting that "the relative ability of the forums to compel the attendance of significant unwilling witnesses at trial" is an important factor in transfer analysis). This Court should transfer the case to ensure that key witnesses like Davison are available to provide testimony.[7]

Third, because this claim presents primarily federal questions, there is no difference in the relative familiarity with the applicable law between these two courts. If anything, the Middle District of Florida is better suited to address expeditiously these questions because it is already addressing them in the related matters. *See Vital Pharms.*, 2020 WL 6162796 at *3 (discussing how transferee court was better suited to resolve issue because it was already familiar with the law and facts through related proceedings); *see also* Notice of Removal.

Finally, any local interest in the controversy weighs in favor of transfer. The heart of this controversy lies in Florida where EquiAlt was run, where the Receivership was formed and exists, and where Wassgren now lives. Ex. _ (Gaugush Declaration). Further, Florida has a greater interest in this case than California does because of the several cases involving EquiAlt and its conduct that have been ongoing in Florida for years.

## CONCLUSION

Armijo agreed to litigate claims related to EquiAlt in Florida. He already *is* litigating the same arguments he raises here in several lawsuits pending in the Middle District of Florida. This lawsuit is an end-run around those Florida cases. Not only is the Middle District of Florida the more convenient forum for this action, it is the forum in which the interests of justice demand this lawsuit be brought.

---

[7] Davison, along with other EquiAlt witnesses, will likely be called to show that Wassgren did not in fact provide incompetent advice regarding federal securities laws or aid or abet a fraud, among Armijo's other claims.

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

1   For the foregoing reasons, Defendants respectfully request that this Court transfer

2   this action to the United States District Court for the Middle District of Florida pursuant

3   to 28 U.S.C. § 1404(a).

4

5   Dated: December _, 2022

6

Respectfully submitted,
SWANSON & MCNAMARA, LLP

7   By: /s/_____

8   Edward W. Swanson
    Britt Evangelist

9   *Attorneys for Defendant Paul R. Wassgren*

10  Dated: December _, 2022

KLINEDINST PC

11  By: /s/_____

12  Heather L. Rosing
    Daniel S. Agle

13  Amara S. Barbará

14  *Attorneys for Defendant DLA Piper LLP*
    *(US)*

15

16  Dated: December _, 2022

WILLIAMS & CONNOLLY LLP

17  By: */s/_____*

18  John K. Villa
    Vidya Atre Mirmira

19  Joseph Bayerl

20  *Attorneys for Defendant DLA Piper LLP*
    *(US)*

21

22  Dated: December _, 2022

JENNER & BLOCK LLP

23

24  By: */s/_____*

25  Michael P. McNamara
    Effiong Dampha

26  *Attorneys for Defendant Fox Rothschild*
    *LLP*

27

28

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.

**Certificate of Compliance**

The undersigned, counsel of record for DLA Piper LLP (US), certifies that this brief contains _____ words, which complies with the word limit of L.R. 11-6.1.

Dated: December ___, 2022

By:_____

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER          Case No.